IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Alexandria Division

FILED
IN OPEN COURT

JUN - 4 2007

CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CRIMINAL NO. 1:07CR209 |
| | ) | |
| | ) | |
| v. | ) | Count 1: 18 U.S.C. § 371 |
| | ) | (Conspiracy to Solicit Bribes by a Public |
| | ) | Official, Deprive Citizens of Honest |
| WILLIAM J. JEFFERSON, | ) | Services by Wire Fraud, and Violate the |
| | ) | Foreign Corrupt Practices Act) |
| Defendant. | ) | |
| | ) | Count 2: 18 U.S.C. § 371 |
| | ) | (Conspiracy to Solicit Bribes by a Public |
| | ) | Official and Deprive Citizens of Honest |
| | ) | Services by Wire Fraud) |
| | ) | |
| | ) | Counts 3-4: 18 U.S.C. § 201(b)(2)(A) |
| | ) | (Solicitation of Bribes by a Public Official) |
| | ) | |
| | ) | Counts 5-10: 18 U.S.C. §§ 1343 and 1346 |
| | ) | (Scheme to Deprive Citizens of Honest |
| | ) | Services by Wire Fraud) |
| | ) | |
| | ) | Count 11: 15 U.S.C. § 78dd-2(a) |
| | ) | (Foreign Corrupt Practices Act) |
| | ) | |
| | ) | Counts 12-14: 18 U.S.C. § 1957 |
| | ) | (Money Laundering) |
| | ) | |
| | ) | Count 15: 18 U.S.C. § 1512(c)(1) |
| | ) | (Obstruction of Justice) |
| | ) | |
| | ) | Count 16: 18 U.S.C. § 1962(c) |
| | ) | (Racketeer Influenced Corrupt Organization, |
| | ) | Pattern of Racketeering Activity (RICO)) |
| | ) | |
| | ) | Forfeiture Allegations: 18 U.S.C. §§ 981, |
| | ) | 982, and 1963; 28 U.S.C. § 2461 |

## INDICTMENT

### June 2007 Term - At Alexandria

THE GRAND JURY CHARGES THAT:

## GENERAL ALLEGATIONS

At all times relevant to this Indictment:

1.     Since 1991, WILLIAM J. JEFFERSON, the defendant, was a Member of the
United States House of Representatives, representing the 2nd Congressional District in the State
of Louisiana.  As such, he was a public official within the meaning of Title 18, United States
Code, § 201(a)(1).

2.     Defendant JEFFERSON maintained several offices for the purpose of conducting
his official congressional duties, including offices in Washington, D.C., and New Orleans,
Louisiana.  Defendant JEFFERSON supervised and directed the activities of congressional staff
members who worked in those offices and who, at the direction of Defendant JEFFERSON,
routinely contacted government agencies on behalf of constituents.

3.     At various times relevant to this Indictment, Defendant JEFFERSON was a
Member of the Committee on Ways and Means, Subcommittee on Trade; Member of the
Committee on the Budget; Co-Chair of the Africa Trade and Investment Caucus; and Co-Chair
of the Congressional Caucus on Nigeria.

4.     Defendant JEFFERSON received a Juris Doctor degree from Harvard University
in June 1972 as well as a Master of Laws Degree in Taxation from the Georgetown University
Law Center in February 1996.  In addition, Defendant JEFFERSON was a citizen of the United

-2-

States, and as such, Defendant JEFFERSON was a "domestic concern" within the meaning of the

Foreign Corrupt Practices Act of 1977 ("FCPA"), 15 U.S.C. § 78dd-2(h)(1)(A).

### The Congress of the United States and Responsibilities
### of Members of the United States House of Representatives

5. The Congress of the United States, comprised of a Senate and House of

Representatives, was established by Article I of the United States Constitution. Since that time,

Members of Congress have played an important role in the system of government in the United

States by proposing and passing laws, taking actions to protect citizens, and providing services

and assistance to their constituents.

6. At the beginning of a new Congress, each Member was required to take the

following oath of office:

> I, [Member's Name], do solemnly swear (or affirm) that I will
> support and defend the Constitution of the United States against all
> enemies, foreign and domestic; that I will bear true faith and
> allegiance to the same; that I take this obligation freely, without
> any mental reservation or purpose of evasion; and that I will well
> and faithfully discharge the duties of the office on which I am
> about to enter: So help me God.

7. In addition to the above-referenced oath, the Rules of the United States House of

Representatives set forth certain rules and codes of conduct that:

      a. prohibited a Member of the House from receiving outside compensation as a result of the improper exercise of influence from the Member's position in Congress;

      b. prohibited a Member of the House from earning outside income in a calendar year that exceeded 15% of a certain basic pay rate;

      c. required that a Member of the House file Annual Financial Disclosure Statements with the Clerk of the House;

d.      required that a Member of the House seek an exemption from the House
        Committee on Standards of Official Conduct to receive more than $250
        worth of gifts annually, and, in any event, only from a person the Member
        designated as a personal friend;

e.      prohibited trips by a Member of the House paid for by private sources
        unless the trip was taken in connection with the Member's duties as an
        officeholder; and

f.      required that a Member of the House and the Member's staff sign and file
        a Travel Disclosure Form ("Travel Form") with the Clerk of the House
        within 30 days after any trip paid for by private sources, with the Travel
        Form containing detailed information about the purpose, cost, and sponsor
        of the trip, and an affirmation that the travel was in connection with the
        Member's duties as an officeholder and would not create the appearance
        that the Member was using public office for private gain.

8.      Consistent with his oath of office and the duties of the office he held, Defendant

JEFFERSON owed the citizens of the United States and the United States House of

Representatives a duty to perform the responsibilities of his office free from deceit, fraud,

concealment, bias, conflict of interest, self-enrichment, and self-dealing.

## **Relevant Individuals**

9.      **Vernon L. Jackson ("Jackson")**:  Since in or about January 1998, Jackson was

the president, chief executive officer, and chairman of the board of iGate, Incorporated, a

Louisville, Kentucky telecommunications firm.

10.     **Brett M. Pfeffer ("Pfeffer")**:  In 2004 and 2005, Pfeffer was employed as the

president of an investment firm located in McLean, Virginia.  In the mid-1990's, Pfeffer served

on the congressional staff of Defendant JEFFERSON in both his New Orleans and Washington,

D.C., offices.  In addition, Pfeffer was a citizen of the United States, and as such, was a

"domestic concern" within the meaning of the FCPA, 15 U.S.C. § 78dd-2(h)(1)(A).

-4-

11.     **Nigerian Official A**:  In 2004 and 2005, Nigerian Official A was a high-ranking

official in the executive branch of the Government of the Federal Republic of Nigeria and acted

in an official capacity for and on behalf of the Federal Republic of Nigeria, and as such, was a

"foreign official" within the meaning of the FCPA, 15 U.S.C. § 78dd-2(h)(2)(A).  During this

same time period, a spouse of Nigerian Official A ("Nigerian Official A's Spouse"), who lived in

Potomac, Maryland, was a United States citizen, and as such, was a "domestic concern" within

the meaning of the FCPA, 15 U.S.C. § 78dd-2(h)(1)(A).

12.     **Cooperating Witness ("CW")**:  In or about March 2005, a McLean, Virginia,

businessperson reported a suspected fraud involving iGate, Jackson, and Defendant JEFFERSON

to the Federal Bureau of Investigation ("FBI").  After contacting the FBI, that businessperson

became a cooperating witness for the government.

13.     **Jefferson Family Members**:  Certain relatives of Defendant JEFFERSON, by

birth or by marriage, are referred to in this Indictment as "Family Members 1-5," respectively.

14.     **Congressional Staff Members**: Individuals employed by the Office of

Congressman WILLIAM J. JEFFERSON, are referred to in this Indictment as "congressional

staff members."

### Relevant United States Government Agencies

15.     **Export-Import Bank of the United States ("Ex-Im Bank")**:  The Ex-Im Bank,

with its headquarters in Washington, D.C., was the official export credit agency of the United

States and was established by Congress as an agency of the United States "to aid in financing and

to facilitate exports and imports and the exchange of commodities and services between the

United States . . . and any foreign country or the agencies or nationals thereof."  The Ex-Im Bank

typically provided loan guarantees and other means of financing designed to support United States exports to foreign countries.

16.   **United States Trade and Development Agency ("USTDA")**:  The USTDA, with its headquarters in Arlington, Virginia, within the Eastern District of Virginia, was established by Congress as an agency of the United States "to promote United States private sector participation in development projects in developing and middle-income countries, with special emphasis on economic sectors with significant United States export potential, such as energy, transportation, telecommunications, and environment." The USTDA pursued this goal by funding various forms of technical assistance, investment analysis, training, orientation visits, and business workshops.

### Jefferson Family-Controlled Companies

Defendant JEFFERSON participated in controlling and directing the actions of each of the following companies:

17.   **The ANJ Group, L.L.C. ("ANJ")**:  ANJ was a limited liability company organized under the laws of the State of Louisiana on or about January 19, 2001.  Records on file with the Louisiana Secretary of State listed Family Member 1 as an organizer, manager, and member of ANJ.  Five other Jefferson family members were also listed as members of ANJ, and Defendant JEFFERSON's accountant and campaign treasurer was listed as the registered agent for ANJ.

18.   **B.E.P. Consulting Services, LLC ("BEP")**:  BEP was a limited liability company organized under the laws of the State of Louisiana on or about October 24, 2000.

-6-

Records on file with the Louisiana Secretary of State listed Family Member 2 as the registered agent, member, and president of BEP.

19.   **Global Energy & Environmental Services LLC ("Global")**:  Global was a limited liability company organized under the laws of the State of Delaware on or about March 21, 2003, and, as such, was a "domestic concern" and Defendant JEFFERSON was an "agent of such domestic concern" within the meaning of the FCPA, 15 U.S.C. §§ 78dd-2(a) and 78dd-2(h)(1)(B).  Company records listed five Jefferson family members as members of Global.

20.   **International Petroleum, LLC ("International Petroleum")**:  International Petroleum was a limited liability company organized under the laws of the State of Louisiana on or about May 24, 2002.  Records on file with the Louisiana Secretary of State listed the daughter of a congressional staff member as the manager, organizer, and registered agent of International Petroleum.

21.   **Jefferson Interests, Inc. ("Jefferson Interests")**:  Jefferson Interests was incorporated under the laws of the State of Louisiana on or about January 3, 1983, and whose authority to do business in Louisiana was revoked on or about November 19, 1990.  Records on file with the Louisiana Secretary of State listed Defendant JEFFERSON as the president, Family Member 2 as the secretary and treasurer, and another Jefferson family member as the vice-president of the corporation.

22.   **Multi-Media Broad Band Services, Inc. ("Multi-Media")**:  Multi-Media was incorporated under the laws of the State of Delaware on or about July 20, 2005, by Defendant JEFFERSON.  Defendant JEFFERSON designated Family Member 5 as the chief executive

-7-

officer of Multi-Media.  As of August 3, 2005, ANJ held a 40% ownership interest in Multi-Media.

23.    **Providence International Petroleum Company, LLC ("PIPCO")**:  PIPCO was
a limited liability company organized under the laws of the State of Louisiana on or about
January 29, 2002.  Records on file with the Louisiana Secretary of State listed a congressional
staff member as the organizer and manager of PIPCO.  Those records also listed Defendant
JEFFERSON's accountant and campaign treasurer as the registered agent of PIPCO.

24.    **Providence Lake, L.L.C. ("Providence Lake")**:  Providence Lake was a limited
liability company formed on August 25, 2000, and organized under the laws of the State of
Louisiana on or about October 5, 2000, and it also did business as "Providence International
Company" and "Providence International, LLC."  Records on file with the Louisiana Secretary of
State listed a congressional staff member as the organizer and manager of Providence Lake.
Those records also listed Defendant JEFFERSON's accountant and campaign treasurer as the
registered agent of Providence Lake.

### Companies That Defendant
### JEFFERSON Solicited for Bribes

25.    **iGate, Incorporated ("iGate")**:  iGate was incorporated under the laws of the
State of Indiana in or about January 1998 and headquartered in Louisville, Kentucky.  As such,
iGate was a "domestic concern" and Defendant JEFFERSON was an "agent of such domestic
concern" within the meaning of the FCPA, 15 U.S.C. §§ 78dd-2(a) and 78dd-2(h)(1)(B).  Vernon
L. Jackson was the president, chief executive officer, and chairman of the board of iGate.  iGate
developed and marketed "Triple Play" technology, which enabled audio, video, and data to be
transmitted over copper wire.

26.     **W2-IBBS, Limited ("W2-IBBS")**:  W2-IBBS was a company organized under the laws of the Federal Republic of Nigeria.  W2-IBBS was controlled by CW.

27.     **International Broad Band Services, LLC ("IBBS")**:  IBBS was a company that was in the process of being registered under the laws of the Republic of Ghana.  IBBS was controlled by CW.

28.     **Nigerian Company A**:  Nigerian Company A was a telecommunications company with its corporate offices located in Abuja, Nigeria.  Nigerian Businessperson A was involved in conducting its operations.

29.     **Company A**:  Company A was a business that provided satellite-based radio and data broadcasting services to subscribers in numerous regions of the world.  Company A was headquartered in Washington, D.C.  Company A's chairman and chief executive officer was a person hereinafter referred to as Businessperson A.

30.     **Company B**:  Company B was a South African business that, among other things, sought certain drilling rights to deep water oil reserves located in the territorial waters off the coast of the Republic of Sao Tome and Principe in the Gulf of Guinea.  Company B was represented by a person hereinafter referred to as Businessperson BC.  A person hereinafter referred to as Lobbyist A was involved with these deep water oil reserves.

31.     **Company C**:  Company C was incorporated under the laws of the State of Delaware that manufactured and sold systems that converted various traditional waste products into electricity for commercial and residential use.  Company C was represented by Businessperson BC.

32.    **Company D**:  Company D was incorporated under the laws of the State of Louisiana whose business was to provide full service design, engineering, and construction services in numerous regions of the world, including Africa.  A person hereinafter referred to as Businessperson DEF was vice-president of Company D and participated in decisions concerning the direction and control of Company D.

33.    **Company E**:  Company E was a corporation organized under the laws of the State of Louisiana whose business was to provide services related to the design and construction of sugar factories.  Businessperson DEF participated in decisions concerning the direction and control of Company E.

34.    **Company F**:  Company F was a corporation organized under the laws of the State of Louisiana whose business was, in part, to develop oil and natural gas projects internationally.  Businessperson DEF participated in directing and controlling Company F.

35.    **Company G**:  Company G was a limited liability company organized under the laws of the State of Louisiana whose business objectives included the development of various projects in Nigeria such as marginal oil fields and a fertilizer plant.  A person hereinafter referred to as Businessperson G was a member of Company G and participated in directing and controlling Company G.  Lobbyist A also represented Company G in connection with its efforts to gain the official assistance of Defendant JEFFERSON.

### Other Nigerian Businesses

36.    **Nigerian Company B**:  Nigerian Company B was an Internet service provider with its headquarters in Abuja, Nigeria.  Nigerian Businessperson B was the founder and chief executive officer of Nigerian Company B.

37.     **Nigeria Telecommunications, Ltd. ("NITEL")**:  NITEL was a government-controlled Nigerian company headquartered in Nigeria, and was the main telecommunications service provider in Nigeria.

38.     **Nigerian Joint Venture**:  From in or about August 2004 through August 2005, Defendant JEFFERSON, CW, Nigerian Businessperson B, and others negotiated a joint venture agreement between W2-IBBS and Nigerian Company B to pursue a telecommunications business in Nigeria using iGate technology and equipment.  The proposed joint venture ("Nigerian Joint Venture") contemplated a partnership between W2-IBBS and Nigerian Company B wherein costs and profits would be divided between them with W2-IBBS maintaining a controlling interest in the Nigerian Joint Venture.

