IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | Criminal No. 1:07CR209 (TSE) |
| | ) | |
| WILLIAM J. JEFFERSON, | ) | |
| | ) | |
| Defendant. | ) | |

MOTION TO SUPPRESS EVIDENCE SEIZED AT 1922
MARENGO STREET HOME AND MEMORANDUM IN SUPPORT

Pursuant to Fed. R. Crim. Proc. 12(b)(3)(c), defendant William J. Jefferson respectfully moves this Court to suppress all evidence seized and statements obtained during the August 3, 2005 search of 1922 Marengo Street, New Orleans, Louisiana, as well as the fruits of the search, because the agents executing the search deliberately and systematically exceeded the scope of the warrant and transformed the search into an unconstitutional general search of Mr. Jefferson's home and private papers by taking clear, digital photographs of documents they knew they were not entitled to seize. In support of this motion, Mr. Jefferson relies upon the points and authorities set forth in the accompanying memorandum of law.[1]

---

[1] Based upon the information known to the defense at this time, this motion relates to the search of Mr. Jefferson's New Orleans home. Should the defense become aware of similar images seized during the August 3, 2005 execution of the search warrants for 1350 F. St. N.E., Washington, D.C., the 1990 Blue Lincoln Town Car, VIN Number 1LNLM82F2LY706812, or the offices of Mr. Jefferson's accountants, Swetland and Childress, or during the May 20 – 21, 2006 search of Rayburn House Office Building Room 2113, this motion would be expanded to cover those searches as well.

## MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION TO SUPPRESS EVIDENCE SEIZED AT 1922 MARENGO STREET HOME

The FBI agents searching Mr. Jefferson's home on August 3, 2005, knowingly and willfully disregarded the constitutional limits on their authority. When they saw a document they were entitled to seize under the warrant, they took the original. When they saw a document they found interesting but they knew they had no authority to seize, they took a clear, readable digital photograph of the document. It was as if the agents brought a photocopying machine to the house so that they could photocopy all documents of interest that they knew were outside the scope of the warrant. None of the photographed documents appears on the search inventory, so what was in practice an unlawful general search of the premises was made to look like a lawful, narrow search conducted pursuant to a duly issued warrant. The agents' conduct was egregious and indefensible.

The unlawful conduct of the agents was compounded when the prosecution used the illegally seized evidence to expand the investigation, bringing charges that are based upon and derived from evidence illegally seized. Mr. Jefferson has therefore moved this court to suppress all evidence seized and statements obtained during the August 3, 2005 search of 1922 Marengo Street, New Orleans, Louisiana, as well as all fruits of the search, because the officers executing the search deliberately exceeded the scope of the warrant and transformed the search into an unconstitutional general search of Mr. Jefferson's home and private papers. At the very least, the court must suppress all evidence seized that was beyond the scope of the warrants and the fruits of that evidence. Should the record reveal that additional photographs were taken that are not known to the defense at this time, this court should also suppress evidence seized during the execution of the warrants for 1350 F Street N.E., Washington, D.C., the 1990 Blue Lincoln

Town Car, the offices of Swetland and Childress, and Rayburn House Office Building Room 2113.[1]

## FACTUAL BACKGROUND

On August 3, 2005, agents of the Federal Bureau of Investigation executed a warrant to search 1922 Marengo Street, New Orleans, Louisiana, the home occupied by Mr. Jefferson and his family. The warrant, a copy of which is attached hereto as Exhibit 1, called for the seizure of records and documents related to specific entities, and communications with particular individuals or concerning particular subjects that were described in detail in the warrant application. During the course of the search, as the agents reviewed papers belonging to Mr. Jefferson to identify the material covered by the warrant, they came across additional records that plainly fell outside the scope of the warrant. The agents did not carry away those paper records or include them in their inventory – they obviously understood that the documents were not subject to seizure. But the agents did not ignore or set aside the unresponsive material as is required by law; instead, they took close-up, digital photographs of every page of every document they found to be interesting, and the prosecution then utilized the information obtained

