IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | Criminal No. 1:07CR209 |
| v. | ) | |
| | ) | Hon. T.S. Ellis, III |
| WILLIAM J. JEFFERSON, | ) | |
| | ) | Motions Hearing: October 12, 2007 |
| Defendant. | ) | |

**GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION
TO SUPPRESS EVIDENCE SEIZED AT 1922 MARENGO STREET HOME**

The United States of America, by its attorneys, Chuck Rosenberg, United States Attorney

for the Eastern District of Virginia, and Mark D. Lytle and Rebeca H. Bellows, Assistant United

States Attorneys, and Charles E. Duross, Special Assistant United States Attorney, respectfully

submits this Opposition to Defendant's Motion to Suppress Evidence Seized at 1922 Marengo

Street Home.  The defendant's motion should be denied.

Introduction

The defendant has filed a motion to suppress all the documents seized by the government

during the execution of a search warrant at his New Orleans residence on August 3, 2005.  The

basis for this motion is not that the nearly 1400 documents removed from his home were not

subject to seizure under the terms of the warrant, but rather, that the FBI photographed some

documents they did not remove from his home and that the taking of those photographs rendered

the entire search unreasonable.  The answer to the defendant's complaint is that the documents

that were photographed -- some of which were in fact seized as well -- could, with very few

exceptions, have been taken pursuant to the search warrant or under the plain view doctrine.

Accordingly, the search could not possibly be deemed unreasonable.  Furthermore, the photographs at issue here have not been used by the government in its investigation or prosecution so there are no records or witnesses that were discovered as a result of the photographs that may be subject to suppression or exclusion pursuant to the fruit of the poisonous tree doctrine.

<u>Background Facts</u>

On July 29, 2005, the government secured a warrant to search the residence of Defendant Jefferson located at 1922 Marengo Street, New Orleans, Louisiana.   Before they conducted the search, the team of agents tasked with executing the search warrant were instructed to make their best efforts to seize only items specifically described in Schedule B of the warrant application, that is, the Items to be Seized list.

On the morning of August 3, 2005, after Defendant Jefferson participated in a consensual interview with two FBI agents, Special Agent Timothy Thibault – one of the interviewing agents and one of the two case agents assigned to the investigation at that time – advised Defendant Jefferson that the officers had a warrant to search his residence.  Shortly thereafter, a team of FBI agents began conducting the search of the residence pursuant to the warrant.

The search, which lasted approximately 7 ½ hours, resulted in agents seizing nearly 1400 pages of documents.  All these documents have been bates stamped, scanned and provided to the defense in a searchable format.[1]  Also seized was the reddish brown lawyer's briefcase that on

---

[1]   The bates numbers corresponding to the nearly 1400 pages of documents removed from Defendant Jefferson's residence are NO-RES-01-0001 to 0864; NO-RES-02-0001 to 0572; NO-RES-03-0001 to 0008.

July 30, 2005, contained the $100,000.00 in recorded U.S. Currency that Defendant Jefferson

received from CW as a bribe payment to a high-ranking Nigerian official.

During the search, an FBI photographer took photographs of the following:  the areas

searched; the physical non-documentary evidence that was seized; and some documents that

special agents conducting the search directed her to photograph.  A total of 468 photographs

were taken during the execution of the search.  Of those, 83 photographs were of eleven separate

documents, 53 were of an address book, and 114 were of a 1991 appointment/calendar book.

Therefore, in all, only thirteen separate items were photographed.

Of these thirteen separate items, three were actually seized and removed from the

residence.[2]  Among the items that were not seized (but were photographed) were documents

relating to telecommunications projects -- including some financial projections -- and contracts

which were consistent with Jefferson's known *modus operandi* of using family members and

nominee companies to receive benefits in exchange for his official assistance.  With respect to

these documents, the reviewing agents had probable cause to believe that they constituted

evidence of similar fraudulent schemes.  However, because the agents had been cautioned to

only seize items that were specifically called for by Schedule B, the agents had these

incriminating documents photographed.  In addition, many of these photographed items were in

fact subject to seizure under the specific terms provided in Schedule B.

