**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| v. | ) | **Criminal No. 1:07CR209 (TSE)** |
| | ) | |
| **WILLIAM J. JEFFERSON,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**REPLY IN SUPPORT OF MOTION TO
SUPPRESS EVIDENCE SEIZED AT 1922 MARENGO STREET HOME**

The government's opposition makes no serious argument that taking readable copies of documents is not a search or seizure. And it does not contest the proposition that a search or seizure of items that fall outside the scope of the warrant or an exception to the warrant requirement violates the Fourth Amendment. The government instead seeks to justify the improper photographing of documents by arguing that the records that were seized in this manner could have been seized pursuant to the warrant or the "plain view" doctrine. This argument is without merit. The government falls back on a flat denial that the investigation was tainted by the Fourth Amendment violation because neither the lead agent nor the prosecutors saw the actual photographs until after the indictment was returned. This argument is beside the point as well as an implausible defense to taint, and it raises more questions than it answers.

DOJ's opposition sidesteps the critical issue in the motion: whether the evidence obtained unlawfully by virtue of the photographs was used in the prosecution and must be suppressed. A review of the indictment makes it clear that the very documents the agents violated the Constitution to seize play a significant role in Count 2 and the RICO count. Even if the Court does not invalidate the entire search due to this flagrant violation of fundamental principles of

Fourth Amendment law, well known to every FBI agent, the court must suppress the illegally obtained material and the fruits of that evidence.

### A. TAKING AWAY READABLE PHOTOGRAPHS OF DOCUMENTS NOT SPECIFIED IN THE WARRANT VIOLATED THE FOURTH AMENDMENT.

The government has made a number of arguments that are beside the point. It points out that many documents were covered by the warrant and were properly seized. It also points out that a number of documents covered by the warrant were either seized, photographed, or both. None of that is in issue in this motion. The defendant's motion is addressed to documents that were outside the scope of the warrant, that the agents photographed to have a readable copy to further their investigation, and that are actually identified in the indictment or were used to develop other evidence relating to specific charges in the indictment.

The government concedes that at the time of the search, documents were photographed rather than seized because the agents determined that the items were not "specifically called for by Schedule B." Gov't Opp. at 3.[1] Now, the government has stitched together theories, employing after-the-fact rationalizations, to claim that the documents did fall within the warrant even though the agents did not think so at the time. The government's *post hoc* justifications stretch credulity; the agents got it right the first time when they determined that the documents were not covered by the warrant.

---

[1] The government does not specify which agents made the decision to photograph them rather than carry them away, but it is difficult to imagine that such a significant decision was made unbeknownst to the lead case agent.

2

For example, the government now argues that the August 27, 2001 Non-Circumvention and Non-Disclosure Agreement, Def. Ex. 2 at 57-68, between Arkel International and Providence International Co. was responsive to a warrant calling for documents related to ANJ Group, LLC. The August 2001 Agreement was with Family Member 2, who, as the agents well knew, was not part of or involved in ANJ. And yet the government argues that it is related to ANJ merely because Providence International and ANJ had the same business mailing address, which as the agents knew, was also the address of a third-party accountant who did work for the Jefferson and presumably for others. Gov't Opp. at 9-10. If this *post hoc* rationalization works to validate the seizure of these records within the scope of the warrant, then the Fourth Amendment's warrant requirement is flimsy protection indeed.

Similarly, the government now argues that the January 29, 2002 agreement between Providence International Petroleum Co., Procurer Financial Consultants, and Creaghan, *et al.*, Def. Ex. 2 at 192-201, could have been seized pursuant to the warrant, even though at the time of the search, the agents made the judgment that it could not be. Scouring the document now to come up with some rationale for the authority to photograph the document, the only thing the government is able to come up with is that the fax legend contains the word "Global." In effect the government is saying, "if we realized then what we realize now, we would have seized it." But of course, they would have to concede that if they realized then what they realize now, they would not have been able to seize it, for the fax legend refers to a different company from Global Energy & Environmental Services LLC, the company identified in the warrant. See Gov't Opp. at 10.

The agents correctly concluded that these two documents were not specified in the warrant. The agents should have stopped there. They didn't. There is no exception in the Constitution for things that make an agent curious or suspicious.

