**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| v. | ) | **Case No. 1:07cr209** |
| | ) | |
| **WILLIAM J. JEFFERSON** | ) | |
| **Defendant.** | ) | |

### MEMORANDUM OPINION

A sixteen-count indictment (the "Indictment") charges defendant William J. Jefferson, a sitting member of the United States House of Representatives, with a variety of crimes including bribery, conspiracy, wire fraud, foreign corrupt practices, money laundering, obstruction of justice, and racketeering. Defendant has moved to suppress statements he made to law enforcement officers during an interview conducted at defendant's residence on the morning of August 3, 2005.[1] He contends he was questioned in conditions that restrained his freedom to the degree associated with a formal arrest, and that the law enforcement officers' failure to appraise him of his Constitutional rights render his statements inadmissible under *Miranda v. Arizona*, 384 U.S. 436 (1966).

The facts pertinent to the suppression motion were adduced in the course of an evidentiary hearing[2] at which three FBI agent testified on behalf of the government: Special Agent in Charge (SAC) James Bernazzani, and Special Agents Daniel H. Evans and Timothy R. Thibault. Defendant

---

[1] Defendant has also moved to suppress evidence seized during a search of his residence conducted immediately following the interview. That motion will be addressed in a separate Order.

[2] The hearing was held over parts of four days in December, 2007 and January, 2008.

1

testified on his own behalf. The resulting factual findings are set forth herein pursuant to Rule 12(d),

Fed. R. Civ. P., together with the legal reasons that compel the conclusion that defendant was not

in custody and accordingly that his statements to Agents Thibault and Evans are not subject to the

*Miranda* exclusionary rule.

## I.

Defendant is the currently sitting member of the United States House of Representatives

representing Louisiana's 2nd Congressional District, an office he has held since 1991. He is a

graduate of Harvard Law School and a former law clerk for the late United States District Judge

Alvin B. Rubin. Prior to his election to Congress he was a member of the Louisiana state senate, and

following his election to Congress he earned a graduate law degree in tax law from the Georgetown

University Law Center.

The Indictment alleges that beginning in or about January 2001, defendant used his office

to advance the business interests of various individuals and corporations in return for money and

other things of value paid either directly to defendant or via 'nominee companies,' *i.e.*, companies

ostensibly controlled by one of defendant's family members, but in fact controlled by defendant

himself. The specific schemes alleged in the Indictment are described in greater detail in an earlier

Memorandum Opinion. *See United States v. Jefferson*, 534 F.Supp.2d 645 (E.D. Va. 2008).

As part of the investigation leading to the Indictment in this case, agents from the Federal

Bureau of Investigation (FBI) went to defendant's residence at 1922 Marengo Street in New Orleans,

Louisiana on the morning of August 3, 2005 to execute a search warrant and to interview defendant,

if he consented. At approximately seven o'clock that morning, SAC Bernazzani and Assistant

Special Agent in Charge (ASAC) Howard Schwartz approached defendant's residence and knocked on the door. Although SAC Bernazzani did not plan to participate in either the search or the interview, he decided it would be appropriate for him to initiate contact with defendant that morning because he had previously met defendant at the time Bernazzani became SAC of the FBI's New Orleans field office. Bernazzani believed his presence would reassure defendant that the individuals coming to his house that morning were in fact FBI agents. When defendant answered the door, SAC Bernazzani introduced himself and told defendant that Agents Thibault and Evans, who were then waiting in a car parked on the street, wished to ask defendant some questions. Defendant agreed to meet with the agents and answer their questions, at which point ASAC Schwartz signaled Thibault and Evans to approach the residence. All four agents were in plain clothes, and although they were carrying firearms at the time, their firearms were holstered and concealed and remained so for the entire interview.

At defendant's invitation, Agents Bernazzani, Schwartz, Thibault, and Evans entered defendant's residence. Defendant led Agents Thibault and Evans into a sitting room, leaving SAC Bernazzani and ASAC Schwartz in a foyer by the front door of the residence. SAC Bernazzani remained by the front door for approximately a minute, and then departed the residence and returned to his office; ASAC Schwartz departed the residence some time shortly thereafter, but remained nearby.

