**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| v. | ) | **Case No. 1:07cr209** |
| | ) | |
| **WILLIAM J. JEFFERSON** | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION**

A sixteen-count indictment (the "Indictment") charges defendant William J. Jefferson, a sitting member of the United States House of Representatives, with a variety of crimes including bribery, conspiracy, wire fraud, foreign corrupt practices, money laundering, obstruction of justice, and racketeering. Defendant moved to dismiss Counts 2, 3, 10, and 12-14 of the Indictment for lack of venue, and to transfer the remaining Counts to the United States District Court for the District of Columbia. By Order dated November 30, 2007, defendant's motion was denied. *See United States v. Jefferson*, 1:07cr209 (E.D. Va. Nov. 30, 2007) (Order).

Defendant now moves for reconsideration of the November 30, 2007 Order, arguing that the government's decision to try this case in the Eastern District of Virginia, rather than in the District of Columbia, raises equal protection concerns similar to those in *Batson v. Kentucky*, 476 U.S. 79 (1986) owing to the disparity in the racial composition of the populations of the two jurisdictions. According to defendant, the Supreme Court's recent decision in *Snyder v. Louisiana*, 128 S. Ct. 1203 (2008) reaffirms a three-step process for adjudication of his claim and establishes that he is entitled to discovery related to the government's decision to prosecute this case in this district. Defendant's

1

reliance on *Snyder* is misplaced; that case does not extend the reasoning of *Batson* to the government's venue decisions, and even assuming *Batson* extended so far, the government's choice of venue in this case would warrant neither discovery nor dismissal and transfer. Accordingly, for the reasons that follow, defendant's motion to reconsider must be denied.

## I.

Defendant is the currently sitting member of the United States House of Representatives representing Louisiana's 2nd Congressional District, an office he has held since 1991. The Indictment alleges that beginning in or about January 2001, defendant used his office to advance the business interests of various individuals and corporations in return for money and other things of value paid either directly to defendant or via 'nominee companies,' *i.e.*, companies ostensibly controlled by one of defendant's family members, but in fact controlled by defendant himself. The specific schemes alleged in the Indictment are described in greater detail in an earlier Memorandum Opinion. *See United States v. Jefferson*, 534 F.Supp.2d 645 (E.D. Va. 2008).

The investigation into defendant's activities began when Lori Mody, a businesswoman from McLean, Virginia, approached the Federal Bureau of Investigation to report what she believed to be a fraud perpetrated by defendant. Mody alleged that defendant had solicited bribes in return for his assistance in promoting telecommunications ventures that Mody was pursuing in Nigeria, Ghana, and elsewhere in Africa.[1] Specifically, as alleged in the indictment, Mody claimed that defendant

---

[1] Defendant had introduced Mody to Vernon Jackson, president and CEO of iGate, Inc., in an effort to encourage Mody to invest in a telecommunications venture iGate was pursuing in various African countries. The Indictment alleges that defendant had previously solicited bribes from Jackson and iGate in return for defendant's assistance in promoting iGate's own telecommunications ventures in Africa.

had sought payment in the form of fees paid to defendant's family members, as well as shares in

Mody's companies, in return for various acts including defendant's assistance in securing financial

assistance for Mody's African ventures from the Export-Import Bank of the United States (Ex-Im

Bank).[2]  Defendant and Mody, who had become a cooperating government witness, thereafter met

in Vienna, Virginia, and discussed the possibility of bribing Atiku Abubakar, then the Vice President

of Nigeria, in order to ensure the success of Mody's Nigerian venture.  Defendant and Mody later

met in Arlington, Virginia, at which time Mody gave defendant $100,000 in cash which he was to

use to bribe Abubakar, according to the Indictment.  FBI agents later discovered $90,000 of this

money in defendant's freezer during a search of his Washington, D.C. residence.

