**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| v. | ) | **Case No. 1:07cr209** |
| | ) | |
| **WILLIAM J. JEFFERSON** | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OPINION**

A sixteen-count indictment (the "Indictment") charges defendant William J. Jefferson, a sitting member of the United States House of Representatives, with a variety of crimes including bribery, conspiracy, wire fraud, foreign corrupt practices, money laundering, obstruction of justice, and racketeering. As part of the investigation leading to the Indictment, Federal Bureau of Investigation (FBI) agents executed a search warrant at defendant's residence at 1922 Marengo Street in New Orleans, Louisiana on August 3, 2005. Defendant was also consensually interviewed on that date. Following his arraignment, Defendant moved to suppress (i) his statements to agents during the interview and (ii) certain evidence seized during the search, as well as the investigative fruits of the evidence alleged to have been improperly seized.

The facts pertinent to both motions were adduced in the course of an evidentiary hearing held over parts of four days in December, 2007 and January, 2008. Special Agents Lisa Horner and Timothy Thibault testified regarding the execution of the search. A previous memorandum opinion resolved the motion to suppress defendant's statements. *See United States v. Jefferson*, ___ F.Supp.2d ___ (E.D. Va. June 23, 2008). This Memorandum Opinion addresses the search motion,

setting forth factual findings pursuant to Rule 12(d), Fed. R. Civ. P., together with the legal reasons that compel the conclusion that, except with regard to two specific documents, defendant's motion to suppress must be denied.

**I.**

Defendant is the currently sitting member of the United States House of Representatives representing Louisiana's 2nd Congressional District, an office he has held since 1991. The Indictment alleges that beginning in or about January 2001, defendant used his office to advance the business interests of various individuals and corporations in return for money and other things of value paid either directly to defendant or via 'nominee companies,' *i.e.*, companies ostensibly controlled by one of defendant's family members, but in fact controlled by defendant himself. The specific schemes alleged in the Indictment are described in greater detail in an earlier Memorandum Opinion. *See United States v. Jefferson*, 534 F.Supp.2d 645 (E.D. Va. 2008).

As part of the investigation leading to the Indictment in this case, agents from the Federal Bureau of Investigation (FBI) went to defendant's residence at 1922 Marengo Street in New Orleans, Louisiana on the morning of August 3, 2005 to execute a search warrant and to interview defendant. Following the conclusion of the interview, FBI agents executed a search of defendant's residence pursuant to the terms of a warrant issued by the United States District Court for the Eastern District of Louisiana. Schedule B to the search warrant listed "items to be seized from" the Marengo Street residence in four general categories: (1) records and documents related to various corporate entities, (2) records and documents related to specific correspondence or communications between certain individuals, (3) records and documents related to travel to Ghana and/or Nigeria by certain

individuals, and (4) records and documents related to appointments, visits, and telephone messages to or for defendant.

During the course of the search, which lasted roughly seven-and-a-half hours, FBI agents seized and removed approximately 1,400 pages of documents from defendant's residence. Defendant has not challenged the seizure and removal of any of those 1,400 pages of documents. In addition to these seizures, an FBI photographer took high-resolution photographs of thirteen separate items,[1] and agents conducting the search took cursory notes of the contents of certain documents not seized or photographed as well as bank account information discovered during the search but not physically seized.   It is the agents' photographs and notes that are the focus of defendant's suppression motion.

---

[1] Specifically, photographs were taken of the following items:

1.  A hand-written list of topics relating to Multimedia Broadband Services, Inc.
2.  A document relating to iGate, Inc. and containing a telephone message.
3.  A twenty-two page document relating to iGate, Inc.
4.  A document containing telephone numbers and messages.
5.  An e-mail from B.K. Son to Defendant regarding Multimedia Broadband Services, Inc.
6.  A printout of a power-point presentation entitled "E-Star Wireless Broadband Network Business Opportunity."
7.  E-mails between B.K. Son, Darren Purifoy, and Defendant and accompanying technical data.
8.  Business cards of Nigerian government officials.
9.  A non-circumvention and non-disclosure agreement between Arkel Sugar and Providence Lake, together with a letter from Arkel Sugar to Providence Lake written to the attention of Mose Jefferson.
10.  An agreement between Providence International Petroleum Company, James Creaghan, and Procurer Financial Consultants.
11.  Fifty-five pages of an address book.
12.  A 1991 calendar/appointment book.
13.  Documents relating to Moss Creek.

Agents Thibault and Horner testified that they would normally have removed the documents at issue under the 'plain view' doctrine,[2] rather than photographing them or taking notes of their contents. But according to these agents, attorneys with the U.S. Attorney's Office for the Eastern District of Virginia had instructed them to seize and remove only evidence that was directly responsive to the list of items in the warrant's Schedule B. Both agents testified they understood this instruction to be a prudential limit on their ability to remove evidence that they were nonetheless Constitutionally permitted to search and seize under the plain view doctrine, and that the photographs and notes were taken in an effort to comply with the prosecutors' instructions while still giving effect to the plain view doctrine.

