IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | Criminal No. 1:07CR209 |
| | ) | |
| v. | ) | Sentencing: November 13, 2009 |
| | ) | Time: 9:00 a.m. |
| WILLIAM J. JEFFERSON, | ) | Courtroom 900 |
| | ) | |
| Defendant. | ) | The Honorable T.S. Ellis, III |

## GOVERNMENT'S SENTENCING MEMORANDUM

Having been convicted by the jury of selling his congressional office with the intention of enriching his family with hundreds of millions of dollars in bribe proceeds and concealing more than $478,000.00 in actual bribe payments through nominee companies and sham consulting agreements, the defendant, Congressman William J. Jefferson, now comes before this Court to be sentenced for his stunning betrayal of the public trust. The defendant betrayed the public's trust time after time by using his congressional office as a criminal enterprise to further a pattern of racketeering acts of corruption and self-enrichment. His crimes included no fewer than eleven distinct bribe schemes as well as a conspiracy involving an extraordinary and historically unprecedented agreement to bribe the then-sitting Vice President of Nigeria, Atiku Abubakar. In committing these crimes, Congressman Jefferson reneged on his obligation to the citizens of the United States to perform the responsibilities of his public office free from deceit, concealment, and self-dealing.

The Probation Office has calculated the Sentencing Guidelines for Congressman Jefferson at a level 41 (Criminal History I), resulting in a guideline range of 324 to 405 months or approximately 27 to 33 years of imprisonment. Because Congressman Jefferson's crimes against the people of the United States were exceptional in their sheer number, length, and

breadth, the United States respectfully requests that this Court sentence the defendant within the applicable guideline range. While the guidelines sentence calculated by the Probation Office is lengthy, it is appropriate, in that Congressman Jefferson's criminal activities have surely caused or substantially added to the loss of public confidence and trust in our nation's highest levels of government.

In addition, because at this juncture the defendant poses a significant risk of flight, the United States requests that the defendant be remanded to the custody of the United States Marshals Service at the time he is sentenced.

## I.     Offense Conduct

### A.      Defendant's Background

Congressman Jefferson was first elected to the United States House of Representatives in 1990, representing the 2nd Congressional District in New Orleans, Louisiana and occupied that position for eighteen years. As a graduate of Harvard Law School and recipient of a Master of Laws Degree in Taxation from the Georgetown University Law Center, Congressman Jefferson's knowledge of the law are surpassed by few. During the same time he was committing the numerous crimes of corruption for which he was convicted, Congressman Jefferson was a Member of the powerful Ways and Means Committee; Subcommittee on Trade; Member of the Committee on the Budget; Co-Chair of the Africa Trade and Investment Caucus; and Co-Chair of the Congressional Caucus on Nigeria.

**B.      Summary of Offense Conduct**

On August 5, 2009, a jury convicted Congressman Jefferson of eleven counts, including conspiracy to commit bribery, deprivation of honest services by wire fraud, and violations of the Foreign Corrupt Practices Act (Count 1); conspiracy to commit bribery and deprivation of honest services by wire fraud (Count 2); bribery (Counts 3 and 4); deprivation of honest services by wire fraud (Counts 6, 7 and 10); money laundering (Counts 12, 13, and 14); and a violation of the Racketeer Influenced Corrupt Organization Act through the performance of a pattern of racketeering acts (Count 16).   The evidence presented at trial firmly established that between August 2000 and August 2005, Congressman Jefferson sought hundreds of millions of dollars on behalf of himself and family members.  In return, the defendant used his congressional office to promote the business interests of bribe-paying companies whose very success was dependent upon the approvals of certain United States and west African government agencies and officials. The types of business ventures that Congressman Jefferson corruptly promoted included:  (1) telecommunications deals in Nigeria, Ghana, and elsewhere; (2) oil concessions in Equatorial Guinea; (3) satellite transmission contracts in Botswana, Equatorial Guinea, and the Republic of Congo; (4) deep water offshore oil reserves in the territorial waters of Sao Tome and Principe; (5) waste recycling systems in Nigeria and Equatorial Guinea; (6) development of different plants and facilities in Nigeria; and (7) marginal oil fields in Nigeria.

As the government proved at trial, the financial payoff sought by Congressman Jefferson for himself and his family members was staggering.  In exchange for performing official acts on behalf of individuals and businesses who had agreed to his bribe solicitations, Congressman Jefferson anticipated reaping massive benefits equal to a half a billion dollars or more, to wit:

$172 million in the first five years of a telecommunications project he promoted to both U.S. and Nigerian government officials; a similarly rich telecommunications project in Ghana, which he promoted to both U.S. and Ghanaian government officials; $300 to $500 million for his intervention in a dispute over offshore oil development in the territory of the island nation of Sao Tome & Principe; $30 million from the development of marginal oil fields in Nigeria; $6 million for his intervention with U.S. and Nigerian government officials regarding the awarding of a government contract to build a sugar processing plant in Jigawa State Nigeria; and 4% of satellite transmission contracts in Botswana, Equatorial Guinea, and the Republic of Congo (potential profit not determined).