## COUNT 1
### Conspiracy to Solicit Bribes by a Public Official, Deprive Citizens of Honest Services by Wire Fraud, and Violate the Foreign Corrupt Practices Act

THE GRAND JURY FURTHER CHARGES THAT:

39.     Paragraphs 1 through 38 of this Indictment are re-alleged as if fully set forth herein.

### THE CONSPIRACY AND ITS OBJECTS

40.     Beginning in or about January 2001 through in or about August 2005, within the Eastern District of Virginia and elsewhere, the defendant, WILLIAM J. JEFFERSON, did knowingly combine, conspire, confederate, and agree, together with Vernon L. Jackson, Brett M. Pfeffer, and others known and unknown to the grand jury, to commit the following offenses against the United States:

a.     to, directly and indirectly, corruptly demand, seek, receive, accept, and agree to receive and accept anything of value personally and for any other person and entity, in return for being influenced in the performance of any official act, in violation of Title 18, United States Code, Section 201(b)(2)(A);

b.     to devise a scheme and artifice to defraud and deprive the citizens of the United States and the United States House of Representatives of their right to the honest services of Defendant JEFFERSON, performed free from deceit, fraud, concealment, bias, conflict of interest, self-enrichment, and self-dealing, and to use wire communications in interstate and foreign commerce to further the scheme to defraud, in violation of Title 18, United States Code, Sections 1343 and 1346; and

-12-

c.     to willfully use the mails and any means and instrumentalities of interstate commerce corruptly in furtherance of an offer, payment, promise to pay, and authorization of the payment of any money, and offer, gift, promise to give, and authorization of the giving of anything of value to any foreign officials for purposes of: (i) influencing acts and decisions of such foreign officials in their official capacities; (ii) inducing such foreign officials to do and omit to do acts in violation of the lawful duty of such officials; (iii) securing any improper advantage; and (iv) inducing such foreign officials to use their influence with a foreign government and instrumentality thereof to affect and influence any act and decision of such government and instrumentality, in order to assist Defendant JEFFERSON and others in obtaining and retaining business for and with, and directing business to, any person, in violation of Title 15, United States Code, Section 78dd-2(a).

## NATURE AND PURPOSE OF THE CONSPIRACY

The nature and purpose of the conspiracy included the following:

41.     To provide for the unjust enrichment of Defendant JEFFERSON and his family members by corruptly seeking, soliciting, and directing that things of value be paid to him and his family members in return for Defendant JEFFERSON's performance of official acts.

42.     To use the Office of Congressman WILLIAM J. JEFFERSON, including the congressional staff members employed therein, to perform official acts to advance the interests of the businesses and persons who had agreed to pay things of value to Defendant JEFFERSON and his family members.

43.     To conceal the illegal nature of Defendant JEFFERSON's solicitations for, and receipt of, various things of value through the preparation of misleading written agreements, the

-13-

use of nominee companies, and the omission of material facts concerning the financial benefits that were sought on behalf of, and received by, Defendant JEFFERSON and his family members, all to ensure the continued existence and success of the conspiracy.

44.    To offer, promise, and make bribe payments to foreign officials of the Federal Republic of Nigeria, including Nigerian Official A, in order to advance the business interests of the Nigerian Joint Venture, its members and stockholders, and others who had agreed to pay Defendant JEFFERSON and his family things of value in return for his official acts.

## MANNER AND MEANS OF THE CONSPIRACY

Among the manner and means by which Defendant JEFFERSON and his co-conspirators would and did carry out the conspiracy were the following:

45.    As a Member of the United States House of Representatives and certain of its committees and caucuses, Defendant JEFFERSON discussed providing official assistance to constituent companies, including iGate and CW's companies, and businesspersons, including Vernon Jackson and CW, seeking to obtain and conduct business in west African nations, including Nigeria, Ghana, and Cameroon.

46.    After initially discussing such business endeavors with these businesspersons, Defendant JEFFERSON sought things of value for himself and his family members in return for providing official assistance to promote those business endeavors.  The things of value Defendant JEFFERSON sought in return for providing his official assistance included monthly fees or retainers, consulting fees, percentage shares of revenue and profit, flat fees per item sold, and stock ownership in the companies seeking his official assistance.

-14-

47.     Defendant JEFFERSON sought to and did conceal his and his family members' expected or actual receipt of things of value by directing congressional staff members, family members, and others to form nominee companies that entered into business agreements to receive the things of value sought by Defendant JEFFERSON while not referencing him or disclosing his involvement in obtaining the agreements.  The nominee companies included ANJ, Global, and Multi-Media.

48.     While seeking things of value, Defendant JEFFERSON typically required that the agreements with the nominee companies be reduced to writing to make them appear to be lawful agreements for professional and legitimate services when, in fact, the companies and businesspersons were giving things of value to Defendant JEFFERSON and his designees in return for official acts to be performed by Defendant JEFFERSON.

49.     In return for things of value, Defendant JEFFERSON agreed to perform and did perform a pattern of official acts to promote and advance the business interests of these companies and businesspersons in West Africa and elsewhere.  These official acts included:

        a.      conducting official travel to foreign countries and meeting with foreign government officials for the purpose of influencing those officials;

        b.      using his congressional staff members to create trip itineraries, accompany Defendant JEFFERSON on travel, and otherwise provide official assistance;

        c.      contacting both United States and foreign embassies to schedule meetings with foreign government officials, obtaining entry and exit visas for travelers, and otherwise assisting with the official travel;

-15-

        d.       sending official correspondence on congressional letterhead to foreign government officials; and

        e.       scheduling and participating in meetings with officials of United States agencies to secure potential financing for the business ventures sought by the companies and businesspersons.

50.     Defendant JEFFERSON failed to disclose his and his family's financial interests in these business ventures by omitting this material information from travel and financial disclosure forms required to be filed by the Rules of the United States House of Representatives and, in some cases, by simply failing to make any of the required filings.

51.     Defendant JEFFERSON failed to disclose to United States and foreign government officials his and his family's financial interests in the business ventures he was officially promoting in order to give the false impression that Defendant JEFFERSON was merely acting as an impartial public servant promoting United States business interests abroad.

52.     Defendant JEFFERSON, Nigerian Businessperson B, and others agreed that bribes would be paid, as needed, to various Nigerian government officials if deemed necessary to the success of the Nigerian Joint Venture. Defendant JEFFERSON was responsible for negotiating, offering, and delivering the payment of bribes to Nigerian Official A to induce Nigerian Official A to use his position to assist in securing approvals necessary to the success of the Nigerian Joint Venture. Nigerian Businessperson B was responsible for the payment of bribes to lower ranking Nigerian government officials to ensure the success of the Nigerian Joint Venture.

## OVERT ACTS

In furtherance of the conspiracy, and to effect the objects thereof, the following overt acts were committed within the Eastern District of Virginia and elsewhere:

### Defendant JEFFERSON Sought Bribes from iGate for ANJ

53.     In or about January 2001, after initially assisting iGate, Defendant JEFFERSON informed Jackson that Defendant JEFFERSON would not continue to use his official position as a United States Congressman to promote iGate's business unless Jackson agreed to pay ANJ (a Jefferson family-controlled company).

54.     In or about January 2001, Defendant JEFFERSON presented a "Professional Services Agreement" to Jackson that called for payments from iGate to ANJ, including monthly payments of $7,500.00; 5% of iGate's gross sales and certain capital raised; and options for up to one million shares of iGate stock over a five-year period.

55.     On or about January 15, 2001, Jackson signed the Professional Services Agreement on behalf of iGate and Family Member 1 signed on behalf of ANJ.

56.     On or about January 19, 2001, Defendant JEFFERSON and Family Member 1 caused the formation of ANJ under the laws of the State of Louisiana.

57.     On or about January 22, 2001, Jackson caused iGate to issue 100,000 shares of iGate stock to ANJ.

58.     On or about February 15, 2001, Jackson caused the first of several payments of $7,500.00 to be made to ANJ.

59.     In or about June 2002, Defendant JEFFERSON introduced Jackson to a Member of the United States House of Representatives, who was a prominent member of the

-17-

Subcommittee on Telecommunications, Trade, and Consumer Protection, for the purpose of

garnering that Member's support for iGate's technology without disclosing Defendant

JEFFERSON's family's financial interest in iGate's business.

      60.     On or about October 22, 2002, as a result of the above-referenced meeting,

Defendant JEFFERSON caused the aforementioned Member to send to iGate on official

congressional letterhead and under that Member's signature praising iGate's technology.

### Defendant JEFFERSON Sought Bribes from Nigerian Company A

      61.     In or about July 2003, in Nigeria, Defendant JEFFERSON met executives of

Nigerian Company A, who were pursuing a telecommunications venture in Nigeria and

elsewhere in Africa, and advised them that iGate could provide the goods and services desired by

Nigerian Company A.

      62.     On or about July 20, 2003, in London, England, Defendant JEFFERSON

introduced Jackson to Nigerian Company A executives, including Nigerian Businessperson A,

who preliminarily agreed to purchase iGate's products and services for Nigerian Company A's

use in Nigeria.

      63.     On or about July 20, 2003, in London, England, without Jackson's knowledge,

Defendant JEFFERSON solicited from Nigerian Businessperson A a percentage of revenue and

stock, as well as fees estimated to be worth $1 million, to be paid to Defendant JEFFERSON, all

in return for Defendant JEFFERSON's official assistance with Nigerian and United States

government officials to further a telecommunications venture by Nigerian Company A and iGate

in Nigeria.

## Defendant JEFFERSON Sought an
## Increase in Bribe Payments from iGate for ANJ

64. On or about July 24, 2003, in Washington, D.C., Defendant JEFFERSON presented Jackson with an "Amendment to Professional Services Agreement," which required iGate to pay ANJ 35% of any profits derived from iGate's business in Africa.

65. On or about August 6, 2003, in New York, New York, Jackson, on behalf of iGate, entered into a business agreement whereby Nigerian Company A agreed to pay iGate a total of $44,934,400.00 contingent upon an iGate production schedule, which included a $6.5 million up-front payment to iGate by Nigerian Company A within five business days of entering into the agreement.

66. In or about August 2003, in Washington, D.C., Defendant JEFFERSON introduced Jackson and Nigerian Company A executives to personnel of the Ex-Im Bank for the purpose of obtaining financial support for iGate and Nigerian Company A's venture in Nigeria.

67. On or about September 22, 2003, after iGate had received approximately $1.5 million pursuant to its business agreement with Nigerian Company A, Defendant JEFFERSON caused Family Member 1 to submit an invoice to Jackson seeking $240,000.00 "currently due to [ANJ] as compensation under its professional services agreement."

68. On or about December 27, 2003, in anticipation of additional payments from Nigerian Company A to iGate, Defendant JEFFERSON reminded Jackson in writing that iGate owed money to ANJ, stating, "When the money comes in in a few days for the African project, I trust that . . . iGate's debt to ANJ will be brought fully current.  It now stands at $262,500.00."

69.     On or about January 23, 2004, one day after iGate had received approximately $5 million from Nigerian Company A, Jackson caused $200,000.00 to be wired from iGate's bank account in New Albany, Indiana, to ANJ's bank account in New Orleans, Louisiana.

70.     On or about January 26, 2004, Jackson caused an additional $30,000.00 to be wired from iGate's bank account in New Albany, Indiana, to ANJ's bank account in New Orleans, Louisiana.

71.     On or about January 28, 2004, Defendant JEFFERSON presented a memorandum to Jackson proposing that iGate issue additional shares of iGate stock to ANJ, increasing ANJ's ownership stake in iGate to 15%.

72.     On or about February 2, 2004, Defendant JEFFERSON caused a congressional staff member to send an e-mail from Defendant JEFFERSON's Washington, D.C., congressional office to the United States Embassy in Abuja, Nigeria, seeking assistance in arranging meetings for Defendant JEFFERSON with high-ranking Nigerian government officials during Defendant JEFFERSON's upcoming trip to Nigeria.

73.     On or about February 15, 2004, Defendant JEFFERSON, Jackson, a congressional staff member, and others departed from Washington Dulles International Airport in Loudoun County, Virginia, on an iGate co-sponsored trip to several west African nations, including Nigeria, to promote iGate and other business ventures to government officials of those nations.

74.     From on or about February 17, 2004, through on or about February 20, 2004, Defendant JEFFERSON, in his capacity as a Member of the United States House of Representatives, met with government officials in Nigeria and Cameroon and promoted iGate

-20-

and its business ventures without disclosing his and his family's financial interests in such
ventures.

75.    On or about March 24, 2004, Defendant JEFFERSON caused to be filed with the
Clerk of the United States House of Representatives a Travel Form regarding his February 2004
trip to Nigeria, acknowledging that the "travel was in connection with my duties as a Member or
Officer of the U.S. House of Representatives" but failing to disclose his and his family's
financial interests in the iGate project.

76.    In or about May 2004, Defendant JEFFERSON caused his congressional staff to
make arrangements for Defendant JEFFERSON, Jackson, and two iGate employees to travel to
Nigeria and Cameroon.

77.    On or about May 23, 2004, Defendant JEFFERSON, Jackson, and others departed
from Washington Dulles International Airport in Loudoun County, Virginia, on an iGate-funded
trip to Africa.

78.    From on or about May 23, 2004, through on or about May 31, 2004, Defendant
JEFFERSON, in his capacity as a Member of the United States House of Representatives, met
with foreign government officials in Nigeria and Cameroon and promoted iGate and its business
ventures without disclosing his and his family's financial interests in such ventures.

79.    On or about May 28, 2004, Defendant JEFFERSON sent a letter on congressional
letterhead to a high-ranking Nigerian government official, promoting the use of iGate technology
in Nigeria and addressing a dispute between Nigerian Company A and iGate.

80.     In or about June 2004, Defendant JEFFERSON failed to file with the Clerk of the United States House of Representatives a Travel Form regarding his May 2004 trip to Nigeria and Cameroon to promote iGate to foreign government officials.

### After Nigerian Company A Withdrew from Its Agreement with iGate, a Replacement Investor Was Sought

81.     On or about June 29, 2004, in Washington, D.C., following Nigerian Company A's withdrawal from its business agreement with iGate, Defendant JEFFERSON and Pfeffer introduced CW to Jackson in order to convince CW to finance a venture using iGate products and services in Nigeria and elsewhere in Africa.

82.     On or about July 9, 2004, Jackson, on behalf of iGate, signed an agreement that required CW's company to pay iGate approximately $45 million for the exclusive right to use iGate's technology and equipment for a telecommunications venture in Nigeria, which included an anticipated loan guarantee from the Ex-Im Bank.

83.     On or about July 12, 2004, Defendant JEFFERSON assisted in preparing an invoice for iGate, to be signed by Family Member 1, which sought payment to ANJ for "professional services" of $50,000.00 and reimbursement for travel expenses for Defendant JEFFERSON's May 2004 trip to Africa "incurred on behalf of iGate by ANJ."

84.     On or about July 26, 2004, following iGate's receipt of $1.5 million from CW's company, Jackson caused $50,000.00 to be wired from an iGate bank account in New Albany, Indiana, to an ANJ bank account in New Orleans, Louisiana.

85.     In or about August 2004, after CW had entered into an agreement with iGate regarding the telecommunications venture in Nigeria, Defendant JEFFERSON advised CW and

Pfeffer that Family Member 3 should be awarded the legal work associated with the venture in Nigeria.

86.     On or about August 20, 2004, Jackson caused 30 million Class A Common shares of iGate stock to be issued to ANJ.

## Defendant JEFFERSON Sought Bribes
## from CW to Be Paid to Jefferson Family Members

87.     On or about August 20, 2004, in New Orleans, Louisiana, Defendant JEFFERSON advised Pfeffer that Defendant JEFFERSON required 5% to 7% of W2-IBBS, CW's newly-formed Nigerian company, be given to members of Defendant JEFFERSON's family in return for his assistance with the Nigerian Joint Venture.

88.     On or about August 20, 2004, in New Orleans, Louisiana, Defendant JEFFERSON introduced CW, Jackson, Pfeffer, and Nigerian Businessperson B to Family Member 3 so that Family Member 3 could perform legal work in relation to the Nigerian Joint Venture, including drafting the joint venture agreement between W2-IBBS and Nigerian Company B.

89.     On or about September 12, 2004, Defendant JEFFERSON edited a draft letter to Jackson, for the signature of Family Member 1, requesting a $50,000.00 payment for "amounts currently due to [ANJ]."

90.     On or about September 23, 2004, three days after iGate received a $2 million wire transfer from CW pursuant to the agreement with iGate, Jackson caused $50,000.00 to be wired from an iGate bank account in New Albany, Indiana, to an ANJ bank account in New Orleans, Louisiana.

-23-

91.     In or about December 2004, in a congressional dining room in Washington, D.C.,

Defendant JEFFERSON asked CW for a 5% to 7% share of W2-IBBS for Jefferson family

members in return for Defendant JEFFERSON's performance of official acts on behalf of the

Nigerian Joint Venture.

92.     On or about March 31, 2005, in McLean, Virginia, Pfeffer told CW that

Defendant JEFFERSON would want a Jefferson family member to be paid "a couple grand a

month salary" in addition to the 7% equity share of W2-IBBS that would be provided to

Defendant JEFFERSON's family members.