---

[1]     In response to a specific request, the government provided the defense with copies of photographs taken during the searches, and close-up images of documents were included among the pictures taken at Marengo Street. Should there be additional photographs which the defense has not yet received, this motion covers those as well. At the hearing on this motion, the government should be required to produce copies of any additional photographs taken during the execution of any of the warrants so that the full scope of the violation, and the full reach of the taint, can be established. The government should be required to produce the officers who executed the searches and records of any instructions – whether written, oral, or electronic – provided to the agents that related to the handling of documents outside the scope of the warrant and/or the use of cameras during the course of the search. Pursuant to Fed. R. Crim. P. 26.2(g), the government must also produce all statements of any motions hearing witnesses that relate to the subject matter of the witnesses' testimony.

in that manner to broaden the scope of the investigation. Copies of such photographs are attached to this motion as Exhibit 2.

For example, when searching Mr. Jefferson's nightstand, the agents discovered an agreement dated January 29, 2002, between Providence International Petroleum Company, LLC ("PIPCO"), Creaghan, et. al, and Procurer Financial Consultants, signed by James Creaghan and Mose Jefferson. None of these individuals or entities was mentioned in the warrant, and knowing that, the agents did not take the papers with them. The pages were not listed in the search warrant inventory.[2] But the agents took close-up digital photographs of every single page of the agreement. Exhibit 2 at P192-201.

Similarly, in searching Mr. Jefferson's briefcase, the agents observed an agreement dated August 27, 2001 between Arkel International/Arkel Sugar, Inc., and Providence International Co., LLC., signed by Mose Jefferson and W. Bradley Kimbrough and George Knost of Arkel. Exhibit 2 at P056-070. Again, the agents did not remove the paper records from the premises or include any mention of the records in their inventory, but they painstakingly generated a clear digital replica of every page.

The copying of personal records was extensive. The agents discovered the family's address book, and they methodically photographed every single page it contained, seizing the names, addresses, and phone numbers of many of the family's relatives, friends, and

---

[2]     Copies of the documents seized from the New Orleans residence and described in the search inventory were Bates-stamped with control numbers NO-RES-01-0001 - 0864 and NO-RES-02-0001 - 0573 and produced in discovery. The photographed documents were produced later in discovery with photographs taken at the time of the search. The photographed documents have no control numbers. *See* Exhibit 2.

acquaintances from A to Z.[3] They discovered a Day-Timer calendar from 1991 and photographed every single page, documenting appointments with individuals not mentioned in the warrant for all 365 days of a year well outside the time period of the warrant. Exhibit 2 at P079-191. Images of documents related to other businesses and individuals were also seized. Exhibit 2 at P001-005, P010-033, P071-075.

After the Special Agents photographed the materials in Mr. Jefferson's home, prosecutors made direct use of the information. While there is nothing in the record provided to the defense to date to indicate that prior to August 3, 2005, the prosecutors knew anything about Creaghan, PIPCO, Procurer Financial Consultants, Providence International or Arkel, they thereafter obtained records related to every one of those individuals and entities. DOJ obtained records directly from Creaghan, Arkel Sugar and other companies as well records concerning PIPCO and Providence International from the Louisiana Secretary of State. Mr. Creaghan had gathered and produced his records by September 14, 2005, so it is clear from the chronology that he was contacted quite quickly after the search. *See* Exhibit 3. DOJ also expanded the list of materials it was seeking from other sources to include these business transactions, and not just the iGate and ANJ matters that had been at the center of the investigation before. See *e.g.* Exhibit 4 (Subpoena to Chief Administrative Officer for the House of Representatives for records related to, *inter alia,* Arkel International, Inc., Providence International Petroleum, Procura, and James Creaghan), and Exhibit 5 (Subpoena to Stephanie Butler).

---

[3]     To protect the Jefferson's privacy and the privacy of their children and friends, only redacted copies of the first and last pages of the address book are included in Exhibit 2 at P071-77. The entire set of materials will be introduced as evidence for the court's review at the hearing on this motion.