As to the 114 photographs of a 1991 appointment/calendar book, those photographs were

apparently taken by mistake.  The search warrant specifically authorized the seizure of

---

[2]   The defendant has nowhere suggested that these three documents were improperly
seized.

appointment calendars reflecting visits, appointments, and telephone messages from January, 2004 to the present.  The team leader at the search site realized that the appointment/calendar book was for the year 1991 while the taking of photographs of that item was in progress.  Upon realizing the age of the appointment/calendar book, the team leader thus directed the photographer to discontinue taking photographs of the book.

     None of the 250 photographs at issue here were ever used to further the investigation. Only one of the two case agents assigned to the case, Special Agent Thibault, participated in executing the search at Defendant Jefferson's New Orleans residence.  Special Agent Thibault was aware that photographs were being taken during the search, but was unaware that photographs were being taken of documents at close range.  It was not until earlier this year that Special Agent Thibault learned from a New Orleans special agent that such photographs had been taken during the search.  Special Agent Thibault, however, did not view the photographs of the documents before the Indictment was returned in this case.[3]

     Nor have the photographs been used by prosecutors to investigate or bring charges against Defendant Jefferson.  It was not until July, 2007 -- more than a month after the Indictment was returned – that the FBI provided copies of the photographs taken during the search of the Marengo Street residence to the prosecutors.  That production was made in

---

[3]  The other case agent at the time of the search was then Special Agent Edward Cooper, who retired on June 30, 2006.  After his retirement, two other FBI agents were assigned to join Special Agent Thibault as case agents of the investigation.  Mr. Cooper and the two other FBI agents have not seen the photographs at issue nor used them in any way to further the investigation.

connection with a substantial Rule 16 production made by the government to defense counsel on July 27, 2007.[4]

Argument

It is noteworthy that the defendant does not challenge even one of the nearly 1400 pages of documents removed from his home on the basis that it exceeded the scope of the search warrant. This fact speaks volumes about the efforts the agents made to limit the seizure of items to those specifically called for by Schedule B and how careful they were in executing the warrant.       Instead, Defendant Jefferson complains about the taking of photographs of documents during the search. But in his motion and memorandum, Defendant Jefferson fails to acknowledge an important fact: the vast majority of the documents photographed could have been seized pursuant to the terms of the warrant itself or in accordance with the plain view doctrine.   Defendant Jefferson ignores this fact for one obvious reason: there is no Fourth Amendment violation when an agent who is lawfully authorized to seize a document does not take it but merely photographs it.

I.      The Court Should Not Suppress the Evidence Seized from 1922 Marengo Street,
        New Orleans, Virginia Because the Search Was Lawfully Executed

The Court need not address the constitutional question of whether a photograph of a document at close range constitutes a "seizure" implicating the Fourth Amendment. While the

---

[4] Defendant Jefferson states in footnote 1 that the photographs at issue were produced to the defense "in response to a specific request," suggesting that the government would otherwise have withheld the photographs from the defense. Defendant Jefferson knows that this assertion is untrue. The photographs were produced to the defense as part of the government's ongoing production of Rule 16 material, not in response to a "specific request" by counsel. At the same time these photographs were produced, the government produced all photographs taken at other locations searched on August 3, 2005, as well as numerous video recordings of consensual meetings and surveillance.

5

government disputes that the taking of a photograph of a document is necessarily tantamount to a seizure under the Fourth Amendment,[5] the Court need not reach this constitutional question as the documents photographed here were either: (1) actually seized pursuant to the warrant; (2) subject to seizure under the terms of the warrant or under the plain view doctrine; or (3) mistakenly photographed with absolutely no prejudice to the defendant.

A.      Photographs of Documents that Were Actually Seized Do Not Run
        Afoul of the Fourth Amendment

Defendant Jefferson, in challenging the photographs of documents, never once mentions to the Court that some of the documents photographed were actually seized pursuant to the search warrant.[6]  But that is in fact the case.  Specifically, the following are photographs of documents that were seized from Defendant Jefferson's home and produced to the defense during discovery:

(1)     The photograph marked as Def. Exh. 2 at 56 is a photograph of an open suitcase exposing a document that was seized during the search.  That document, which was a hand-written list of topics relating to Multimedia Broadband Services, Inc., was properly seized by the agents pursuant to Section A.7. of Schedule B.[7]  That document has been marked NO-RES-02-0060.