Since the notion that the documents were called for by the warrant fails, DOJ tries to say that they could be seized under the plain view exception to the warrant requirement. Most "plain view" cases deal with contraband, typically drugs, drug paraphernalia, and guns.[2] The test for whether an item not described in the warrant can be seized is whether the incriminating character of the evidence is plainly and immediately apparent on its face, "a character sufficiently incriminating to establish probable cause for its seizure." *United States v. Heldt*, 668 F.2d 1238, 1267 (D.C. Cir. 1981). The seizure of the documents at issue does not begin to satisfy that test.

The government says now that agents understood the documents to be subject to seizure then under the plain view doctrine because they were aware that companies owned or managed by Jefferson's wife, daughters or son-in-law were to receive things of value from iGate, Multimedia, W2-IBBS and IBBS. From this fact, they claim that two agreements seized were plainly and immediately incriminating. Gov't Opp. 9-11. How? The agreements refer to companies that are not mentioned anywhere in the search warrant affidavit and that were unknown to the agents; they identify Jefferson's brother, Mose, who likewise is not mentioned in the search warrant affidavit. The government says the agreements "looked like so many others

---

[2] In *Horton v. California*, 496 U.S. 128 (1990), the Supreme Court upheld the seizure under the plain view doctrine of firearms that matched the specific description of those that had been used in the robbery, but it noted that the police had refrained from seizing other weapons found at the location of the search because there was no probable cause to believe that those weapons were used in the crime. *Id.* at 131 n.1. This is an appropriately narrow view of the plain view exception to the warrant requirement, one significantly at odds with the expansive argument that the government makes in the instant case.

4

utilized by Defendant Jefferson to enrich himself and his family members in return for the performance of official acts." Even if true, that would not give rise to probable cause. There is nothing illegal about a Member's family being in business. In fact, there is nothing illegal about a Member being in business. Moreover, the search warrant makes no reference to "so many other[]" agreements because the agents had no knowledge of "so many others." The government's argument is another *post hoc* rationalization. The government has taken the knowledge that it thinks it has acquired since the search, and applied it retroactively to try to argue probable cause during the search.

The government entirely misperceives the "plain view" exception to the warrant requirement. "[T]he 'plain view' doctrine may not be used to extend a general exploratory search from one object to another until something incriminating at last emerges." *Horton v. California*, 496 U.S. at 136, quoting *Coolidge v. New Hampshire*, 403 U.S. 443, 465-466 (1971). Here, the agents took what should have been a narrow search for specifically identified documents and illegally converted it into a general search for whatever documents they found interesting. The subject documents should be suppressed.

> B. THE GOVERNMENT HAS NOT SHOWN AND CANNOT SHOW THAT EVIDENCE TO SUPPORT COUNT 2 AND RACKETEERING ACTS 6-11 IS NOT TAINTED BY THE ILLEGAL SEARCH AND SEIZURE.

There is no taint, says the government, because the lead case agent, SA Thibault, and the prosecutors did not actually see the subject photos until after the indictment. If that is correct, here is what it would mean:

- The search team leader, unnamed, was aware that agents were taking close-up photographs of documents. He was the one who told one of the agents not to take any more photographs of the calendar because it was from 1991. Gov't Opp. at 4. If SA Thibault, the lead

5

case agent, was not the architect of the strategy to circumvent the Fourth Amendment through the use of digital photography, the search team leader presumably was. At minimum, the search team leader and the lead case agent were responsible for the agents' conduct at the search site.

- SA Thibault was present in the Jefferson home for the 7 ½ hours of the search, yet according to the government's opposition, he was unaware – "until earlier this year" – that the agents were taking close-up photographs of documents, some 250 close-ups in all. *Id.* Apparently, SA Thibault was in the house – which the photographs show is not so large that one would not bump into the other agents searching – but he did not see what they were doing. Was the lead case agent in the investigation of a U.S. Congressman simply not paying attention at the search of the Congressman's home?

- Apparently, neither the search team leader nor any other agents communicated with the lead case agent for about 18 months or more about evidence that the government now says was plainly and immediately discernible as incriminating.