Agents Thibault and Evans seated themselves in defendant's sitting room, and while defendant did not tell them where to sit, he testified he had no problem with the seats they chose. After introducing themselves, the agents proceeded to question defendant for approximately two

3

hours. The questioning related to an ongoing FBI investigation into allegations made by Lori Mody, a Virginia businesswoman, who claimed that defendant had solicited bribes from her in return for promoting Mody's business interests in Africa. The government contends that during the interview defendant made a number of inculpatory statements and admissions to the agents.[3]

At some point during the interview, defendant stood up and indicated that he needed to use the bathroom.[4] Agent Evans stated that he followed defendant to the bathroom as a routine and precautionary measure to ensure agent safety and the integrity of the anticipated search. The parties

---

[3] The parties did not elicit the precise nature of these statements and admissions at the evidentiary hearing.

[4] The parties dispute the timing of defendant's trip to the bathroom. The agents testified that defendant used the bathroom towards the end of the two-hour-long interview. Defendant contends that he used the bathroom towards the beginning of the interview. Defendant argues that this dispute is material because it goes to the agents' credibility. Whether defendant's trip to the bathroom came at the end or near the beginning of the interview is not a significant dispute that would affect the agents' credibility.

Similarly, the parties dispute whether defendant left the sitting room during the interview to take a phone call. Agent Thibault testified that defendant left the sitting room at least once during the interview to take a phone call, and that defendant was unaccompanied when he did so. Defendant denies leaving the sitting room during the interview except to go to the bathroom. The evidence adduced at the hearing on this matter shows that while a number of calls were made to defendant's cell phone during the interview, the cell phone was turned off and was upstairs in defendant's bedroom. The evidence further shows that a call was made to defendant's home phone at approximately 8:57 a.m., around the time the agents and defendant say the interview finished, and that defendant made and received a number of phone calls in the hours following the interview during the execution of the search.

Accordingly, while the evidence supports defendant's recollection that he did not leave the sitting room to answer the telephone during the interview, this fact does not substantially affect Agent Thibault's credibility, since defendant did use the telephone immediately after the interview. It is likely that Thibault remembered defendant receiving a telephone call earlier in the interview than actually occurred. In any case, there is no evidence that defendant ever asked to leave the sitting room except to go to the bathroom, or that the agents would have prevented defendant from doing so to answer the telephone had it rung.

dispute what happened next: Defendant claims that Agent Evans followed him into the bathroom and watched while he urinated, while Agent Evans maintains that he remained outside the bathroom. It is not surprising that defendant and Evans recall the events differently more than two years after the fact. In any event, the more convincing account is that given by Agent Evans. At most, the door to the bathroom remained partially ajar while defendant was inside, but taken as a whole the evidence shows that Evans did not enter the bathroom or watch defendant urinate. When defendant had finished using the bathroom, Evans accompanied him back to the sitting room.

Approximately two hours after the interview began, Agent Thibault asked defendant about money allegedly given to him by Lori Mody, the Virginia businesswoman whose allegations had prompted the FBI investigation and who had become a cooperating witness. At that point defendant said that he wished to terminate the interview. The agents complied with this request and immediately stopped asking defendant questions related to their investigation. From that point on defendant was not asked and did not answer any further questions.[5] The agents did ask defendant whether he would watch a video which they had brought with them, and defendant said he would. The agents then played a video allegedly showing defendant receiving money from Mody.

After viewing the video, defendant volunteered a number of further statements which the government contends are inculpatory. According to Agent Evans, defendant slumped back into his

---

[5] Defendant explicitly conceded this point at the January 17, 2008 hearing:

**Government**: But you didn't answer any further questions after — or get asked any further questions after you said, "I don't want to answer any more questions."
**Defendant**:    No, except — no.

seat and said "what a waste"; defendant says he merely commented "what a waste of time."[6]  Agent Thibault testified that defendant then asked what he ought to do, and Thibault advised him that he ought to cooperate with the FBI's investigations.[7]  Thibault informed defendant that the FBI had a warrant to search his residence and that they intended to execute the search immediately, and defendant went to wake his family and inform them of the search.