Mody's allegations prompted an investigation that revealed several other schemes involving

defendant's solicitation of bribes in return for official acts.  *See United States v. Jefferson*, 534

F.Supp.2d 645 (E.D. Va. 2008) (describing the various schemes alleged in the Indictment).  The

schemes generally involved defendant allegedly soliciting things of value in return for using his

office to advance the business interests of various individuals and corporations by, *inter alia*, (i)

meeting with American government officials (including officials at the Ex-Im Bank and the United

States Trade Development Agencty (USTDA)[3]), (ii) meeting with foreign government officials, (iii)

traveling to Africa via Washington Dulles International Airport in Dulles, Virginia, and (iv) using

---

[2]   The Export-Import Bank of the United States, located in Washington, D.C., is an agency established by Congress "to assist in financing the export of U.S. goods and services to international markets."  *About Ex-Im*, http://www.exim.gov/about/mission.cfm (Last visited June 24, 2008).

[3]  The USTDA, located in Arlington, Virginia, is an agency established by Congress to "advance[] economic development and U.S. commercial interests in developing and middle income countries."  *About USTDA: Mission Statement*, http://www.ustda.gov/about/mission.asp (Last visited June 24, 2008.)

his congressional staff.[4]  A number of the overt acts undertaken in furtherance of these schemes, both

by defendant and by his alleged co-conspirators, took place in the Eastern District of Virginia.

Defendant originally challenged venue on two grounds.  First, defendant argued that the

allegations in the Indictment failed to establish that venue was proper in this district as to Counts 2

(Conspiracy to Solicit Bribes and to Commit Wire Fraud), 3 (Solicitation of Bribes), 10 (Wire

Fraud), and 12-14 (Money Laundering).  Second, defendant argued that while venue was strictly

proper in this district as to the other Counts of the Indictment, the decision to prosecute his case here

rather than in the District of Columbia was racially discriminatory given the disparity in the racial

composition of the jury pools in the two districts.  Defendant accordingly moved to dismiss Counts

2, 3, 10, and 12-14 and to transfer venue over the remaining Counts to the United States District

Court for the District of Columbia.  By Order dated November 30, 2007, defendant's motion was

denied.  *See United States v. Jefferson*, 1:07cr209 (E.D. Va. Nov. 30, 2007) (Order).

Defendant now moves for reconsideration of the November 30, 2007 Order, arguing that it

failed to apply the proper analysis to his claim of racial discrimination.  Specifically, defendant

argues that, as the Supreme Court held in *Batson* and recently reaffirmed in *Snyder*, when a

defendant establishes a *prima facie* case of purposeful racial discrimination in the jury selection

process, the burden rests on the government to establish a race-neutral explanation for its jury

selection practices.  The government responds that defendant's argument would unnecessarily extend

---

[4] An earlier Memorandum Opinion rejected defendant's argument that these acts did not constitute "official acts" under the Bribery Statute, 18 U.S.C. § 201, and that the Indictment was infirm with regard to its bribery Counts.  *See United States v. Jefferson*, 1:07cr209 (E.D. Va. May 23, 2008) (Memorandum Opinion).

4

the *Batson* holding beyond its original facts, and that even if *Batson* were extended in this manner, defendant has failed to establish a *prima facie* showing of purposeful discrimination. The matter has been fully briefed and argued and is now ripe for disposition.

Additionally, although defendant has not specifically renewed his venue challenge regarding Counts 2, 3, 10, and 12-14, this Memorandum Opinion reiterates briefly the reasons underlying the November 30, 2007 Order denying defendant's original motion.

## II.

The jurisdictional rules regarding venue in federal criminal prosecutions are rooted in the Constitution's guarantee that a criminal defendant be tried "in the State where the said Crimes shall have been committed."[5]   This guarantee is given effect in two ways. First, a statute creating a criminal offense may include an express provision indicating where Congress considers the place of the crime to be. In this event, of course, the venue determination is straightforward.[6]  But when the statute creating the offense is silent as to venue, the Constitutional venue guarantee is given effect by requiring a court to determine the place or places where the crime was committed based on "the nature of the crime alleged and the location of the act or acts constituting it."[7]  This

---

[5] U.S. Const. Art. III, § 2, cl. 3; *see also* U.S. Const. Am. VI ("In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law . . ."); Fed. R. Crim. P. 18 ("Except as otherwise permitted by statute or these rules, the prosecution shall be had in a district in which the offense was committed.").