Defendant now seeks blanket suppression of all evidence seized during the August 3, 2005 search of his residence and all evidence tainted by having been obtained in reliance on information seized or recorded during the search.[3] Although defendant does not specifically challenge seizure of the 1,400 pages of documents, he argues that *all* evidence seized in the search should be suppressed because the FBI agents' decision to photograph and take notes of documents that were not (in defendant's view) subject to seizure under the terms of the search warrant transformed the search into an impermissible general search of the sort prohibited by the Fourth Amendment.[4] In the

---

[2] *See United States v. Jackson*, 131 F.3d 1105, 1109 (4th Cir. 1997) (summarizing plain view doctrine).

[3] *See United States v. Lentz*, 524 F.3d 501, 522 (4th Cir. 2008) ("Derivative evidence, or "fruit of the poisonous tree" is evidence that "has been come at by exploitation of [an] illegality ... instead [of] means sufficiently distinguishable to be purged of the primary taint.") (citing *Wong Sun v. United States*, 371 U.S. 471, 488 (1963)).

[4] *See Maryland v. Garrison*, 480 U.S. 79, 84 (1987) (manifest purpose of Fourth Amendment's Warrant Clause is to prevent general searches).

-4-

alternative, defendant seeks suppression of the specific documents photographed by agents or about which agents took notes during the search, as well as all tainted evidence, *i.e.* evidence obtained in reliance on those photographs or notes.  As this matter has been fully briefed and argued by the parties, it is now ripe for disposition.

## II.

The Supreme Court long ago established an exclusionary rule which prohibits the use of unlawfully seized evidence in the prosecution's case in chief.  *See Weeks v. United States*, 232 U.S. 383, 391-94 (1914); *United States v. Mowatt*, 513 F.3d 395, 403 (4th Cir. 2008).   That same exclusionary rule also prohibits admission of evidence acquired as a direct or indirect result of an illegal search, unless the connection between the search and the evidence is "so attenuated as to dissipate the taint." *Wong Sun*, 371 U.S. at 487-88; *Mowatt*, 513 F.3d at 403.  But importantly, the exclusionary rule has its limits; specifically, the rule will not be applied to put the prosecution in a worse position than they would have been had there been no police misconduct. *Nix v. Williams*, 467 U.S. 431, 443 (1984).  Accordingly, evidence obtained by independent, legitimate means may be admitted if the government establishes that the legitimate discovery of the evidence was not the result of information obtained by means of the original, illegal search. *Murray v. United States*, 487 U.S. 533, 537-41 (1988); *Mowatt*, 513 F.3d at 403-04.

Application of these principles to this case requires a three-step analysis:

1. First, as a threshold matter, it is necessary to determine whether (i) taking high-resolution photographs of documents or (ii) taking notes of the contents of documents constitutes either a search or a seizure under the Fourth Amendment.

2. Next, as to each specific item either photographed by the FBI or about which agents took notes, it is necessary to determine whether the item or document was properly subject to search or seizure under either the terms of the search warrant or the plain view doctrine.

3. Finally, as to those items or documents not subject to search or seizure, it is necessary to determine whether the government later obtained the same evidence from independent, legitimate sources so as to avoid any taint. Any improperly seized evidence, and any evidence tainted by the improper seizure, must then be suppressed. *See Wong Sun*, 371 U.S. at 487-88.

### III.

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures." U.S. Const. amend. IV. Accordingly, it is first necessary to determine whether photographing documents or taking notes of the contents of documents constitutes either a search or a seizure as those terms are used in the Fourth Amendment context.[5] A "search" occurs when "an expectation of privacy that society is prepared to consider reasonable is infringed." *Maryland v. Macon*, 472 U.S. 463, 469 (1985). A "seizure" occurs when "there is some meaningful interference with an individual's possessory

---

[5] The government suggests that it is unnecessary, and even inappropriate, to decide this constitutional issue because the documents at issue either could have been seized, or were later obtained from a legitimate and independent source. Yet, to assume, without deciding, the constitutional question raised here would result in an impermissible advisory opinion regarding the theoretical admissibility of challenged evidence. *See United Public Workers of America (C.I.O.) v. Mitchell*, 330 U.S. 75, 89 (1947) ("As is well known, the federal courts established pursuant to Article III of the Constitution do not render advisory opinions."). While it is "the obligation of the Judicial Branch to avoid deciding constitutional issues needlessly," *Christopher v. Harbury*, 536 U.S. 403, 417 (2002), such a principle must give way where, as here, disposition of the issues raised by the parties requires a resolution of the constitutional issue.

interests in the property seized." *Id.*  The question, then, is whether taking photographs or notes constitutes a meaningful interference with an individual's possessory privacy interest in the property seized.