Despite expending significant government resources towards obtaining these illegal objectives, Congressman Jefferson did not receive the hundreds of millions of dollars in bribes that he demanded. His illicit and corrupt conduct, however, did garner him $478,153.47 in actual bribe proceeds. As the evidence established at trial, in exchange for the performance of official acts, Congressman Jefferson and his family received a total of $367,500.00 from iGate, Incorporated and its founder, Vernon L. Jackson, through a company called The ANJ Group, LLC, which was nominally owned by Congressman Jefferson's wife and five daughters and used to conceal the defendant's involvement in the bribe scheme. Further, in return for Congressman Jefferson's official acts to promote a construction project pursued by Arkel Sugar and Arkel International ("Arkel") in Nigeria, Arkel paid $21,353.47 in bribes to B.E.P. Consulting Services, LLC, another nominee company held in the name of the defendant's brother, Mose Jefferson. Finally, financial records and recorded conversations involving the defendant, established that the Congressman solicited and received bribe payments amounting to a total of

$89,300.00 from a government cooperating witness, Lori Mody. In addition to these cash payments, Congressman Jefferson demanded and received over 30 million shares of stock during these various schemes.

In an effort to promote and further the business endeavors of those who agreed to his bribe solicitations, Congressman Jefferson performed numerous official acts in his capacity as a Member of the United States House of Representatives. The numerous official acts were established, in part, through the testimony of at least twelve witnesses from various government agencies that the defendant sought to influence. These witnesses were public officials that came from a broad cross-section of our federal government, which Congressman Jefferson sought to influence in order to assist the companies that had secretly agreed to pay his bribe solicitations.[1] They included, but were not limited to:

1.      high-ranking officials with the United States Army;

2.      the Chairman and a staff member of the Committee on Energy and Commerce, Telecommunications and Internet Sub-Committee;

3.      a staff member of the House Armed Services Committee;

4.      employees of the United States Department of State and various U.S. Embassies and Consulates;

5.      employees of the Export-Import Bank of the United States (a U.S. government credit agency)(Ex-Im Bank);

6.      employees of the United States Trade and Development Agency (a U.S. government credit agency)(USTDA); and

7.      the Director and other employees of the National Aeronautics and Space

---

[1] These witnesses, who testified as part of the government's case-in-chief at trial, included General James C. Hylton, (Ret.), Col. Joseph D. Brown, Howard Waltzman, Paul Arcangelli, James Maxstadt, Bert Ubamadu, Tom Hardy, Patricia Hutchinson, and Brian Chase.

Administration (NASA).

In addition to taking official action to influence the decisions of public officials in the United States government for the benefit of the bribe-paying companies, Congressman Jefferson also attempted to influence foreign government officials by, among other things, leading official business delegations to Africa, conducting official meetings with foreign government officials, corresponding with foreign government officials using congressional stationery, and utilizing congressional staff members to otherwise advance the endeavors of such companies and businesspersons. Many of these former congressional staff members testified at trial. Their testimony was compelling in that they confirmed the official nature of Congressman Jefferson's conduct as well as the official actions the defendant directed them to unwittingly perform on behalf of the bribe-paying companies. The congressional staff that testified at trial included, Melvin Spence, Lionel Collins, Jr., Roberta Hopkins, and Angelle Kwemo. Finally, the evidence at trial established that Congressman Jefferson concealed his and his family's financial interests in these business ventures by, among other things, using nominee companies, employing bogus consulting agreements, and omitting material facts about these arrangements in his annual financial disclosure statements and travel disclosure forms filed with the Clerk of the United States House of Representatives.

Yet as egregious and illegal as his bribe solicitations were, Congressman Jefferson further compounded his criminal culpability by conspiring with others to pay a bribe to the then-sitting Vice President of Nigeria. In hushed and sometimes cryptic taped-recorded conversations, Congressman Jefferson explained in detail how the success of the Nigerian telecommunications venture depended on bribing the Vice President of Nigeria, who the

defendant described as "really corrupt."  *See* Government Exhibit 103-1.  After the Nigerian

government-owned telephone company ("NITEL") declined to grant the joint venture access to

the Nigerian telephone lines, Congressman Jefferson explained to Lori Mody that the Nigerian

Vice President oversaw NITEL and could thus overturn its decision.  During recorded

conversations, Congressman Jefferson explained to Lori Mody that he had offered, and the Vice

President had agreed to receive, a bribe in return for securing all necessary approvals from

NITEL.  On several occasions, Congressman Jefferson explained that the bribe would consist of

a "front end" payment in the amount of $500,000.00 and a "back end" payment amounting to