## Defendant JEFFERSON Initiated
## Discussion About Bribing Nigerian Officials

93.     On or about April 27, 2005, in Vienna, Virginia, Defendant JEFFERSON

discussed with CW the possibility of paying someone designated by Nigerian Official A a

percentage of the Nigerian Joint Venture in return for Nigerian Official A directing NITEL to

provide the Nigerian Joint Venture with access to telephone lines in Nigeria.

94.     On or about May 4, 2005, Defendant JEFFERSON advised CW that they may not

need to bribe Nigerian Official A because Nigerian Businessperson B had reached an agreement

with NITEL, but that if there were such a need to bribe Nigerian Official A, Defendant

JEFFERSON could see him in Nigeria.

95.     On or about May 12, 2005, in Washington, D.C., Defendant JEFFERSON

discussed with CW increasing Defendant JEFFERSON's equity share in W2-IBBS from 7% to

between 17% and 20%, stating, "I make a deal for my children.  It wouldn't be me."

96.     On or about May 12, 2005, in Washington, D.C., Defendant JEFFERSON told

CW that Nigerian Businessperson B had "a lot of folks to pay off" in connection with the

Nigerian Joint Venture and that a portion of the proceeds going to Nigerian Company B would be

used to bribe political people, including Nigerian Official A and other high-ranking Nigerian

government officials.

### Defendant JEFFERSON Sought and Accepted Bribe Payments from CW and Further Discussed Bribing Nigerian Government Officials

97.     On or about May 15, 2005, Defendant JEFFERSON sent via facsimile from New

Orleans, Louisiana, to CW in McLean, Virginia, a document setting forth the percentages of

ownership interest in W2-IBBS that Defendant JEFFERSON proposed be split among CW,

Pfeffer, iGate, and Global, a Jefferson family-controlled company.  Through that document,

Defendant JEFFERSON solicited a 30% ownership of W2-IBBS for his family.

98.     On or about May 16, 2005, Defendant JEFFERSON sent from his congressional

e-mail account in Washington, D.C., an e-mail to CW in McLean, Virginia, attaching a proposed

joint venture agreement between W2-IBBS and Nigerian Company B.

99.     On or about May 31, 2005, in Washington, D.C., Defendant JEFFERSON

directed CW to transfer W2-IBBS stock certificates representing 30% ownership of W2-IBBS (a

total of 1.5 million shares of stock) to Global, stating, "That way I provide for them, all this stuff

and that helps us."

100.    On or about May 31, 2005, in Washington, D.C., Defendant JEFFERSON

discussed with CW the possibility of paying bribes to Nigerian government officials to advance

the Nigerian Joint Venture, stating, "I would rather take care of it, rather than have [Nigerian Businessperson B] take care of it . . . I'm talking about with elected people and big shots, okay?"

101.   On or about June 7, 2005, in Washington, D.C., Defendant JEFFERSON met with Nigerian Official A's Spouse and told her about a competitive threat to the Nigerian Joint Venture posed by a Chinese company, requested a meeting with Nigerian Official A, and expressed his willingness to provide things of value to Nigerian Official A in return for Nigerian Official A assisting the Nigerian Joint Venture.

102.   On or about June 8, 2005, in Washington, D.C., Defendant JEFFERSON explained to CW potential ways in which Nigerian Official A could receive the bribe payments, such as through making payments to a charitable foundation run by Nigerian Official A's Spouse and giving Nigerian Official A a share of the profits from the Nigerian Joint Venture.

103.   On or about June 8, 2005, in Washington, D.C., Defendant JEFFERSON accepted from CW a stock certificate issued to Global, amounting to 1,500,000 shares (or 30%) of the outstanding shares of W2-IBBS, and he also agreed to travel to Ghana and promote a similar telecommunications venture on behalf of CW and iGate in exchange for, among other things, CW signing the agreement for the Nigerian Joint Venture.

### Defendant JEFFERSON Planned Travel to Ghana to Influence Ghanaian Government Officials and Continued to Discuss Bribing Nigerian Government Officials

104.   On or about June 9, 2005, Defendant JEFFERSON directed a congressional staff member to send via facsimile from his congressional office in Washington, D.C., to CW in McLean, Virginia, visa forms for completion by CW in order to obtain the requisite authorizations to travel to Ghana.

-26-

105.    On or about June 9, 2005, Nigerian Businessperson B asked Jackson whether Defendant JEFFERSON had spoken to Nigerian Official A and then implored, "now is the time for interceding with [Nigerian Official A]" as they did not "have an edge" in the negotiation with NITEL and that Defendant JEFFERSON "has to move in and move in fast."

106.    On or about June 17, 2005, in Washington, D.C., Defendant JEFFERSON asked CW to provide Defendant JEFFERSON a payment of more than $7 million for the takeover of iGate and other related business expenses in Nigeria and Ghana, stating, "In a perfect business world, this is you financing my acquisition. . . . The acquisition would be made by, by an outfit called ANJ, which is [Family Member 1] and my children. That's what it is."

107.    On or about June 21, 2005, Defendant JEFFERSON composed and caused to be delivered a letter on congressional letterhead addressed to Nigerian Official A, which, among other things:  (a) requested that Nigerian Official A intervene with NITEL to secure the Nigerian Joint Venture's right to co-locate its equipment at NITEL facilities and use NITEL's telephone lines; and (b) sought a meeting with Nigerian Official A during that official's trip to the United States in July 2005.

108.    On or about June 21, 2005, Defendant JEFFERSON composed and caused to be delivered to Nigerian Official A's Spouse a letter addressed to her enclosing the aforementioned June 21, 2005 official letter addressed to Nigerian Official A, along with financial projections of revenue to be generated by the Nigerian Joint Venture showing anticipated gross profits of more than $200 million per year after five years.

109.    On or about June 22, 2005, Defendant JEFFERSON wrote and caused to be delivered a letter on congressional letterhead to the Ambassador of Ghana to the United States

-27-

advising that he was leading a delegation to Ghana on an upcoming trip and requesting assistance in arranging meetings with high-ranking Ghanaian government officials.

110.    On or about June 22, 2005, Defendant JEFFERSON sent a facsimile from Washington, D.C., to CW in McLean, Virginia, requesting that CW wire $59,225.18 to a bank account held by ANJ for payment of some of iGate's immediate expenses.

111.    On or about June 23, 2005, Defendant JEFFERSON caused CW to transfer via wire $59,300.00 from CW's bank account in McLean, Virginia, to an ANJ bank account in New Orleans, Louisiana.

112.    On or about June 24, 2005, in Washington, D.C., Defendant JEFFERSON met with CW and advised that he had provided Nigerian Official A's Spouse with a description of the project and investment information so that Nigerian Official A would see it and "salivate over what the opportunities are there." Further, Defendant JEFFERSON agreed to secure commitments from the Ghanaian and Nigerian governments that were necessary for the success of the telecommunications ventures in exchange for, among other things, CW financing ANJ's acquisition of iGate.

113.    On or about June 24, 2005, during a telephone conversation with CW, who was in McLean, Virginia, Defendant JEFFERSON discussed the commitments Defendant JEFFERSON would seek to obtain from Nigerian and Ghanaian government officials on behalf of CW's companies, including those involving rights to co-locate equipment in both countries, the right to build and exclusively use microwave towers in Ghana, and the rental and use of existing government-controlled copper wire lines. In expressing his commitment to securing assurances from the Nigerian and Ghanaian governments, Defendant JEFFERSON stated, "I would give it a

-28-

thousand percent as you, as you might envision I will.  I will try my very best to deliver for you and not disappoint you."

114.    On or about June 29, 2005, Defendant JEFFERSON sent from Washington, D.C., a letter on congressional letterhead addressed to a high-ranking Ghanaian government official in Accra, Ghana, advising that Defendant JEFFERSON was leading a delegation on an upcoming trip to Ghana regarding a proposed telecommunications project and requesting assistance in arranging meetings with other Ghanaian government representatives.

115.    In or about late June and early July 2005, Defendant JEFFERSON caused his congressional staff to make arrangements for him and others to travel to Ghana.

116.    On or about July 1, 2005, Defendant JEFFERSON caused CW to transfer $30,000.00 via wire from CW's bank account in McLean, Virginia, to ANJ's bank account in New Orleans, Louisiana.

117.    On or about July 5, 2005, Defendant JEFFERSON, accompanied by Family Member 5, the son of a high-ranking Ghanaian government official, Pfeffer, and others, departed from Washington Dulles International Airport in Loudoun County, Virginia, and traveled to Ghana to meet with Ghanaian government officials for the purpose of advancing a telecommunications venture financed by CW.

118.    From on or about July 6, 2005, through on or about July 10, 2005, in Accra, Ghana, Defendant JEFFERSON, in his capacity as a Member of the United States House of Representatives, promoted to Ghanaian government officials the telecommunications venture financed by CW and sought commitments and assistance from those officials on behalf of the venture.

119.    On or about July 12, 2005, in Washington, D.C., Defendant JEFFERSON

described to CW the meetings he had with Ghanaian government officials to promote the

telecommunications venture and discussed Defendant JEFFERSON's understanding that his and

his family's financial stake in the Ghanaian venture would be similar to their stake in the

Nigerian Joint Venture.

120.    On or about July 12, 2005, in Washington, D.C., Defendant JEFFERSON

discussed his plans to take control of iGate by restructuring iGate's Board of Directors to include

CW, Jackson, and "somebody from my [Defendant JEFFERSON's] side . . . maybe [Family

Member 3], or [Family Member 5], or [Family Member 1]." Defendant JEFFERSON explained,

"I'm in the shadows behind the curtain somewhere."

121.    On or about July 15, 2005, in Washington, D.C., at the offices of the Ex-Im Bank,

Defendant JEFFERSON introduced CW and Pfeffer to Ex-Im Bank officials for the purpose of

assisting CW in securing financial backing for the telecommunications ventures in Nigeria and

Ghana.

### Defendant JEFFERSON Offered a Bribe to Nigerian Official A

122.    On or about July 18, 2005, at the residence of Nigerian Official A in Potomac,

Maryland, Defendant JEFFERSON met privately with Nigerian Official A and offered to pay a

bribe to induce him to use his position to assist in obtaining commitments from NITEL for the

benefit of the Nigerian Joint Venture.

123.    On or about July 18, 2005, following the meeting with Nigerian Official A,

Defendant JEFFERSON and CW traveled from Potomac, Maryland, to McLean, Virginia, where

Defendant JEFFERSON informed CW that, during his private meeting with Nigerian Official A,

-30-

Defendant JEFFERSON had offered, and Nigerian Official A had agreed to accept, a bribe in the form of a percentage of the profits generated by the Nigerian Joint Venture in exchange for Nigerian Official A's official assistance in securing necessary approvals from NITEL.

124.    On or about July 21, 2005, in Washington, D.C., Defendant JEFFERSON advised CW that he was in the process of forming a new company called Multi-Media, that ANJ and CW would be the principal shareholders, and that Family Member 5 would have authority to sign contracts on behalf of Multi-Media.

125.    On or about July 21, 2005, in Washington, D.C., Defendant JEFFERSON assured CW that they had "a deal with [Nigerian Official A]," explaining that the bribe to Nigerian Official A would consist of: (a) a "front-end" payment of $500,000 to Nigerian Official A that would ensure that the "little hook is in there"; and (b) a "back-end" payment of at least half of Nigerian Company B's share of the Nigerian Joint Venture's profits.

126.    On or about July 21, 2005, in Washington, D.C., Defendant JEFFERSON told CW that he was satisfied with Global receiving a 30% equity interest in CW's Ghanaian company, IBBS, which would entitle Global to 30% of the proceeds due to IBBS from the telecommunications venture in Ghana.

127.    On or about July 22, 2005, Defendant JEFFERSON caused to be prepared financial projections for the Nigeria Joint Venture contemplating the replacement of iGate by a Jefferson family-controlled company, Multi-Media.

128.    On or about July 26, 2005, in Washington, D.C., Defendant JEFFERSON told CW that he would deliver to Nigerian Official A a bribe payment of $100,000.00 in cash to be provided by CW, with the expectation that more money would be paid at a later date.

-31-

129.     On or about July 26, 2005, in Washington, D.C., Defendant JEFFERSON provided CW with financial projections for the Nigerian Joint Venture that reflected Global receiving 22.5% (or approximately $173 million) of the profits from the Nigerian Joint Venture over a five-year period.

130.     On or about July 30, 2005, in Arlington, Virginia, Defendant JEFFERSON directed CW to make several wire transfers on August 1, 2005, including: (a) more than $7 million to a Multi-Media bank account in New Orleans, Louisiana, controlled by Family Member 5, for the start-up costs of the Ghanaian and Nigerian telecommunications projects and the first-year operating costs of Multi-Media; and (b) $1 million to a Global bank account in New Orleans, Louisiana, for "other project costs," including bribes to foreign government officials.

131.     On or about July 30, 2005, in Arlington, Virginia, Defendant JEFFERSON received $100,000.00 in cash from CW for delivery by Defendant JEFFERSON to Nigerian Official A.

132.     On or about July 30, 2005, following the meeting with CW, Defendant JEFFERSON drove his car with the $100,000.00 in cash from Arlington, Virginia, to his residence in Washington, D.C.

133.     On or about July 30, 2005, Defendant JEFFERSON and a congressional staff member traveled in Defendant JEFFERSON's vehicle from Alexandria, Virginia, to Defendant JEFFERSON's congressional office in Washington, D.C.

134.     On or about July 30, 2005, in Washington, D.C., at his congressional office, Defendant JEFFERSON directed a congressional staff member to sign CW's name on a letter to

NITEL, which Defendant JEFFERSON planned to deliver to Nigerian Official A for further delivery to NITEL.

135. On or about July 31, 2005, Defendant JEFFERSON and a congressional staff member traveled in Defendant JEFFERSON's vehicle from Washington, D.C., to a hotel in Bethesda, Maryland, at which time the congressional staff member, at Defendant JEFFERSON's direction, delivered to one of Nigerian Official A's assistants two letters designed to secure the necessary approvals from NITEL: (a) a hand-written letter on congressional letterhead from Defendant JEFFERSON to Nigerian Official A; and (b) the letter authored by Defendant JEFFERSON, signed by the congressional staff member in CW's name, and addressed to a senior official of NITEL, requesting that NITEL permit the Nigerian Joint Venture to co-locate its equipment at NITEL's facilities and use NITEL's telephone lines.

136. On or about August 1, 2005, in Arlington, Virginia, Defendant JEFFERSON told CW that he had delivered the "African art" to Nigerian Official A and that Defendant JEFFERSON intended to travel to Nigeria on August 20, 2005, and meet with Nigerian Official A to evaluate the progress being made on behalf of the Nigerian Joint Venture.

137. On or about August 1, 2005, in Arlington, Virginia, Defendant JEFFERSON accepted from CW a stock certificate issued to Global, consisting of 1.5 million of the 5 million outstanding shares of IBBS, and a stock certificate issued to ANJ, consisting of 600 of the 1,500 outstanding shares of Multi-Media.

138. On or before August 3, 2005, at his residence in Washington, D.C., Defendant JEFFERSON secreted in his freezer $90,000.00 of the $100,000.00 in cash provided by CW as

part of the front-end bribe payment to Nigerian Official A, which was separated into $10,000.00 increments, wrapped in aluminum foil, and concealed inside various frozen food containers.

139.    On or about August 12, 2005, Defendant JEFFERSON caused to be filed with the Clerk of the United States House of Representatives a Travel Form regarding his July 2005 trip to Ghana representing that the trip was "in connection with my duties as a Member or Officer of the U.S. House of Representatives" but failing to disclose his and his family's financial interests in the Ghanaian telecommunications project.

(All in violation of Title 18, United States Code, Section 371.)

-34-

## COUNT 2
### Conspiracy to Solicit Bribes by a Public Official
### and Deprive Citizens of Honest Services by Wire Fraud

THE GRAND JURY FURTHER CHARGES THAT:

140.    Paragraphs 1 through 38 of this Indictment are re-alleged as if fully set forth herein.

### THE CONSPIRACY AND ITS OBJECTS

141.    Beginning in or about August 2000 through in or about March 2005, within the Eastern District of Virginia and elsewhere, the defendant, WILLIAM J. JEFFERSON, did knowingly combine, conspire, confederate, and agree, together with others, known and unknown to the grand jury, to commit the following offenses against the United States:

a.    to, directly and indirectly, corruptly demand, seek, receive, accept, and agree to receive and accept anything of value personally and for any other person and entity, in return for being influenced in the performance of any official act in violation of Title 18, United States Code, Section 201(b)(2)(A); and

b.    to devise a scheme and artifice to defraud and deprive the citizens of the United States and the United States House of Representatives of their right to the honest services of Defendant JEFFERSON, performed free from deceit, fraud, concealment, bias, conflict of interest, self-enrichment, and self-dealing, and to use wire communications in interstate and foreign commerce to further the scheme to defraud in violation of Title 18, United States Code, Sections 1343 and 1346.