4

DOJ prevailed upon Creaghan to cooperate with the investigation, to secretly record conversations with other business people and Jefferson family members, and to ask his business partners for their records. The recorded conversations reveal that he was dispatched to try to obtain a copy of the very document the agents had unlawfully copied during the search. Finally, the prosecution team included these individuals and entities in the schedule of items to be seized in the warrant for the subsequent search of Mr. Jefferson's Capitol Hill office.[4]

Upon information and belief, these investigative efforts, derived directly from the evidence seized outside the scope of the warrant, resulted in the conspiracy allegations set forth in Count 2 and the RICO charges in Count 16 – in particular, the paragraphs related to companies B, C, D, E, F, and G; Lobbyist A; Businesspersons BC, DEF and G; and Family Member 2: ¶¶ 142 – 205, and alleged Racketeering Acts 6 – 11 (a) and (b). Paragraphs 165 and 192 specifically reference the documents copied in Mr. Jefferson's home.

## <u>ARGUMENT</u>

Taking photographs of private papers that were not enumerated in the warrant constituted a search and seizure of those papers without a warrant in violation of the Fourth Amendment. This was not the mere blunder of a police officer caught up in the moment – this was a knowing, systematic, and pervasive violation, and it was countenanced and compounded by the DOJ prosecutors, who made extensive use of the illegally obtained material. The callous disregard of Mr. Jefferson's right to privacy and his possessory interest in his papers tainted the entire search,

---

[4]     Indeed, in litigation before the United States District Court for the District of Columbia, DOJ justified the office search with its expansive list of search terms by declaring that "*during and after* the August 2005 search, federal agents gathered evidence linking Rep. Jefferson to at least seven other schemes …." *See* Exhibit 6 (Government's Response to Representative William Jefferson's Motion for Return of Property) at 5 (emphasis added).

and the appropriate remedy would be to suppress *all* evidence seized on August 3, 2005, including all statements obtained from the defendant pursuant to the search, and any evidence derived therefrom.

At the very least, all records outside the scope of the warrant that were imaged during the course of the search should be suppressed. Other evidence – such as documents received in response to the resultant subpoenas or search warrants, or the testimony of witnesses identified through the photographed documents – was obtained by exploiting the illegality and must also be suppressed pursuant to *Wong Sun v. United States,* 371 U.S. 471, 488 (1963).

## I.   THE CONSTITUTION REQUIRES STRICT ADHERENCE TO THE TERMS OF THE WARRANT.

> If the scope of a search exceeds that permitted by the terms of a validly issued warrant … the subsequent seizure is unconstitutional without more.

*Horton v. California,* 496 U.S. 128, 140 (1990).

The Constitution "requires that a search warrant describe the things to be seized with sufficient particularity to prevent a 'general, exploratory rummaging.'" *United States v. Oloyede,* 982 F.2d 133, 138 (4th Cir. 1993) (quoting *Coolidge v. New Hampshire,* 403 U.S. 443, 467 (1971)). The particularity requirement ensures that the search is confined in scope to evidence relating to the specific crime for which there was probable cause to justify the invasion, *id.,* and it prevents the police from converting a specific warrant into a general search. *Horton*, 496 U.S. at 139. A valid warrant must specify the particular things to be seized so that nothing is left to the discretion of the officers executing the search, *United States v. Uzenski,* 434 F.3d 690, 706 (4th Cir. 2006), and the Supreme Court has insisted upon "scrupulous adherence" to the requirement that the search  be limited to the express terms of the warrant. *Horton,* 496 U.S. at 140.

These principles apply with particular force when officers are searching a private home: "[p]hysical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *Payton v. New York,* 445 U.S. 573, 585 (1980) (citations omitted). *See also Wilson v. Layne,* 526 U.S. 603, 610 (1999) (The Fourth Amendment embodies an "overriding respect for the sanctity of the home that has been embedded in our traditions since the origins of the Republic").