---

[5]   A "seizure" occurs when governmental intrusion meaningfully interferes with an individual's possessory interest.  *See United States v. Jacobsen*, 466 U.S. 109, 113 (1984).  *See also Arizona v. Hicks*, 480 U.S. 321, 324-25 (1987) (recording serial numbers on stereo equipment did not constitute seizure because there was no meaningful interference with defendant's possessory interest in the numbers recorded or the stereo).  The mere photographing of documents that were left at the residence cannot be said to have *meaningfully interfered* with Defendant Jefferson's possessory interest in that document.

[6]   The defendant should know this since he has been provided with all the seized documents in a searchable format.

[7]   To facilitate the Court's review, the government is attaching a copy of Schedule B of the warrant authorizing the search of the Marengo Street residence.  *See* Gov. Exh. 1.

(2)     The photographs marked as Def. Exh. 2 at 202 and 203 are photographs of a sheet of paper that was seized from the residence because it related to wiring information for Vernon Jackson, iGate's President, and reflected telephone messages.  That document was subject to seizure pursuant to Sections A.2. and D.3. of Schedule B, which sections authorized the seizure of documents relating to iGate and documents relating to paper telephone messages (either printed or handwritten), respectively.  The document reflected in this photograph has been marked NO-RES-01-0003.

(3)     The photographs marked as Def. Exh. 2 at 204 and 205 are of one page of a 22-page document that was seized from the Marengo Street residence.  The entire document was subject to seizure pursuant to Section A.2. of Schedule B as it contained specific references to iGate.  The entire document has been bates numbered NO-RES-01-0004 to 0025, and the page that was photographed is numbered NO-RES-01-0019.

Because these photographs are all of documents that were seized pursuant to the search warrant and Defendant Jefferson has not asserted that the government exceeded the scope of the warrant with respect to any document it seized, Defendant Jefferson has no grounds to challenge the photographs of those properly seized documents.

>    B.     The Photographs of Eight Responsive and/or Incriminating Documents
>            Did Not Violate the Fourth Amendment as the Agents were Authorized
>            to Seize those Documents

As a matter of law, the documents discussed below were subject to seizure under Schedule B and/or as evidence of a crime in plain view.  The defendant does not challenge the warrant as over broad or lacking particularity.  Therefore, if items that were photographed fell within Schedule B, Defendant Jefferson cannot claim that their seizure would violate his Fourth Amendment rights.  As will be discussed below, many of the documents that were photographed could have been seized pursuant to the warrant.

In addition, the plain-view doctrine would have permitted seizure of a significant number of documents that were photographed during the search.  "[T]he plain-view doctrine authorizes warrantless seizures of incriminating evidence when (1) the officer is lawfully in a place from

which the object may be plainly viewed; (2) the officer has a lawful right of access to the object

itself; and (3) the object's incriminating character is immediately apparent." *United States v.*

*Jackson*, 131 F.3d 1105, 1109 (4th Cir. 1997), *citing Horton v. California*, 496 U.S. 128, 136-37

(1990).  In this case, since the FBI agents were executing a valid search warrant at Defendant

Jefferson's home *for records and documents*, there can be no question that the agents were

authorized to be inside the residence and were authorized to review documents found there.

      In determining whether the incriminating character of the seized item is "readily

apparent," it is sufficient that "the agents collectively ha[ve] probable cause to believe the [item]

was evidence of a crime at the time of the seizure." *United States v. Wells*, 98 F.3d 808, 810 (4th

Cir. 1996) (upholding seizure of firearm during authorized search in bank fraud investigation

based on one agent's knowledge that subject was a convicted felon).  Therefore, probable cause

cannot be determined in a vacuum.  Law enforcement officers may use their experience and

knowledge to draw inferences of criminal activity from items that on their face are not criminal.