- The lead case agent learned of the photographed documents "earlier this year" but apparently did not view the so-called incriminating evidence until after the June indictment. *Id.*

The government's spare denial of taint raises more questions than it answers. At minimum it indicates an investigation utterly lacking in supervision. The government's taint defense is simple – if the lead agent did not actually see the photographs pre-indictment, that must mean that they were not used in the investigation. More than false logic, the government's bare-bones response is a telling omission of any detail that would explain how the very documents that were photographed came to be identified in the indictment and the obvious role that they played in the expansion of the government's investigation. Numerous agents were

6

involved to one degree or another in the investigation,[3] and numerous agents would have been involved in following up leads out of different field offices. The agents on the search team obviously found the subject documents to be interesting, and the government now says that beyond interesting or suspicious, the documents were immediately determined to be incriminating. It is not plausible that having gone to the trouble of photographing them, the agents did nothing further with them to follow up with the information that could be gleaned from further study of the documents. If one of the agents recommended that a grand jury subpoena be sent to Arkel, for example, that would be an unlawful exploitation of the violation.

But more to the point, while it may be important to know who *saw* the photographs and when, it is more important to know who *used* the photographs (or the information they contain) and how. The government's assertions that the material did nothing to advance its investigation cannot be squared with its previous judicial admission over a year ago that "*during* and after the August 2005 search, federal agents gathered evidence linking Rep. Jefferson to at least seven other schemes …." *See* Exhibit 6 to Defendant's Motion to Suppress Evidence Seized at 1922 Marengo Street Home (Government's Response to Representative William Jefferson's Motion for Return of Property) at 5 (emphasis added). It will be up to the government to prove, by a preponderance of the evidence, that it came upon the information leading to Count 2 and the related allegations in the RICO count independently. DOJ will need to detail the steps it took, who took them and what leads were followed. Mr. Jefferson respectfully doubts that DOJ can do that.

---

[3]   Records provided in discovery to date name at least nine agents raiding the home: Thibault, Evans, Kent, Horner, Nguyen, Jacobs, Hardee, Smith, and Koerperich.

For instance, the fact that Mr. Jefferson mentioned that James Creaghan went to Nigeria with him in 2004 (which was on behalf of TDC) does not lead directly to the 2002 agreement about Sao Tome, or to the Arkel counts in the indictment, Ind. ¶¶ 152-171, or to other details from the expanded investigation. DOJ cannot dispel the taint.

## CONCLUSION

The taking of photographs of documents that the agents knew they were not entitled to seize was a flagrant violation of the defendant's Fourth Amendment rights. The government has offered no explanation that would excuse this conduct nor any demonstration that the fruit of the agents' illegal conduct was not used to expand the investigation and to support the charges in Count 2 and the corresponding RICO allegations.

Respectfully submitted,

WILLIAM J. JEFFERSON

By Counsel

/s/ Robert P. Trout

_____

Robert P. Trout
(Va. Bar No. 13642)
rtrout@troutcacheris.com
Amy Berman Jackson
(Va. Bar No. 25919)
ajackson@troutcacheris.com
Gloria B. Solomon
(Admitted *pro hac vice*)
gsolomon@troutcacheris.com
TROUT CACHERIS, PLLC
1350 Connecticut Ave, N.W., Suite 300
Washington, D.C. 20036
Phone: (202) 464-3300
Fax: (202) 464-3319

**Certificate of Service**

      I hereby certify that on this 9th day of October, 2007, I electronically filed the foregoing reply with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to the following:

        Mark Lytle
        mark.lytle@usdoj.gov
        Rebeca H. Bellows
        becky.bellows@usdoj.gov
        United States Attorney's Office
        2100 Jamieson Avenue
        Alexandria, Virginia 22314

        Charles E. Duross
        charles.duross@usdoj.gov
        U.S. Department of Justice
        1400 New York Avenue, N.W.
        Washington, D.C. 20005

                /s/ Robert P. Trout
                _____

                Robert P. Trout
                (Va. Bar No. 13642)
                rtrout@troutcacheris.com
                Attorney for William J. Jefferson
                TROUT CACHERIS, PLLC
                1350 Connecticut Ave, N.W., Suite 300
                Washington, D.C. 20036
                Phone: (202) 464-3300
                Fax:  (202) 464-3319