Defendant now seeks to suppress all statements he made to Agents Thibault and Evans during the course of the two hour interview, both before and after he told the agents that he wished to terminate the questioning.  Defendant argues that the objective circumstances of the interview

---

[6] Agent Evans recalled the conversation as follows:

| | |
|---|---|
| **Government**: | And what was defendant Jefferson's reaction to that video? |
| **Evans**: | It was — how to put it in words.  He looked very dejected at the sight of that, kind of sunk back into the couch, into the seat; and at some point, just started saying, "What a waste." |

Defendant's recollection differs:

| | |
|---|---|
| **Counsel**: | [D]id you say anything after this DVD was played? |
| **Defendant**: | Yes. |
| **Counsel**: | What did you say? |
| **Defendant**: | He questioned me, he said to me — well, I can tell you what he said.  He said, "You need to talk — you may need to talk to somebody about this."  I said, "What a waste of time." |

[7] According to Agent Thibault, the conversation proceeded as follows:

| | |
|---|---|
| **Thibault**: | There was some discussion.  He actually asked me what he should do.  And there was, there was some discussion about me basically telling him that probably the best course of action for him to take was just to tell the truth, accept responsibility.  I told him I knew this might be the worst day in his life, but that he could remedy this, that he could recover, and he could recover by, by taking responsibility and cooperating with us. |

6

demonstrate that he was in custody throughout, and that the agents' failure to appraise him of his *Miranda* rights renders his statements to them inadmissible. The government responds that *Miranda* does not apply because defendant was not in custody during the interview, and that his statements to Agents Thibault and Evans should be admissible.

## II.

The Fifth Amendment guarantees that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. To protect this right, the Supreme Court in *Miranda* adopted a series of procedural rules that must be followed during custodial interrogations. *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). It is well settled that any statement elicited from a suspect in violation of these rules is inadmissible in the prosecution's case-in-chief, although such statements may be admissible at trial for other purposes such as impeachment of a defendant's trial testimony. *Oregon v. Elstad*, 470 U.S. 298, 307 (1985); *Harris v. New York*, 401 U.S. 222, 224 (1971). It is also settled that *Miranda* applies only to custodial interrogations, that is, interrogations conducted after a suspect has been formally arrested or "where there has been such a restriction on a person's freedom as to render him 'in custody.'" *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977). It is undisputed here that the agents' interview with defendant constituted an interrogation. *See Rhode Island v. Innis*, 446 U.S. 291, 301 (1980) ("[T]he term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response."). Accordingly, the only dispute is whether defendant was in custody during the interrogation.

7

An individual is in custody for *Miranda* purposes when his "freedom of action is curtailed to a degree associated with formal arrest." *Berkemer v. McCarty*, 468 U.S. 420, 440 (1984) (internal quotations omitted). The custody inquiry is objective: the question is not whether the suspect or the interrogating officer believed that the suspect was in custody, but whether a reasonable person in the suspect's position would have understood that he or she was in custody. *Berkemer*, 468 U.S. at 442.

Given the fact-intensive nature of the custody inquiry, it is not surprising that courts have emphasized that "the question whether an individual is 'in custody' must be made on a case-by-case basis." *United States v. Jones*, 818 F.2d 1119, 1123 (4th Cir. 1987). It is also not surprising, therefore, that the caselaw addressing the custody question is voluminous, since the facts of each case must be carefully examined to determine whether a reasonable person in the suspect's position would have understood that he or she was in custody in those particular circumstances.[8] A review

---

[8] *See, e.g.*, *United States v. Mittel-Carey*, 493 F.3d 36, 39 (1st Cir. 2007) ("[T]his circuit has identified four factors which ought to be considered when custody is at issue, including whether the suspect was questioned in familiar or at least neutral surroundings, the number of law enforcement officers present at the scene, the degree of physical restraint placed upon the suspect, and the duration and character of the interrogation.") (internal quotations omitted); *United States v. Revels*, 510 F.3d 1269, 1275 (10th Cir. 2007) ("Several relevant factors inform our fact-specific analysis, including: (1) whether the circumstances demonstrated a police-dominated atmosphere; (2) whether the nature and length of the officers' questioning was accusatory or coercive; and (3) whether the police made [the suspect] aware that she was free to refrain from answering questions, or to otherwise end the interview."); *United States v. Thompson*, 496 F.3d 807, 810-11 (7th Cir. 2007) ("[When determining custody] [w]e consider such factors as whether the encounter occurred in a public place; whether the suspect consented to speak with the officers; whether the officers informed the individual that he was not under arrest and was free to leave; whether the individual was moved to another area; whether the was a threatening presence of several officers and a display of weapons or physical force; and whether the officers' tone of voice was such that their requests were likely to be obeyed."); *United States v. Salvo*, 133 F.3d 943, 950 (6th Cir. 1998) ("[T]he factors that courts have relied on include: (1) the purpose of the questioning; (2) whether the place of the questioning was hostile or coercive; (3) the length of the questioning; and (4) other indicia of custody such as whether the suspect was informed at the time that the questioning was voluntary or that the suspect