[6] *United States v. Bowens*, 224 F.3d 302, 308 (4th Cir. 2000) ("While the venue rule — trial in the district where the crime is committed — seems straightforward, the place of the crime can be difficult to determine. Of course, Congress can prevent some of that difficulty by including an express provision in a criminal statute.").

[7] *United States v. Anderson*, 328 U.S. 699, 703 (1946); *Bowens*, 224 F.3d at 308.

5

determination "may yield more than one appropriate venue, or even a venue in which the defendant has never set foot."[8]  In a multiple-count prosecution, venue must be proper as to each count, and the government bears the burden of proving venue by a preponderance of the evidence.[9]

Defendant contends that venue is improper in the Eastern District of Virginia as to Counts 2, 3, 10, and 12-14 of the Indictment in this case.

A.  Count 2 - Conspiracy to Solicit Bribes by a Public Official and to Deprive Citizens of Honest
    Services by Wire Fraud

Count 2 charges defendant with conspiracy to solicit bribes and to commit wire fraud.  Venue in a conspiracy charge may be laid "in any district in which a conspirator performs an overt act in furtherance of the conspiracy or performs acts that effectuate the object of the conspiracy."  *United States v. Mitchell*, 70 Fed.Appx. 707, 711 (4th Cir. 2003) (citing *Hyde v. United States*, 225 U.S. 347, 356-57 (1912)).  The overt acts necessary to support venue in a conspiracy case do not have to be substantial, *United States v. Smallwood*, 293 F.Supp.2d 631, 638 (E.D. Va. 2003) (quoting *Mitchell*, 70 Fed.Appx. at 711), and the acts of one conspirator can be attributed to all other conspirators for venue purposes.  *United States v. Al-Talib*, 55 F.3d 923, 928 (4th Cir. 1995).

Count 2 alleges that defendant and his alleged co-conspirators performed numerous overt acts in this district in furtherance of the conspiracy, including travel to and from Washington Dulles International Airport in Dulles, Virginia; filing of an application with the USTDA in Arlington, Virginia; and communication with officials of the USTDA in Arlington, Virginia.  These overt acts

---

[8] *Bowens*, 224 F.3d at 309.

[9] *Id.*

6

plainly suffice to support venue in this district as to Count 2.

## B. Count 3 - Solicitation of Bribes by a Public Official

Count 3 charges defendant with soliciting bribes in return for being influenced in the performance of official acts, in violation of 18 U.S.C. § 201. Under that section, any person who "being a public official or person selected to be a public official, directly or indirectly, corruptly demands, seeks, receives, accepts, or agrees to receive or accept anything of value personally or for any other person or entity, in return for being influenced in the performance of any official act," is guilty of an offense. *See United States v. Jefferson*, 1:07cr209 (E.D. Va. May 23, 2008). Section 201 is violated when a public official solicits or accepts money in return for being influenced in the performance of official acts, regardless of whether any official acts are ever performed. *United States v. Brewster*, 408 U.S. 501, 526 (1972). Accordingly, venue is proper wherever a public official "demands, seeks, receives, accepts, or agrees to receive or accept anything of value" in return for being influenced in the performance of official acts.

Count 3 alleges that defendant solicited and received, on behalf of ANJ Group, L.L.C., things of value from Vernon Jackson and iGate, Inc. in the Eastern District of Virginia and elsewhere. Count 3 further alleges that defendant solicited and received these things of value in return for being influenced in the performance of official acts. Accordingly, Count 3's allegations are sufficient to give rise to venue for that Count in this district.

## C. Count 10 - Scheme to Deprive Citizens of Honest Services by Wire Fraud

Count 10 alleges that defendant devised and engaged in a scheme to deprive citizens of defendant's honest services by means of wire fraud in violation of 18 U.S.C. § 1343; specifically,

Count 10 alleges that on July 6, 2005, defendant engaged in a wire communication — a telephone call from defendant in Accra, Ghana to Vernon Jackson in Louisville, Kentucky — in furtherance of a scheme to promote iGate's and Mody's telecommunications ventures in Ghana and Nigeria in return for bribes from Jackson and Mody.