Importantly in this respect, the Supreme Court has extended the Fourth Amendment's protections to intangible as well as tangible possessory interests. *See Hoffa v. United States*, 385 U.S. 293 (1966).  In *Hoffa*, a paid government informant overheard the defendant make numerous incriminating statements and reported those statements to law enforcement officials.  Following his conviction, the defendant challenged the use of those statements on the ground that they had been unconstitutionally seized by the paid informant.  The Supreme Court made clear that the Fourth Amendment's protections were "surely not limited to tangibles, but can extend as well to oral statements." *Id.* at 302.  Nevertheless, the Supreme Court affirmed the conviction, holding that the defendant had no expectation of privacy in statements he made in public and to people he mistakenly took into his confidence. *Id.*

The Supreme Court again addressed the Fourth Amendment's applicability to intangible matters in *Katz v. United States*, 389 U.S. 347 (1967).  There, the defendant had been convicted of transmitting wager information by telephone across state lines, based in part on a recording of the defendant's phone call which the FBI had obtained by placing an electronic listening device on the phone booth from which defendant placed his call. *Id.* at 348.  Reversing the defendant's conviction, the Supreme Court held that the defendant had a reasonable expectation of privacy in his telephone conversation, even though he placed his call from a public telephone booth. *Id.* at 353.  In so holding, the Supreme Court reaffirmed the applicability of the Fourth Amendment to intangible

matters such as oral statements.  *Id.*

Both *Hoffa* and *Katz* therefore support the proposition that an individual has a possessory privacy interest in intangible information which he or she discloses orally, provided that such disclosure is done in manner reasonably expected to be private.  In *United States v. New York Telephone Co.*, 434 U.S. 159 (1977), the Supreme Court extended this line of reasoning beyond oral statements to information recorded electronically, namely pen registers which record all numbers dialed by a particular telephone.  Citing *Katz*, the Supreme Court held that the electronic recording of telephone numbers by means of a pen register constituted a permissible search and seizure of such information under the Fourth Amendment and Rule 41, Fed. R. Crim. P.  *Id.* at 168-69.

Taken together, therefore, *Hoffa*, *Katz*, and *New York Telephone Co.* stand for the proposition that the Fourth Amendment protects an individual's possessory interest in information itself, and not simply in the medium in which it exists.  In essence these cases recognize that the Fourth Amendment privacy interest extends not just to the paper on which the information is written or the disc on which it is recorded but also to the information on the paper or disc itself.  It follows from this that recording the information by photograph or otherwise interferes with this possessory privacy interest even if the document or disc is not itself seized.

To be sure, the Supreme Court has yet to elucidate or clarify the content and boundaries of this proposition.  Indeed, as the government has argued, the Supreme Court's decision in *Arizona v. Hicks*, 480 U.S. 321 (1987) seems to be in some tension with this teaching of *Hoffa*, *Katz*, and *New York Telephone Co.* and to suggest that the mere recording of information does not constitute

a seizure.[6]  Yet, the government's argument rests on a misreading of *Hicks*.  To begin with, the statement in *Hicks* on which the government relies is dictum, for the basic holding in *Hicks* involves searches, not seizures.  In other words, because the result in *Hicks* rested on the conclusion that moving stereo equipment constituted a search, the Supreme Court did not have to reach the issue of whether recording the information disclosed by the search was a seizure of that information.

Beyond this, while *Hicks* certainly reaffirms the general proposition that a seizure, as that term is defined in the Fourth Amendment context, requires an interference with a possessory interest[7], *Hicks* does not consider or address whether seizure of information by note or photograph is an interference with the possessory interest in the information itself even if it is not an interference with the possessory interest in the medium in which the information is recorded.  Nor is this interference with the possessory interest in the information itself (as opposed to the medium in which it is recorded) insignificant, given that taking notes or photographs necessarily diminishes the privacy

---

[6] In *Hicks*, a police officer searching a suspect's residence following a shooting became suspicious when he saw an expensive stereo system that seemed out of place in an apartment that was (in Justice Scalia's words) "squalid and otherwise ill-appointed."  480 U.S. at 323.  Although he had no warrant to search for or seize the stereo equipment, the officer moved a number of the stereo components to get access to their serial numbers, which he then recorded and reported to his headquarters.  *Id.*  The serial numbers identified the equipment as having been stolen in an armed robbery, and the suspect was subsequently indicted for the robbery.  *Id.* at 323-34.  The Supreme Court affirmed the state trial court's suppression of the stereo equipment, holding that while the officer had entered the apartment lawfully and could therefore inspect those parts of the equipment that were in plain view, moving the equipment constituted a separate and unwarranted search unrelated to the purpose of the initial entry.  *Id.* at 324-25.  In reaching this conclusion the Court stated, in passing, that "the mere recording of the serial numbers did not constitute a seizure" because "it did not 'meaningfully interfere' with [the suspect's] possessory interest in [the serial numbers]."  *Id.* at 324.  It is on this statement that the government relies.