12.5% of the joint venture's profits.[2]

In sum, over the 8 weeks of trial in this matter, the government presented more than 45

witnesses and 700 exhibits, which included numerous tape-recorded conversations between the

defendant and others, to establish the overwhelming criminal culpability of Congressman

---

[2]  The government recognizes that the jury returned a verdict of "not guilty" to the charge
contained in Count 11 of the indictment, a substantive violation of the Foreign Corrupt Practices
Act.  The government believes that the jury found Congressman Jefferson not guilty on Count
11, at least in part, because he ultimately failed to deliver the $100,000.00 in cash to the Nigerian
Vice President before the Vice President departed the United States on July 31, 2005.  However,
the evidence fully supports the proposition that the jury, nevertheless, found that the defendant
conspired to bribe the Vice President of Nigeria, an object of the conspiracy charged in Count 1,
a count on which the jury returned a guilty verdict.  Such a verdict would not require proof of the
actual delivery of the cash to the Vice President (front end) or actual payment of the percentage
of the proceeds of the joint venture (back end).  The government believes that the evidence
supports such a split finding by the jury as to Counts 1 and 11.  Although delivery of the cash to
the Vice President of Nigeria was not a legal pre-requisite to finding Congressman Jefferson
guilty of Count 11, it offers a compelling explanation for the jury's split verdict.  Finally, the
government recognizes that such a split verdict can never be completely confirmed because the
conspiracy charged in Count 1 contained three objects, one of them being the charge related to
the bribe of the Vice President of Nigeria.  The verdict form completed by the jury on August 5,
2009 did not require the jury to delineate which, if not all, of the objects charged in the
conspiracy in Count 1 were found to have been proved, only that at least one of the objects was
proven by the government beyond a reasonable doubt.

Jefferson. As is discussed in this memorandum, the jury's August 5, 2009 verdict, finding the defendant guilty on eleven of the sixteen counts he faced, was supported by compelling and credible evidence.

## II. Sentencing Analysis

As this Court is aware, following the Supreme Court's decision in *United States v. Booker*, the Sentencing Guidelines are now advisory. 543 U.S. 220, 261 (2005). As such, "[i]n the wake of *Booker* . . . the discretion of a sentencing court is no longer bound by the range prescribed by the guidelines." *United States v. Hughes*, 401 F.3d 540, 546 (4th Cir. 2005) (quoting *Booker*, 542 U.S. at 264). The Supreme Court has clarified that this means the sentencing court "may not presume that the Guidelines range is reasonable." *Nelson v. United States*, 129 S.Ct. 890, 892 (2009). Nevertheless, the sentencing court must first calculate the Guidelines range. *Id.*; *see also Hughes*, 401 F.3d at 546 (holding that a sentencing court is still required to "consult [the] Guidelines and take them into account when sentencing"). Thus, "sentencing courts are not left with unguided and unbounded sentencing discretion." *United States v. Green*, 436 F.3d 449, 455 (4th Cir. 2006).

### A. Use of 2008 Sentencing Guidelines Manual

The U.S. Sentencing Guidelines determine that "the court should use the Guidelines Manual in effect on the date that the defendant is sentenced." U.S.S.G. § 1B1.11(a). The government acknowledges that the Guidelines Manual in effect on the date that the offense was committed should be used by the Court only if use of the guidelines in effect on the date of sentencing would result in a violation of the *ex post facto* clause of the United States Constitution. U.S.S.G. § 1B1.11(b)(1). However, no such violation of the *ex post facto* clause

has occurred here since each of the counts of conviction involved conduct that occurred after the effective date of the November 2004 Guidelines Manual.  There are no substantive differences between the November 2004 and November 2008 Manuals that apply to the conduct at issue in this case.  Even if one of the Counts of conviction contained conduct that pre-dated the November 2004 Guidelines Manual, the "one book rule" would dictate that the later Manual should be used by the Court.  "If a defendant is convicted of two offenses occurring both before and after a revised version of Guidelines became effective, § 1B1.11(b)(3) provides that the revised version of the Guidelines is to be applied to both offenses."  *United States v. Duane*, 533 F.3d 441, 447 (6th Cir. 2008).  *See also United States v. Foote*, 413 F.3d 1240, 1249, n.5 (10th Cir. 2005); *United States v. Anderson*, 570 F.3d 1025, 1033-34 (8th Cir. 2009); *United States v. Lewis*, 235 F.3d 215, 218 (4th Cir. 2000) ("Lewis therefore had ample warning, when she committed the later acts of tax evasion, that those acts would cause her sentence for the earlier crime to be determined in accordance with the Guidelines Manual applicable to the later offenses, and thus that the intervening amendment to the tax table would apply.").  Accordingly, the government believes that the Probation Office has correctly applied the November 2008 Guidelines Manual in calculating the Sentencing Guidelines that apply to the defendant's criminal conduct.