## NATURE AND PURPOSE OF THE CONSPIRACY

The nature and purpose of the conspiracy included the following:

142.   To provide for the unjust enrichment of Defendant JEFFERSON and his family members by corruptly seeking, soliciting, and directing that things of value be paid to him and his family members in return for Defendant JEFFERSON's performance of official acts.

143.   To use the Office of Congressman WILLIAM J. JEFFERSON, including the congressional staff members employed therein, to perform official acts to advance the interests of the businesses and persons who had agreed to pay things of value to Defendant JEFFERSON and his family members.

144.   To conceal the illegal nature of Defendant JEFFERSON's solicitations for, and receipt of, various things of value through the preparation of misleading written agreements, the use of nominee companies, and the omission of material facts concerning the financial benefits that were sought on behalf of, and received by, Defendant JEFFERSON and his family members, all in order to ensure the continued existence and success of the conspiracy.

## MANNER AND MEANS OF THE CONSPIRACY

Among the manner and means by which Defendant JEFFERSON and his co-conspirators would and did carry out the conspiracy were the following:

145.   As a Member of the United States House of Representatives and certain of its committees and caucuses, Defendant JEFFERSON discussed providing official assistance to constituent companies, including Companies A, B, C, D, E, F, and G, and businesspersons, including Businesspersons A, BC, DEF, and G, seeking to obtain and conduct business in west African nations, including Nigeria, Equatorial Guinea, and Sao Tome and Principe.

-36-

146.     After initially discussing such business endeavors with these businesspersons, Defendant JEFFERSON sought things of value for himself and his family members in return for providing official assistance to promote those business endeavors. The things of value Defendant JEFFERSON sought in return for providing his official assistance included monthly fees or retainers, consulting fees, percentage shares of revenue and profit, and commissions per item sold.

147.     Defendant JEFFERSON sought to and did conceal his and his family members' expected or actual receipt of things of value by directing congressional staff members, family members, and others to form nominee companies that entered into business agreements to receive the things of value sought by Defendant JEFFERSON while not referencing him or disclosing his involvement in obtaining the agreements. The nominee companies included BEP, Global, PIPCO, and Providence Lake.

148.     While seeking things of value, Defendant JEFFERSON typically required that the agreements with the nominee companies be reduced to writing to make them appear to be lawful agreements for professional and legitimate services when, in fact, the companies and businesspersons were giving things of value to Defendant JEFFERSON and his designees in return for the official acts by Defendant JEFFERSON.

149.     In return for things of value, Defendant JEFFERSON agreed to perform and did perform a pattern of official acts to promote and advance the business interests of these companies and businesspersons in West Africa and elsewhere. These official acts included:

    a.     conducting official travel to foreign countries and meeting with foreign government officials for the purpose of influencing those officials;

-37-

      b.     using his congressional staff members to create trip itineraries, accompany Defendant JEFFERSON on travel, and otherwise provide official assistance;

      c.     contacting both United States and foreign embassies to schedule meetings with foreign government officials, obtaining entry and exit visas for travelers, and otherwise assisting with the official travel;

      d.     sending official correspondence on congressional letterhead to foreign government officials; and

      e.     scheduling and participating in meetings with officials of United States agencies to secure potential financing for the business ventures sought by the companies and businesspersons.

150.    Defendant JEFFERSON failed to disclose his and his family's financial interests in these business ventures by omitting this material information from travel and financial disclosure forms required to be filed by the Rules of the United States House of Representatives.

151.    Defendant JEFFERSON failed to disclose to United States and foreign government officials his and his family's financial interests in the business ventures he was officially promoting in order to give the false impression that Defendant JEFFERSON was merely acting as an impartial public servant promoting United States business interests abroad.

## OVERT ACTS

In furtherance of the conspiracy, and to effect the objects thereof, the following overt acts were committed within the Eastern District of Virginia and elsewhere:

**Defendant JEFFERSON Solicited Bribes Related to the Development of a
Sugar Factory, Food Processing Facilities and Marginal Oil Fields in Nigeria**

152.   On or about August 17, 2000, in Washington, D.C., Defendant JEFFERSON received correspondence from Businessperson DEF, who sought Defendant JEFFERSON's direct assistance in highlighting the business projects of Company D in Nigeria.

153.   On or about August 25, 2000, in Baton Rouge, Louisiana, Defendant JEFFERSON caused the formation of a company called Providence Lake, which also did business as "Providence International, LLC."

154.   In or about Fall 2000, in Louisiana, Defendant JEFFERSON informed Businessperson DEF that before Defendant JEFFERSON would officially assist Businessperson DEF's projects in Nigeria, Family Member 2 would have to be compensated.

155.   On or about October 24, 2000, in Baton Rouge, Louisiana, Family Member 2 caused the formation of a company called BEP with Family Member 2 as BEP's registered agent, member, and president.

156.   In or about Fall 2000, in Baton Rouge, Louisiana, Defendant JEFFERSON introduced a high-ranking Nigerian government official to Businessperson DEF for the purpose of advancing Businessperson DEF's efforts to obtain a contract to build a sugar plant in Jigawa State, Nigeria.

157.   On or about December 13, 2000, in New Orleans, Louisiana, Defendant JEFFERSON, Family Member 2, and Businessperson DEF met and discussed business related to the development of a sugar plant in Jigawa State, Nigeria.

158.    On or about January 29, 2001, Defendant JEFFERSON caused an agreement to be executed between Companies D and E and Providence Lake that provided Providence Lake a commission of between 3% and 10% of the contract price for "the development and establishment of a sugar factory(ies) in Jigawa State, Nigeria."

159.    On or about February 13, 2001, in Washington, D.C., at the congressional office of Defendant JEFFERSON, Defendant JEFFERSON met with the president of the Ex-Im Bank, the president of Company E, and a high-ranking Nigerian government official to promote United States government financing of portions of a proposed contract to develop a sugar factory in Jigawa State, Nigeria.

160.    On or about May 1, 2001, in Washington, D.C., Defendant JEFFERSON caused a meeting to occur at Ex-Im Bank's offices, attended by Ex-Im Bank officials, one of Defendant JEFFERSON's congressional staff members and the president of Company E to further promote United States government financing of portions of a proposed contract to develop a sugar factory in Jigawa State, Nigeria.

161.    On or about May 1, 2001, in Washington, D.C., Defendant JEFFERSON caused an agreement to be entered into between a sugar company in Jigawa State, Nigeria, and Company E regarding a feasibility study and engineering services related to a proposed sugar factory with a contract price of approximately $8 million.

162.    On or about July 27, 2001, Defendant JEFFERSON assisted Company E in causing $187,230.00 to be wired from a bank account in Jigawa State, Nigeria, to a bank account in the name of Company E in Baton Rouge, Louisiana.

-40-

163.    On or about August 22, 2001, in Baton Rouge, Louisiana, in response to an invoice submitted by Family Member 2 seeking payment from Company D for "Consulting with Jagawa [sic], State of Nigeria, Africa, Sugar Plant Project," Businessperson DEF caused a check to be issued and made payable to "Providence International, LLC" for $7,489.00, which was mailed to Family Member 2.

164.    On or about August 23, 2001, in New Orleans, Louisiana, in the presence of Family Member 2, Defendant JEFFERSON informed Businessperson DEF that Family Member 2 would have to be compensated before Defendant JEFFERSON would assist Businessperson DEF to obtain contracts for the rights to drill marginal oil fields in Akwa Ibom State, Nigeria, and the development of various food processing facilities in Kaduna State, Nigeria.

165.    On or about August 27, 2001, in Louisiana, Defendant JEFFERSON caused an agreement to be executed between Companies D and E and Providence Lake that provided Providence Lake a commission of between 4% and 10% of the contract price for "the development and establishment of an Agro-Industrial Complex . . . in Kaduna State, Nigeria."

166.    On or about August 30, 2001, in Abuja, Nigeria, Defendant JEFFERSON caused an agreement to be executed between Company F and BEP that provided BEP the payment of a bonus of no less than $200,000.00 per marginal oil field and no less than $500,000.00 per offshore oil field acquired and a one-sixth interest in all revenue obtained by Company F as a result of Company F's development of any oil fields in Akwa Ibom State, Nigeria.

167.    On or about August 30, 2001, in Abuja, Nigeria, following the execution of the agreement between Company F and BEP, Defendant JEFFERSON introduced Businessperson DEF to a high-ranking Nigerian government official and promoted Company F to that official.

-41-

168.    On or about December 14, 2001, Defendant JEFFERSON assisted Company E in causing $85,914.92, related to the sugar factory project, to be wired from a bank account in Jigawa State, Nigeria, to a bank account in the name of Company E in Baton Rouge, Louisiana.

169.    On or about January 14, 2002, in Baton Rouge, Louisiana, in response to an invoice submitted by Family Member 2 seeking payment from Company E for "Consulting Services for Jigawa State, Nigeria, Africa - Sugar Plant Project," Businessperson DEF caused a check to be issued and made payable to "Providence International, LLC" for $3,436.59, which was mailed to Family Member 2.

170.    On or about April 18, 2002, Defendant JEFFERSON assisted Company E in causing $260,697.04, related to the sugar factory project, to be wired from a bank account in Jigawa State, Nigeria, to a bank account in the name of Company E in Baton Rouge, Louisiana.

171.    On or about April 29, 2002, in Baton Rouge, Louisiana, in response to an invoice submitted by Family Member 2 seeking payment from Company D for "Consulting with Jagawa [sic], State of Nigeria, Africa, Sugar Plant Project," Businessperson DEF caused a check to be issued and made payable to "Providence International, LLC" for $10,427.88, which was mailed to Family Member 2.

## Defendant JEFFERSON Continued to Solicit
## Bribes in Connection with the Marginal Oil Fields

172.    In or about September 2001, in Folsom, Louisiana, Businessperson DEF advised Businessperson G, who later formed and co-owned Company G, of an opportunity to pursue drilling rights to marginal oil fields in Akwa Ibom State, Nigeria, which Businessperson DEF

-42-

described as a "wired" deal that required payments to Family Member 2 to have the continued support of Defendant JEFFERSON.

173.    In or about late 2001, in New Orleans, Louisiana, Defendant JEFFERSON spoke with Lobbyist A about Businessperson G's pursuit of marginal oil fields and the possible development of a fertilizer plant, among other things, in Akwa Ibom State, Nigeria.

174.    In or about December 2001, in New Orleans, Louisiana, Defendant JEFFERSON discussed with Businessperson G and others an upcoming trip to Nigeria and Defendant JEFFERSON's requirement that Company G would have to enter into an agreement to compensate Family Member 2 before Defendant JEFFERSON would travel to Nigeria and meet with Nigerian government officials to promote Company G's business ventures in that country.

175.    On or about December 27, 2001, in Louisiana, Businessperson G paid $3,760.29 for airfare for Family Member 2 to travel from New Orleans, Louisiana, to Nigeria.

176.    On or about January 10, 2002, in New Orleans, Louisiana, Defendant JEFFERSON caused Businessperson G to draft an agreement providing for compensation to Family Member 2.

177.    On or about January 10, 2002, in New Orleans, Louisiana, Defendant JEFFERSON reviewed a draft agreement between Company G and BEP and told Businessperson G that its terms were insufficient for Family Member 2.

178.    On or about January 10, 2002, in New Orleans, Louisiana, Businessperson G assured Defendant JEFFERSON that Family Member 2's interest would be maintained in Company G's proposed projects in Nigeria.

179.    On or about January 11, 2002, Defendant JEFFERSON traveled from New

Orleans, Louisiana, to Nigeria with Lobbyist A, Family Member 2, and Businessperson G,

among others, to promote Company G's business interests in that country.

180.    From on or about January 12, 2002 through on or about January 19, 2002, in

Nigeria, Defendant JEFFERSON met with various high-ranking Nigerian government officials to

advance Company G's business ventures.

181.    On or about January 19, 2002, in Abuja, Nigeria, Defendant JEFFERSON caused

Businessperson G to pay $6,554.97 for hotel suite charges for Defendant JEFFERSON, Family

Member 2, and Businessperson G.

182.    On or about May 6, 2002, in Arlington, Virginia, Businessperson G caused an

application to be filed with the USTDA for the funding of a feasibility study related to the

development of a fertilizer plant in Akwa Ibom State, Nigeria.

183.    In or about May 2002, in Washington, D.C., Defendant JEFFERSON caused a

congressional staff member to inquire of the USTDA in Arlington, Virginia, about the status of

the pending application for funding of the fertilizer plant development in Akwa Ibom State,

Nigeria.

184.    On or about July 10, 2002, in Washington, D.C., Defendant JEFFERSON sent a

letter on congressional letterhead to a high-ranking Nigerian government official requesting that

that official direct a letter to the USTDA pledging support for the fertilizer plant project in Akwa

Ibom State, Nigeria.

185.    On or about August 5, 2002, Defendant JEFFERSON caused a congressional staff

member to send via facsimile to the USTDA in Arlington, Virginia, a letter from a high-ranking

-44-

Nigerian government official pledging support for the proposed development of a fertilizer plant in Akwa Ibom State, Nigeria.

186.    On or about March 21, 2003, in Washington, D.C., Defendant JEFFERSON met with USTDA staff, a high-ranking Nigerian government official, Businessperson G, and others to discuss the status of the USTDA's funding of the fertilizer plant development in Akwa Ibom State, Nigeria.

187.    In or about September 2003, in Washington, D.C., at the congressional offices of Defendant JEFFERSON, Defendant JEFFERSON met with USTDA staff, a high-ranking Nigerian government official, and a congressional staff member to further discuss the fertilizer plant in Akwa Ibom State, Nigeria, and the status of the application with the USTDA.

**Defendant JEFFERSON Solicited Bribes in
Connection with Disputed Oil Exploration Rights**

188.    In or about late 2001, in Washington, D.C., Lobbyist A and Businessperson BC sought the assistance of Defendant JEFFERSON regarding a dispute over oil exploration rights -- worth an estimated $300 million to $500 million -- off the coast of Sao Tome and Principe.

189.    In or about late 2001, in Washington, D.C., Defendant JEFFERSON instructed Lobbyist A that Defendant JEFFERSON was willing to assist in resolving the dispute over oil exploration rights, but that Family Member 2 would need to be compensated before Defendant JEFFERSON would intervene.

190.    On or about January 10, 2002, after Lobbyist A informed Businessperson BC that Defendant JEFFERSON required compensation to Family Member 2 in return for Defendant

JEFFERSON's assistance, Businessperson BC sent an e-mail to Lobbyist A proposing that Family Member 2 receive a one-third interest in the oil exploration rights.

191.    In or about January 2002, in New Orleans, Louisiana, Defendant JEFFERSON caused a congressional staff member to type an agreement for Company B, Lobbyist A, and PIPCO to provide compensation to Family Member 2.

192.    On or about January 28, 2002, at a meeting with Lobbyist A and Businessperson BC in New Orleans, Louisiana, Defendant JEFFERSON caused an agreement to be executed by Company B, Lobbyist A and PIPCO, which provided that Lobbyist A and PIPCO "shall be entitled to and shall receive fifty percent of the proceeds . . . received or falling due to be received by [Company B]," if the dispute over oil exploration rights was successfully resolved.

193.    On or about January 29, 2002, in Baton Rouge, Louisiana, Defendant JEFFERSON caused the formation of PIPCO and caused a congressional staff member to be listed as its manager.

### Defendant JEFFERSON Solicited Bribes
### in Connection with the Sale of Waste Recycling Systems

194.    In or about early 2003, Lobbyist A sought the assistance of Defendant JEFFERSON to help Company C promote sales of its waste recycling systems in Africa to high-ranking government officials.

195.    In or about early 2003, Defendant JEFFERSON advised Lobbyist A that Defendant JEFFERSON was willing to promote sales of Company C's waste recycling systems in Africa, but that Family Member 2 would need to be compensated before Defendant JEFFERSON would provide such assistance.

-46-

196.   On or about February 15, 2003, in New Orleans, Louisiana, Defendant JEFFERSON caused an agreement to be executed by Company C, Lobbyist A, and PIPCO, which provided that Lobbyist A and PIPCO would receive both a commission from Company C for the sale of any waste recycling system and a share of the revenue from its operation.

197.   On or about February 15, 2003, Defendant JEFFERSON and others traveled from New Orleans, Louisiana, to Nigeria to, among other things, promote the use and sale of Company C's waste recycling systems to high-ranking Nigerian government officials.