When officers take it upon themselves to go outside the scope of the judicial authorization and engage in a self-directed fishing expedition, they are engaging in the kind of warrantless search repeatedly condemned as *per se* unreasonable by the Supreme Court. *See Katz v. United States,* 389 U.S. 347, 357 (1967). When officers exceed the scope of a warrant, items so seized must be excluded, *Horton,* 496 U.S. at 140, and when the disregard for the warrant is flagrant, blanket suppression of all material seized may also be required. *Uzenski,* 434 F.3d at 706. All fruits of the illegally obtained evidence must be suppressed as well. *Wong Sun,* 371 U.S. 471.

Government agents are particularly bound to stay within the limits of a search warrant for documents. As the Supreme Court noted in *Andresen v. Maryland,* 427 U.S. 463 (1976):

> [T]here are grave dangers inherent in executing a warrant authorizing a search and seizure of a person's papers that are not necessarily present in executing a warrant to search for physical objects whose relevance is more easily ascertainable. In searches for papers, it is certain that some innocuous documents will be examined, at least cursorily, in order to determine whether they are, in fact, among those papers authorized to be seized. Similar dangers, of course, are present in executing a warrant for the "seizure" of telephone conversations. In both kinds of searches, responsible officials, including judicial officials, must take care to assure that they are conducted in a manner that minimizes unwarranted intrusions upon privacy.

427 U.S. at 482 n.11. The appeal in *Andresen* did not directly involve the suppression of material that fell outside the warrant, but the record revealed that the agents executing the search had seized numerous papers other than those introduced into evidence. The court observed:

> [T]o the extent such papers were not within the scope of the warrants or were otherwise improperly seized, the State was correct in returning them voluntarily and the trial judge was correct in suppressing others.

*Id.*

In this case, the agents were not confronted with a large volume of documents, but even if they had uncovered a substantial quantity of material, they would have been obligated to comply with the warrant and leave unresponsive material behind.

> It is true that all items in a set of files may be inspected during a search, provided that sufficiently specific guidelines for identifying the documents sought are provided in the search warrant and are followed by the officers conducting the search. … However, the wholesale *seizure* for later detailed examination of records not described in a warrant is significantly more intrusive, and has been characterized as "the kind of investigatory dragnet that the Fourth Amendment was designed to prevent."

*United States v. Tamura,* 694 F.2d 591, 595 (9th Cir. 1982) (citations omitted)**;** *see also United States v. Srivastava,* 444 F. Supp. 2d 385, 394 (D. Md. 2006). Mr. Jefferson submits that the police could not circumvent this fundamental principle simply by creating and taking exact replicas of documents instead of the original documents themselves.

## II.   THE AGENTS' ACTIONS CONSTITUTED A SEARCH AND A SEIZURE WITHOUT A WARRANT.

The Fourth Amendment protects against "unreasonable searches and seizures," so the court must determine as an initial matter whether the capturing and carrying away of a precise image of a private document can be characterized as one or the other.

A "search" occurs when an expectation of privacy that society is prepared to consider reasonable is infringed. A "seizure" of property occurs when there is

some meaningful interference with an individual's possessory interests in that property.

*United States v. Jacobsen,* 466 U.S. 109, 113 (1984).

It goes without saying that an individual has a reasonable expectation of privacy in papers maintained within the confines of his own private residence, *see Payton v. New York,* 445 U.S. at 585. The FBI was executing a warrant for the search of the Marengo street home, so Mr. Jefferson does not contend in this motion that the officers violated the Fourth Amendment in entering the place in which the documents could be found. Nor does he complain that the officer's simple viewing of the premises and its contents – including the visual scanning of his papers – violated his right to privacy. *See Horton,* 496 U.S. at 133 n.5 ("[A]n officer's mere observation of an item left in plain view … generally involves no Fourth Amendment search."); and *Arizona v. Hicks,* 480 U.S. 321, 328 (1987) ("A truly cursory inspection – one that involves merely looking at what is already exposed to view, without disturbing it – is not a 'search' for Fourth Amendment purposes…").  But in this case, the officers did something more than merely look, and the taking of photographs violated the constitution because it was both a  seizure and a search.