*See Wells*, 98 F.3d at 810.  Furthermore, in the case of documents, '[t]he incriminating nature

limitation necessarily permits a brief perusal of documents in plain view in order to determine

whether probable cause exists for their seizure under the warrant." *United States v. Heldt*, 668

F.2d 1238, 1267 (D.C. Cir. 1981).

      Upon applying these governing principles to the documents that were photographed, it is

clear that the following documents could have been seized rather than merely photographed:

(1)      A piece of paper reflecting a recipe and phone calls and numbers that was affixed to the
refrigerator with a magnet.  Def. Exh. 2 at 6 and 7.  This document was subject to seizure
under the warrant as it was specifically described in Section D.3. of Schedule B, namely,
paper telephone messages (either printed or handwritten) from January 2004 to the
present.  The fact that this document was affixed to the refrigerator indicated that the
messages were relatively recent to the search.

(2)    An e-mail, photographed twice, from BK Son to Defendant Jefferson regarding Nigerian Financial Projections and MBSI Operation Plan. Def. Ex. 2 at 8, 9. This document was subject to seizure because paragraphs A.1. and A.7. of Schedule B specifically authorized the seizure of records and documents relating to iGate and Multimedia Broadband Services, respectively. Agents conducting the investigation knew that BK Son was an employee of iGate and that MBSI was an acronym for Multimedia Broadband Services, Inc.. Therefore, that e-mail fell within the scope of the search warrant.

(3)    A power-point presentation titled the E-Star Wireless Broadband Network, Business Opportunity, Def. Exh. 2 at 10-33. This power-point document was very similar to ones prepared by iGate and provided to CW during the investigation. Like the iGate presentations, the E-Star document included financial projections strikingly similar to ones that Defendant Jefferson had provided to CW. Since the searching agents knew that Defendant Jefferson was promoting telecommunications ventures as a Congressman in exchange for things of value, the agents had probable cause to believe that this E-Star document with its financial projections was additional evidence of his crimes.

(4)    Email traffic between BK Son, Darron Purifoy, and William Jefferson dated as recently as July 30, 2005, and documents reflecting technical data that appeared to accompany the email exchanges. Def. Exh. 2 at 34 to 54. Seizure of the e-mails to or from BK Son were specifically authorized by Section B.4.b. of the Schedule B, which section permitted seizure of all communications to or from Defendant Jefferson and Byeong K. Son related to any business projects involving iGate. Since BK Son was communicating about the purchase of telecommunications equipment, he was either acting on behalf of iGate or Multimedia Broadband Services.[8] Accordingly, the e-mail communications were also subject to seizure pursuant to sections A.2. or A.7. Because the documents reflecting the technical data appeared to accompany the e-mail exchanges, they too could have been seized as a continuation of the responsive document.

(5)    Business cards of Nigerian government officials, Def. Exh. 2 at 55. Those cards were subject to seizure within the scope of the warrant as records related to travel by Defendant Jefferson to Nigeria. Receipt of business cards from foreign government officials would be indicative of visits to a foreign country.

(6)    A Non-Circumvention and Non-Disclosure Agreement between Company E and Providence Lake, Def. Exh. 2 at 57 to 68, and a Letter from Company E to Providence Lake, to the attention of Family Member 2, Def. Exh. 2 at 69-70. These two documents could have been seized both pursuant to the warrant or, in the alternative, as incriminating evidence in plain view. First, Section A.1. of Schedule B included all records and documents from January 1, 2001, to the present relating to the ANJ Group,

---

[8]    Among the documents seized from the Marengo home was an unexecuted employment agreement between Byeong K. Son and Multimedia Broadband Services, Inc.