of this voluminous caselaw suggests that the following factors, while not individually determinative, are often most important to a custody determination:

(1) Whether defendant was informed that he was not under arrest and that he was free to terminate the questioning;[9]

(2) Whether defendant possessed unrestrained freedom of movement during questioning;[10]

(3) Whether defendant voluntarily submitted to questioning;[11]

(4) Whether the agents employed strong arm tactics or deceptive stratagems during questioning;[12]

(5) Whether the atmosphere of the questioning was police-dominated;[13] and

(6) Whether defendant was placed under arrest at the termination of the questioning.[14]

These factors provide an appropriate analytical framework for determining whether defendant was in custody during his interview with Agents Thibault and Evans.

---

was free to leave or to request the officers to do so; whether the suspect possessed unrestrained freedom of movement during questioning; and whether the suspect initiated contact with the police or voluntarily admitted the officers to the residence and acquiesced to their requests to answer some questions."); *United States v. Griffin*, 922 F.2d 1343, 1347-49 (8th Cir. 1990) ("[R]elevant factors . . . include an accused's freedom to leave the scene, and the purpose, place, and length of the interrogation.").

[9] *See, e.g.*, *Revels*, 510 F.3d at 1275; *Thompson*, 496 F.3d at 810; *Salvo*, 133 F.3d at 950.

[10] *See, e.g.*, *Mittel-Carey*, 493 F.3d at 39; *Salvo*, 133 F.3d at 950.

[11] *See, e.g.*, *Thompson*, 496 F.3d at 810; *Salvo*, 133 F.3d at 950.

[12] *See, e.g.*, *Revels*, 510 F.3d at 1275; *Thompson*, 496 F.3d at 810-11.

[13] *See, e.g.*, *Mittel-Carey*, 493 F.3d 39; *Revels*, 510 F.3d at 1275; *Thompson*, 496 F.3d at 810.

[14] *See Griffin*, 922 F.2d at 1349.

1.  Whether defendant was informed that he was not under arrest and that he was free to terminate the questioning

Law enforcement officers may often remove doubt regarding the non-custodial nature of an interrogation by telling the person being interviewed that he is not under arrest and that he is free to terminate the questioning.[15]  Of course such reassurances may be hollow if the circumstances otherwise indicate that a suspect is not in fact free to terminate questioning.  The Fourth Circuit has made clear that while informing a suspect that he is not under arrest is often a key element in determining a lack of custody, "it is not a talismanic factor," and "where the entire context indicates a lack of custody, failure to inform defendant of his status is not dispositive."  *Davis v. Allsbrooks*, 778 F.2d 168, 171-72 (4th Cir. 1985).

In this case, none of the agents who spoke with defendant from the time he answered his front door to the time the interview concluded ever told defendant that he was not under arrest or that he was free to terminate questioning.  Yet, it is also important to note that the agents never told defendant that he *was* under arrest, and they never told him he could *not* terminate questioning. Equally important is the fact that defendant acknowledged that he understood he could have refused to submit to questioning.  The transcript of the January 14, 2008 hearing records the following exchange:

---

[15] Although it is not necessary to advise a person being interviewed that he or she is not under arrest and may terminate the interview in order to avoid rendering an interrogation custodial, prudent law-enforcement agents are well advised to do so.

Also, in many circumstances it is appropriate to inquire whether defendant was free to leave the place of questioning; however, because this defendant was questioned in his own home, the more appropriate inquiry is whether defendant was free to ask the agents to leave.

**Government**: You could have said 'no' [to being interviewed]; is that correct?
**Defendant**:    I didn't want to say 'no.'
**Government**: You could have said 'no,' right?
**Defendant**:    Yes.  I wanted to be cooperative and speak with them.