To convict a defendant of wire fraud, the government must prove 1) a scheme to defraud and 2) the use of a wire communication in furtherance of that scheme. *United States v. Allen* 491 F.3d 178, 185 (4th Cir. 2007). The Fourth Circuit has held that wire fraud is a continuing offense as defined in 18 U.S.C. § 3237(a), and that venue is accordingly appropriate in any district to which or from which a communication is transmitted in furtherance of the fraud scheme. *United States v. Ebersole*, 411 F.3d 517, 527 (4th Cir. 2005). The communication alleged in Count 10 was not transmitted from, through, or to this district. Yet, the government contends that venue is nonetheless proper here because the communication was made in furtherance of a scheme to defraud that was devised and acted upon in this district. The question, then, is whether venue in a wire fraud case is appropriate in a district where a defendant devises and acts upon a scheme to defraud, even if the wire transmission underlying the offense was not transmitted from, through, or to that district.

Although the Fourth Circuit has not directly addressed this question, caselaw from other circuits provides an instructive framework for determining when venue in a wire fraud case is appropriate in districts other than those in which the transmission at issue originated, passed through, or terminated. In *United States v. Pearson*, 340 F.3d 459, 466 (7th Cir. 2003) (vacated on other grounds), the Seventh Circuit held that venue in a wire fraud case was proper in a district where defendants performed acts manifesting an intent to defraud, even though the wire transfer at issue

8

did not originate in, pass through, or terminate in that district. The defendants in *Pearson* had

devised a scheme to defraud customers in the Southern District of Illinois, and in furtherance of that

scheme they had published false advertisements and sold defective products in that district. *Id.* at

466-67. The *Pearson* court found venue to be appropriate in the Southern District of Illinois even

though the transmission underlying the wire fraud count had originated in the Eastern District of

Pennsylvania and terminated in the Northern District of Illinois, and had never passed through the

Southern District of Illinois. *Id.* at 466. In support of this result, the Seventh Circuit reasoned that

a scheme to defraud is an integral element of a wire fraud offense, and that accordingly venue is

proper wherever a defendant performs any over act in furtherance of the scheme. *Id.*

The Ninth Circuit has taken a somewhat narrower view of venue in wire fraud cases. In

*United States v. Pace*, 314 F.3d 344, 349 (9th Cir. 2002), the defendant had been charged in the

District of Arizona with wire fraud based on wire transmissions from Mexico to Ohio. *Id.* at 347-48.

The government argued that venue was proper in Arizona because the defendant had devised his

scheme to defraud in Arizona. *Id.* at 349. Noting that "it is using wires and causing wires to be used

in furtherance of the fraudulent scheme that constitutes prohibited conduct," the Ninth Circuit held:

> "[V]enue is established in those locations where the wire transmission at issue
> originated, passed through, or was received, *or from which it was orchestrated*. In
> other words, venue may lie only where there is a direct or causal connection to the
> misuse of wires."

*Id.* (internal citations omitted and emphasis added). Because the government had not proven a causal

connection between the defendant's actions in Arizona and the wire transfer from Mexico to Ohio,

the Ninth Circuit concluded that venue was improper in the District of Arizona. *Id.* at 350-51.

The Second Circuit took a similarly narrow view of venue in a mail fraud case in *United*

*States v. Ramirez*, 420 F.3d 134 (2d Cir. 2005). There, the defendant in *Ramirez* was charged with sending a fraudulent visa petition from New Jersey to the Immigration and Naturalization Service branch office in Vermont in furtherance of a scheme that had been devised in Manhattan. *Id.* at 143-44. Relying on the Supreme Court's decision in *Rodriguez-Moreno* that venue is determined "from the nature of the crime alleged and the location of the *act* or *acts* constituting it," 526 U.S. at 279 (emphasis added), the Second Circuit held that the mere devising of a scheme to defraud did not give rise to venue because "[w]hile a scheme to defraud is certainly one of three essential elements of mail fraud, it is not an essential *conduct* element." 420 F.3d at 146. And because the government had not introduced any evidence of acts performed in Manhattan that had a causal connection to the actual mailing at issue, the *Ramirez* court determined that venue was not proper in the Southern District of New York. *Id.* at 145-46.