[7] *See Maryland v. Macon*, 472 U.S. 463, 469 (1985) ("A seizure occurs when 'there is some meaningful interference with an individual's possessory interests' in the property seized.").

value of information once privately-held but made public by way of the seizure, an issue neither presented nor considered in *Hicks*.   In other words, while copying the contents of a person's documents by way of photographs or written notes does not interfere with a person's possession of those documents, it does interfere with the person's sole possession of the information contained in those documents: it diminishes the person's privacy value in that information.

In sum, *Hoffa*, *Katz*, and *New York Telephone Co.* all support the proposition that individuals possess a constitutionally protected right to preserve the privacy of information recorded in books and documents against government attempts to photograph, transcribe, or otherwise copy the information.   This conclusion is convincingly confirmed by recognizing that a contrary rule would significantly degrade the right to privacy protected by the Fourth Amendment.   Thus, if Fourth Amendment protection did not extend to the information reflected in books and documents, then there would be no constitutional bar to police entering an individual's home pursuant to a lawful warrant and then evading the warrant's limits by recording every detail of the premises and its contents by way of high-resolution photographs and notes, all in a search for evidence of crimes unrelated to the matter giving rise to the warrant.   To put this point more concretely, failure to recognize that photographing or taking notes of private information, without seizing the medium on which the information exists, constitutes a seizure under the Fourth Amendment would allow the government to ignore a narrowly circumscribed warrant in searching a premises containing volumes of documents by simply photographing the documents without removing them, and then reviewing the documents at length back at the station house.

Certainly, *Hicks* should not be read to sanction a result so inimical to Fourth Amendment

values.  Instead, the more reasonable reading of *Hicks*, consistent with the *Hoffa* line of cases, is that

a search and a *seizure* of information that is subject to the strictures of the Fourth Amendment occurs

where, as here, law enforcement officials photograph the contents of documents, or take notes

reflecting the contents of documents.  That search and seizure of information does not offend the

Fourth Amendment (1) where the documents fall within the warrant's scope or (2) where the

document discloses probable cause in plain view, i.e. on its face.  If the seizure satisfies neither of

these conditions, then the document's contents may not be photographed or otherwise recorded

without running afoul of the Fourth Amendment.  This does not mean, however, that law

enforcement officials may not examine documents in the course of the search to ascertain whether

they fall within the scope of the warrant.[8]  Yet, if this examination discloses neither that the

document is within the scope of the warrant, nor that there is probable to seize it under the plain view

doctrine, agents may not *seize* the document's information by photographing, copying, or making

notes of it.  Of course, the agents are not required to erase from their memories what they saw in the

documents, and if they subsequently obtain information that, coupled with what they saw, gives them

probable cause to seize the documents, they may then seek a warrant to seize the documents.

These principles, applied here, compel the conclusion that (i) taking high-resolution

photographs of documents and (ii) taking notes of the contents of documents each constitute both

---

[8] *See United States v. Giannetta*, 909 F.2d 571, 577 (1st Cir. 1990) ("Courts have regularly held that in searches for papers, the police may look through notebooks, journals, briefcases, file cabinets, files and similar items and briefly peruse their contents to determine whether they are among the documentary items to be seized."); *United States v. Antarelli*, 778 F.2d 609, 615-16 (11th Cir. 1985) ("Given the fact that the search warrant entitled the agents to search for documents . . . it is clear that the agents were entitled to examine each document . . . to determine whether it constituted evidence they were entitled to seize under the warrant.").

a search and a seizure of the information contained in those documents for Fourth Amendment purposes.

## IV.

Given this conclusion, it is next necessary to determine whether such a search and seizure was warranted in this instance with regard to each specific item at issue.  And the first step in doing so is to consider whether the information seized by way of photograph or written note is within the scope of the search warrant.  *See* U.S. Const. Amend. IV ("[N]o Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."); *Steagald v. United States*, 451 U.S. 204, 211-12 (1981) (warrant required for search of private residence); *Mowatt*, 513 F.3d at 403 (exclusionary rule requires suppression of evidence seized beyond the terms of a search warrant).  The second step — plain view analysis — is necessary only if the document's contents fall outside the warrant's scope.