**B.      Summary of Guidelines Calculations**

As discussed above, the Probation Office has properly calculated the defendant's Sentencing Guidelines at a level 41, resulting in a guidelines range of 324 to 405 months of imprisonment.  For the reasons more fully discussed below, the government concurs with the Probation Office's calculations.  A summary of the guidelines calculation prepared by the

Probation Office follows.



§2C1.1. Bribery and Honest Services
(a)     Base Offense Level                                      +14
(b)     Specific Offense Characteristics
        (1)     More than one bribe                             + 2
        (2)     Value of Bribe Payments (2B1.1 Table)    +14
                ($400,000 to $1 million)
        (3)     Offense involved Elected Official          + 4
        (4)     Defendant was a public official who
                facilitated (A) entry into U.S.                         +
                                                                2

§3B1.1. Aggravating Role
(a)     Leader / Organizer                                    + 4
        (Five or more participants or otherwise extensive)

§2S1.1. Laundering of Monetary Instruments (b)(2)(A)          + 1
_____
Total Guidelines Calculation =                                    41
                                                (324 to 405 months)
                                                (27 to 33 years)

**C.      Offense Conduct**

**1.      Calculation of the Base Offense Level**

Under the Sentencing Guidelines for charges related to bribery and the deprivation of

honest services by wire fraud, U.S.S.G. § 2C1.1(a), the base offense level is 14, if the defendant

was a public official.  At all times relevant to the criminal conduct for which the defendant was

convicted, he was a sitting Member of the United States House of Representatives.  Accordingly,

his base offense level was correctly calculated by the Probation Office at a level 14.

**2.      Specific Offense Characteristics**

**a.      More Than One Bribe**

A two-level increase in the offense level is mandated where "the offense involved more

than one bribe or extortion." U.S.S.G. § 2C1.1(b)(1).  The evidence admitted at trial in this case

overwhelmingly established that Congressman Jefferson's offense involved no fewer than eleven distinct bribe schemes. Accordingly, a two-level enhancement for more than one bribe has been correctly applied to the defendant's sentencing calculation.

**b.** **The Value of Anything Obtained or to Be Obtained**

U.S.S.G. § 2C1.1(b)(2) dictates that "[i]f the value of anything obtained or to be obtained by a public official . . . whichever is greatest, exceeded $5,000, increase by the number of levels from the table in §2B1.1 . . . corresponding to that amount." As was established at trial, Congressman Jefferson intended to obtain, for his family, what he expected to be a share of the Nigerian telecommunications joint venture worth $172 million over a five-year period. *See* Government Exhibit 3-145A. This amount of intended gain represents just one of the many bribes the defendant solicited. Since the intended gain of $172 million is greater than the actual bribes paid at the direction of Congressman Jefferson, the Sentencing Guidelines call for a 26-level enhancement. *See* §§ 2C1.1(b)(2) and 2B1.1(b)(1)(N). The Probation Office, however, declined to include an enhancement based on the financial gains intended by the defendant. Instead, the Probation Officer applied an enhancement of 14 levels (more than $400,000.00) to the defendant's sentencing calculation based on the actual bribe payments received by Congressman Jefferson and his family. *See* §§ 2C1.1(b)(2) and 2B1.1(b)(1)(H). While the government believes that the language of U.S.S.G. §§ 2C1.1(b)(2) and 2B1.1(b)(1) call for the higher enhancement, the government does not object to the Court assessing only a 14-level increase in the defendant's guidelines calculations based on actual gain.

### c.    The Offense Involved an Elected Public Official

U.S.S.G. § 2C1.1(b)(3) directs that a four-level enhancement be applied "[i]f the offense involves an elected public official or any public official in a high-level decision-making or sensitive position. . ."  As a Member of the United States House of Representatives, Congressman Jefferson was first elected to his position in Congress in 1990 and was re-elected every two years thereafter until 2008.  The defendant committed his crimes during this time frame, and most of his offense conduct involved soliciting and receiving things of value in exchange for official acts performed in his capacity as a high-level, elected public official. Accordingly, a four-level enhancement has been properly assessed pursuant to § 2C1.1(b)(3).

### d.    A Public Official Who Facilitated Entry into the United States

U.S.S.G. § 2C1.1(b)(4) states that "[i]f the defendant was a public official who facilitated (A) entry into the United States for a person . . . ; [or] (B) the obtaining of a passport of a document relating to naturalization, citizenship, legal entry . . . increase by 2 levels."  During the course of the conduct that resulted in his conviction, Congressman Jefferson wrote, on several occasions, to U.S. consulates and other government agencies to expedite or facilitate the entry into the United States of persons associated with companies who had agreed to pay the bribes solicited by the defendant.  Examples of these official requests to expedite entry into the United States included letters by Congressman Jefferson to  (1) U.S. Consul General, London, England, dated July 22, 2003, seeking entry into the U.S. for Dumebi Kachikwu (NDTV); (2)  U.S. Consul General, Lagos, Nigeria, dated February 27, 2004 and March 3, 2004 for Olusegun Egonjobi (NDTV); and (3) U.S. Consulate General, Belfast, Ireland, dated June 12, 2003 and the