198.   On or about February 19, 2003, Defendant JEFFERSON advised Businessperson BC that the February 18, 2003, agreement needed to be replaced by two separate agreements, one for Lobbyist A and one for Family Member 2, with BEP replacing PIPCO in the latter agreement.

199.   On or about February 19, 2003, Businessperson BC sent via facsimile from Florida to Lobbyist A in Nigeria (for delivery to Defendant JEFFERSON) a revised draft of the February 18, 2003, consulting agreement.

200.   On or about February 19, 2003, Defendant JEFFERSON spoke by telephone from Abuja, Nigeria, with Businessperson BC in Florida and advised Businessperson BC that Defendant JEFFERSON would not go into further meetings with high-ranking Nigerian government officials until the agreement had been revised to his satisfaction.

201.   On or about March 18, 2003, Defendant JEFFERSON caused two new separate agreements to be prepared for execution with Company C:  one by Lobbyist A and one by Global.

202.   On or about March 21, 2003, Defendant JEFFERSON caused the incorporation of Global in Delaware.

-47-

203.    On or about February 15, 2004, Defendant JEFFERSON, Lobbyist A, and others traveled from Washington Dulles International Airport in Loudoun County, Virginia, to Nigeria, Equatorial Guinea, Cameroon, and Sao Tome and Principe on a trip co-sponsored by Company C.

204.    From on or about February 16, 2004, through on or about February 22, 2004, Defendant JEFFERSON, in his capacity as a Member of the United States House of Representatives, met with government officials in Nigeria, Equatorial Guinea, Cameroon, and Sao Tome and Principe and promoted various business opportunities, including the sale of Company C's waste recycling systems.

205.    On or about March 24, 2004, Defendant JEFFERSON caused to be filed with the Clerk of the United States House of Representatives a Travel Form regarding his February 2004 trip to West Africa, acknowledging that the "travel was in connection with my duties as a Member or Officer of the U.S. House of Representatives" but failing to disclose his and his family's financial interests in the promotion and sale of Company C's waste recycling systems. (All in violation of Title 18, United States Code, Section 371.)

**COUNT 3**
**Solicitation of Bribes by a Public Official**

THE GRAND JURY FURTHER CHARGES THAT:

206.    Paragraphs 1 through 38 of this Indictment are re-alleged as if fully set forth herein.

207.    Beginning in or about January 2001 through in or about August 2005, within the Eastern District of Virginia and elsewhere, the defendant, WILLIAM J. JEFFERSON, being a public official, did, directly and indirectly, knowingly and corruptly demand, seek, receive, accept, and agree to receive and accept anything of value personally and for any other person and entity, in return for being influenced in the performance of any official acts, to wit:  Defendant JEFFERSON did demand, seek, receive, accept, and agree to receive and accept things of value from Vernon L. Jackson and iGate for ANJ, a Jefferson family-controlled company, in the form of monthly payments of money, shares of profits and revenue, and iGate stock, in return for Defendant JEFFERSON's performance of official acts to advance iGate's business ventures in Nigeria, Ghana, and elsewhere.  These official acts included, among other things, official travel to Nigeria, Ghana, and elsewhere, official meetings and correspondence with both United States and foreign government officials, and the use of congressional staff members.

(All in violation of Title 18, United States Code, Sections 201(b)(2)(A) and 2.)

-49-

## COUNT 4
### Solicitation of Bribes by a Public Official

THE GRAND JURY FURTHER CHARGES THAT:

208.   Paragraphs 1 through 38 of this Indictment are re-alleged as if fully set forth herein.

209.   From in or about June 2004 through in or about August 2005, within the Eastern District of Virginia and elsewhere, the defendant, WILLIAM J. JEFFERSON, being a public official, did, directly and indirectly, knowingly and corruptly demand, seek, receive, accept, and agree to receive and accept anything of value personally and for any other person and entity, in return for being influenced in the performance of any official acts, to wit:  Defendant JEFFERSON did demand, seek, receive, accept, and agree to receive and accept things of value from CW and CW's companies, W2-IBBS and IBBS, including:

   a.   1.5 million shares of W2-IBBS stock to Global, representing 30% ownership of W2-IBBS;

   b.   1.5 million shares of IBBS stock to Global, representing 30% ownership of IBBS;

   c.   a payment of more than $7 million from CW to Multi-Media to be used to fund the start-up costs of the Ghanaian and Nigerian telecommunications projects as well as to pay the first-year operating costs of Multi-Media; and

   d.   a payment of $1 million to Global for "other project costs," including bribes to Nigerian Official A,

all in return for Defendant JEFFERSON's performance of official acts to advance CW's business

ventures in Nigeria, Ghana, and elsewhere. These official acts included, among other things,

official travel to Nigeria, Ghana, and elsewhere, official meetings and correspondence with both

United States and foreign government officials, and the use of congressional staff members.

(All in violation of Title 18, United States Code, Sections 201(b)(2)(A) and 2.)

**COUNTS 5-10**
**Scheme to Deprive Citizens of Honest Services by Wire Fraud**

THE GRAND JURY FURTHER CHARGES THAT:

210.     Paragraphs 1 through 38 of this Indictment are re-alleged as if fully set forth herein.

211.     From in or about January 2001 and through in or about August 2005, within the Eastern District of Virginia and elsewhere, the defendant, WILLIAM J. JEFFERSON, did knowingly devise a scheme and artifice to defraud and deprive the citizens of the United States and the United States House of Representatives of their right to the honest services of Defendant JEFFERSON, a Member of the United States House of Representatives, performed free from deceit, fraud, concealment, bias, conflict of interest, self-enrichment, and self-dealing, by knowingly and corruptly demanding, seeking, receiving, accepting, and agreeing to receive and accept things of value from:

        a.     Vernon L. Jackson and Jackson's company, iGate, including monthly payments, shares of profits and revenue, and iGate stock; and

        b.     CW and CW's companies, W2-IBBS and IBBS, including 1.5 million shares of W2-IBBS stock to Global (representing 30% ownership of W2-IBBS), 1.5 million shares of IBBS stock to Global (representing 30% ownership of IBBS), a payment of more than $7 million from CW to Multi-Media (to be used to fund the start-up costs of the Ghanaian and Nigerian telecommunications projects as well as to pay the first-year

operating costs of Multi-Media), and a payment of $1 million to Global

(for "other project costs," including bribes to Nigerian Official A),

all in return for Defendant JEFFERSON's performance of official acts to advance iGate's and

CW's business ventures in Nigeria, Ghana, and elsewhere. These official acts included, among

other things, official travel to Nigeria and Ghana, official meetings and correspondence with both

United States and foreign government officials, and the use of congressional staff members.

Defendant JEFFERSON also concealed his and his family's financial interests in these business

ventures by, among other things, using nominee companies, employing misleading business

agreements, and omitting material facts in public filings.

212.    On or about the dates set forth below, within the Eastern District of Virginia and

elsewhere, and for the purpose of executing such scheme and artifice to defraud, Defendant

JEFFERSON did knowingly transmit and cause to be transmitted writings, signs, signals, and

sounds by means of wire communications in interstate and foreign commerce:

| COUNT | DATE | WIRE COMMUNICATION |
|---|---|---|
| 5 | May 23, 2004 | Credit card charge by Defendant JEFFERSON in the amount of $14,885.95 at Dulles International Airport in Loudoun County, Virginia, for the payment of air travel to Lagos, Nigeria with the understanding that iGate would reimburse that charge |
| 6 | May 15, 2005 | Facsimile from Defendant JEFFERSON in New Orleans, Louisiana to CW in McLean, Virginia, setting forth the proposed percentages of ownership in W2-IBBS to be given to CW, Pfeffer, iGate, and Global |
| 7 | June 23, 2005 | Wire transfer of $59,300.00 in funds from CW's bank account in McLean, Virginia, to an ANJ bank account in New Orleans, Louisiana |

| COUNT | DATE | WIRE COMMUNICATION |
|---|---|---|
| 8 | June 28, 2005 | Facsimile from Defendant JEFFERSON in Washington, D.C., to CW in McLean, Virginia, attaching various documents, including a letter on congressional letterhead to Nigerian Official A promoting the Nigerian Joint Venture |
| 9 | June 30, 2005 | Facsimile from Defendant JEFFERSON in Washington, D.C., to CW in McLean, Virginia, attaching a copy of an official letter Defendant JEFFERSON had sent to a high-ranking Ghanaian government official seeking to arrange meetings with other Ghanaian government representatives |
| 10 | July 6, 2005 | Telephone call from Defendant JEFFERSON in Accra, Ghana, to Vernon Jackson in Louisville, Kentucky, discussing, among other things, the progress of meetings taking place in Ghana and a letter sent by Defendant JEFFERSON to Nigerian Official A |

(All in violation of Title 18, United States Code, Sections 1343, 1346, and 2.)

## COUNT 11
### Foreign Corrupt Practices Act Violation

THE GRAND JURY FURTHER CHARGES THAT:

213.     Paragraphs 1 through 38 of this Indictment are re-alleged as if fully set forth herein.

214.     From in or about April 2005 through on or about August 3, 2005, in the Eastern District of Virginia and elsewhere, the defendant, WILLIAM J. JEFFERSON, being a "domestic concern" and an "agent" of domestic concerns, as those terms are defined in the Foreign Corrupt Practices Act, willfully did use and cause to be used the mails and means and instrumentalities of interstate commerce corruptly in furtherance of an offer, payment, promise to pay, and authorization of the payment of any money, and offer, gift, promise to give, and authorization of the giving of anything of value, namely, an up-front monetary payment, including an immediate payment of $100,000.00 in cash, and a later payment that would consist of a share of the Nigerian Joint Venture's future profits, to any foreign official, that is, Nigerian Government Official A, for purposes of:  (a) influencing acts and decisions of such foreign official in his official capacity; (b) inducing such foreign official to do and omit to do acts in violation of the lawful duty of such official; (c) securing any improper advantage; and (d) inducing such foreign official to use his influence with a foreign government and instrumentality thereof to affect and influence any act and decision of such government and instrumentality, in order to assist the Nigerian Joint Venture, its individual members, and their shareholders and others known and unknown to the grand jury, in assisting Defendant JEFFERSON and others in obtaining and

-55-

retaining business for and with, and directing business to, the Nigerian Joint Venture and its individual members, including:

        a.     On or about July 30, 2005, Defendant JEFFERSON drove his car with $100,000.00 in cash from Arlington, Virginia, within the Eastern District of Virginia, to Washington, D.C.; and

        b.     On or about July 30, 2005, Defendant JEFFERSON drove his car from Alexandria, Virginia, within the Eastern District of Virginia, to the Rayburn House Office Building in Washington, D.C., to prepare a package to be delivered to Nigerian Official A.

(All in violation of Title 15, United States Code, Sections 78dd-2(a), 78dd-2(g)(2)(A), and 78ff(a), and Title 18, United States Code, Section 2.)

## COUNTS 12-14
### Money Laundering

THE GRAND JURY FURTHER CHARGES THAT:

215.    Paragraphs 1 through 38 of this Indictment are re-alleged as if fully set forth herein.

216.    On or about the dates and in the amounts set forth below, the defendant, WILLIAM J. JEFFERSON, knowingly participated in the transfer of the proceeds of a specified unlawful activity, that is: bribery of a public official in violation of Title 18, United States Code, Section 201(b)(2)(A), from the Eastern District of Virginia to the Eastern District of Louisiana, and there and then did knowingly engage and cause another to engage in the following monetary transactions in criminally derived property that was of a value greater than $10,000.00 and was derived from said specified unlawful activity, and that affected interstate and foreign commerce:

| COUNT | DATE | AMOUNT | MONETARY TRANSACTION |
|-------|------|--------|----------------------|
| 12 | June 24, 2005 | $25,015.00 | Transfer of Check No. 1121 written from ANJ Account No. *****4467 at Dryades Savings Bank payable to Jefferson Committee, which was deposited on June 24, 2005 to Jefferson Committee Account No. ****7045 at Liberty Bank and Trust |
| 13 | June 27, 2005 | $25,000.00 | Wire transfer from ANJ Account No. *****4467 at Dryades Savings Bank to iGate Account No. ******9024 at Bank of America |
| 14 | July 26, 2005 | $25,000.00 | Transfer of Check No. 1122 written from ANJ Account No. *****4467 at Dryades Savings Bank made payable to Family Member 1, which was deposited on July 26, 2005, to Dryades Savings Bank Account No. ******3417, in the name of Defendant JEFFERSON and Family Member 1 |

(All in violation of Title 18, United States Code, Sections 1957 and 2.)

## COUNT 15
### Obstruction of Justice

THE GRAND JURY FURTHER CHARGES THAT:

217.     Paragraphs 1 through 38 of this Indictment are re-alleged as if fully set forth herein.

218.     On or about August 3, 2005, in New Orleans, Louisiana, the defendant, WILLIAM J. JEFFERSON, knowingly and corruptly concealed a record, document, and other object, and attempted to do so, with intent to impair the object's integrity and availability for use in official proceedings, namely, an investigation being conducted by the Federal Bureau of Investigation in the Eastern District of Virginia and elsewhere and the present criminal prosecution through this Indictment and court proceeding, that is, Defendant JEFFERSON, among other things, attempted to conceal from law enforcement agents, during a court approved search of Defendant JEFFERSON's New Orleans, Louisiana residence, an August 3, 2005, facsimile with attached documents addressed to Defendant JEFFERSON, seeking his input prior to the purchase of telecommunication parts from Korean suppliers for use in telecommunications ventures in Nigeria, Ghana, and elsewhere.

(All in violation of Title 18, United States Code, Sections 1512(c)(1) and 2.)

-58-

## COUNT 16
### Racketeer Influenced Corrupt
### Organization, Pattern of Racketeering Activity (RICO)

THE GRAND JURY FURTHER CHARGES THAT:

## THE ENTERPRISE

219.    Paragraphs 1 through 38 of this Indictment are re-alleged as if fully set forth

herein.

220.    At all times relevant to this Indictment, the defendant, WILLIAM J. JEFFERSON,

supervised the operations of his congressional offices located in Washington, D.C., and in the 2nd

Congressional District of Louisiana.  In addition, Defendant JEFFERSON supervised and

directed the activities of the congressional staff members who worked in those offices.

Defendant JEFFERSON, together with those offices and individuals, constituted an enterprise as

defined in Title 18, United States Code, Section 1961(4), which enterprise was commonly known

as The Office of Congressman WILLIAM J. JEFFERSON.  This enterprise was engaged in, and

its activities affected, interstate and foreign commerce.

## THE RACKETEERING VIOLATION

221.    From in or about August 2000 through in or about August 2005, in the Eastern

District of Virginia and elsewhere, the defendant, WILLIAM J. JEFFERSON, being a person

employed by and associated with The Office of Congressman WILLIAM J. JEFFERSON, which

enterprise was engaged in, and the activities of which affected, interstate and foreign commerce,

did knowingly and unlawfully conduct and participate, directly and indirectly, in the conduct of

the affairs of the above enterprise through a pattern of racketeering activity, that is, through the

commission of Racketeering Acts One through Twelve as set forth below.

-59-

## MANNER AND MEANS OF THE RACKETEERING ACTIVITY

222.    From in or about August 2000 through in or about August 2005, Defendant
JEFFERSON participated in a pattern of criminal conduct that involved seeking and demanding
things of value on behalf of himself and various family members in return for Defendant
JEFFERSON's agreement to use his office, The Office of Congressman WILLIAM J.
JEFFERSON, to promote the business interests of various companies and businesspersons. The
official activities undertaken by Defendant JEFFERSON included, among other things, leading
official business delegations to Africa, conducting official meetings, corresponding with United
States and foreign government officials, and utilizing congressional staff members to otherwise
advance the endeavors of such companies and businesspersons. In addition, Defendant
JEFFERSON directed and caused to be directed monetary transactions in money derived from
certain of these schemes. Finally, Defendant JEFFERSON concealed his and his family's
financial interests in these business ventures by, among other things, using nominee companies,
employing misleading business agreements, and omitting material facts in public filings.

223.    The various business ventures that Defendant JEFFERSON promoted through
official acts in return for things of value and in violation of his fiduciary duty to the citizens of
the United States and the United States House of Representatives included:
(a) telecommunications deals in Nigeria, Ghana, and elsewhere; (b) oil concessions in Equatorial
Guinea; (c) satellite transmission contracts in Botswana, Equatorial Guinea, and the Republic of
Congo; (d) deep water offshore oil reserves in the territorial waters of Sao Tome and Principe;
(e) waste recycling systems in Nigeria and Equatorial Guinea; (f) development of different plants
and facilities in Nigeria; and (g) marginal oil fields in Nigeria.