###    A.    Photographing Mr. Jefferson's Private Papers Was A Seizure Of Those Papers.

Taking photographs has been deemed to be a seizure in this circuit. *See United States v. Espinoza,* 641 F.2d 153, 166 (4th Cir. 1981) (taking photographs during the execution of a warrant was a permissible "seizing" of what the officer viewed since there was a clear nexus between the scenes photographed and the criminal activity under investigation). The government may point out that the *Espinoza* opinion predated the Supreme court opinions which defined seizure in terms of an interference with a possessory interest, *see Jacobsen,* 466 U.S. at 113. But

even after *Jacobsen,* courts held the taking of images to be a seizure because, as was set forth in *Katz,* 398 U.S. at 353, the Fourth Amendment governs not only the seizure of tangible property, but also the seizure of intangibles. *See Caldarola v. County of Westchester,* 343 F.3d 570 (2nd Cir. 2003) (making a videotape of a defendant during a "perp walk" constituted a seizure of his image); *United States v. Villegas,* 899 F.2d 1324, 1334-35 (2nd Cir. 1990) (taking of photographs described as a "seizure of intangible evidence" within the scope of Fed. R. Crim. P. 41 and the Fourth Amendment). The FBI did not merely "view" the documents; they carried their image away, just as if they had wheeled a photocopying machine into the Jefferson's living room and copied everything that they found. Such a confiscation constituted a seizure. Once the agents shared possession of the materials, Mr. Jefferson's possessory interest in them had been violated in a significant way.

The seizure in this case cannot be justified as an application of the plain view doctrine. The police may lawfully seize incriminating evidence found in plain view during the execution of an otherwise lawful search, *Coolidge,* 403 U.S. at 465, but such a seizure is not constitutional unless all of the elements of the plain view doctrine have been satisfied. Not only must the item in fact be in plain view, but it must be "immediately apparent" to the officer upon discovery that the item is evidence, or the fruit or instrumentality of a crime. *Horton,* 496 U.S. at 136. "If … the police lack probable cause to believe that an object in plain view is contraband without conducting some further search of the object …  its incriminating character is not 'immediately apparent.'" *Minnesota v. Dickerson,* 508 U.S. 366, 375 (1993) (citations omitted).

The "immediately apparent" rule pertains even when a warrant calls for the seizure of documents, and an initial cursory examination of a person's papers may be necessary. *See United States v. Soussi,* 29 F.3d 565 (10th Cir. 1994). Under such circumstances, the question to be

determined is "whether the government can satisfy the second prong of *Horton:* was the incriminating character of the documents seized under the plain view doctrine immediately apparent during the cursory review (i.e. did the agents have probable cause to believe that the items were evidence of a crime or illegal contraband?)" *Id.* at 572 (citations omitted). In this case, the cursory review of the documents revealed quickly that they did not fall within the scope of the warrant, and the seizing officer lacked probable cause to believe he was looking at evidence of a crime, so the seizure was unlawful.

The fact that the documents were photographed and not removed demonstrates that the agents were well aware that they lacked probable cause when they came across the records. Had the agents actually believed that the records were subject to seizure under the "plain view" doctrine, they would have seized the originals and handled them the way the other properly seized records were handled. But as the agents themselves recognized, the plain view doctrine does not apply.

**B.      Photographing The Papers Can Also Be Characterized As A Search.**

Even if the court concludes that photographing the documents did not compromise Mr. Jefferson's possessory interest enough to be deemed a seizure, the copying of the material must be suppressed as an illegal search in light of the Supreme Court's decision in *Arizona v. Hicks,* 480 U.S. 321 (1987).