LLC.  Agents familiar with the investigation knew that the ANJ Group's registered address was 650 Poydras Street, Suite 2245, New Orleans, Louisiana 70130, the office of Jack Swetland, Defendant Jefferson's campaign treasurer and accountant.  In fact, another team of agents was executing a search warrant at 650 Poydras Street, Suite 2245, in connection with this investigation at the same time agents were searching Defendant Jefferson's Marengo Street residence.  The Non-Circumvention and Non-Disclosure Agreement between Company E and Providence Lake as well as the letter to Providence Lake, to the attention of Family Member 2, provide 650 Poydras Street, Suite 2245, New Orleans, Louisiana, as the address for Providence Lake.   Because this address also belongs to the ANJ Group, Inc., these two documents – both dated in late August, 2001 – were subject to seizure under the warrant as records relating to the ANJ Group, LLC.

Moreover, even if these particular documents had not reflected ANJ's business address, they would have been subject to seizure under the plain view doctrine.  Agents familiar with the investigation were fully aware that Defendant Jefferson's means of executing his bribery schemes often involved family members receiving things of value through nominee companies in exchange for Defendant Jefferson's performance of official acts.  At the time of the search itself, agents were aware of Defendant Jefferson's use of nominee companies ANJ and Global, both having family members as managers or directors, to receive things of value from iGate, Multimedia, W2-IBBS, and IBBS.  Consequently, when agents came across the agreement between Company E and Providence Lake, signed by Defendant Jefferson's brother Mose, for commissions to Providence Lake for Company E contracts in Nigeria, they had more than probable cause to believe these two documents were evidence of a crime.

(7)     An agreement dated January 29, 2002, between Providence International Petroleum Company (PIPCO), Lobbyist A, and Company B, Def. Exh. at 192 to 201.  Like the previous document, this document was subject to seizure pursuant to the warrant and as evidence of a crime in plain view.  Section A.3. of Schedule B permitted seizure of records and documents relating to Global Energy & Environmental Services, LLC.  The January 29, 2002, PIPCO agreement reflects that the agreement had been sent or received *via* facsimile by an entity called Global.  Although sometime after the August 3, 2005, search, the investigation revealed that the Global reflected in the PIPCO agreement was not Global Energy & Environmental Services, LLC, at the time of the search, it would have been reasonable to conclude that the PIPCO agreement related to Global Energy & Environmental Services and therefore subject to seizure under the terms of the warrant.

In addition, as with the Company E and Providence Lake agreement described in (7) above, Family Member 2 signed this agreement and was positioned to receive considerable benefits (50% of proceeds to be split with Lobbyist A) for negotiating a settlement of a dispute over petroleum blocks in the Democratic Republic of Sao Tome and Principe.  This agreement looked like so many others utilized by Defendant Jefferson to enrich himself and his family members in return for the performance of official acts.

Because the agents executing the search knew of this particular *modus operandi*, they had probable cause to believe this particular agreement was evidence of a crime.

(8)     An address book, part of which is marked as Def. Exh. 2 at 71 to 77.  Although the defendant has produced for the Court only 7 photographs of that document, 55 pages of the address book were photographed.[9]  The address book, which was bound, contained the name and address of ANJ's registered agent, Jack Swetland.  The address for Jack Swetland was listed in the address book as 650 Poydras Street, Suite 2245, the very address known to agents as belonging to the ANJ Group.  In addition, the address book contained the telephone numbers for an individual Defendant Jefferson had selected to be on the board of directors for Multimedia Broadband Services, Inc.[10]  Consequently, the entire address book that was photographed constituted a record and document relating to the ANJ Group and Multimedia Broadband Services, Inc., which record was subject to seizure under Sections A.1. and A.7. of Schedule B.

The documents in the foregoing photographs could have been seized under the specific terms of

the warrant and/or the plain view doctrine.  While these photographed documents could have

been removed from the home, out of an abundance of caution, the agents opted instead to have

them photographed.  As these eight documents were in fact subject to seizure pursuant to the

search warrant or to the plain view doctrine, there is no basis upon which to suppress their

photographs or to conclude that the entire search was somehow unreasonable because these few

documents were photographed.[11]

_____

[9]     All 55 photographs of this address book will be submitted to the Court at the hearing on this motion.  The government does not file it as an attachment to this pleading as it contains personal information of individuals who have not been criminally charged.