Although custody determinations "do not depend on the subjective views of . . . the person being questioned," *Parker*, 262 F.3d at 419, defendant's testimony, together with the testimony of the agents, supports the government's position that as a matter of fact defendant was free to refuse questioning and to terminate the interview at any time.  This position is further supported by the fact that defendant ultimately did terminate the interview.[16]  In these circumstances, the agents' failure to tell defendant that he was not under arrest or that he was free to terminate questioning does not support defendant's contention that he was in custody.

2.  Whether defendant possessed unrestrained freedom of movement during questioning

A second important factor in the custody determination is whether the suspect possessed unrestrained freedom of movement during questioning.  Defendant argues that he was subject to restraint of a degree associated with formal arrest when Agent Evans accompanied him to the bathroom.  Not surprisingly, given the frequency of police interrogations, there is caselaw addressing an agent's accompaniment of a suspect to the bathroom during an interview.  This caselaw establishes that mere accompaniment to the bathroom does not rise to the level of restraint normally associated with formal arrest, especially where, as here, other indicia of custody are absent.[17]

---

[16] *See supra* note 5 and accompanying text.

[17] *See United States v. Vidal*, 85 Fed.Appx. 858, 860, 862 (3d Cir. 2004) (no custody where suspect allowed to get dressed, take medication, and use bathroom even though bathroom door kept partially ajar); *United States v. Welch*, 80 Fed.Appx. 7, 9 (9th Cir. 2003) (no custody where suspect allowed to move freely about the house "as long as she was accompanied by an officer to ensure the safety of [suspect] and the officers").

11

Defendant seeks to avoid this conclusion by citing *United States v. Madoch*, 149 F.3d 596 (7th Cir. 1998), in which an agent had followed the suspect into the bathroom to supervise the suspect as she pumped breast milk.  The Seventh Circuit noted that "the presence of the agent in the bathroom with [the suspect] was eloquent evidence that she could not just walk out the door and terminate her conversation with the agents."  149 F.3d at 601.

*Madoch* is distinguishable from the present case in a number of respects.  First, unlike the agent in *Madoch*, Agent Evans did not enter the bathroom with defendant.  Second, while the agent's presence in the bathroom in *Madoch* illustrated the custodial nature of the situation, it was not the only factor indicating custody.  In *Madoch*, the agents raided the suspect's house, yelling, and ordered the suspect into the kitchen.[18]  When the suspect started for another room, one agent reached for his gun.[19]  Moreover, agents (i) handcuffed the suspect's husband and separated the suspect from her husband, (ii) ordered the suspect to remain in her kitchen, and (iii) refused to allow the suspect to answer her phone.[20]  In these circumstances, the agent's presence in the bathroom when the suspect was expressing breast milk was simply one among a host of factors indicating the suspect's lack of freedom.

None of these factors is present in the instant case; rather, the facts of this case are more analogous to the facts of *United States v. Vidal*, 85 Fed.Appx. 858 (3d Cir. 2004).  In *Vidal*, the suspect was "permitted to move about the house, although only if accompanied by an agent," and

---

[18] *Madoch*, 149 F.3d at 600.

[19] *Id.*

[20] *Id.*

12

"was permitted to use the bathroom by himself, but with the door partially ajar." 85 Fed.Appx. at 860. In light of the other facts of the case — in particular, the fact that the suspect was not placed under arrest, frisked, or told that he could not leave; the fact that the interrogation took place in the suspect's home; and the fact that his requests to get dressed, use the bathroom, and take his medication were all honored — the Third Circuit concluded that the situation was not custodial, despite the fact that the suspect had been accompanied as he moved about his house and despite the fact that fourteen agents were present in the house at the time of the questioning. 85 Fed.Appx. at 861-62.

For the same reasons, Agent Evans's supervision of defendant during his trip to the bathroom has minimal impact on the custody determination. The agents did not prevent defendant from going to the bathroom as soon as defendant indicated his desire to do so. Agent Evans did not direct defendant to a particular bathroom, but rather followed defendant as he freely moved about his own house. And Agent Evans did not enter the bathroom with defendant, but rather waited outside while, at most, the bathroom door remained partially open. Absent other indicia of custody, Agent Evans's actions do not represent the sort of restraint normally associated with a formal arrest.