Although these cases appear to present a circuit split, in fact, when carefully read they are in harmony. Taken together, they establish that (i) merely devising a scheme in a particular district does not give rise to venue in that district over a wire fraud offense predicated on a transmission between two other jurisdictions, but (ii) orchestrating a wire transmission or performing other acts directly or causally connected to the wire transmission does give rise to venue in the district where such acts are performed, even if the wire transmission does not originate, pass through, or terminate in that district. These sensible principles are also in harmony with other authority relating to venue in wire fraud and cases.[10] The point is simply that venue cannot be based on the purely mental

_____

[10] *See, e.g.*, *United States v. Goldberg*, 830 F.2d 459, 465 (3d Cir. 1987) (venue in wire fraud case appropriate in district where defendant performed acts necessary to accomplish wire transmission between two other districts).

element of devising a scheme, for it is impossible to ascertain or prove where a scheme was hatched. But in order for a wire fraud to be criminally actionable, steps must be taken to actuate the scheme or bring it to fruition.  It is these acts on which venue must be based.  Put differently, although venue for a wire fraud or mail fraud scheme cannot be based on where the scheme was hatched, it is also not limited to those places where the wire or mail was transmitted, passed through, or arrived; other acts in furtherance of the scheme may also support venue.[11]

These principles, applied here, compel the conclusion that venue is appropriate in this district for Count 10 of the Indictment.  That Count alleges that defendant engaged in a wire communication, namely a telephone call from Accra, Ghana to Vernon Jackson in Louisville, Kentucky, in direct furtherance of a scheme devised at least in part in the Eastern District of Virginia.  According to the Indictment, defendant and Jackson discussed the progress of defendant's meetings in Ghana relating to defendant's promotion of a telecommunications venture for which defendant had solicited and received bribes from Jackson and Mody.  Defendant and Jackson also allegedly discussed a letter defendant had sent to Nigerian Vice President Atiku Abubakar relating to defendant's promotion of a related telecommunications venture for which defendant had also solicited and received bribes from Jackson and Mody.

The Indictment alleges a number of specific acts performed by defendant in the Eastern District of Virginia that are clearly causally and directly connected to the wire communication at issue in Count 10.  Specifically, the Indictment alleges that (i) defendant directed an employee, Brett

---

[11] While it is possible to read the Second Circuit's decision in *Ramirez* as contrary to this conclusion, such a reading is neither required nor warranted in light of the principles underlying that decision and the decisions of the other circuits cited herein.

Pfeffer, to meet with Mody in McLean, Virginia, to solicit bribes in return for defendant's promotion of iGate's and Mody's African telecommunications ventures; (ii) defendant met with Mody in Vienna, Virginia to discuss defendant's promotion of iGate's and Mody's African ventures; and (iii) defendant sent a number of facsimiles to Mody in McLean, Virginia soliciting bribes and discussing defendant's promotion of iGate's and Mody's African ventures.   The wire communication alleged in Count 10 was made to appraise Jackson of the progress of the scheme; specifically, defendant and Jackson allegedly discussed defendant's promotion of iGate's and Mody's telecommunications ventures in both Ghana and Nigeria.   In short, defendant did not merely devise the underlying scheme in this district; instead, he is alleged to have performed various acts that were directly and causally connected to the wire transmission.   It follows that venue is proper in this district over the wire fraud offense alleged in Count 10 of the Indictment.

D.  Counts 12-14 - Money Laundering

Counts 12-14 allege that defendant engaged in money laundering by knowingly participating in the transfer of the proceeds of criminal activity, namely the bribery proceeds, from the Eastern District of Virginia to the Eastern District of Louisiana.   These counts further allege that defendant knowingly caused another to engage in three separate monetary transactions, also in violation of the money laundering statute, 18 U.S.C. § 1957.   That statute specifically provides establishes venue for money laundering cases in (1) any district in which the financial or monetary transaction is conducted or (2) any district where a prosecution for the underlying specified unlawful activity could be brought, if the defendant participated in the transfer of the proceeds from that district to the district where the transaction is conducted.   18 U.S.C. § 1956(i).