The plain view doctrine authorizes the warrantless seizure of evidence when (1) the seizing law enforcement official is lawfully in a place from which the object may be plainly viewed; (2) the official has a lawful right of access to the object itself; and (3) the object's incriminating character is immediately apparent.  *United States v. Jackson*, 131 F.3d 1105, 1109 (4th Cir. 1997).  Here, the agents were lawfully in defendant's residence and had lawful access to the evidence at issue by virtue of the search warrant, which entitled them to conduct a cursory review of all documents to determine whether any particular document was responsive to the list of items subject to seizure in Schedule B.  Accordingly, applicability of the plain view doctrine in this case turns squarely on whether the incriminating character of any specific piece of evidence was immediately apparent.  The Fourth

Circuit has interpreted this prong of the plain view doctrine to mean that police must have probable cause to believe that an object is evidence of a crime. *See United States v. Wells*, 98 F.3d 808, 810 (4th Cir. 1996). And, probable cause exists where "the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief" that the object is evidence of a crime. *Brinegar v. United States*, 338 U.S. 160, 175-76 (1949).

Finally, if the information was not properly seized under either the warrant or the plain view doctrine, it is necessary to determine whether that information was later obtained from an independent and legitimate source, or whether the impermissible search and seizure of the information tainted other evidence obtained in reliance thereon. *See Mowatt*, 513 F.3d at 403-04 (evidence obtained on the basis of illegally seized evidence must be suppressed unless the connection between this evidence and the illegally seized evidence is so attenuated as to dissipate any taint, or unless the evidence is later discovered or obtained by independent and legitimate means).

**A.**

As noted above, the FBI photographer took high-resolution photographs of thirteen separate documents or groups of documents. Each group must be separately considered.

1.  Hand-written list of topics relating to Multimedia Broadband Services, Inc.

The first item at issue is a handwritten document containing a list of topics related to Multimedia Broadband Services, Inc. The document itself was seized pursuant to Schedule B, Section A(7) of the search warrant, which authorized seizure of records and documents related to Multimedia Broadband Services. Because the warrant authorized seizure of such documents, the

seizure by photograph of the information contained in this particular document was legal and the motion to suppress this information fails.

### 2.  Document Containing Telephone Messages and Wiring Information

The second item at issue is a document containing telephone messages as well as information relating to the wiring of funds for Vernon Jackson, president of iGate, Inc.  The document itself was seized pursuant to Schedule B, Section A(2), which authorized seizure of records and documents related to iGate, Inc., and Section D(3), which authorized seizure of records and documents relating to telephone messages to or for defendant, including paper telephone messages whether printed or handwritten.   Because  the  warrant  authorized  seizure  of  the  information  contained  in  the photographed document, its use cannot be suppressed.

### 3.  Twenty-two Page Document Relating to iGate, Inc.

The third item at issue is a twenty-two page document containing specific references to iGate, Inc.  The FBI photographer took high-resolution photographs of specific pages of the document.  The entire document was seized pursuant to Schedule B, Section A(2) of the warrant, which authorized seizure of records and documents related to iGate, Inc.  Accordingly, seizure of the information contained in the document was also authorized, and suppression is unwarranted.

### 4.  Document Containing Telephone Numbers and Messages

The fourth item at issue is a piece of paper containing telephone messages and numbers that was affixed to defendant's fridge with a magnet.  Agents did not seize and remove the paper, but photographed it instead.  The information contained in the paper was subject to seizure pursuant to Schedule B, Section D(3) of the warrant, which authorized seizure of records and documents relating

-14-

to telephone messages to or for defendant.  Accordingly, suppression of the information seized by means of this photograph is unwarranted.

5.  E-mail From B.K. Son to Defendant Regarding Multimedia Broadband Services, Inc.

The fifth item at issue is an e-mail from B.K. Son to defendant regarding an "MBSI Operation Plan."  Agents had reason to believe that "MBSI" was an acronym for Multimedia Broadband Services, Inc.  Accordingly, the e-mail was subject to seizure pursuant to Schedule B, Section A(7) of the warrant, which authorized seizure of records and documents related to Multimedia Broadband Services, and suppression is inappropriate.

6.  Power-Point Presentation Entitled "E-Star Wireless Broadband Network Business Opportunity"

The sixth item at issue is a power-point presentation regarding an enterprise known as E-Star.  The warrant did not authorize seizure of documents or records relating to E-Star, and nothing else in the power-point presentation made it responsive to Schedule B.  The government nevertheless contends that the power-point presentation was appropriately seized under the plain view doctrine.