U.S. Department of Homeland Security, dated August 1, 2003 for Dr. Christopher McCormack (LETH).  *See* Government Exhibits 23-30, 24-17, 24-18, 24-46 and 24-11 attached hereto as Exhibit "A."  By way of example, in his June 12, 2003 letter to the U.S. Consulate General in Belfast, Northern Ireland, Congressman Jefferson wrote, among other things: "I would be most appreciative if you could arrange to meet with Dr. McCormack and *facilitate* his entry into the United States."  *Id.* (emphasis added).  The letters achieved their intended effect as Dr. McCormack received his visa and was able to enter the United States in September 2003 and other occasions thereafter.  *See* Border crossing records for Dr. McCormack attached hereto as Exhibit "B."[3]

### D.    Adjustment for Role in the Offense

A four-level upward adjustment in the offense level is appropriate in this case due to Congressman Jefferson's aggravating role as the organizer or leader of a criminal activity that included five or more participants or was otherwise extensive.  U.S.S.G. § 3B1.1(a).  The evidence at trial clearly established the applicability of this adjustment to Congressman Jefferson's sentencing calculations.  There were at least five participants in the criminal activity and Congressman Jefferson was the organizer and leader of the corruption he endorsed.  Further, Congressman Jefferson was the organizer and leader of criminal activity that was extensive.

---

[3]  In his objections to the Presentence Report, the defendant challenged the Probation Officer's use of this enhancement on the grounds that its application violated the *ex post facto* clause of the Constitution.  He claimed that because the letters, sent in 2003 and 2004, pre-date the November 2004 guidelines manual that contained for the first time the enhancement set forth in U.S.S.G. § 2C1.1(b)(4), application of that guidelines provision contravened the *ex post facto* clause.  However, the offenses of conviction for which this enhancement has been applied involved conduct that occurred after the November 2004 amendments.  Accordingly, application of § 2C1.1(b)(4) does not violate *the ex post facto* clause.  *See also* discussion in Section II.A. above.

Indeed, over the course of at least five years, the defendant proposed and pursued eleven different bribe schemes.[4]

### 1. The Criminal Activity Involved at Least Five Participants or Was Otherwise Extensive

#### a. There Were At Least Five Participants

A "participant" is defined in the Application Notes as a person "who is criminally responsible for the commission of the offense, but need not have been convicted." U.S.S.G. § 3B1.1, Application Note 1. *United States v. Harvey*, 532 F.3d 326, 337-38, (4th Cir. 2008); *United States v. Stubbs*, 11 F.3d 632, 640-41 (6th Cir. 1993).

In this case, there were certainly more than five persons criminally responsible for the commission of the offenses of which the defendant was convicted. In addition to Congressman Jefferson, the evidence at trial established that there were at least 15 individuals who participated in illegal conduct with him. Vernon Jackson, Brett Pfeffer, Mose Jefferson, Andrea Jefferson, Jamila Jefferson, Phillip Jones, Torey Bullock, George Knost, Deborah Haggard, Bradley Kimbrough, John Melton, Ramon Jarrell, James Creaghan, Noreen Wilson (Griffin), and Dumebi Kachikwu were all participants in Congressman Jefferson's numerous crimes of bribery and honest services fraud. The most involved criminal participants included Vernon Jackson and Brett Pfeffer, both of whom pleaded guilty to conspiring with the defendant. Also, James Creaghan, George Knost, John Melton, Noreen Wilson (Griffin), and Dumebi Kachikwu each

_____

[4] U.S.S.G. § 3B1.1, Application Note 4 provides additional factors to consider in determining whether or not this enhancement should apply. They include ". . . the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others."

testified under letters of immunity and admitted to having agreed to the defendant's bribe solicitations.

### b.     Congressman Jefferson's Criminal Activity Was Extensive

In assessing whether a criminal activity was "otherwise extensive," which is an alternative basis for applying this guideline adjustment, the Guidelines direct courts to consider "all persons involved in the course of the entire offense."  U.S.S.G. § 3B1.1, Application Note 3. As an example, the Application Notes provide that "a fraud that involved only three participants but used the *unknowing* services of many outsiders can be considered extensive.  *Id*. (emphasis added).

In this case, the criminal activity was clearly extensive.  In addition to the individuals listed above that meet the description of participants, there were several other individuals who are not criminally responsible, but unknowingly aided Congressman Jefferson in furthering his numerous corruption schemes.  For example, congressional staff members -- such as Lionel Collins, Jr., Melvin Spence, Roberta Hopkins, and Angelle Kwemo -- testified that, at Congressman Jefferson's direction, they performed official acts on behalf of persons and companies to benefit the persons and companies who, unbeknownst to them, had agreed to provide things of value to Congressman Jefferson and his family members.