-60-

## THE PATTERN OF RACKETEERING ACTIVITY

224.    The pattern of racketeering activity, as defined in Title 18, United States Code,

Sections 1961(1) and 1961(5), consisted of the following acts:

## RACKETEERING ACT 1

### Telecommunications Deals in Nigeria, Ghana, and
### Elsewhere:  Defendant JEFFERSON's Solicitation of Bribes from iGate

225.    With respect to Defendant JEFFERSON's solicitation of bribes from iGate in

return for Defendant JEFFERSON's official assistance to advance iGate's business in Nigeria,

Ghana, and elsewhere, Defendant JEFFERSON committed the following acts, any one of which

alone constitutes the commission of Racketeering Act 1.

### Racketeering Act 1(a):  Bribery of a Public Official

226.    From in or about January 2001 through in or about August 2005, within the

Eastern District of Virginia and elsewhere, the defendant, WILLIAM J. JEFFERSON, being a

public official, did, directly and indirectly, knowingly and corruptly demand, seek, receive,

accept, and agree to receive and accept anything of value personally and for any other person and

entity, in return for being influenced in the performance of any official acts, to wit:  Defendant

JEFFERSON did demand, seek, receive, accept, and agree to receive and accept things of value

from iGate for ANJ, a Jefferson family-controlled company, in the form of monthly payments of

money, shares of profits and revenue, and iGate stock, in return for Defendant JEFFERSON's

performance of official acts to advance iGate's business ventures in Nigeria, Ghana, and

elsewhere.  Such official acts included, among other things, official travel to Nigeria, Ghana, and

elsewhere, official meetings and correspondence with both United States and foreign government

officials, and the use of congressional staff members, all in violation of Title 18, United States
Code, Section 201(b)(2)(A).

### Racketeering Act 1(b):  Deprivation of Honest Services by Wire Fraud

227.    From in or about January 2001 through in or about August 2005, within the
Eastern District of Virginia and elsewhere, the defendant, WILLIAM J. JEFFERSON, did
knowingly devise a scheme and artifice to defraud and deprive the citizens of the United States
and the United States House of Representatives of their right to the honest services of Defendant
JEFFERSON, a Member of the United States House of Representatives, performed free from
deceit, fraud, concealment, bias, conflict of interest, self-enrichment, and self-dealing, by
corruptly demanding, seeking, receiving, accepting, and agreeing to receive and accept things of
value from iGate for ANJ, in the form of monthly payments, shares of profits and revenue, and
iGate stock in return for Defendant JEFFERSON's performance of official acts to advance
iGate's business ventures in Nigeria, Ghana, and elsewhere.  Such official acts included, among
other things, official travel to Nigeria, Ghana, and elsewhere, official meetings and
correspondence with both United States and foreign government officials, and the use of
congressional staff members.  Defendant JEFFERSON also concealed his and his family's
financial interests in this business venture.

228.    For the purpose of executing such scheme and artifice to defraud, Defendant
JEFFERSON did knowingly transmit and cause to be transmitted writings, signs, signals, and
sounds by means of a wire communication in interstate and foreign commerce, to wit:  a January
23, 2004, wire transfer of $200,000.00 from a bank account held by iGate in New Albany,

Indiana, to a bank account held by ANJ in New Orleans, Louisiana, all in violation of Title 18, United States Code, Sections 1343, 1346, and 2.

## RACKETEERING ACT 2

### Telecommunications Deal in Nigeria: Defendant JEFFERSON's Solicitation of Bribes from Nigerian Company A

229. With respect to Defendant JEFFERSON's solicitation of bribes from Nigerian Company A in return for Defendant JEFFERSON's official assistance to advance Nigerian Company A's telecommunications venture in Nigeria, Defendant JEFFERSON committed the following acts, any one of which alone constitutes the commission of Racketeering Act 2.

### Racketeering Act 2(a): Bribery of a Public Official

230. From in or about July 2003 through in or about May 2004, within the Eastern District of Virginia and elsewhere, the defendant, WILLIAM J. JEFFERSON, being a public official, did, directly and indirectly, knowingly and corruptly demand, seek, receive, accept, and agree to receive and accept anything of value personally and for any other person and entity, in return for being influenced in the performance of any official acts, to wit: Defendant JEFFERSON did demand, seek, receive, accept, and agree to receive and accept things of value from Nigerian Company A to be paid to Defendant JEFFERSON and his nominees, a percentage of revenue and stock, as well as fees estimated to be worth $1 million, from Nigerian Company A and iGate's telecommunications business venture in Nigeria, in return for Defendant JEFFERSON's performance of official acts to advance Nigerian Company A and iGate's business venture. Such official acts included, among other things, official travel to Nigeria, official meetings and correspondence with both United States and foreign government officials,

and the use of congressional staff members, all in violation of Title 18, United States Code,

Section 201(b)(2)(A).

### Racketeering Act 2(b): Deprivation of Honest Services by Wire Fraud

231. From in or about July 2003 through in or about May 2004, within the Eastern

District of Virginia and elsewhere, the defendant, WILLIAM J. JEFFERSON, did knowingly

devise a scheme and artifice to defraud and deprive the citizens of the United States and the

United States House of Representatives of their right to the honest services of Defendant

JEFFERSON, a Member of the United States House of Representatives, performed free from

deceit, fraud, concealment, bias, conflict of interest, self-enrichment, and self-dealing, by

corruptly demanding, seeking, receiving, accepting, and agreeing to receive and accept things of

value from Nigerian Company A to be paid to Defendant JEFFERSON and his nominees, a

percentage of revenue and stock, as well as fees estimated to be worth $1 million, from Nigerian

Company A and iGate's telecommunications business venture in Nigeria, in return for Defendant

JEFFERSON's performance of official acts to advance Nigerian Company A and iGate's

business venture in Nigeria. Such official acts included, among other things, official travel to

Nigeria, official meetings and correspondence with both United States and foreign government

officials, and the use of congressional staff members. Defendant JEFFERSON also concealed

his and his family's financial interests in this business venture.

232. For the purpose of executing such scheme and artifice to defraud, Defendant

JEFFERSON did knowingly transmit and cause to be transmitted writings, signs, signals, and

sounds by means of a wire communication in interstate and foreign commerce, to wit: a

February 2, 2004, e-mail from a congressional staff member at Defendant JEFFERSON's

-64-

congressional office in Washington, D.C., to an employee of the United States Embassy in

Abuja, Nigeria, seeking assistance in scheduling meetings for Defendant JEFFERSON with

United States and foreign government officials in advance of a February 2004 trip to Nigeria, all

in violation of Title 18, United States Code, Sections 1343, 1346, and 2.

### RACKETEERING ACT 3

#### Telecommunications Deals in Nigeria, Ghana, and Elsewhere: Defendant JEFFERSON's Solicitation of Bribes from CW

233.    With respect to Defendant JEFFERSON's solicitation of bribes from CW in

return for Defendant JEFFERSON's official assistance to advance telecommunications deals in

Nigeria, Ghana, and elsewhere, Defendant JEFFERSON committed the following acts, any one

of which alone constitutes the commission of Racketeering Act 3.

#### Racketeering Act 3(a): Bribery of a Public Official

234.    From in or about June 2004 through in or about August 2005, within the Eastern

District of Virginia and elsewhere, the defendant, WILLIAM J. JEFFERSON, being a public

official, did, directly and indirectly, knowingly and corruptly demand, seek, receive, accept, and

agree to receive and accept anything of value personally and for any other person and entity, in

return for being influenced in the performance of any official acts, to wit:  Defendant

JEFFERSON did demand, seek, receive, accept, and agree to receive and accept things of value

from CW and CW's companies, W2-IBBS and IBBS, including:

        a.     1.5 million shares of W2-IBBS stock to Global, representing 30% ownership of W2-IBBS;

        b.     1.5 million shares of IBBS stock to Global, representing 30% ownership

of IBBS;

    c.    a payment of over $7 million from CW to Multi-Media to be used to fund the start-up costs of the Ghanaian and Nigerian telecommunications projects as well as to pay the first-year operating costs of Multi-Media; and

    d.    a payment of $1 million to Global for "other project costs," including bribes to Nigerian Official A,

all in return for Defendant JEFFERSON's performance of official acts to advance iGate's and CW's business ventures in Nigeria, Ghana, and elsewhere. Such official acts included official travel to Nigeria and Ghana, official meetings and correspondence with both United States and foreign government officials, and the use of congressional staff members, all in violation of Title 18, United States Code, Section 201(b)(2)(A).

### Racketeering Act 3(b): Deprivation of Honest Services by Wire Fraud

235.    From in or about June 2004 through in or about August 2005, within the Eastern District of Virginia and elsewhere, the defendant, WILLIAM J. JEFFERSON, did knowingly devise a scheme and artifice to defraud and deprive the citizens of the United States and the United States House of Representatives of their right to the honest services of Defendant JEFFERSON, a Member of the United States House of Representatives, performed free from deceit, fraud, concealment, bias, conflict of interest, self-enrichment, and self-dealing, by corruptly demanding, seeking, receiving, accepting, and agreeing to receive and accept things of value from CW and CW's companies, W2-IBBS and IBBS, including:

    a.    1.5 million shares of W2-IBBS stock to Global, representing 30% ownership of W2-IBBS;

      b.     1.5 million shares of IBBS stock to Global, representing 30% ownership of IBBS;

      c.     a payment of over $7 million from CW to Multi-Media, to be used to fund the start-up costs of the Ghanaian and Nigerian telecommunications projects as well as to pay the first-year operating costs of Multi-Media; and

      d.     a payment of $1 million to Global for "other project costs," including bribes to Nigerian Official A,

all in return for Defendant JEFFERSON's performance of official acts to advance iGate's and CW's business ventures in Nigeria, Ghana, and elsewhere. Such official acts included official travel to Nigeria and Ghana, official meetings and correspondence with both United States and foreign government officials, and the use of congressional staff members. Defendant JEFFERSON also concealed his and his family's financial interests in these business ventures.

     236.    For the purpose of executing such scheme and artifice to defraud, Defendant JEFFERSON did knowingly transmit and cause to be transmitted writings, signs, signals, and sounds by means of a wire communication in interstate and foreign commerce, to wit: a June 28, 2005, facsimile from Defendant JEFFERSON in Washington, D.C., to CW in McLean, Virginia, within the Eastern District of Virginia, attaching various documents, including a letter on congressional letterhead to Nigerian Official A promoting the Nigerian Joint Venture, all in violation of Title 18, United States Code, Sections 1343, 1346, and 2.

## RACKETEERING ACT 4

### Oil Concessions in Equatorial Guinea:  Defendant
### JEFFERSON's Solicitation of Bribes from Businessperson A

237.    With respect to Defendant JEFFERSON's solicitation of bribes from

Businessperson A and International Petroleum in return for Defendant JEFFERSON's official

assistance in obtaining oil concessions from the government of Equatorial Guinea, Defendant

JEFFERSON committed the following acts, any one of which alone constitutes the commission

of Racketeering Act 4.

### Racketeering Act 4(a):  Bribery of a Public Official

238.    From in or about May 2002 through in or about Fall 2002, within the District of

Columbia and elsewhere, the defendant, WILLIAM J. JEFFERSON, being a public official, did,

directly and indirectly, knowingly and corruptly demand, seek, receive, accept, and agree to

receive and accept anything of value personally and for any other person and entity, in return for

being influenced in the performance of any official acts, to wit:  Defendant JEFFERSON did

demand, seek, receive, accept, and agree to receive and accept things of value from

Businessperson A and International Petroleum (a company that Defendant JEFFERSON caused

to be formed and intended to transfer to Businessperson A in furtherance of the scheme) in the

form of stock and legal services contracts to be granted by International Petroleum to a Jefferson

family member, all in return for Defendant JEFFERSON's performance of official acts to

advance Businessperson A and International Petroleum's efforts to obtain oil concessions from

the government of Equatorial Guinea.  Such official acts included official travel to Equatorial

Guinea, official meetings with a high-ranking government official of Equatorial Guinea to assist

in obtaining oil concessions there, and the use of congressional staff members, all in violation of

Title 18, United States Code, Section 201(b)(2)(A).

### Racketeering Act 4(b):  Deprivation of Honest Services by Wire Fraud

239.  From in or about May 2002 through in or about Fall 2002, within the District of

Columbia and elsewhere, the defendant, WILLIAM J. JEFFERSON, did knowingly devise a

scheme and artifice to defraud and deprive the citizens of the United States and the United States

House of Representatives of their right to the honest services of Defendant JEFFERSON, a

Member of the United States House of Representatives, performed free from deceit, fraud,

concealment, bias, conflict of interest, self-enrichment, and self-dealing, by corruptly demanding,

seeking, receiving, accepting, and agreeing to receive and accept things of value from

Businessperson A and International Petroleum (a company that Defendant JEFFERSON caused

to be formed and intended to transfer to Businessperson A in furtherance of the scheme) in the

form of stock and legal services contracts to be granted by International Petroleum to a Jefferson

family member, all in return for Defendant JEFFERSON's performance of official acts to

advance Businessperson A and International Petroleum's efforts to obtain oil concessions from

the government of Equatorial Guinea.  Such official acts included official travel to Equatorial

Guinea, official meetings with a high-ranking government official of Equatorial Guinea, and the

use of congressional staff members.  Defendant JEFFERSON also concealed his and his family's

financial interests in this business venture.

240.  For the purpose of executing such scheme and artifice to defraud, Defendant

JEFFERSON did knowingly transmit and cause to be transmitted writings, signs, signals, and

sounds by means of a wire communication in interstate and foreign commerce, to wit:  a May 23,

2002, e-mail from an employee of Company A in Washington, D.C., to a leasing company in

Kansas City, Missouri, for the purpose of securing air transportation between various west

African nations, including Equatorial Guinea, for Businessperson A and Defendant

JEFFERSON, among others, all in violation of Title 18, United States Code, Sections 1343,

1346, and 2.

## RACKETEERING ACT 5

### Satellite Transmission Contracts in Botswana,
### Equatorial Guinea, and the Republic of Congo:
### Defendant JEFFERSON's Solicitation of Bribes from Company A

241.    With respect to Defendant JEFFERSON's solicitation of bribes from Company A

in return for Defendant JEFFERSON's official assistance to advance Company A's efforts to

obtain satellite transmission contracts in Botswana, Equatorial Guinea, and the Republic of

Congo, Defendant JEFFERSON committed the following acts, any one of which alone

constitutes the commission of Racketeering Act 5.

### Racketeering Act 5(a):  Bribery of a Public Official

242.    From in or about May 2002 through in or about Fall 2002, within the District of

Columbia and elsewhere, the defendant, WILLIAM J. JEFFERSON, being a public official, did,

directly and indirectly, knowingly and corruptly demand, seek, receive, accept, and agree to

receive and accept anything of value personally and for any other person and entity, in return for

being influenced in the performance of any official acts, to wit:  Defendant JEFFERSON did

demand, seek, receive, accept, and agree to receive and accept things of value from Company A

in the form of a share of Company A's gross revenue from satellite transmission contracts it

sought in Botswana, Equatorial Guinea, and the Republic of Congo, to be paid to ANJ, a

-70-

Jefferson family-controlled company, all in return for Defendant JEFFERSON's performance of official acts to advance Company A's efforts to obtain such satellite transmission contracts. These official acts included official travel to Botswana, Equatorial Guinea, and the Republic of Congo for meetings with government officials in those countries, correspondence with United States and foreign government officials, and the use of congressional staff members, all in violation of Title 18, United States Code, Section 201(b)(2)(A).

### Racketeering Act 5(b): Deprivation of Honest Services by Wire Fraud

243.     From in or about May 2002 through in or about Fall 2002, within the District of Columbia and elsewhere, the defendant, WILLIAM J. JEFFERSON, did knowingly devise a scheme and artifice to defraud and deprive the citizens of the United States and the United States House of Representatives of their right to the honest services of Defendant JEFFERSON, a Member of the United States House of Representatives, performed free from deceit, fraud, concealment, bias, conflict of interest, self-enrichment, and self-dealing, by corruptly demanding, seeking, receiving, accepting, and agreeing to receive and accept things of value from Company A in the form of a share of Company A's gross revenue from satellite transmission contracts it sought in Botswana, Equatorial Guinea, and the Republic of Congo, to be paid to ANJ, a Jefferson family-controlled company, all in return for Defendant JEFFERSON's performance of official acts to advance Company A's efforts to obtain such satellite transmission contracts. These official acts included official travel to Botswana, Equatorial Guinea, and the Republic of Congo for meetings with government officials in those countries, correspondence with United States and foreign government officials, and the use of congressional staff members. Defendant JEFFERSON also concealed his and his family's financial interests in this business venture.