In the *Hicks* case, an expensive stereo system caught the eye of a police officer conducting a lawful search of a shooting suspect's run down apartment. The officer read and recorded the serial numbers off of each of the components, and he had to physically move some of the components in order to have access to the numbers, which were later used to establish the fact that the stereo had been stolen. The court found that the moving of the equipment

constituted a search separate from the lawful search that had justified the entry into the apartment, 480 U.S. at 324-25. Similarly here, the officer's actions in taking the affirmative step to study and photograph private materials not described in the warrant constituted a search. [5]

The court in *Hicks* went on to find the search of the stereo equipment to be unreasonable under the Fourth Amendment because it was not supported by probable cause. *Id.* at 326-27.

> A dwelling-place search, no less than a dwelling place seizure, requires probable cause, and there is no reason in theory or practicality why application of the "plain view" doctrine would supplant that requirement.

*Id.* at 328. In other words, according to Justice Scalia's teaching in *Hicks,* even if officers have legal authority to search an individual's home – based upon a warrant, consent, or another recognized exception to the warrant requirement – they cannot search or seize anything outside the scope of that authorization without independent probable cause.

The *Hicks* reasoning has been specifically applied to searches for documents:

> Just as officers may not, upon glancing at a stereo, move it to look for a serial number unless they have probable cause … neither may officers, upon glancing at documents noticeably beyond the scope of the consent, peruse them in search of incriminating evidence.

---

[5]     The court's decision in *United States v. Squillacote,* 221 F.3d 542 (4th Cir. 2000) does not compel a different result. While the court commented in *dicta* that it was "unnecessary and improper to isolate certain conduct occurring during the execution of the warrant and treat that conduct as a separate and discrete search," *id.* at 555, the conduct challenged in *Squillacote* – the agents' presence in the home overnight for multiple nights – involved the execution of a valid warrant and the seizure of evidence pursuant to that warrant. There was no argument in that case that items seized fell outside the scope of the warrant. In any event, the court emphasized that the scope of a search is limited by the terms of its authorization, and instructed: "the question that must be answered is whether the government exceeded the scope of the warrant." *Id.*

*United States v. Padilla,* 986 F. Supp. 163, 170 (S.D.N.Y. 1997).[6] While agents executing a search for incriminating documents can fairly examine other records for the purpose of determining whether or not they should be seized, "if the incriminating nature of the document cannot be readily ascertained without moving or disturbing it, an officer may not, absent probable cause, move or further search the book or document." *United States v. Silva,* 714 F. Supp. 693, 696 n.6 (S.D.N.Y. 1989). The harm complained of here is not the agent's review of papers incident to the search, but the "further search": the copying of apparently innocuous papers found within the Jefferson home for the purpose of further investigation. The preservation, transportation and study of those images was both a search and a seizure, conducted without judicial authorization and without probable cause.

## III.   SUPPRESSION IS THE APPROPRIATE REMEDY FOR A FOURTH AMENDMENT VIOLATION.

The officers searching Mr. Jefferson's home grossly exceeded the scope of the warrant and displayed such flagrant disregard of its terms that the particularity requirement was undermined, and the valid entry onto the premises was transformed into an unlawful general warrant and fishing expedition. To make matters worse, the unlawful conduct was either pre-approved or subsequently ratified by DOJ, which used the evidence to substantially broaden the scope of the investigation and multiply the number of counts in the indictment. Under such circumstances, all of the evidence gathered during the search, and the fruits of such evidence, should be excluded. *Srivastava,* 444 F. Supp. 2d at 397-401.

---

[6]     The *Padilla* case cannot be distinguished on the grounds that the search that was exceeded in *Padilla* was premised upon consent instead of a valid warrant. The Supreme Court made clear in *Horton* that if the scope of a search exceeds what is permitted by a warrant "or the character of the relevant exception to the warrant requirement," the evidence must be excluded. 496 U.S. at 140 (emphasis added).