[10]     In fact, two documents seized from Defendant Jefferson's New Orleans residence connected this particular individual to Multimedia.  The two documents were blank forms titled Shareholders Ballot Election of Directors of Multimedia Broadband Services, Inc. and  dated August 1, 2005.  The two forms, one to be signed by CW as a shareholder of Multimedia and the other to be signed by the ANJ Group as another shareholder of Multimedia -- nominated this particular individual as a member of the Board of Directors for Multimedia.   (NO-RES-02-0145, 0146).

[11]     As for the remaining two documents that were photographed, the 1991 calendar/appointment book and the documents relating to Moss Creek, these were not subject to seizure under the terms of the warrant.  As stated above, however, when the team leader realized

II.     Even if this Court Were to Hold that the Taking of Photographs Was, In
        Some Instances, Improper, the Evidence Seized Pursuant to the Search
        Warrant Should not Be Suppressed

Should this Court conclude that some or all of the photographs were taken in contravention of the Fourth Amendment, the Court should nonetheless permit the government to use all the evidence that was properly seized pursuant to the search warrant.  Where law enforcement officers exceed the proper scope of a search warrant, the exclusionary rule does not require suppression of those items properly seized.  *See United States v. Shilling*, 826 F.2d 1365, 1369 (4th Cir. 1987) (improper seizure of entire file cabinet did not require suppression of individual files properly taken).  *See also Photogrammetric Data Services*, 259 F.3d 229, 238-40 (4th Cir. 2001) (noting general rule that proper and improper seizures during a search only require suppression of *improperly* seized items); *United States v. Jones*, 31 F.3d 1304, 1314 (4th Cir. 1994) (seizure beyond scope of warrant did not require exclusion of properly seized item); *United States v. Borromeo*, 954 F.2d 245 (4th Cir. 1991) (improper seizure of 57 files did not require suppression of 35 files that had been properly seized).

The "extraordinary remedy" of blanket suppression of *all* items seized during the execution of a warrant is only available where the officers have demonstrated a "flagrant disregard" for the scope of a warrant.  *See, e.g. United States v. Uzenski*, 434 F.3d 690, 706-08

---

that the date of the calendar/appointment book was 1991, she immediately directed the photographer to discontinue taking photographs of that item.  With respect to the Moss Creek documents, agents conducting the search were aware that Reginald Walker had been indicted on fraud and conspiracy charges less than two months before the August 3, 2005, search.  Those documents, while suspicious, were not subject to seizure under Schedule B.  It is well established that the Fourth Amendment is not violated by certain "honest mistakes."  *See United States v. Patterson*, 278 F.3d 315 (4th Cir. 2002).   Furthermore, the taking of photographs of these two items in no way prejudiced Defendant Jefferson as they have not been used to further the investigation or the prosecution.

12

(4th Cir. 2006); *United States v. Robinson*, 275 F.3d 371, 381-82 (4th Cir. 2001).   As the Fourth

Circuit explained in *Uzenski*, 434 F.3d at 706, blanket suppression of all documents seized

during a search is to be used "only when the violations of the warrant's requirements are so

extreme that the search is essentially transformed into an impermissible general search."

It is abundantly clear in this case that the agents who executed the search warrant at the

Marengo Street residence did not engage in an impermissible fishing expedition.  There is

absolutely no evidence to suggest that the agents took photographs in efforts to deliberately

exceed the scope of the warrant.[12]   To the contrary, the taking of photographs rather than the

seizure of the documents themselves demonstrates considerable restraint by the agents and a

good faith attempt to strictly adhere (and, in some instances, to adhere too narrowly) to Schedule

B.  Furthermore, given that there is no clearly established law on whether photographs of this

nature constitute impermissible seizures, the taking of photographs, even if ultimately

determined by this court to have been improper, was not a flagrant violation of the Fourth

Amendment warranting suppression of all the evidence properly seized during the search.

---

[12]   If that were the case, one would expect that the case agent would have known about
such photographs and would have tried to use them during the investigation.  But that is clearly
not what happened here.