3. Whether defendant voluntarily submitted to questioning

Courts have been reluctant to find that an individual is in custody when he voluntarily agrees to a police request for questioning.[21] Here, it is pellucidly clear that defendant voluntarily submitted

---

[21] *See Davis v. Allsbrooks*, 778 F.2d 168, 171 (4th Cir. 1985) (no custody where suspect's contact with police was the result of suspect's voluntary response to police request to speak with him); *see also United States v. Fazio*, 914 F.2d 950, 956 (7th Cir. 1990) (no custody where suspect voluntarily agreed to police questioning); *United States v. Lewis*, 556 F.2d 446, 449 (6th Cir. 1977) (same); *Spinney v. United States*, 385 F.2d 908, 910 (1st Cir. 1967) (same).

to questioning by Agents Thibault and Evans.  Defendant recounted his initial interaction with the

FBI agents as follows:

> **Defendant**:  . . . I opened the door slightly, and the special agent who heads the New Orleans office introduced himself, and told me that the other men with him were FBI agents.
>
> **Counsel**:  And what did he say?
>
> **Defendant**:  He said they would like to speak with me, and asked if they could.
>
> **Counsel**:  And what did you say?
>
> **Defendant**:  I told him yes, they could speak with me.
>
> . . .
>
> **Government**:  You made the choice to be interviewed — to agree to be interviewed by the agents; is that correct?
>
> **Defendant**:  That's correct.[22]

Defendant again voluntarily submitted to questioning after indicating his desire to terminate the

interrogation when he agreed to view the video the agents had brought with them.   In the

circumstances, it is clear that defendant voluntarily submitted to questioning, and his voluntariness

weighs against a determination that he was in custody during the interrogation.

4.  Whether the agents employed strong arm tactics or deceptive stratagems during questioning

      A fourth important factor in the custody determination focuses on police use of coercive or

deceptive tactics during the interrogation.   Such tactics include using hostile tones of voice,

confronting the suspect with false or misleading witness statements, and employing good guy/bad

guy tactics.[23]   The Supreme Court in *Miranda* made clear that such tactics of "intimidation or

---

[22] Defendant also acknowledged that he could have refused to submit to questioning.  *See supra* n.8.

[23] *See United States v. Willaman*, 437 F.3d 354, 359-60 (3d Cir. 2006) ("Courts consider a variety of factors when determining if a person was in custody, including . . . whether the officers used coercive tactics such as hostile tones of voice."); *United States v. Beraun-Panez*, 812 F.2d 578, 580 (9th Cir. 1987) (custody where agents repeatedly accused suspect of lying, confronted him with

trickery" are antithetical to the Fifth Amendment's guarantee against self-incrimination,[24] and use of such tactics often indicates the existence of custodial circumstances.[25]

There is no evidence that Agents Thibault or Evans employed any coercive or deceptive practices during their interview with defendant. All three men testified that the interview was generally cordial, and although Agent Thibault made a remark toward the end of the interrogation to the effect that it was likely the worst day of defendant's life, this remark was clearly intended to be sympathetic rather than threatening. In summary, there is no evidence that Agents Thibault and Evans employed unduly hostile tones of voice, false or misleading witness statements, good guy/bad guy tactics, or any other behavior indicative of coercion or deception in the course of the interrogation.

5. Whether the atmosphere of the questioning was police-dominated

Courts are more likely to find that a suspect was in custody when the atmosphere in which the interrogation was conducted was dominated by law enforcement agents. Relevant in this regard are the place and length of questioning[26] and the nature of the police presence.[27] Courts are less

---

false or misleading witness statements, employed good guy/bad guy tactics, took advantage of suspect's alien status, and insisted on the "truth" until being told what they wanted to hear).

[24] *Miranda*, 384 U.S. at 460-61.

[25] *Griffin*, 922 F.2d at 1351.

[26] *Griffin*, 922 F.2d at 1352 ("The question is whether the entire context of the questioning, including such considerations as place and length of the interrogation, demonstrates that the course of the investigation was police dominated.").