12

For the reasons stated in Part II(B) above, venue is proper in this district for the underlying specified unlawful activity, namely the solicitation and receipt of bribes in return for being influenced in the performance of official duties. Accordingly, because defendant is alleged to have participated in the transfer of the proceeds of bribery from the Eastern District of Virginia to the Eastern District of Louisiana, venue is proper in this District for Counts 12-14 pursuant to 18 U.S.C. § 1956(i).

### III.

In addition to these specific challenges to venue, defendant seeks dismissal or transfer of all Counts of the Indictment on the ground that the government's decision to prosecute this case in the Eastern District of Virginia violates *Batson v. Kentucky*, 476 U.S. 79 (1986). The *Batson* Court famously determined that the Equal Protection Clause of the Fourteenth Amendment forbids peremptory challenges to prospective jurors based solely on race, and established the standard by which a defendant may make a *prima facie* case of purposeful discrimination. *Id.* at 84, 96. Under that standard, a defendant must show (i) that prosecutors have used peremptory challenges to remove members of a cognizable racial group from the venire; and (ii) that the peremptory removal of such individuals, and other relevant circumstances, raise an inference that prosecutors used peremptory challenges to exclude those individuals from the jury on account of their race. *Id.* at 96; *see also Powers v. Ohio*, 499 U.S. 400, 415 (1991) (modifying *Batson* by allowing defendants of races different than the excluded jurors to challenge such peremptory challenges). Once a defendant has made a *prima facie* showing of purposeful discrimination, the prosecution must offer a race-neutral explanation for the removal of those individuals. *Id.* at 97. The trial court must then determine

13

whether, in light of the parties' submissions, the defendant has shown purposeful discrimination. *Id.* at 98.

Defendant argues that the government's decision to prosecute this case in the Eastern District of Virginia rather than in the District of Columbia creates a *Batson* issue given the disparate racial makeup of the two jurisdictions.[12] Defendant seeks reconsideration of the November 30, 2007 Order denying his original motion on the ground that he has made a *prima facie* showing of purposeful discrimination and that accordingly the government bears the burden of proffering a race-neutral reason for its choice of venue.[13]

Defendant's argument is unpersuasive. To begin with, the Fourth Circuit has addressed and rejected the very argument defendant advances here. In *United States v. Scates*, 11 Fed.Appx. 208 (4th Cir. 2001), the defendant challenged, on Due Process and *Batson* grounds, the decision to prosecute him in federal court in the Eastern District of Virginia rather than in the courts of the Commonwealth of Virginia, arguing that trial in federal court had the effect of diminishing minority representation on his jury. *Id.* at 210-11. The Fourth Circuit rejected this argument on both Due Process and Equal Protection grounds. With regard to Due Process, the court noted that a criminal

---

[12] According to the United States Census Bureau, the population of the District of Columbia is approximately 55.4% black or African American, while the population of the Alexandria Division of the Eastern District of Virginia is approximately 11.16% black or African American.

[13] In support of his motion, defendant cites the Supreme Court's recent decision in *Snyder v. Louisiana*, 128 S.Ct. 1203 (2008). In *Snyder*, the Supreme Court found that a Louisiana trial court had erred in rejecting a capital defendant's *Batson* challenge to the peremptory removal of all five black members of the venire panel. *Id.* at 1207. Applying the deferential standard under which a trial court's *Batson* rulings are reviewed, the Court nonetheless found the prosecution's proffered reasons for one peremptory strike to be pretextual. *Id.* at 1212. *Snyder* is merely a straightforward application of *Batson* and its progeny, and it adds nothing to the analysis here.

14

defendant "has no right to a jury of any particular racial composition so long as that jury is fairly selected from the jurisdiction it serves." *Id.* at 211. Because the defendant had presented no evidence either that juries in the Eastern District of Virginia are selected in an unconstitutional manner or that the decision to prosecute him in federal court was designed to alter the racial composition of the petit jury in his case, the Fourth Circuit found his Due Process claim to be without merit. *Scates*, 11 Fed.Appx. at 211.