Because the agents were lawfully in defendant's house and because they were authorized to conduct a cursory inspection of documents they found to determine whether those documents were subject to seizure, the plain view analysis with regard to the power-point presentation therefore turns on whether its incriminating character was apparent on its face.  Here, agents had probable cause to believe that the power-point presentation was evidence of a crime.  The investigation into defendant's activities that had led to the search at issue focused on a number of schemes by which defendant had allegedly solicited payment in return for the performance of official acts.  Agents Horner and Thibault testified that many of these alleged schemes involved telecommunications

ventures. According to Agent Horner, the E-Star power-point presentation, which detailed a telecommunications venture, closely resembled similar presentations involving iGate, Inc. that had been provided to the FBI by cooperating witness Lori Mody. Because the agents were familiar with defendant's receipt of bribes in return for his performance of official acts on behalf of iGate, the similarity between the iGate venture and the venture described in the E-Star power-point presentation gave rise to a reasonable belief that the power-point presentation was evidence of another illegal scheme, and warrantless seizure of the power-point was appropriate under the plain view doctrine. *See Wells*, 98 F.3d at 810.

Moreover, even assuming the absence of probable cause on its face, the E-Star power-point presentation is not subject to suppression because it was produced voluntarily by Noreen Wilson, a cooperating witness first identified in a newspaper article that Agent Thibault reviewed in August, 2005, and later identified by Noah Samara, a cooperating witness whose name had appeared in documents lawfully seized during the August 3, 2005 search. Accordingly, because it was later obtained by legitimate, independent means, the E-Star power-point presentation is not subject to suppression. *See Murray*, 487 U.S. at 537-41.

7. E-mails Between B.K. Son, Darren Purifoy, and Defendant, and Accompanying Technical Data

The seventh item at issue is a series of e-mails between B.K. Son, Darron Purifoy, and defendant involving telecommunications equipment. Although the e-mails and accompanying technical data did not specifically identify iGate, Inc., agents knew that B.K. Son was an employee of iGate and that iGate was engaged in telecommunications ventures. Accordingly, the e-mails were subject to seizure pursuant to Schedule B, Section (B)(4)(b) of the warrant, which authorized seizure

-16-

of communications between defendant and B.K. Son related to iGate business projects.

## 8.  Business Cards of Various Nigerian Government Officials

The eighth item at issue is a set of business cards of various Nigerian government officials, which were photographed, but not removed from defendant's residence.  Schedule B, Section C of the warrant authorized seizure of "records and documents related to travel from January 2004 . . . to or from Ghana and/or Nigeria regarding prospective or real iGate business, products, or services." Additionally, the agents executing the search had knowledge that defendant had traveled to Nigeria and had met with Nigerian government officials regarding iGate's telecommunications ventures. Accordingly, seizure of the business cards was authorized under Schedule B, Section C of the warrant.

## 9.  Arkel Sugar / Providence Lake Agreement and Letter

The ninth item at issue is a non-circumvention and non-disclosure agreement between the corporations Arkel Sugar and Providence Lake, together with a letter from Arkel Sugar to Providence Lake addressed to the attention of defendant's brother, Mose Jefferson.  In addition, the documents indicated that Providence Lake shared a business address with ANJ, which address was known to the agents at the time of the search.[9]  Accordingly, the government argues that these documents were subject to seizure pursuant to Schedule B, Section A(1) of the warrant, which authorizes seizure of records and documents related to the ANJ Group, LLC.  This argument, by itself, is unpersuasive; the mere fact that an address used by ANJ appeared on a document addressed

---

[9] In fact, FBI agents were executing a search warrant at this address contemporaneously with the search of defendant's residence.

to Providence Lake is not, by itself, enough to establish that the Providence Lake documents were related to ANJ, as required by the warrant. But there was more; the agents testified that the scheme outlined in the non-circumvention and non-disclosure agreement closely resembled the other schemes that were under investigation. Specifically, the agreement involved payments to a company controlled by a member of defendant's family in connection with an African business venture. In light of the shared ANJ address, agents had reason to believe that the document described a further illegal scheme whereby defendant performed official acts in return for the payment of bribes to a nominee company controlled by a member of his family. Accordingly, while the Arkel Sugar / Providence Lake agreement and letter were not subject to seizure pursuant to the warrant, they were subject to seizure under the plain view doctrine. *See Wells*, 98 F.3d at 810.

10.   Providence International Petroleum Company, James Creaghan, and Procurer Financial Consultants Agreement

        The tenth item at issue is an agreement between Providence International Petroleum Company (PIPCO), James Creaghan, and Procurer Financial Consultants. The agreement was signed by Mose Jefferson, who was entitled to receive certain proceeds pursuant to the agreement. Neither PIPCO, Creaghan, nor Procurer appear in Schedule B to the search warrant. The government nevertheless contends that this item was responsive to the warrant because the word "Global" was printed in the document's fax header, and Schedule B, Section A(3) authorized seizure of records and documents relating to Global Energy & Environmental Services, LLC. Yet, the government concedes that the "Global" appearing in the fax header is not Global Energy & Environmental Services, and in any case Agent Horner, who directed the photographing of this item, has testified

-18-

that she did not notice the word "Global" at the time of the search and did not rely on its appearance in deciding to have the item photographed.  Accordingly the item was not subject to seizure under the warrant.