Congressman Jefferson also used the unknowing services of other government officials who were employed at various U.S. government agencies, including the United States Army; the House Committee on Energy and Commerce, Telecommunications and Internet Sub-Committee; the House Armed Services Committee;  the United States Department of State and various U.S. Embassies and Consulates; the Ex-Im Bank; the USTDA; and NASA.  None of these

government officials, nor their agencies, were aware that Congressman Jefferson's contacts with them on behalf of constituents were in return for the secret bribes the defendant had solicited.

### 2. Congressman Jefferson Was the Organizer and Leader of the Criminal Activity.

Congressman Jefferson was the leader or organizer of the participants listed above. With regard to the unwitting congressional staff members, Congressman Jefferson, as the head of his congressional office, operated that congressional office as a criminal enterprise to further the many corruption schemes from which he sought to profit. Congressman Jefferson directly supervised individuals such as Lional Collins, Jr., Melvin Spence, Roberta Hopkins, Angelle Kwemo, Atonte Diete-Spiff, and Stephanie Butler. Each of these individuals was hired by Congressman Jefferson, could be fired by Congressman Jefferson, and their duties and salary were determined by Congressman Jefferson. Congressman Jefferson was unquestionably the leader of the congressional office. Congressman Jefferson was also the leader and organizer of the criminal activity involving the businesspersons and companies that had agreed to his bribe solicitations. He instructed them, sometimes tacitly and sometimes directly, that they had to pay his designated family members in order to receive his official assistance. It was Congressman Jefferson who instructed the bribe-paying companies that sham consulting agreements had to be executed between the bribe-paying company and a nominee company controlled by one of the defendant's family members. In many cases, it was Congressman Jefferson who instructed his congressional staff to file the necessary paperwork with the Louisiana Secretary of State to form the nominee companies designed to conceal his numerous bribe schemes.

In short, Congressman Jefferson was the central figure in each of the bribery and corruption schemes he committed. He was the one who called the shots. Congressman Jefferson

used the participants listed above, virtually his entire congressional staff, numerous employees of other federal agencies, and the employees of those companies who had agreed to pay the bribes solicited by him to conduct the charged pattern of bribery, honest services by wire fraud, and money laundering offenses for which he now stands convicted. Because Congressman Jefferson was the leader and organizer of the criminal activity proven at trial, the government agrees with the Probation Office's assessment of a four-level enhancement pursuant to U.S.S.G. § 3B1.1(a).

###### E.    Adjustment for Money Laundering in Violation of 18 U.S.C. § 1957

U.S.S.G. § 2S1.1(d)(A) provides for a one-level enhancement "[i]f the defendant was convicted under 18 U.S.C. § 1957. . ." Since Congressman Jefferson was convicted of three counts of money laundering under section 1957 (Counts 12, 13, and 14), the government agrees with the Probation Office's application of a one-level enhancement to the defendant's sentencing calculations.

###### F.    A Sentence Within the Advisory Guideline Range Meets the Factors Set Forth in 18 U.S.C. § 3553(a)

After calculating the appropriate guidelines range, "the court must 'determine whether a sentence within that range . . . serves the factors set forth in § 3553(a)' and, if not, select a sentence [within statutory limits] that does serve those factors." *United States v. Moreland*, 437 F.3d 424, 432 (4th Cir. 2006) (quoting *Green*, 436 F.3d at 455). Section 3553(a) directs the sentencing court to consider various factors including the nature and circumstances of the offense and characteristics of the defendant. In addition, Section 3553(a) states that the court must consider other factors, including the need for the sentence "to reflect the seriousness of the offense, to promote respect for law, and to provide just punishment for the offense; [and] to afford adequate deterrence to criminal conduct." 18 U.S.C. § 3553(a)(2)(A) & (B).

In general, a sentencing court must "articulate the reasons for selecting the particular sentence, especially explaining why a sentence outside of the Sentencing Guidelines range better serves the relevant sentencing purposes set forth in § 3553(a)." *Green*, 436 F.3d at 456. *See also United States v. Hughes*, 401 F.3d 540, 546 (4th Cir. 2005) ("If the court imposes a sentence outside the guidelines range, it should explain its reason for doing so."). As such, it is the government's position that the Sentencing Guidelines establish a reasonable sentencing range that appropriately accounts for each of the factors set forth in 18 U.S.C. § 3553(a).

> 1. **A Sentence Within the Guidelines Range Is Appropriate and Reasonable in Light of the Nature of the Defendant's Criminal Conduct and Characteristics**

In formulating a sentence, this Court must take into account the nature and circumstances of the offense and the defendant's characteristics. 18 U.S.C. § 3553(a)(1). Based on the facts of the matter before the Court, the United States urges the Court to impose a sentence within the guidelines range of 324 to 405 months.