-71-

244.    For the purpose of executing such scheme and artifice to defraud, Defendant

JEFFERSON did knowingly transmit and cause to be transmitted writings, signs, signals, and

sounds by means of a wire communication in interstate and foreign commerce, to wit:  a July 7,

2002, telephone call from Defendant JEFFERSON in Washington, D.C., to Businessperson A in

Maryland requesting Businessperson A to travel from Maryland to meet with Defendant

JEFFERSON and Family Member 1 at Defendant JEFFERSON's Washington, D.C., residence to

discuss a proposed contract between ANJ and Company A, all in violation of Title 18, United

States Code, Sections 1343, 1346, and 2.

## RACKETEERING ACT 6

### Offshore Oil Rights in Sao Tome and Principe:  Defendant
### JEFFERSON's Solicitation of Bribes from Businessperson BC and Company B

245.    With respect to Defendant JEFFERSON's solicitation of bribes from

Businessperson BC and Company B in return for Defendant JEFFERSON's official assistance to

advance Company B's efforts to obtain offshore oil rights in Sao Tome and Principe, Defendant

JEFFERSON committed the following acts, any one of which alone constitutes the commission

of Racketeering Act 6.

### Racketeering Act 6(a):  Bribery of a Public Official

246.    From in or about late 2001 through in or about Fall 2002, within the Eastern

District of Louisiana and elsewhere, the defendant, WILLIAM J. JEFFERSON, being a public

official, did, directly and indirectly, knowingly and corruptly demand, seek, receive, accept, and

agree to receive and accept anything of value personally and for any other person and entity, in

return for being influenced in the performance of any official acts, to wit:  Defendant

-72-

JEFFERSON did demand, seek, receive, accept, and agree to receive and accept things of value from Company B for Family Member 2, through PIPCO, in the form of a share of any settlement obtained as a result of and in return for intervening with a high-ranking official in the government of Sao Tome and Principe concerning a dispute between Company B and another company over oil drilling rights in the territorial waters of that country. Such official acts included meetings with a high-ranking government official of Sao Tome and Principe and the use of congressional staff members, all in violation of Title 18, United States Code, Section 201(b)(2)(A).

**Racketeering Act 6(b): Deprivation of Honest Services by Wire Fraud**

247. From in or about late 2001 through in or about Fall 2002, within the Eastern District of Louisiana and elsewhere, the defendant, WILLIAM J. JEFFERSON, did knowingly devise a scheme and artifice to defraud and deprive the citizens of the United States and the United States House of Representatives of their right to the honest services of Defendant JEFFERSON, a Member of the United States House of Representatives, performed free from deceit, fraud, concealment, bias, conflict of interest, self-enrichment, and self-dealing, by corruptly demanding, seeking, receiving, accepting, and agreeing to receive and accept things of value from Company B for Family Member 2, through PIPCO, in the form of a share of any settlement obtained as a result of and in return for Defendant JEFFERSON's performance of official acts which included intervening with a high-ranking official in the government of Sao Tome and Principe concerning a dispute between Company B and another company over oil drilling rights in the territorial waters of that country. Such official acts included meetings with a high-ranking government official of Sao Tome and Principe and the use of congressional staff

-73-

members. Defendant JEFFERSON also concealed his and his family's financial interests in the settlement of this dispute.

248.     For the purpose of executing such scheme and artifice to defraud, Defendant JEFFERSON did knowingly transmit and cause to be transmitted writings, signs, signals, and sounds by means of a wire communication in interstate and foreign commerce, to wit:  a January 11, 2002, e-mail from Businessperson BC in Florida to Lobbyist A in Louisiana discussing, among other things, the share of oil rights that Family Member 2 would receive in the event Defendant JEFFERSON was able to resolve the dispute over those oil exploration rights, all in violation of Title 18, United States Code, Sections 1343, 1346, and 2.

### RACKETEERING ACT 7

### Promotion and Sale of Waste Recycling Systems in Nigeria and Equatorial Guinea: Defendant JEFFERSON's Solicitation of Bribes from Company C

249.     With respect to Defendant JEFFERSON's solicitation of bribes from Company C in return for Defendant JEFFERSON's official assistance to advance Company C's efforts to promote and sell its waste recycling systems, Defendant JEFFERSON committed the following acts, any one of which alone constitutes the commission of Racketeering Act 7.

### Racketeering Act 7(a):  Bribery of a Public Official

250.     From in or about early 2003 through in or about January 2005, within the Eastern District of Louisiana and elsewhere, the defendant, WILLIAM J. JEFFERSON, being a public official, did, directly and indirectly, knowingly and corruptly demand, seek, receive, accept, and agree to receive and accept anything of value personally and for any other person and entity, in return for being influenced in the performance of any official acts, to wit:  Defendant

-74-

JEFFERSON did demand, seek, receive, accept, and agree to receive and accept things of value

from Company C to be paid to various family members through different Jefferson family-

controlled companies, in the form of commissions on the sale of Company C's waste recycling

systems to foreign governments and a share of the revenues from the operation of such systems,

all in return for Defendant JEFFERSON's performance of official acts to advance Company C's

sales to those foreign governments. Such official acts included official travel to Nigeria and

Equatorial Guinea, official meetings and correspondence with United States and foreign

government officials, and the use of congressional staff members, all in violation of Title 18,

United States Code, Section 201(b)(2)(A).

## Racketeering Act 7(b): Deprivation of Honest Services by Wire Fraud

251.    From in or about early 2003 through in or about January 2005, within the Eastern

District of Louisiana and elsewhere, the defendant, WILLIAM J. JEFFERSON, did knowingly

devise a scheme and artifice to defraud and deprive the citizens of the United States and the

United States House of Representatives of their right to the honest services of Defendant

JEFFERSON, a Member of the United States House of Representatives, performed free from

deceit, fraud, concealment, bias, conflict of interest, self-enrichment, and self-dealing, by

corruptly demanding, seeking, receiving, accepting, and agreeing to receive and accept things of

value from Company C to be paid to various family members through different Jefferson family-

controlled companies, in the form of commissions on the sale of Company C's waste recycling

systems to foreign governments and a share of the revenues from the operation of such systems,

all in return for Defendant JEFFERSON's performance of official acts to advance Company C's

sales to those foreign governments. Such official acts included official travel to Nigeria and

-75-

Equatorial Guinea, official meetings and correspondence with United States and foreign government officials, and the use of congressional staff members. Defendant JEFFERSON also concealed his and his family's financial interests in supporting this business venture.

252.    For the purpose of executing such scheme and artifice to defraud, Defendant JEFFERSON did knowingly transmit and cause to be transmitted writings, signs, signals, and sounds by means of a wire communication in interstate and foreign commerce, to wit: a February 19, 2003, facsimile from Businessperson BC in Florida to Lobbyist A, who was traveling with Defendant JEFFERSON in Abuja, Nigeria. Attached to the facsimile was a re-drafted consulting agreement, pursuant to Defendant JEFFERSON's request, for the benefit of Family Member 2, all in violation of Title 18, United States Code, Sections 1343, 1346, and 2.

## RACKETEERING ACT 8

### Development of Sugar Plant in Jigawa State, Nigeria:
### Defendant JEFFERSON's Solicitation of Bribes from Companies D and E

253.    With respect to Defendant JEFFERSON's solicitation of bribes from Companies D and E in return for Defendant JEFFERSON's official assistance to advance Company D and E's efforts to obtain a contract to build a sugar plant in Jigawa State, Nigeria, Defendant JEFFERSON committed the following acts, any one of which alone constitutes the commission of Racketeering Act 8.

### Racketeering Act 8(a):  Bribery of a Public Official

254.    From in or about August 2000 through in or about December 2004, within the Middle District of Louisiana and elsewhere, the defendant, WILLIAM J. JEFFERSON, being a public official, did, directly and indirectly, knowingly and corruptly demand, seek, receive,

-76-

accept, and agree to receive and accept anything of value personally and for any other person and entity, in return for being influenced in the performance of any official acts, to wit: Defendant JEFFERSON did demand, seek, receive, accept, and agree to receive and accept things of value from Companies D and E to be paid to Family Member 2 through Providence Lake, in the form of a percentage share of the contract price established for Companies D and E to perform a feasibility study and possible future construction of a sugar plant in Jigawa State, Nigeria, in return for Defendant JEFFERSON's performance of official acts to advance the business ventures of Companies D and E in Jigawa State, Nigeria. Such official acts included official travel to Nigeria, official correspondence and meetings with United States and Nigerian government officials, and the use of congressional staff members, all in violation of Title 18, United States Code, Section 201(b)(2)(A).

### Racketeering Act 8(b): Deprivation of Honest Services by Wire Fraud

255.    From in or about August 2000 through in or about December 2004, within the Middle District of Louisiana and elsewhere, the defendant, WILLIAM J. JEFFERSON, did knowingly devise a scheme and artifice to defraud and deprive the citizens of the United States and the United States House of Representatives of their right to the honest services of Defendant JEFFERSON, a Member of the United States House of Representatives, performed free from deceit, fraud, concealment, bias, conflict of interest, self-enrichment, and self-dealing, by corruptly demanding, seeking, receiving, accepting, and agreeing to receive and accept things of value from Companies D and E to be paid to Family Member 2 through Providence Lake, in the form of a percentage share of the contract price established for Companies D and E to perform a feasibility study and possible future construction of a sugar plant in Jigawa State, Nigeria, in

-77-

return for Defendant JEFFERSON's performance of official acts to advance the business ventures of Companies D and E in Jigawa State, Nigeria. Such official acts included official travel to Nigeria, official correspondence and meetings with United States and Nigerian government officials, and the use of congressional staff members. Defendant JEFFERSON also concealed his and his family's financial interests in this business venture.

256.    For the purpose of executing such scheme and artifice to defraud, Defendant JEFFERSON did knowingly transmit and cause to be transmitted writings, signs, signals, and sounds by means of a wire communication in interstate and foreign commerce, to wit: a March 6, 2001, e-mail from a congressional staff member in the Washington, D.C., congressional office of Defendant JEFFERSON to an employee of Company E in Louisiana discussing the Ex-Im Bank in relation to the proposed sugar plant project in Jigawa State, Nigeria, all in violation of Title 18, United States Code, Sections 1343, 1346, and 2.

## RACKETEERING ACT 9

### Development of Various Facilities in Kaduna State, Nigeria:
### Defendant JEFFERSON's Solicitation of Bribes from Companies D and E

257.    With respect to Defendant JEFFERSON's solicitation of bribes from Companies D and E in return for Defendant JEFFERSON's official assistance to advance Company D and E's efforts to obtain contracts to develop various food processing facilities in Kaduna State, Nigeria, Defendant JEFFERSON committed the following acts, any one of which alone constitutes the commission of Racketeering Act 9.

### Racketeering Act 9(a): Bribery of a Public Official

258.     From in or about August 2001 through in or about January 2002, within the
Middle District of Louisiana and elsewhere, the defendant, WILLIAM J. JEFFERSON, being a
public official, did, directly and indirectly, knowingly and corruptly demand, seek, receive,
accept, and agree to receive and accept anything of value personally and for any other person and
entity, in return for being influenced in the performance of any official acts, to wit: Defendant
JEFFERSON did demand, seek, receive, accept, and agree to receive and accept things of value
from Companies D and E to be paid to Family Member 2 through Providence Lake, in the form
of a percentage share of any contract price established for Companies D and E to obtain contracts
to develop various food processing facilities in Kaduna State, Nigeria, all in return for Defendant
JEFFERSON's performance of official acts to advance the business ventures of Companies D
and E in Kaduna State, Nigeria. Such official acts included official travel to Nigeria, official
correspondence and meetings with United States and Nigerian government officials, and the use
of congressional staff members, all in violation of Title 18, United States Code, Section
201(b)(2)(A).

### Racketeering Act 9(b): Deprivation of Honest Services by Mail Fraud

259.     From in or about August 2001 through in or about January 2002, within the
Middle District of Louisiana and elsewhere, the defendant, WILLIAM J. JEFFERSON, did
knowingly deprive the citizens of the United States and the United States House of
Representatives of their right to the honest services of Defendant JEFFERSON, a Member of the
United States House of Representatives, performed free from deceit, fraud, concealment, bias,
conflict of interest, self-enrichment, and self-dealing, by corruptly demanding, seeking, receiving,

accepting, and agreeing to receive and accept things of value from Companies D and E to be paid

to Family Member 2 through Providence Lake, in the form of a percentage share of any contract

price established for Companies D and E to develop various food processing facilities in Kaduna

State, Nigeria. Such official acts included official travel to Nigeria, official correspondence and

meetings with United States and Nigerian government officials, and the use of congressional

staff members. Defendant JEFFERSON also concealed his and his family's financial interests in

this business venture.

260.    For the purpose of executing such scheme and artifice to defraud and attempting

so to do, Defendant JEFFERSON did knowingly and intentionally cause any matter or thing to be

sent and delivered by the United States Postal Service and any private and commercial interstate

carrier, to wit: an August 30, 2001, letter sent from Company E in Baton Rouge, Louisiana, to

Family Member 2 through Providence Lake, in New Orleans, Louisiana, enclosing a signed copy

of an August 27, 2001, consulting agreement providing that Providence Lake be paid a

percentage share of any contract price obtained by Companies D and E to develop various food

processing facilities in Kaduna State, Nigeria, all in violation of Title 18, United States Code,

Sections 1341, 1346, and 2.

### RACKETEERING ACT 10

#### Marginal Oil Fields in Akwa Ibom State, Nigeria:
#### Defendant JEFFERSON's Solicitation of Bribes from Company F

261.    With respect to Defendant JEFFERSON's solicitation of bribes from Company F

in return for Defendant JEFFERSON's official assistance to advance Company F's efforts to

obtain rights to develop marginal oil fields in Akwa Ibom State, Nigeria, Defendant

-80-

JEFFERSON committed the following acts, any one of which alone constitutes the commission of Racketeering Act 10.

### Racketeering Act 10(a): Bribery of a Public Official

262.    In or about August 2001, within the Middle District of Louisiana and elsewhere, the defendant, WILLIAM J. JEFFERSON, being a public official, did, directly and indirectly, knowingly and corruptly demand, seek, receive, accept, and agree to receive and accept anything of value personally and for any other person and entity, in return for being influenced in the performance of any official acts, to wit:  Defendant JEFFERSON did demand, seek, receive, accept, and agree to receive and accept things of value from Company F to be paid to Family Member 2 through BEP in the form of fees and a percentage share of any revenue received by Company F as a result of its development of marginal oil fields in Akwa Ibom State, Nigeria, all in return for Defendant JEFFERSON's performance of official acts to advance Company F's efforts to obtain the rights to develop such marginal oil fields.  Such official acts included official travel to Nigeria, official correspondence and meetings with United States and foreign government officials, and the use of congressional staff members, all in violation of Title 18, United States Code, Section 201(b)(2)(A).

### Racketeering Act 10(b):  Deprivation of Honest Services by Wire Fraud

263.    In or about August 2001, within the Middle District of Louisiana and elsewhere, the defendant, WILLIAM J. JEFFERSON, did knowingly devise a scheme and artifice to defraud and deprive the citizens of the United States and the United States House of Representatives of their right to the honest services of Defendant JEFFERSON, a Member of the United States House of Representatives, performed free from deceit, fraud, concealment, bias, conflict of

interest, self-enrichment, and self-dealing, by corruptly demanding, seeking, receiving, accepting, and agreeing to receive and accept things of value from Company F to be paid to Family Member 2 through BEP in the form of fees and a percentage share of any revenue received by Company F as a result of its development of marginal oil fields in Akwa Ibom State, Nigeria, all in return for Defendant JEFFERSON's performance of official acts to advance Company F's efforts to obtain the rights to develop such marginal oil fields. Such official acts included official travel to Nigeria, official meetings and correspondence with United States and foreign government officials, and the use of congressional staff members. Defendant JEFFERSON also concealed his and his family's financial interests in this business venture.

264.     For the purpose of executing such scheme and artifice to defraud, Defendant JEFFERSON did knowingly transmit and cause to be transmitted writings, signs, signals, and sounds by means of a wire communication in interstate and foreign commerce, to wit:  a facsimile sent on or about August 31, 2001, from Businessperson DEF in Abuja, Nigeria, to an employee of Company F in Baton Rouge, Louisiana, for further transmittal to Family Member 2, all in violation of Title 18, United States Code, Sections 1343, 1346, and 2.