As the court observed in *Srivastava:*

[A]n examination of the books, papers and personal possessions in a suspect's residence is an especially sensitive matter…

The belief that a search warrant gives an officer free rein to search and seize cannot be tolerated … Condoning [the agent's] conduct would be to invite a government official to use a seemingly precise and legal warrant only as a ticket to get into a man's home, and once inside, to launch forth upon unconfined searches and indiscriminate seizures as if armed with all the unbridled and illegal power of a general warrant.

*Id.* at 399 (citations omitted), s*ee also United States v. Foster,* 100 F.3d 846 (10th Cir. 1996) (extraordinary remedy of blanket suppression mandated when warrant was executed in flagrant violation of its terms).

Even if the court does not suppress *all* of the seized evidence, the seized images that were obtained unlawfully must be excluded, *Squillacote,* 221 F.3d at 556, and *Srivastava,* 444 F. Supp. 2d at 396, and all evidence derived from the exploitation of that illegality must be suppressed as well. *Wong Sun,* 371 U.S. at 488. Thus, in addition to the specific records seized by virtue of digital photography, the following material derived by exploiting the illegal search should also be suppressed:

- The testimony of  Lobbbyist A and business people BC, DEF, and G.

- All consensual recordings obtained by Lobbyist A.

- Documents obtained from Arkel Sugar and Arkel Oil, Bates No. AI0001 – 01090 and AS00001 – 01641.

- Documents obtained from George Knost of Arkel Sugar, Bates No.00001 – 00236.

- Documents obtained from John Melton, Bates No. JAM 00001 – 01972.

- Documents obtained from James Creaghan, Bates No. 00001 – 02639.

- Louisiana State Incorporation documents, Bates. No. LA00001 – 00368.

- Documents obtained from Noreen Wilson, Bates. No. NW00001 – 06156.

- All other documents, including travel documents or bank or telephone records, related to Companies B – G, Business people BC, DEF, and G, Lobbyist A, Family Member #2, or any other person or entity whose identity became known to the government through the photographs taken during the execution of the warrant.

- Any other materials revealed at the hearing to be fruits of the images seized on August 3, 2005.

WHEREFORE, in light of all of the points and authorities set forth above and the evidence to be introduced at the hearing, Mr. Jefferson respectfully submits that all evidence seized and statements obtained during the August 3, 2005 search of 1922 Marengo Street, New Orleans, Louisiana must be suppressed, as well as all evidence derived from the material gathered during the search. At the very least all records seized outside the scope of the warrant and all of the fruits of those seizures must be excluded.

Respectfully submitted,

WILLIAM J. JEFFERSON

By Counsel

/s/ Robert P. Trout
_____
Robert P. Trout
(Va. Bar No. 13642)
rtrout@troutcacheris.com
Amy Berman Jackson
(Va. Bar No. 25919)
ajackson@troutcacheris.com
Gloria B. Solomon
(Admitted *pro hac vice*)
gsolomon@troutcacheris.com
TROUT CACHERIS, PLLC
1350 Connecticut Ave, N.W., Suite 300
Washington, D.C. 20036
Phone: (202) 464-3300
Fax:  (202) 464-3319

**<u>Certificate of Service</u>**

I hereby certify that on this 7th day of September, 2007, I electronically filed the foregoing motion and the accompanying memorandum with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to the following:

> Mark Lytle
> mark.lytle@usdoj.gov
> Rebeca H. Bellows
> becky.bellows@usdoj.gov
> United States Attorney's Office
> 2100 Jamieson Avenue
> Alexandria, Virginia 22314
>
> Charles E. Duross
> charles.duross@usdoj.gov
> U.S. Department of Justice
> 1400 New York Avenue, N.W.
> Washington, D.C. 20005

> /s/ Robert P. Trout
> _____
> Robert P. Trout
> (Va. Bar No. 13642)
> rtrout@troutcacheris.com
> **Attorney for William J. Jefferson**
> TROUT CACHERIS, PLLC
> 1350 Connecticut Ave, N.W., Suite 300
> Washington, D.C. 20036
> Phone: (202) 464-3300
> Fax:  (202) 464-3319