13

III.    <u>The Fruit of the Poisonous Tree Doctrine Has No Application Here</u>

The exclusionary rule extends to the direct and indirect products of unlawful action.  In *Wong Sun v. United States*, 371 U.S. 471, 488 (1963), the Supreme Court held that the proper inquiry was whether the evidence was obtained through the exploitation of the constitutional violation or by means sufficiently attenuated from such violation so as to eliminate the initial taint.  Even if this Court were to conclude that the taking of photographs of documents constituted a constitutional violation, there would nevertheless be no taint here.

The photographs at issue were not used in any manner to further the investigation or the prosecution.  The government's gathering of records related to Lobbyist A, PIPCO, Company B, Providence International, and Company E were not, as defendant claims, a product of the documents that were photographed.  As stated above, the case agents did not use the photographs in any manner to further the investigation and the prosecutors did not receive copies of the photographs until after Defendant Jefferson had been indicted.  Moreover, as Defendant Jefferson well knows, he identified Lobbyist A during the consensual interview with agents on August 3, 2005.  Defendant Jefferson is simply wrong in claiming that the photographs led the government to locating Lobbyist A and identifying the companies with which he was associated.

Of all the witnesses and materials identified by Defendant Jefferson on pages 14 and 15 of his motion, not one of them was found as a result to the photographs Defendant Jefferson challenges in the present motion.  Therefore, there is absolutely no basis for suppressing those

14

documents or precluding those witnesses from testifying at trial.  *See Wong Sun*, 371 U.S. at 488.[13]

Conclusion

For the foregoing reasons, Defendant Jefferson's motion to suppress evidence seized during the August 3, 2005, search of his New Orleans residence should be denied.

Respectfully submitted,

Chuck Rosenberg
United States Attorney

By: _____/s/_____
Mark D. Lytle
Assistant United States Attorney
Attorney for the United States
United States Attorney's Office
2100 Jamieson Avenue
Alexandria, VA 22314
Phone:   703-299-3700
Fax:       703-299-3981
Mark.Lytle@usdoj.gov

---

[13]  Moreover, even if the court were to find that the witnesses and materials identified on pages 14 and 15 of the defendant's motion were "fruits" of the photographed documents, all those witnesses and materials would have ultimately and inevitably been discovered by the government.  Given the thoroughness of the grand jury investigation, the materials uncovered during other lawful searches, and the extent to which most of those witnesses and entities were identified through independent means, the government would have undoubtedly discovered all the witnesses and documents identified by the defendant on pages 14 and 15 of his motion.  As a result, Defendant Jefferson's request for suppression and exclusion of all witnesses and documents identified on pages 14 and 15 of his motion should, in the alternative, also be denied under the inevitable discovery doctrine.  *See, e.g. Nix v. Williams*, 467 U.S. 431, 444 (1984); *United States v. Thomas*, 955 F.2d 207, 210-11 (4th Cir. 1992).

_____
          /s/
Rebeca H. Bellows
Assistant United States Attorney
Attorney for the United States
United States Attorney's Office
2100 Jamieson Avenue
Alexandria, VA 22314
Phone:   703-299-3700
Fax:        703-299-3981
Becky.Bellows@usdoj.gov

_____
          /s/
Charles E. Duross
Special Assistant U.S. Attorney
Attorney for the United States
United States Attorney's Office
2100 Jamieson Avenue
Alexandria, VA 22314
Phone:   703-299-3700
Fax:        703-299-3981
Charles.Duross@usdoj.gov

16

## CERTIFICATE OF SERVICE

I hereby certify that on the 28th day of September, 2007, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send a notification of such filing (NEF) to the following:

>Robert P. Trout
>Trout Cacheris, PLLC
>1350 Connecticut Avenue, N.W.
>Suite 300
>Washington, D.C.  20036
>rtrout@troutcacheris.com

>>_____/s/_____
>>Mark D. Lytle
>>Assistant United States Attorney
>>United States Attorney's Office
>>2100 Jamieson Avenue
>>Alexandria, VA 22314
>>Phone:   703-299-3768
>>Fax:       703-299-3981
>>Mark.Lytle@usdoj.gov

17