[27] *United States v. Colonna*, 511 F.3d 431, 436 (4th Cir. 2007) (atmosphere police-dominated where twenty-three FBI agents entered house, woke suspect at gunpoint and guarded suspect at all times).

likely to find a police-dominated environment when a suspect is interviewed in his own home,[28] although the fact of familiar surroundings may be outweighed by the physical control agents exercised over the suspect and the scene.[29]

Defendant here was interrogated in his own home by two agents whom he had invited in and whose questions he had voluntarily agreed to answer.  The agents never displayed their firearms and never controlled defendant's movements inside his own house, either by directing him where to sit or stand or by preventing him from moving about his home.  And although the agents questioned defendant for approximately two hours, there is no indication that they were less than professional in their demeanor.  In sum, the fact that defendant was interviewed in his own home, with his consent, and that he was not subject to control or restraint by the questioning agents, demonstrates conclusively that the atmosphere of the interrogation was not police-dominated and weighs substantially against a finding of custody here.

6.  Whether defendant was placed under arrest at the termination of the questioning

Finally, it is significant to the custody determination whether the suspect was in fact arrested at the conclusion of the interrogation.  Formal arrest at the conclusion of an interrogation indicates

---

[28] *See Beckwith*, 425 U.S. at 347 (interview in suspect's home "does not present the elements which the *Miranda* court found so inherently coercive. . ."); *United States v. Parker*, 262 F.3d 415, 419 (4th Cir. 2001) (fact that suspect was interviewed in her own home counted against finding that she was in custody).

[29] *See Orozco v. United States*, 394 U.S. 324, 326-27 (1969) (suspect in custody when interrogated by four police officers while in his bed at four in the morning); *Mittel-Carey*, 493 F.3d at 40 ("While an interrogation in a defendant's residence, without more, certainly weighs against a finding of custody, the level of physical control the agents exercised over [the suspect] weighs heavily in the opposite direction, despite the fact that the control was exercised inside defendant's home.").

that a suspect would not have been free to terminate questioning or to leave the scene.[30]  Here, defendant was not arrested at the conclusion of the interrogation, a fact that weighs against a finding of custody.

### III.

Application of these factors, each drawn from the voluminous caselaw addressing the custody determination, clearly establishes that defendant was not in custody during his interview with Agents Thibault and Evans.  Specifically, (i) although defendant was never told that he was not under arrest or that the questioning was voluntary, he has acknowledged that he knew he could refuse to submit to questioning, and he ultimately did terminate questioning; (ii) defendant had unrestrained freedom of movement throughout the interrogation; (iii) defendant voluntarily submitted to questioning by the agents; (iv) no strong arm tactics or deceptive stratagems were employed during questioning; (v) the atmosphere of the interrogation was not police-dominated; and (vi) defendant was not placed under arrest at the termination of the questioning.  Given these facts, it cannot be said that defendant was subject to restraints of the sort generally associated with formal arrest, and accordingly defendant was not in custody during his interrogation.[31]  It follows that defendant was not entitled

---

[30] *See Griffin*, 922 F.2d at 1355 ("[W]e believe [the suspect's] arrest at the conclusion of the interview is objective evidence which tends to support the reasonableness of [the suspect's] subjective belief that he was in custody from the inception of the encounter and that his arrest was imminent.").

[31] Where *Miranda* warnings are unnecessary, a suspect may still seek to suppress inculpatory statements on the ground that his will was overborne and that his statements were accordingly not made voluntarily.  *Culombe v. Connecticut*, 367 U.S. 568, 602 (1961).  Defendant understandably does not argue that his statements were involuntary or that his will was overborne, in light of his extensive legal and professional experience and the subjective nature of the voluntariness test.  *See United States v. Wertz*, 625 F.2d 1128, 1133-34 (4th Cir. 1980) ("Whether a confession is involuntary . . . is a question of fact to be determined from the totality of the circumstances — both

to be appraised of his rights under *Miranda v. Arizona*, and his statements to Agents Thibault and Evans are not inadmissible because of the agents' failure to give defendant a *Miranda* warning.[32] Accordingly, defendant's motion to suppress these statements must be denied.

An appropriate Order will issue.

_____/s/_____
T.S. Ellis, III
United States District Judge

Alexandria, Virginia
June 23, 2008

_____

the characteristics of the accused and the details of the interrogation.") (internal quotations omitted).

[32] Defendant will have the opportunity at trial to object to the admissibility of these statements on other grounds, such as the Federal Rules of Evidence.