Similarly, the *Scates* defendant's *Batson* argument met the same fate; the Fourth Circuit rejected this claim for two independently dispositive reasons. First, the Fourth Circuit stated emphatically that "the *Batson* rule and analysis are applicable only to the petit jury selection process as applied through peremptory jury strikes." *Scates*, 11 Fed.Appx. at 211. This reason ends the matter, rendering further analysis unnecessary. Yet, even so, the court went on to hold that even if a *Batson*-like Equal Protection argument might be made, the fact of a statistical disparity between the jurisdictions at issue did not implicate Equal Protection because "a defendant is not entitled to a jury composed of individuals from any given race." *Scates*, 11 Fed. Appx. at 211. *Scates* therefore stands for the sound proposition that when venue is proper in multiple jurisdictions, the mere fact of a racial disparity between the jurisdictions is insufficient to give rise to an inference of purposeful prosecutorial discrimination stemming from a government venue choice.[14]

*Scates* forecloses the arguments defendant makes here and compels denial of his reconsideration motion. Defendant has no right to a jury of any particular racial composition; he is

---

[14] *See also United States v. Jones*, 36 F.Supp.2d 304, 310-11 (E.D. Va. 1999) (relative paucity of minority jurors in one of two possible venues did not implicate Equal Protection).

simply entitled to an impartial jury that is drawn from a fair cross-section of the jurisdiction.[15] Defendant has not challenged the jury selection process in the Eastern District of Virginia,[16] and he has presented no evidence beyond the mere fact of a statistical disparity in the racial composition of the two jurisdictions to show that the government's decision to prosecute this case here rather than in the District of Columbia was designed to alter the racial composition of the petit jury that ultimately hears the case.  Such a statistical disparity is insufficient to give rise to an inference of purposeful discrimination.  Were the law otherwise, venue could always be challenged whenever other potential venues had different racial compositions. In short, defendant has not presented clear evidence "to dispel the presumption that a prosecutor has . . . violated equal protection." *United States v. Armstrong*, 517 U.S. 456, 465 (1996).

Defendant contends that denial of his motion for lack of evidence is unfair because the best evidence of purposeful discrimination, if it exists, will be in the possession of the government in the form of internal memoranda and communications addressing the venue decision.  Defendant therefore seeks discovery of the government's internal communications addressing the venue decision.  In order to establish his entitlement to discovery regarding the government's prosecutorial

---

[15] *Taylor v. Louisiana*, 419 U.S. 522, 538 (1975) ("Defendants are not entitled to a jury of any particular composition, but the jury wheels, pools of names, panels, or venires from which juries are drawn must not systematically exclude distinctive groups in the community and thereby fail to be reasonably representative thereof.") (internal citations omitted).

[16] *See Duren v. Missouri*, 439 U.S. 357, 364 (1979) ("In order to establish a prima facie violation of the fair-cross-section requirement, the defendant must show (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this under-representation is due to systematic exclusion of the group in the jury-selection process.").

decisions, a defendant "must overcome a significant barrier by advancing objective evidence tending to show the existence of prosecutorial misconduct." *United States v. Wilson*, 262 F.3d 305, 315 (4th Cir. 2001); *see also Scates*, 11 Fed. Appx. at 211 ("To establish that he was entitled to discovery with respect to his race-based claims of prosecutorial misconduct, [the defendant] must make a credible showing, by clear and convincing evidence, of different treatment of similarly situated persons of other races."). Defendant has presented no evidence tending to show prosecutorial misconduct here, and this discovery request must also be denied.

## IV.

In summary, the facts alleged in the Indictment adequately support venue for each of the Counts, and the mere existence of a racial disparity between two potential venues is no basis for discovery, dismissal, or transfer on Equal Protection Grounds.

An appropriate Order will issue.


_____/s/_____

Alexandria, Virginia                                  T.S Ellis, III
June 27, 2008                                         United States District Judge

17