Yet this does not end the analysis, as the agreement was subject to seizure under the plain view doctrine.  As noted with regard to item #9 above, agents executing the search were familiar with defendant's alleged practice of soliciting bribes in return for the performance of official acts, and directing payment of such bribes to nominee companies owned or controlled by defendant's family members.  The agents therefore had probable cause to believe that the PIPCO agreement was evidence of a further illegal scheme involving a separate nominee company, and the agreement was subject to seizure under the plain view doctrine.  *See Wells*, 98 F.3d at 810.

Additionally, even assuming the document was not subject to seizure under the plain view doctrine, suppression is unwarranted because the document was later obtained from a legitimate, independent source.  Specifically, the document was produced by James Creaghan, who had been identified by defendant himself during his interview with agents prior to the August 3, 2005 search.  And although Creaghan produced the document in response to a subpoena, the government did not rely on the document in seeking the subpoena.  Accordingly, even assuming the document was illegally seized by photograph during the August 3, 2005 search, suppression is unwarranted because it would nevertheless be admissible under the independent source exception to the exclusionary rule. *See Murray*, 487 U.S. at 537-41.

11.  Address Book

The eleventh item at issue is an address book containing entries for individuals known to be

-19-

associated with the ANJ Group, LLC and Multimedia Broadband Services, Inc.  Accordingly, the address book constituted a document or record related to both ANJ and MBSI and was subject to seizure pursuant to Schedule B, Sections A(1) and (7) of the warrant.

## 12.  1991 Calendar / Appointment Book

The twelfth item at issue is a calendar and appointment book for the 1991 calendar year. Schedule B, Section D(4) authorized seizure of appointment calendars from January, 2004 to the date of the search.  Agents Horner and Thibault testified that the FBI photographer mistakenly believed that the item was responsive under Section D(4), and that as soon as the date of the calendar was observed, efforts to photograph the document ceased.  The government concedes that the calendar is not responsive to the warrant, and it does not argue that it is subject to seizure under the plain view doctrine.  Accordingly, the 1991 calendar and appointment book must be suppressed.  Yet, because there is no evidence that the 1991 calendar and appointment book was used to further the investigation of defendant in any way, its illegal seizure did not taint any other evidence in this case.

## 13.  Moss Creek Documents

Finally, the FBI seized by photograph information contained in documents relating to a corporation known as Moss Creek.  The government concedes that these documents were not responsive to the warrant, nor subject to seizure under the plain view doctrine.  Accordingly, the Moss Creek documents must be suppressed.  Again, however, because there is no evidence that the Moss Creek documents were used to further the investigation, their illegal seizure did not result in any taint.

**B.**

In addition to the thirteen items seized by photograph, agents seized certain information by way of written notes made after reviewing bank records discovered in the course of their search. Specifically, agents seized bank account numbers, names of account-holders, and names of financial institutions.[10]   The government argues that seizure of defendant's banking information was authorized under the plain view doctrine because the agents were investigating various schemes by which defendant allegedly solicited and received bribes in return for the performance of official acts. The government argues that because the crime under investigation involved the receipt of things of value, agents had probable cause to believe that the bank accounts were evidence of a crime.

The government's argument is not entirely persuasive.  The mere fact that the alleged crime under investigation involved the receipt of funds may not give rise to a reasonable belief that *all* of a suspect's financial records are themselves evidence of a crime.   In any event, suppression of defendant's bank account information is unwarranted because law enforcement officials obtained the same information by legitimate, independent means.  Specifically, the FBI submitted a request to the United States Department of the Treasury's Financial Crimes Enforcement Network (FinCEN) for information related to their investigation into defendant's alleged crimes.  The FinCEN request

---

[10] The government has represented that does not intend to introduce in its case in chief evidence relating to the majority of the financial accounts identified by the parties.  The government has represented that it may seek to introduce evidence pertaining to the following accounts, which are the subject of the analysis in Part IV(B): (1) Dryades Savings Bank account ending 3417; (2) Wright Patman Congressional Credit Union account ending 5113; (3) E-Trade account ending 1222; (4) Bank One account ending 4083; (5) First National account ending 9860; (6) Hibernia account ending 0821; (7) Citibank Visa account ending 7060; (8) Dryades Savings Bank account ending 0356; (9) Discover account ending 1167; (10) Citibank Mastercard account ending 4224; and (11) Bank of America account ending 9705.