As is discussed in more detail above, the defendant's criminal conduct was extensive and the ramifications are very serious. As a Member of Congress with powerful committee assignments, Congressman Jefferson repeatedly abused his power and influence to conduct numerous criminal schemes designed to enrich himself and his family. Congressman Jefferson's crimes have resulted in a significant loss of public confidence. The damage done to some of our most important and cherished institutions can never be calculated. In addition, the extensive evidence involving Congressman Jefferson's efforts to bribe the Vice President of Nigeria likely resulted in a negative effect on the United States' ability to hold itself out as a role model in the international community to other countries which do not yet have laws enacted to address

bribery or do not enforce such laws already in place. A sentence within the applicable guidelines range is appropriate in light of the severity of his criminal acts.

### 2. A Sentence Within the Guideline Range Would Provide Appropriate and Reasonable Deterrence

In addition, a sentence within the Guidelines range would be appropriate to provide the requisite level of both specific and general deterrence. 18 U.S.C. § 3553(a)(2)(B). As the defendant stands convicted of some of the most serious corrupt schemes uncovered in recent history, he is without remorse and has yet to accept responsibility for his actions. In fact, at trial he trivialized his criminal conduct, suggesting instead that he was guilty only of technical infractions of ethical rules. A sentence within the guidelines range will communicate to Congressman Jefferson that his repeated attempts to sell his office were not only criminal, they were egregious.

Of even more importance is the message that a lengthy term of imprisonment will send to the general public, which is already well aware of Congressman Jefferson's criminal exploits. A severe sentence would send the message to the public that such egregious and criminal behavior will not be tolerated in our society. The sacred bond between our elected officials and the citizens that place them in office must be honored. Congressman Jefferson's numerous schemes of corruption have done much damage to that bond. A lengthy term of imprisonment would begin to repair the damage that Congressman Jefferson's conduct has caused. As such, the government believes that the guidelines range calculated by the Probation Office establishes a reasonable sentencing range that accounts for each of the factors set forth in 18 U.S.C. § 3553(a).

### H. Monetary Penalties

The government respectfully requests this Court to issue a mandatory special assessment and fine as is appropriate under the guidelines calculation provided by the Probation Office. The government also notes that it has pending before this Court a Motion for Preliminary Order of Forfeiture ("Motion"). Dkt. Entry #597. Consistent with Federal Rule of Criminal Procedure 32.2(b)(3) and the supporting factual and legal basis presented in the government's Motion, the government respectfully requests this Court to enter the proposed order of forfeiture attached to its Motion.

## III. The Defendant Should Be Remanded Following Sentencing

It has been over four years since evidence of Congressman Jefferson's extensive corruption first became public. Congressman Jefferson has had his chance to challenge the government's evidence before three different appellate courts and at trial before a jury of his peers in this Court. The jury has spoken by finding him guilty of the corrupt acts he tried so hard to conceal. It is now time for Congressman Jefferson to begin serving his sentence. It is time for the public to see that all men are created equal before the law and that everyone, even the most powerful public officials in our country, will be punished for the wrongs they have committed.

### A. Legal Standard for Detention of a Convicted Defendant

Motions for release or detention of a defendant pending appeal are governed by 18 U.S.C. § 3143(b), which creates a presumption against release pending appeal. *See United States v. Vance*, 851 F.2d 166, 168 (6th Cir. 1988). The defendant may rebut the presumption of detention by meeting the two-pronged test set forth in 18 U.S.C. § 3143(b)(1)(A) and (B). First, he must demonstrate "by clear and convincing evidence" that he is not likely to flee or pose a

danger to the safety of another person in the community if released.  Second, release is

appropriate only if:

> the judicial officer finds that the appeal is not for purpose of delay
> and raises a substantial question of law or fact likely to result in – (i)
> reversal, (ii) an order for a new trial, (iii) a sentence that does not
> include a term of imprisonment, or (iv) a reduced sentence to a term
> of imprisonment less than the total of the time already served plus the
> expected duration of the appeal process.

*United States v. Steinhorn*, 927 F.2d 195, 196 (4th Cir. 1991).  A "substantial question" is

defined as "a 'close' question or one that very well could be decided the other way."  *Id.* (*citing*

*United States v. Giancola*, 754 F.2d 898, 901 (11th Cir. 1985)).  Whether a question is

"substantial" is decided on a case-by-case basis.  *Id.*  The burden of proof remains on the

defendant.  *United States v. Valera-Elizondo*, 761 F.2d 1020, 1025 (5th Cir. 1985).

**B.      Congressman Jefferson Cannot Rebut the Presumption that He Must be
Detained**

In this case, the defendant is not able to rebut the presumption of detention because he

cannot demonstrate either prong by clear and convincing evidence.  First, the defendant is 62

years of age and a significant sentence may result in his release from prison as an elderly man.