### RACKETEERING ACT 11

### Marginal Oil Fields, a Fertilizer Plant, and Other Projects in Nigeria: Defendant JEFFERSON's Solicitation of Bribes from Company G

265.     With respect to Defendant JEFFERSON's solicitation of bribes from Company G in return for Defendant JEFFERSON's official assistance to advance Company G's interests in developing marginal oil fields, a fertilizer plant, and other projects in Nigeria, Defendant

JEFFERSON committed the following acts, any one of which alone constitutes the commission of Racketeering Act 11.

## Racketeering Act 11(a):  Bribery of a Public Official

266.    From in or about September 2001 through in or about March 2005, within the Eastern District of Virginia and elsewhere, the defendant, WILLIAM J. JEFFERSON, being a public official, did, directly and indirectly, knowingly and corruptly demand, seek, receive, accept, and agree to receive and accept anything of value personally and for any other person and entity, in return for being influenced in the performance of any official acts, to wit:  Defendant JEFFERSON did demand, seek, receive, accept, and agree to receive and accept things of value from Company G to be paid to Family Member 2 through BEP in the form of a percentage share of any revenue received by Company G from its development of marginal oil fields, a fertilizer plant, and other miscellaneous projects in Nigeria, all in return for Defendant JEFFERSON's performance of official acts to advance Company G's business interests in developing marginal oil fields, a fertilizer plant, and other miscellaneous projects in Nigeria.  Such official acts included official travel to Nigeria, official meetings and correspondence with United States and foreign government officials, and the use of congressional staff members, all in violation of Title 18, United States Code, Section 201(b)(2)(A).

## Racketeering Act 11(b):  Deprivation of Honest Services by Wire Fraud

267.    From in or about September 2001 through in or about March 2005, within the Eastern District of Virginia and elsewhere, the defendant, WILLIAM J. JEFFERSON, did knowingly devise a scheme and artifice to defraud and deprive the citizens of the United States and the United States House of Representatives of their right to the honest services of Defendant

JEFFERSON, a Member of the United States House of Representatives, performed free from deceit, fraud, concealment, bias, conflict of interest, self-enrichment, and self-dealing, by corruptly demanding, seeking, receiving, accepting, and agreeing to receive and accept things of value from Company G to be paid to Family Member 2 through BEP in the form of a percentage share of any revenue received by Company G from its development of marginal oil fields, a fertilizer plant, and other miscellaneous projects in Nigeria, all in return for Defendant JEFFERSON's performance of official acts to advance Company G's business interests in developing these projects in Nigeria. Such official acts included official travel to Nigeria, official meetings and correspondence with United States and foreign government officials, and the use of congressional staff members. Defendant JEFFERSON also concealed his and his family's financial interests in these business ventures.

268.    For the purpose of executing such scheme and artifice to defraud, Defendant JEFFERSON did knowingly transmit and cause to be transmitted writings, signs, signals, and sounds by means of a wire communication in interstate and foreign commerce, to wit: an August 5, 2002, facsimile sent from a congressional staff member at the Washington, D.C., congressional office of Defendant JEFFERSON to an employee of the USTDA in Arlington, Virginia, within the Eastern District of Virginia, attaching a letter from a high-ranking Nigerian government official pledging support for the proposed development of a fertilizer plant by Company G, all in violation of Title 18, United States Code, Sections 1343, 1346, and 2.

## RACKETEERING ACT 12

### Monetary Transactions in Amounts over $10,000.00 from Bribe Schemes:
### Defendant JEFFERSON and Family Members Further Distributed the Bribe Money

269.　With respect to Defendant JEFFERSON engaging in or causing monetary

transactions in money derived from bribe schemes in amounts greater than $10,000.00,

Defendant JEFFERSON committed the following acts, any one of which alone constitutes the

commission of Racketeering Act 12.

270.　From in or about January 2001 through in or about August 2005, within the

Eastern District of Louisiana and elsewhere, the defendant, WILLIAM J. JEFFERSON, did

knowingly engage in and cause another to engage in the following monetary transactions,

affecting interstate commerce, in criminally derived property that was of a value greater than

$10,000.00, which was derived from specified unlawful activity, that is, bribery of a public

official in violation of Title 18, United States Code, Section 201(b)(2)(A), all in violation of Title

18, United States Code, Sections 2 and 1957:

| ACT | DATE | AMOUNT | MONETARY TRANSACTION |
|---|---|---|---|
| 12a | January 23, 2004 | $25,000.00 | Transfer of Check No. 1063 written from ANJ Account No. *****4467 at Dryades Savings Bank in New Orleans, Louisiana, payable to Family Member 3, which was deposited on or about January 26, 2004 to Dryades Savings Bank Account No. ******9229 in New Orleans, Louisiana, in the names of Family Members 3 and 4 |

-85-

| ACT | DATE | AMOUNT | MONETARY TRANSACTION |
|-----|------|--------|----------------------|
| 12b | January 23, 2004 | $30,000.00 | Transfer of Check No. 1064 written from ANJ Account No. *****4467 at Dryades Savings Bank in New Orleans, Louisiana, payable to Family Member 1, which was deposited on or about January 26, 2004 to Dryades Savings Bank Account No. ******3417 in New Orleans, Louisiana, in the names of Defendant JEFFERSON and Family Member 1 |
| 12c | January 23, 2004 | $15,000.00 | Transfer of Check No. 1065 written from ANJ Account No. *****4467 at Dryades Savings Bank in New Orleans, Louisiana, payable to a family member, which was deposited on or about January 26, 2004 to Hibernia National Bank Account No. ******5259 in New Orleans, Louisiana, in the names of Family Member 5 and another family member |
| 12d | May 16, 2004 | $23,645.78 | Transfer of Check No. 1095 written from ANJ Account No. *****4467 at Dryades Savings Bank in New Orleans, Louisiana, payable to a family member, which was deposited on or about May 17, 2004 to Hibernia National Bank Account No. ******5479 in New Orleans, Louisiana, in the name of that family member |
| 12e | August 18, 2004 | $14,000.00 | Transfer of Check No. 1110 written from ANJ Account No. *****4467 at Dryades Savings Bank in New Orleans, Louisiana, payable to Family Member 1, which was deposited on or about August 18, 2004 to Dryades Savings Bank Account No. ******3417 in New Orleans, Louisiana, in the names of Defendant JEFFERSON and Family Member 1 |

| ACT | DATE | AMOUNT | MONETARY TRANSACTION |
|---|---|---|---|
| 12f | Sept. 24, 2004 | $15,000.00 | Transfer of Check No. 1111 written from ANJ Account No. *****4467 at Dryades Savings Bank in New Orleans, Louisiana, payable to Family Member 1, which was deposited on or about September 24, 2004 to Dryades Savings Bank Account No. ******3417 in New Orleans, Louisiana, in the names of Defendant JEFFERSON and Family Member 1 |
| 12g | June 24, 2005 | $25,015.00 | Transfer of Check No. 1121 written from ANJ Account No. *****4467 at Dryades Savings Bank in New Orleans, Louisiana, payable to Jefferson Committee, which was deposited on or about June 24, 2005 to Jefferson Committee Account No. ****7045 at Liberty Bank and Trust in New Orleans, Louisiana |
| 12h | June 27, 2005 | $25,000.00 | Wire transfer from ANJ Account No. *****4467 at Dryades Savings Bank in New Orleans, Louisiana, to Bank of America Account No. ******9024 held by iGate in Closter, New Jersey |
| 12i | July 26, 2005 | $25,000.00 | Transfer of Check No. 1122 written from ANJ Account No. *****4467 at Dryades Savings Bank in New Orleans, Louisiana, made payable to Family Member 1, which was deposited on or about July 26, 2005, to Dryades Savings Bank Account No. ******3417 in New Orleans, Louisiana, in the names of Defendant JEFFERSON and Family Member 1 |

(All in violation of Title 18, United States Code, Sections 1962(c).)

## NOTICE OF FORFEITURE - BRIBERY, WIRE FRAUD, FCPA OFFENSES

271.    The allegations contained in Counts 1 through 11 of this Indictment are hereby repeated, re-alleged, and incorporated by reference herein as though fully set forth at length for the purpose of alleging forfeiture pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c).

272.    Pursuant to Rule 32.2(a), the defendant, WILLIAM J. JEFFERSON, is hereby notified that, upon conviction of a violation of Title 18, United States Code, Section 201, as alleged in Counts 3-4, or of a violation of Title 18, United States Code, Section 1343, as alleged in Counts 5-10, or of a conspiracy to commit the same as alleged in Counts 1 and 2, or of a violation of Title 15, United States Code, Section 78dd-2, as alleged in Count 11, the defendant shall forfeit to the United States pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), any property, real or personal, constituting or derived from proceeds traceable to the violation, including:

      a.    all funds on deposit in Dryades Savings Bank account number *****4467 in the name of The ANJ Group, L.L.C. up to and including a sum of money equal to at least $456,800.00 in United States Currency;

      b.    all funds on deposit in Liberty Bank, account number ****0521, in the name of B.E.P. Consulting Services, LLC up to and including a sum of money equal to at least $21,353.47 in United States currency;

      c.    all funds on deposit in Chevy Chase Bank account number ***-***813-6, in the name of W2-IBBS Limited up to and including a sum of money equal to at least $15,000.00;

      d.    30,775,000 shares of Class A stock in iGate, Incorporated, a company incorporated under the laws of the State of Indiana and issued to The ANJ Group, L.L.C.;

-88-

e.   1,500,000 shares of stock in W2-IBBS, Limited, a company organized under the laws of the Federal Republic of Nigeria and issued to Global Energy & Environmental Services LLC, a limited liability company organized under the laws of the state of Delaware;

f.   1,500,000 shares of stock in International Broad Band Services, LLC, a company organized under the laws of the Republic of Ghana and issued to Global Energy & Environmental Services LLC, a limited liability company organized under the laws of the state of Delaware; and

g.   600 shares of stock in Multi-Media Broad Band Services, Inc., a company incorporated in the state of Delaware and issued to The ANJ Group, L.L.C.

273.   Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section § 2461(c), the defendant shall forfeit substitute property up to the value of the property described in the previous paragraph if that property, as a result of any act or omission of the defendant:

a.   cannot be located upon the exercise of due diligence;
b.   has been transferred or sold to, or deposited with, a third party;
c.   has been placed beyond the jurisdiction of this Court;
d.   has been substantially diminished in value; or
e.   has been commingled with other property which cannot be divided without difficulty.

(All in accordance with Title 18, United States Code, Section 981(a)(1)(C); Title 28, United States Code, Section 2461(c); and Rule 32.2(a), Federal Rules of Criminal Procedure.)

## NOTICE OF FORFEITURE - MONEY LAUNDERING OFFENSES

274. The allegations contained in Counts 12 through 14 of this Indictment are hereby repeated, re-alleged, and incorporated by reference herein as though fully set forth at length for the purpose of alleging forfeiture pursuant to Title 18, United States Code, Section 982(a)(1), and Title 28, United States Code, Section 2461(c).

275. Pursuant to Rule 32.2(a), the defendant, WILLIAM J. JEFFERSON, is hereby notified that, upon conviction of a violation of Title 18, United States Code, Section 1957, as alleged in Counts 12 through 14, the defendant shall forfeit to the United States pursuant to Title 18, United States Code, Section 982(a)(1), any property, real or personal, involved in the violation, and any property traceable to such property, including, without limitation, a sum of money equal to at least $75,015.00 in United States currency, representing the amount of property involved in the violations of Title 18, United States Code, Section 1957.

276. Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b), and Title 28, United States Code, Section 2461(c), the defendant shall forfeit substitute property up to the value of the property described in the previous paragraph if that property, as a result of any act or omission of the defendant:

        a.    cannot be located upon the exercise of due diligence;
        b.    has been transferred or sold to, or deposited with, a third party;
        c.    has been placed beyond the jurisdiction of this Court;
        d.    has been substantially diminished in value; or
        e.    has been commingled with other property which cannot be divided without difficulty.

(All in accordance with Title 18, United States Code, Section 982; Title 28, United States Code, Section 2461(c); and Rule 32.2(a), Federal Rules of Criminal Procedure.)

## NOTICE OF RICO FORFEITURE

277.    The allegations contained in Count 16 of this Indictment are hereby repeated,

re-alleged, and incorporated by reference herein as though fully set forth at length for the purpose

of alleging forfeiture pursuant to Title 18, United States Code, Section 1963, and Title 28, United

States Code, Section 2461(c). Pursuant to Rule 32.2(a), the defendant, WILLIAM J.

JEFFERSON, is hereby notified that, upon conviction of the violation of Title 18, United States

Code, Section 1962, the United States will seek forfeiture as part of any sentence in accordance

with Title 18, United States Code, Section 1963.

278.    The defendant,

### WILLIAM J. JEFFERSON

a.    has acquired and maintained interests in violation of Title 18, United

States Code, Section 1962, which interests are subject to forfeiture to the United States, pursuant

to Title 18, United States Code, Section 1963(a)(1);

b.    has an interest in, security of, claims against, and property and contractual

rights which afford a source of influence over, the enterprise named and described herein which

the defendants established, operated, controlled, conducted, and participated in the conduct of, in

violation of Title 18, United States Code, Section 1962, which interests, securities, claims, and

rights are subject to forfeiture to the United States, pursuant to Title 18, United States Code,

Section 1963 (a)(2);

-91-

    c.    has property constituting and derived from proceeds obtained, directly and indirectly, from racketeering activity, in violation of Title 18, United States Code, Section 1962, which property is subject to forfeiture to the United States pursuant to Title 18, United States Code, Section 1963(a)(3).

279.    The property subject to forfeiture to the United States pursuant to Title 18, United States Code, Sections 1963(a)(1), (a)(2), and (a)(3), includes, but is not limited to:

    a.    at least $478,153.47 and all interests and proceeds traceable thereto, including but not limited to the following assets:

        i.    all funds on deposit in Dryades Savings Bank account number *****4467 in the name of The ANJ Group, L.L.C. up to and including a sum of money equal to at least $456,800.00 in United States Currency;

        ii.    all funds on deposit in Liberty Bank, account number ****0521 in the name of B.E.P. Consulting Services, LLC up to and including a sum of money equal to at least $21,353.47 in United States currency;

        iii.    all funds on deposit in Chevy Chase Bank account number ***-***813-6, in the name of W2-IBBS Limited up to and including a sum of money equal to at least $15,000.00;

    b.    30,775,000 shares of Class A stock in iGate, Incorporated, a company incorporated under the laws of the State of Indiana and issued to The ANJ Group, LLC;

    c.    1,500,000 shares of stock in W2-IBBS, Limited, a company organized under the laws of the Federal Republic of Nigeria and issued to Global Energy & Environmental Services LLC, a limited liability company organized under the laws of the state of Delaware;

    d.    1,500,000 shares of stock in International Broad Band Services, LLC, a company organized under the laws of the Republic of Ghana and issued to Global Energy & Environmental Services LLC, a limited liability company organized under the laws of the state of Delaware; and

e.   600 shares of stock in Multi-Media Broad Band Services, Inc., a company incorporated in the state of Delaware and issued to The ANJ Group, L.L.C.

280.   Pursuant to Title 18, United State Code, Section 1963(m) and Title 21, United

States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2462(c), if

any of the property described in Paragraph 279 above, as a result of any act or omission of a

defendant –

a.   cannot be located upon the exercise of due diligence;
b.   has been transferred or sold to, or deposited with, a third party;
c.   has been placed beyond the jurisdiction of this court;
d.   has been substantially diminished in value; or
e.   has been commingled with other property which cannot be divided without difficulty.

the court shall order the forfeiture of any other property of the defendant up to the value of any

property set forth in Paragraph 279 above.

(All in accordance with Title 18, United States Code, Section 1963; Title 28, United States Code, Section 2461(c); and Rule 32.2(a), Federal Rules of Criminal Procedure.)

DATED this _____ day of June 2007

A TRUE BILL

Pursuant to the E-Government Act,
the original of this page has been filed
under seal in the Clerk's Office.

_____

Foreperson of the Grand Jury


Chuck Rosenberg
United States Attorney


By: _____

Mark D. Lytle
Assistant United States Attorney


By: _____

Rebeca H. Bellows
Assistant United States Attorney


Steven A. Tyrrell
Chief, Fraud Section
Mark F. Mendelsohn
Deputy Chief, Fraud Section
Criminal Division
United States Department of Justice


By: _____

Charles E. Duross
Michael K. Atkinson
Special Assistant U.S. Attorneys


-94-