resulted in the production of the same financial information seized by the agents during the August 3, 2005 search. The FinCEN request was not based on information seized during the search, and defendant has not challenged the validity of the FinCEN search. In addition, the government introduced evidence during the course of the suppression hearing showing that law enforcement officials obtained information from multiple sources, including credit reports and subpoenas served on various financial institutions, regarding all accounts that the government seeks to introduce during its case in chief. Because agents obtained this information from legitimate, independent sources, suppression is not warranted.[11]

## C.

In summary, an application of the law stated in Parts II, III, and IV compels the following conclusions regarding defendant's motion to suppress evidence:

(1) The handwritten document containing a list of topics related to Multimedia Broadband Services, Inc. was appropriately seized pursuant to the search warrant;

(2) The document containing telephone messages as well as information relating to the wiring of funds for Vernon Jackson was appropriately seized pursuant to the search warrant;

(3) The twenty-two page document containing specific references to iGate, Inc. was appropriately seized pursuant to the search warrant;

---

[11] During the evidentiary hearing on this motion, the government introduced a chart prepared by Agent Thibault that listed and summarized the financial information obtained by the FBI during the course of its investigation. The government does not rely solely on this chart to establish the origin of the financial information it seeks to introduce in its case-in-chief; in addition to the chart, Agent Thibault's testimony persuasively established that these accounts were identified from legitimate, independent sources.

(4) The piece of paper containing telephone messages and numbers was appropriately seized pursuant to the search warrant;

(5) The e-mail from B.K. Son to defendant regarding an "MBSI Operation Plan" was appropriately seized pursuant to the search warrant;

(6) The power-point presentation entitled "E-Star Wireless Broadband Network Business Opportunity" was appropriately seized under the plain view doctrine, and was in any case later obtained from an independent and legitimate source;

(7) The series of e-mails between B.K. Son, Darron Purifoy, and defendant involving telecommunications equipment was appropriately seized pursuant to the search warrant;

(8) The Nigerian government officials' business cards were appropriately seized pursuant to the warrant;

(9) The non-circumvention and non-disclosure agreement and letter relating toArkel Sugar and Providence Lake were appropriately seized under the plain view doctrine;

(10) The agreement between Providence International Petroleum Company (PIPCO), James Creaghan, and Procurer Financial Consultants was appropriately seized under the plain view doctrine, and was in any case also obtained from a legitimate and independent source;

(11) The address book containing entries for individuals known to be associated with the ANJ Group, LLC and Multimedia Broadband Services, Inc. was appropriately seized pursuant to the search warrant;

(12) The 1991 calendar and appointment book was improperly seized and must be suppressed;

-23-

(13) The Moss Creek documents were improperly seized and must be suppressed; and

(14) The banking information recorded by written notes during the August 3, 2005 search was either seized properly under the plain view doctrine, or was also obtained from legitimate and independent sources, and therefore suppression of information regarding those accounts is unwarranted.

## V.

Finally, it is necessary to address defendant's argument that the FBI agents' practice of seizing information by photograph and written note constituted a general search of defendant's residence beyond the terms of the search warrant, and that all evidence seized during the August 3, 2005 search should be suppressed as a result. This argument fails on both the law and the facts. The Fourth Circuit has recently reaffirmed that "[b]lanket suppression due to an overly broad general search is only justified when officers exhibit flagrant disregard for the terms of the warrant." *United States v. Chandia*, 514 F.3d 365, 374 (4th Cir. 2008). There is no evidence of such flagrant disregard here. As detailed in Part IV above, the majority of evidence seized by way of photograph and written note during the August 3, 2005 search was seized legally pursuant to the search warrant or the plain view doctrine. Only two items were improperly seized — the 1991 calendar and appointment book and the Moss Creek documents. Nor does the record indicate that the improper seizures were a result of any flagrant disregard for the terms of the warrant; to the contrary, in each case there is evidence that the seizing agents acted in good faith. Because this was not a general search based on flagrant disregard for the terms of the warrant, blanket suppression is unwarranted.

In summary, defendant's motion to suppress evidence seized during the August 3, 2005

search of his New Orleans residence must be granted in part and denied in part.  It must be granted

with respect to the 1991 calendar and appointment book and the Moss Creek documents, because

those items were neither responsive to the search warrant nor subject to seizure under the plain view

doctrine. It must be denied in all other respects, because while the photographs and written notes

taken of documents in defendant's home constituted a seizure of the information contained therein,

that information was either subject to seizure under the warrant or the plain view doctrine, or was

obtained from a legitimate and independent source so as to qualify for the independent source

exception to the exclusionary rule.  And, importantly, none of the evidence seized illegally —

whether suppressed or saved from suppression by the independent source exception — resulted in

any taint with regard to any other evidence in this case.

       An appropriate Order will issue.


                                    /s/

Alexandria, Virginia                            T. S. Ellis, III
August 14, 2008                             United States District Judge