Consequently, there is substantial risk that the defendant may attempt to avoid his sentence by

fleeing.  The defendant has frequently traveled to foreign lands in his role as a Member of the

United States House of Representatives and its various committees and caucuses.  During these

official trips, the defendant was able to develop significant relationships with government

officials in countries located in West Africa and other countries on the continent of Africa.  Such

relationships could prove fruitful for the defendant should he decide to flee this jurisdiction prior

to commencing his term of imprisonment.  Moreover, the defendant may have the financial

means necessary to sustain any flight from custody in spite of his recent bankruptcy filing. During the investigation of his numerous bribe schemes, law enforcement agents learned of several wire transfers from offshore territories into U.S. financial accounts that were either controlled by the defendant or whose proceeds were made available for his benefit. *See* Donald C. Semesky, Jr., Tr. at 104 - 116; *see also* Government Exhibits 36-87 (6/26/02 $170,000 wire transfer from account in Nigeria in the name of Aisha Buhari to an account in the name of The ANJ Group, LLC, identifying "William Jefferson" as Beneficiary), Government Exhibits 36-90 and 36-91 (11/28/03 $50,000 wire transfer from account in British Virgin Islands in the name of Dawson Creek Traders to an account in the name of Jefferson Interests, Inc.). Law enforcement agents were unable to substantially confirm the source of these wire transactions and have not ruled out the possibility that the defendant controls nominee companies or financial accounts in foreign jurisdictions. The possibility that the defendant had set up a nominee company and account in Nigeria was also supported by the trial testimony of Dumebi Kachikwu, an executive with NDTV and co-conspirator of the defendant. *See* Kachikwu Tr. at 41-43. Kachikwu testified at trial about a discussion he had with Congressman Jefferson, wherein the defendant asked Kachikwu to form a company in Nigeria to receive the agreed to and expected payment of bribes from NDTV that the defendant had solicited. *Id.*

Given the age of the defendant, the severity of the sentence calculated by the Probation Office, the defendant's frequent travel overseas and unexplained wire transfers from overseas locations to financial accounts used by the defendant, the defendant cannot rebut the presumption at sentencing that he is a risk of flight.

Finally, the government understands that the defendant may very well plan to appeal the verdict returned by the jury on August 5, 2009. But the defendant will be unable to raise any issues on appeal that are likely to result in a reversal or new trial. Issues in this case were thoroughly briefed and this Court has made well-reasoned decisions consistent with legal precedent. Accordingly, the defendant cannot establish that an appeal is likely to result in a reversal or new trial.

The defendant is unable to establish by clear and convincing evidence that he is not a risk of flight. The defendant is unable to establish that any appeal would raise a substantial question of law or fact likely to result in reversal or the granting of a new trial. Accordingly, the defendant should be remanded at sentencing to begin serving his term of imprisonment.

## IV. Conclusion

For the reasons stated above, the government respectfully asks this Court to sentence the defendant within the guidelines range calculated by the Probation Office. The government also requests that a forfeiture order be granted, consistent with the relief requested in its pending Motion. Finally, the government requests that, upon imposition of sentence, the Court remand the defendant to the custody of the United States Marshals Service.

Respectfully submitted,

Neil H. MacBride
United States Attorney

By: _____/s/_____
Mark D. Lytle
Assistant United States Attorney
Attorney for the United States
United States Attorney's Office
2100 Jamieson Avenue
Alexandria, VA 22314

Phone:   703-299-3700
Fax:       703-299-3981
Mark.Lytle@usdoj.gov


_____/s/_____
Rebeca H. Bellows
Assistant United States Attorney
Attorney for the United States
United States Attorney's Office
2100 Jamieson Avenue
Alexandria, VA 22314
Phone:   703-299-3700
Fax:       703-299-3981
Becky.Bellows@usdoj.gov


_____/s/_____
Charles E. Duross
Special Assistant U.S. Attorney
Attorney for the United States
United States Attorney's Office
2100 Jamieson Avenue
Alexandria, VA 22314
Phone:   703-299-3700
Fax:       703-299-3981
Charles.Duross@usdoj.gov

<u>**CERTIFICATE OF SERVICE**</u>

      I hereby certify that on the 6th day of November, 2009, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send a notification of such filing (NEF) to the following:

               Robert P. Trout
               Trout Cacheris, PLLC
               1350 Connecticut Avenue, N.W.
               Suite 300
               Washington, D.C.  20036
               rtrout@troutcacheris.com


                                    /s/
                         _____
                         Mark D. Lytle
                         Assistant United States Attorney
                         United States Attorney's Office
                         2100 Jamieson Avenue
                         Alexandria, VA 22314
                         Phone:   703-299-3768
                         Fax:        703-299-3981
                         Mark.Lytle@usdoj.gov