**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **v.** | ) | **Criminal No. 1:07CR209 (TSE)** |
| | ) | |
| **WILLIAM J. JEFFERSON,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**DEFENDANT'S MEMORANDUM IN AID OF SENTENCING**

Robert P. Trout
Amy Berman Jackson
Gloria B. Solomon
TROUT CACHERIS, PLLC
1350 Connecticut Ave, N.W., Suite 300
Washington, D.C. 20036
Phone: (202) 464-3300
Fax:  (202) 464-3319

Attorneys for William J. Jefferson

# TABLE OF CONTENTS

Page

I.    THE HISTORY AND CHARACTERISTICS OF THE
      DEFENDANT........................................................................................... 2

II.   THE NATURE AND CIRCUMSTANCES OF THE OFFENSE. ................... 15

III.  OTHER SENTENCING CONSIDERATIONS.............................................. 22

IV.   GUIDELINES CALCULATION ................................................................. 23

      A.    The Court Should Not Apply a 2 Point Enhancement for
            Facilitating Entry into the United States............................................. 24

      B.    Ex Post Facto Considerations Weigh Against Use of the
            2008 Guidelines for Calculating the Offense Conduct for
            Count 2........................................................................................... 27

      C.    Especially Given that the Guidelines are Advisory, Ex Post
            Facto Considerations Weigh in Favor of Using the
            November 2003 Guidelines to Calculate the Offense Level
            for the Count 1 Conspiracy and Related Counts.................................. 30

V.    A SENTENCE UNDER 10 YEARS WOULD AVOID
      UNWARRANTED SENTENCING DISPARITIES. ..................................... 31

      A.    A Sentence Longer than 10 Years Would be Markedly
            Disproportionate to Sentences of Other Members of
            Congress Convicted on Corruption Charges. ..................................... 31

            1.    Rep. Randall "Duke" Cunningham......................................... 32

            2.    Rep. Robert Ney.................................................................. 33

            3.    Rep. James Traficant............................................................ 34

            4.    Rep. Melvin Reynolds .......................................................... 35

            5.    Rep. Jay C. Kim ................................................................. 35

            6.    Rep. Donald Lukens............................................................. 36

            7.    Rep. Daniel Rostenkowski.................................................... 36

            8.    Rep. Albert Bustamante ....................................................... 37

            9.    Rep. Patrick Swindall .......................................................... 38

    B.    A sentence of more than 10 years would not be consistent with the sentences already imposed in this case. ................................................. 39

VI.  THE DEFENDANT SHOULD NOT BE REMANDED AT THE TIME OF SENTENCING................................................................................................ 40

VII.  CONCLUSION ........................................................................................................... 41

Pursuant to 18 U.S.C. § 3553(a)(2), the court "shall impose a sentence sufficient, but not greater than necessary," to accomplish the purposes set forth in the statute, including: to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment and to afford adequate deterrence. The defense submits that in this case, a sentence of less than 10 years would more than fulfill these goals. The statute directs the court to consider the history and characteristics of the defendant as well as the nature of the offense when determining what sentence to impose. 18 U.S.C. § 3553(a)(1). And, while the statute instructs the judge to consider the advisory Guidelines among other factors, "the sentencing court does not enjoy the benefit of a legal presumption that the Guidelines sentence should apply." *Rita v. United States*, 551 U.S. 338, 351 (2007). Instead, the Guidelines simply "reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives." *Id.* at 350.[1]

As the Supreme Court has explained, 18 U.S.C. § 3553(a) "tells the sentencing judge to consider (1) offense and offender characteristics; (2) the need for a sentence to reflect the basic aims of sentencing, namely (a) 'just punishment' (retribution), (b) deterrence, (c) incapacitation, (d) rehabilitation; (3) the sentences legally available; (4) the Sentencing Guidelines; (5) Sentencing Commission policy statements; (6) the need to avoid unwarranted disparities; and (7) the need for restitution." *Id.* at 347-48. To aid the court in applying these principles in this case, defendant William Jefferson, through counsel, respectfully submits the following information.

---

[1]    As the government states in its sentencing memorandum, "this means the sentencing court 'may not presume that the Guidelines range is reasonable.'" Gov't Sentencing Memo at 8, quoting *Nelson v. United States,* 129 S. Ct. 890, 892 (2009).

## I.     THE HISTORY AND CHARACTERISTICS OF THE DEFENDANT

The statute that addresses the imposition of sentence explicitly recognizes that the conduct that brought the defendant before the court can only be viewed within the context of his entire life. The statute's mandate – that the court shall consider not only the nature and circumstances of the offense, but also the history and characteristics of the defendant, *see* 18 U.S.C. § 3553(a)(1) – codifies the fundamental principle that the court is sentencing a man, and not merely his misdeeds.

And in the case of a 62 year old man who stands before a sentencing court for the first time in his life, there is a lot of history. The court can, and indeed must, fully explore and consider Mr. Jefferson's life story – the obstacles he has overcome, the career in public service he pursued, and his many positive contributions – to ensure that while the sanction adequately reflects the gravity of the offense, it is not greater than necessary to serve the ends of justice.

The story of William Jefferson is a story of an extraordinary and unlikely rise from simple beginnings, inspired by the faith and industriousness of his parents. It is also a story of a man who never forgot where he came from. While through dint of hard work and determination, William Jefferson walked out of the cotton fields of the segregated south into the nation's finest educational institutions and its highest corridors of power, he is known for his humility and compassion, his conciliatory and cooperative approach towards his adversaries, and his abiding commitment to and respect for the hard working poor of Louisiana and the world. As the letters attached to this memorandum attest, he is animated first and foremost by love of family and faith in God. The court had the opportunity to observe Mr. Jefferson's quiet dignity throughout the course of a lengthy trial, including his out-of-court conduct that was respectful of the court proceedings. He stands before the court mindful of his own imperfections and fully cognizant of

the fact that he alone bears full responsibility for the choices that brought him to this juncture. But William Jefferson is more than the punchline of a late night talk show joke or the one-dimensional character depicted in the prosecution's arguments. He has done much more in his life than pursue the business ventures described during the trial. And therefore the defense seeks to acquaint the court with the rest of the picture, with who William Jefferson is and where he came from.

Mr. Jefferson's biography is best told in his own words:

> I was born on a small cotton farm in northeast Louisiana. I am the sixth of ten children of Mose and Angeline Jefferson. My parents were deeply religious. My father was head deacon and superintendent of our Sunday School. My mother was deaconess at our church and in charge of youth programs there. I loved and respected them completely and wanted and have tried to be like them. We were poor, and we had to work long hours in the cotton fields to make ends meet. But I never felt deprived and had a very happy childhood.[2]

---

[2]    In counsel's opinion, this factual recitation, prepared for purposes of this memorandum, sketches the outline, but does not paint a full, rich picture of the world in which William Jefferson grew up, the parents and grandparents who raised him, and the lessons they imparted. And a legal pleading can hardly do justice to a boy's life in the cotton fields or what his grandparents' prayers meant to him. But the court can get a glimpse of life in Lake Providence as Mr. Jefferson himself remembers it in the very intimate stories that he decided to write down after his emergency bypass surgery in 2002. While many in public life seek out book contracts to embellish their own records or trumpet their accomplishments, Mr. Jefferson quietly put pen to paper in an intimate way to honor his family and to let their faith guide his reconciliation with his own mortality. The stories were published in 2007 in a collection entitled *Dying is the Easy Part,* and the table of contents and a few examples of the personal recollections are attached to this memorandum as Exhibit 1. As Mr. Jefferson writes in the Introduction: "My parents were deeply religious. They interpreted the events in their lives and mine principally through the prism of religious faith and Christian values. Against the backdrop of race-consciousness, discrimination, poverty, and oppression in Southern life, religion provided an ark of peace for us that did not depend upon an understanding of our circumstances…. The stories told here are about the people, the surroundings, the difficulties, and the triumphs of my life. That they deal with racial clashes, rural poverty, humor, family challenges, and consuming faith is not for dramatic effect. They are simply the stories that I grew up with, the stories that I continue to live with, the stories I know."

My mother finished the eighth grade and my father only the fifth grade. But they prayed and worked for our educations. Mama did the most in this area. She was president of the then "East Carroll Parish Colored PTA" – Louisiana schools were strictly racially segregated at the time. As she fought for more books and better pay for teachers at the "colored schools," I got my first glimpse and first impressions of sacrificial public service. From my parents, then, I learned early on to love God, to love learning, and to abhor injustice, and I was inspired to serve others. I have tried to pass this legacy of my parents on to the children with whom God has blessed my wife and me.

Committed to making my parents proud of me, I studied hard and excelled during my school years. I was the class president for each of my four years in high school, and I was able to achieve my parents' dream that I would attend college. I attended Southern University, a historically black college in Louisiana, and in addition to graduating with honors, I was elected sophomore and junior class president and finally, student government president. I was also a battalion commander in ROTC, later becoming a commissioned Army officer.

But nothing made my parents more proud than when I met and married my wife Andrea. She was Miss Southern University at the time we met, and as student government president, it was my responsibility to escort her to school events. I was immediately smitten, but she coolly reminded me that she hadn't even voted for me in the school election. Over time, though, our relationship grew and we have been married for 39 years. Andrea was from a large family like ours, which shared the same values.

I was accepted at Harvard Law School, and my parents reluctantly blessed my departure from Louisiana. You see, they had never heard of Harvard. But my mother accepted the idea when we explained to her that John F. Kennedy had gone there. Meanwhile, Andrea was accepted at Rutgers for graduate school, and we got married after our respective first years. Following our wedding, my mother gave me a tapestry, crocheted by some ladies with whom she worked at a senior citizen's center, bearing the message, "Don't hurry; don't worry; and don't forget to smell the roses." She told me it was intended to remind me that now that I had a wife, and possibly soon children, that they were the flowers of my life and that I should not be in pursuit of any objective in life without treating them as most important. At the birth of our first daughter, I hung this tapestry in my office and never took it down. More importantly, I tried to live by it. When I was in business and later as an elected official, the standing rule in my office was that I took every call coming in from either my wife or children, no matter who I was meeting with or what I was doing. This was a testament to their having first place in my life.

Andrea and I are the parents of five daughters. We discovered quickly that each was distinct, and we have always tried to approach each of them as individuals, and to nurture, educate, and encourage them in each of their own inimitable

styles. But we raised them in the hope that each would come to understand and embrace our beliefs and goals for them. They did. Each is now a self assured young woman with achievements worthy of her status as the grandchild of our parents. Three of our daughters are married, and now we treat our sons-in-law, who are accomplished young men, as our sons. So far, they have given us four grandchildren – three grandsons and a granddaughter – ages two through six.

We live in the same house we bought in 1978, a large 100 year old house that we renovated to make our family home. It is the place around which we center our family activities and gatherings. When my daughters were growing up, we had dinner at home, conversations around the dinner table, and numerous family vacations together. We also took the girls to church, where they joined at an early age and participated in choir, Sunday school and youth activities. My wife volunteered to head our church's college scholarship fund and was also the volunteer principal for its learning academy, a Christian elementary school. I participated in Sunday school and served as a member of the trustee board of our church. Andrea and I tithe faithfully. And, when I was a practicing attorney, I served on the board of directors of the Urban League of Greater New Orleans and Volunteers of America, among other civic and charitable groups. Our children have followed in our footsteps, giving volunteer service to community and church organizations and one of them served as a Louisiana State Representative.

Andrea and I did not just give the girls everything they wanted without their assuming some significant responsibility, even when it came to paying for higher education. We did not want to see the girls saddled with college debt, so as to limit their chances to pursue careers in public service if they desired. We therefore paid nearly all of their undergraduate costs. But each of them was required to take out student loans to fund the better part of their educations beyond the baccalaureate degree.

We are a close family, dedicated to and pulling for each other. We still share church and Sunday dinner time together, usually at our home, and we otherwise visit regularly with each other – and particularly with our grandchildren. My wife and I are repeating the building blocks for them that we used with our children and our parents with us. We are teaching them to be unselfish, faithful, and committed to bettering themselves each day. We recognize our own imperfections as we try to get them to face theirs, and to embrace the responsibility of striving toward erasing as many of them from their lives, with God's help, as they possibly can.

As the attached letters demonstrate, many people can attest to the importance of family and religion in Mr. Jefferson's life and to the commitment to others he demonstrated from an early age. Bishop Paul S. Morton, Senior Pastor and CEO of the Full Gospel Baptist Church in

Atlanta and St. Stephens Ministries in New Orleans observes: "Congressman Jefferson is not the sort of person for whom worship is an occasional event or a campaign photo opportunity – rather, he has always kept the church at the center of his life, and he and his wife have passed those values down to their children." *See* Exhibit 2. Family friend and employee Stephanie Butler echoes that view: "Jeff was a good husband, a good father, a teacher, a mentor, a peacemaker, and a negotiator. He was compassionate and approachable. He was imperfect, opinionated, and spiritual with a quiet humor. More importantly, he did not send his family to church, he took them with him." Exhibit 3. His daughters have also written to the court about the close relationship he cultivated with each of them and the significant role he played in their lives despite the demands of his position. Exhibits 4 and 5.

A law school classmate, Weldon Rougeau, fondly remembers Mr. Jefferson's willingness to babysit for his children with textbooks in tow, and he also writes about serving with Mr. Jefferson at a legal clinic in Roxbury, Massachusetts. "I admired him for his commitment, his talent, and his concern for the downtrodden and often hopeless people who had been accused of crimes. He was passionate about his work, and it was impressive." *See* Exhibit 6.

After he graduated from law school, Mr. Jefferson was offered a position as a law clerk to the Hon. Alvin B. Rubin on the United States District Court for the Eastern District of Louisiana. There he befriended and impressed a fellow clerk on the court, Robert Schuwerk, who is now a law professor at the University of Houston. Professor Schuwerk writes:

> From the very first, I was completely in awe of him. His legal abilities were clearly exceptional, but I had associated with bright people in law school before meeting him, and so was pretty much able to take that in stride. Rather, what made him so extraordinary to me was his deep and unwavering commitment to deploy his legal talents to advance the cause of the downtrodden and oppressed in our society so as to right the searing injustices of that time. Nor was that

> commitment driven by an ideology that made him oblivious to competing equities or that left him able to relate only to his favored causes rather than to people as individuals. To the contrary, my impression of him then – and one that remains to this day – is that he was a thoughtful, unfailingly generous, and extremely open-minded person, interested in and respectful of the views of others.

*See* Exhibit 7.

When his clerkship was over, Mr. Jefferson started a law firm with Norbert Simmons, another young lawyer from Louisiana who he met on his first day of law school in Boston. With just five attorneys, the firm was from the start one of the largest African American law firms in the country. They brought employment discrimination cases and fought to vindicate their clients' civil rights. "Jeff was always a hard worker – the first lawyer in the office, and the last to leave. Our firm grew and became one of the best regarded civil rights firms in the state. Jeff and I both served as cooperating attorneys working with the NAACP Legal Defense Fund. While we enjoyed modest financial success, we always maintained our full commitment to the cause of equal rights for all." Exhibit 8.

But Mr. Jefferson always knew that he would turn to public service, and in 1979, he ran for the state Senate. He describes that experience here:

> I was privileged to serve in the Louisiana State Senate for ten years. There I was a champion for governmental reforms. I led our budget reformation when oil and gas prices plummeted in the mid 80s, authoring and passing the "Revenue Consensus Forecasting Act," and chairing the Budget Stabilization Committee for our entire legislature. I played a leading role in passing the Enterprise Zone Act, which was recognized at the time by The Louisiana Association of Business and Industry, "as the most significant economic development legislation in the last ten years." I was named Legislator of the Year by the Alliance for Good Government on two occasions and received its Lifetime Service Award when I left the Senate for Congress in 1991. I chaired the Senate and Governmental Affairs Committee, handled reapportionment legislation, and fought for Senate independence. I was twice named one of the top two legislators in Louisiana by newspapers and magazines responsible for such designations during my last two years in the Senate.

What Mr. Jefferson does not say in this summary is how remarkable these achievements were given the social realities at the time he served. The former President of the Louisiana State Senate, Sammy Nunez, describes Mr. Jefferson as nothing short of "amazing." *See* Exhibit 9. Mr. Jefferson became known for his ability to get things done in a legislature that included only two African American members, and he began what became a lifetime practice of reaching out to build bridges and work cooperatively with members of the opposing party. According to Mr. Nunez:

> He became a real leader in the Senate in his own right. He combined brainpower, idealism, and compassion to come up with creative ideas for the common good. He was a champion of good government and reforms for budgeting, government contracting and fair reapportionment.
>
> *       *       *
>
> We did not have many Republicans serving in the Louisiana Senate in the 1980's. But Bill insisted that our majority reach out to them and include them in decision-making. That was typical of his approach to government. He was able to work across party lines and racial lines, and he was able to get along with just about anybody. Simply put, he was just a very nice and compassionate person. That was one of the reasons he was as effective as he was.

Looking back on Mr. Jefferson's service in the state legislature, Alden McDonald, President of Liberty Bank and Trust Company, observes, "Bill Jefferson has always been on the side of the little guy who does not have a voice." Exhibit 10. He explains that Mr. Jefferson's commitment to issues such as equality in education was more than just talk, as his letter recounts how the two families enrolled their children in public school so that they could fight from within the system to improve the quality of the education available to all of the students in New Orleans.

> Working with our wives and a few other volunteers, Bill and I developed a program for the school that stressed parental involvement and drew equal numbers of students from impoverished areas, the neighborhood surrounding the school, and the city as a whole. It was our goal to demonstrate that in the right environment and given the right encouragement, all students could learn. I am

proud to say that the model we developed became the formula adopted by the Louisiana state legislature when it later passed charter school legislation.

From the Louisiana State legislature, Mr. Jefferson went on to national politics. He was elected to the United States House of Representatives in 1990 – the first African American member elected to Congress from Louisiana since Reconstruction. In his first year in the House, he was elected whip of his freshman class, and he was called upon to interact with the leadership on policy issues and to count the votes of new members for the leadership. In his second term, he was selected to serve on the Ways and Means Committee. Later, he served on the Armed Services and the Budget Committees as well. And even while he was serving in the House, his intellectual curiosity and desire to improve himself still remained strong. He enrolled in Georgetown University Law School and earned a Master of Laws in Taxation in 1996, becoming only the second member in the history of the Congress to achieve that distinction.

Throughout his years in Congress, Mr. Jefferson worked in a bipartisan manner, particularly on tax and trade issues, and he played a central role in passing critical legislation even when the Democrats were the minority in Congress. Mr. Jefferson's colleagues were struck by his cooperative approach to solving problems. A Republican former Congressman from Louisiana, James O. McCrery III, has told the court:

Although we obviously did not always agree on the issues, I found Jeff to be a conscientious Member who did his homework and who was knowledgeable about the issues. He worked hard to solve problems, and he approached his legislative work with civility and collegiality that promoted bipartisan solutions to the problems our communities and our country faced. This was most apparent in the work that we did together to address the profound consequences to New Orleans and to Louisiana as a result of Hurricane Katrina. Jeff and I put in many long hours together, genuinely working as partners, to achieve passage of a package of provisions that proved critical to the recovery of New Orleans and Louisiana. I was very proud of my role in legislation for post-Katrina recovery, and as I was contemplating leaving Congress in the summer of 2008, I expressed my thanks in a personal letter to Jeff for the way we were able to work together so effectively as a team on this important legislative effort.

Exhibit 11.

While he was in Congress, Mr. Jefferson also worked tirelessly to bring attention to the people of the continent of Africa. But this was not an issue Mr. Jefferson took up for the first time in Washington or even in the Louisiana state senate – it was the outgrowth of a lifelong passion and years of dedication to the Africans' struggle to achieve democracy and self-determination. And while the case before the court focused attention on Mr. Jefferson's involvement in issues involving trade with Africa and his personal interest in eventually doing business there, his interest in Africa was not just economic. The details offered here, while not directly relevant to this case, reveal Mr. Jefferson's passion on the subject of Africa and provide a window to view the events in the case in the broader context of the actions he took over the course of many years.

In 1968, as president of student government at Southern University, I organized and led a campaign to assist refugees from the Bi-Afrin wars, growing out of the efforts of parts of Nigeria to secede from the Federal Republic of Nigeria. We raised thousands of dollars for this effort and I became deeply interested in the people and politics of Nigeria from that experience. In 1976, I made my first trip to Africa, going to Cote'd'Ivoire, Liberia, and Nigeria to work on pollution and environmental issues with oil clean-up and waterway sanitation clients. On this month long trip, I met leaders who were opposed to the military dictators who were in charge of Nigeria then. We stayed in touch, and I encouraged them and tried to find support for them in this country. In 1980, when Nigeria elected a

president, governors, and other elected officials, many of the opposition leaders with whom I had become acquainted were swept into office. By then, I too was an elected official, having taken office as a state senator in April 1980.

Because of the similarity of the topography and natural resources in Nigeria and Louisiana, some of the Nigerian state legislators visited our state to compare notes on delta regions and to learn about the state legislative process. As one of only two African American members of the senate at that time, our senate leadership sought me out to work with them. To everyone's surprise, I knew some of the visitors already. We began a parliamentary exchange program, and I traveled to Nigeria, making talks in their parliaments about the legislative process. Through these trips made on both sides, over a three year period, I met many more Nigerians, from all walks of life and from all parts of the country.

In December 1983, a military coup removed all of the duly elected officials in Nigeria, and they were all rounded up and jailed on false charges of corruption. The military stayed in charge for over 15 years under various dictators. During this time, I was visited by many Nigerians complaining of tyranny in their country, many of whom were forming opposition groups to the military. One such visitor, in the mid to late 80s was M.K.O. Abiola. He was an entrepreneur who wanted to be president. We spent considerable time talking about politics and issues that could interest people in change generally and in him as a candidate for president. We discussed the idea that agriculture – supplying food, fiber and fabric to his people – would do good and at the same time earn him deserved recognition for his political reform pursuits. A Nigerian-Louisiana Agriculture Commission was formed, consisting of the deans of the LSU and Southern schools of Agriculture and the Louisiana Commissioner of Agriculture, and a few Nigerian agriculture professionals. It studied soil, tested crops, planned rice and sugar cane mills, and brought farm managers to Nigeria. Abiola Farms was born, with the stated goal of empowering Nigerians to grow their own food and to otherwise gain independence from reliance on imports. I also helped Abiola distribute a news paper to set the stage for democratic elections, to mount opposition to the dictators and to educate and motivate the public to push the dictators out.

With his work underway, I did not have contact with Abiola for almost two years. But in 1991, I learned that elections were being planned in Nigeria and that one of the candidates for president was Abiola. I was thrilled, because it looked as if change was on the way. In 1993, the long awaited elections were held, and as results showed Abiola to be ahead, the count was stopped and the election aborted. Then, for the first time since the late 80s, Abiola called me. I didn't know he knew I was in Congress. But he had been watching American politics and he knew. He told me he was in London, having fled the military authorities in Nigeria. I assisted him in coming to this country and set up meetings for him with Vice President Gore, the chairman of the House and Senate Foreign relations Committees, the Speaker of the House, the Chair of the Black Caucus, other CBC

members, and other House members generally. He was seeking recognition of his yet to be formed government, or at least pressure on the Nigerian military leaders to complete the count and issue certified results. I went to the floor of the House and spoke for him, asking that his efforts to bring democracy to Nigeria be supported by Congress, much as we were supporting Yeltsin in his fight for democracy in the Soviet Union. Our efforts brought a great deal of sympathy, but few concrete results. After two weeks, Abiola left the US to plead his case in Great Britain and across Europe. After a month away from his country, he returned to a tumultuous welcome, with thousands greeting him at the Lagos airport. I continued to work for his cause and for the cause of Nigerian democracy while he fought for an outcome in his favor on the ground back home. Just before the anniversary of the aborting of his election returns, he called to say that he was going to announce that he was the duly elected president of Nigeria and would form a government. He said that if he made such a declaration, he expected to be arrested. On the day of his announcement, he called me from his home to tell me that the authorities were coming to arrest him, to thank me for my steadfast support and to ask me to continue to try and engage others to his cause. As we spoke, the authorities arrived at his house and took him to prison.

In the fall of 1994, I was able to persuade a Congressional delegation to go to Nigeria to meet with the military leader of Nigeria, General Abacha, to seek Mr. Abiola's release and to seek medical attention for him. The delegation of about 8 members met with Gen. Abacha and asked clemency for Mr. Abiola. Clemency was denied but the General agreed to permit Abiola's wife and doctor to see him and to report on his health. Then I asked if our delegation could visit him. The General said we could choose one person to see him. I was chosen, but I refused to go alone, and secured permission to have Rep. Donald Payne accompany me. We were taken to visit with Abiola briefly, and it was a joyous reunion. We promised we would keep up the fight for his release.

Over the next few years, I made trips to Nigeria in support of a constitutional convention for new elections. I spoke at the constitutional convention urging that the country be held together and that people work patiently toward the goal of Nigerian democracy. During this time, General Obasanjo, who would eventually become president of Nigeria, was imprisoned by Abacha, and I worked with others to secure his release. The constitutional convention resulted in a document to support elections in 1998. Unfortunately, Abiola died in prison, just before he was to be released. Gen. Abacha died shortly thereafter, and Obasanjo was elected in 1999. A great number of the men and women who assumed office as a result of these new elections, as governors, senators, house members, and the like, were people I knew or had worked with on achieving democracy in Nigeria, from as early as the mid 1970s to the late 1990s, before they came to hold their offices starting in 1999.

Mr. Jefferson's comments reveal the history behind his extensive ties to Africa and to Nigeria in particular. Other Congressmen, such as Rep. Donald Payne, were impressed by the connections he made, not just with the leaders in Nigeria, but with everyday people as well: "It was a delight to travel with him on congressional delegations to foster better US relationships in various parts of Africa, and to see how many people knew and respected him there." Exhibit 12.

> Jeff was a visionary and creative policy maker for Africa and in many other areas. Heeding the call of African leaders, he brought fresh thinking on expanding America's relationship with Africa from one of a donor/beneficiary relationship to a true economic partnership in trade and economic affairs. The mantra of African leaders of "not just aid, but trade", under his leadership developed into a paradigm shift in US thinking about not just what America could do for Africa, but what Africa could do for America…. [B]ased on my own numerous experiences working closely with him over the years in and for Africa … he went to Africa with his "heart out" for good and highly principled reasons – reasons that served America and Africa well.

But in the end, a Member of Congress is often measured by what he did for the people of his District. And for many years, the people of New Orleans could count on William Jefferson's dedicated service. In their attached letters, Mr. Jefferson's former staffers describe how his constituents would call him at all times of the day and night, at work and at home, and how the Jeffersons made sure that their telephone number remained listed so that anyone could reach him. *See* Exhibits 3 and 13. Mr. Jefferson states:

> Over my 18 years of service in the House of Representative, I had a very good attendance and voting record. I have maintained office hours in DC, usually Tuesday through Thursday; and maintained two district offices in the New Orleans area, with office hours on Friday and Monday. On Saturdays and Sundays, I attended numerous events to address the demands of constituents. I traveled only during recess times and my family and I seldom took the vacation or annual leave time that I was permitted to take. I was devoted to my constituents, and except for my first and last run for office, I never received less than 67% of the vote, until the 2006 election, when I received 57% of the vote.
>
> I believe my win in 2006 was a testament to the service my office was able to provide in getting our people relief and helping them return home after Hurricane Katrina. Because of my tenure and good relationships with members, during the

13

2006-2008 term, I was a key figure in the House in getting levees rebuilt and strengthened, our colleges and public schools reopened, small and minority business supported strongly by the SBA and ensuring justice in the return and rebuild plans. I posited the question that drove considerations of fairness for all citizens affected by the storm: "For whom and by whom shall be our recovery? To the greatest extent possible, it must be for all of our people, no matter what part of town they came from, and by the hands of local people and businesses." More than a hundred House members visited my district to assess the damage and to work with me toward recovery. And, because I worked with both political parties, members of the executive branch including President Bush, traveled with me to bring our people help and to keep focus on our needs.

In his letter to the court, the Rev. Tom Watson also emphasized Mr. Jefferson's commitment to the poor, particularly after Hurricane Katrina. Exhibit 14.

Other than his wife and daughters, perhaps no one knows Mr. Jefferson better than Stephanie Butler, Andrea's childhood friend who became Mr. Jefferson's legal secretary and then the head of his District office in New Orleans. She tells the court:

Jeff did not take the position of Congressman lightly, he respected it. He respected the institution and its laws, and both sides of the aisle. He wanted to make his mark and make a difference. Jeff wanted to use his position to help others, the poor, the forgotten, the disenfranchised, the seniors – in short, anyone who needed our government's help and protection. The 2nd Congressional District that he represented in New Orleans embodied that philosophy. Our office embodied that philosophy and the employees represented that philosophy.

As mandated by Jeff, we employees were all on board. He made the job exciting and, through his actions, ignited in us a strong desire to serve and help everyone, regardless of race, ethnicity, political affiliation, financial status or sexual orientation. And that is exactly what we did. We took pride in our constituent services program and had a reputation of "getting the job done."

*    *    *

After the devastation of Hurricane Katrina, Congressman Jefferson and his district office went into high gear to help thousands of stranded constituents who were totally disenfranchised from everything – family, housing, transportation, food, water, jobs, and medical care – and they looked to their government for help. Congressional staffers in the district were seeking the same help. But through the urging, assistance and insistence of Congressman Jefferson, two staffers returned to the city after it was deemed safe to return, and began servicing constituents until the remaining staff were able to return. Jeff traveled to his constituents who had evacuated to Texas, Tennessee, Georgia, and other places where there were large

pockets of evacuees from his congressional district. He took staff with him and held town hall meetings to give evacuees the opportunity to air their complaints and concerns, and to let them know that their government was there to help them. He was credited with being the only elected official in Louisiana who fought to return the residents of public housing to their homes in New Orleans.

Exhibit 2.

All of the foregoing is as much a part of who William Jefferson is – and an essential part of the predicate for the imposition of sentence – as what was presented during his trial before this court.

## II.     THE NATURE AND CIRCUMSTANCES OF THE OFFENSE.

Bribery, the core offense for which Mr. Jefferson was convicted,[3] is a very serious offense, and nothing in this sentencing memorandum should be read to suggest otherwise. The jury found that Mr. Jefferson's conduct met the elements of bribery as the court explained them, and the defense recognizes that this is not the place to challenge either the court's legal rulings or the jury's verdict. But while the defense must acknowledge and accept the jury's decision at this

---

[3]     The three wire fraud/honest services counts are essentially duplicative of the bribery counts, and the three money laundering counts and the RICO count are essentially derivative of the bribery counts. And the two conspiracy counts involved conspiracy to commit bribery and to commit honest services fraud involving bribery. The government argues that in its verdict on Count 1, the jury also found Mr. Jefferson guilty of conspiring to bribe the Nigerian Vice President in violation of the Foreign Corrupt Practices Act, speculating that the only reason the jury found him not guilty on Count 11 at the same time is that the bribe was not ultimately delivered. But the government has known from the outset that no bribe was ever delivered to the Vice President, and it brought the FCPA count precisely because the law does not require delivery – merely interstate transportation in furtherance of a promise to pay. And the jury was instructed that delivery was not necessary. So the only fair interpretation of the verdict on Count 11 is that the jury did not find that the government had established the existence of the necessary promise or agreement between Mr. Jefferson and the Vice President. Since Mr. Jefferson could not legally conspire with Lori Mody to violate the FCPA or any other statute, the jury's rejection of the FCPA count means that the FCPA could not have been the object of the conspiracy in Count 1. Under these circumstances, there is no basis for imposing a sentence based on a finding that Mr. Jefferson conspired to or did violate the FCPA.

juncture, it is still necessary under § 3553(a)(1) to take stock of the actual circumstances of the offense and to review what it is that Mr. Jefferson did or did not do. And it does not depreciate the seriousness of the offense to draw distinctions between the proof in this case and other cases, such as, for example, where there was an express, specific quid pro quo and the Member of Congress had a coded price list showing the bribe amounts he would require depending on the value of the Congressional favor being sought.[4]

For the most part, this case was about iGate. While Count 2 (conspiracy) and Count 16 (RICO) involve other companies, Count 1 (conspiracy) and each of the underlying substantive counts on which Mr. Jefferson was convicted (bribery, wire fraud, and money laundering) relate exclusively to iGate. The focus of the government's case was Mr. Jefferson's promotion of the company – in which his family had an interest – in Africa, and the evidence concerned the meetings Mr. Jefferson attended and the letters he wrote "in his capacity as a United States Congressman." Most of this evidence concerned efforts in Africa, but there was also evidence of some contacts with U.S. government agencies, generally in furtherance of the African ventures. It does not quarrel with the jury's verdict to make the following observations about those agency contacts and the proof in this case:

- In the beginning, the iGate-ANJ agreement was not viewed as a corrupt bargain. Adopting the testimony of Vernon Jackson on direct, the government argued to the jury that the original agreement evolved over time into a corrupt agreement. The jury apparently accepted that

---

[4]    There was such a Member of Congress: Randall "Duke" Cunningham, who in 2006 received a sentence of 100 months for having accepted $2.4 million in bribes. The government's sentencing memorandum in that case included a copy of the coded bribery price list.

argument for they determined in the forfeiture proceeding that iGate's initial monthly payment to ANJ of $7500 was not a bribe.

- Mr. Jefferson's dealings with the Army related to iGate were modest at most. According to Jackson's testimony and the government's chronology, the meeting with General Hylton occurred before the January 2001 meeting in Louisville when the iGate–ANJ agreement was reached. In any event, General Hylton testified that Mr. Jefferson made no special requests of the Army and iGate received no special favors. And according to the government's witnesses, Mr. Jefferson had nothing to do with the Army's decision to test the iGate product; it was introduced to the Army by other iGate consultants and business partners. After the iGate–ANJ agreement was reached, Mr. Jefferson's only dealing with the Army was a status meeting with Colonel Brown in July 2001. Whatever the impact a showing of Congressional interest may have had on Col. Brown, Mr. Jefferson never asked Col. Brown to cut any corners or to give iGate favored treatment, and there was no evidence that iGate received any special treatment from the Army. [5]

- The evidence showed that during the relevant 4 ½ year period alleged in the indictment, iGate was pursuing a number of contracts with the Army, yet even Jackson acknowledged that Mr. Jefferson had no involvement at all in those contracts or in pushing the Army to award contracts to iGate. Other than the contract for work at Fort Stewart, which iGate obtained through the prime contractor, Breil Worldwide Management (BWM), iGate received no contract

---

[5]    While a staff member from the House Armed Services Committee was on the witness list as the government indicates in its memorandum, *see* Gov't Sentencing Memo at 5, his testimony did not describe efforts by Mr. Jefferson to use his influence to aid iGate. Paul Archangeli could not identify who made the initial contact to him, he testified that Mr. Jefferson did not even attend the meeting with him, and he noted that neither Pfeffer nor Jackson followed up on the meeting as they would have done if it were important.

from the Army. And when issues arose involving that contract, Jackson did not appeal to Mr. Jefferson to get involved in ironing them out.

- After his meeting with Col. Brown in July 2001, Mr. Jefferson's next contact with anyone associated with the government was almost a year later, when he made a simple introduction of Vernon Jackson to Congressman Billy Tauzin from Louisiana. After Jackson's presentation to Congressman Tauzin, iGate then followed up with Congressman Tauzin's staffer, Howard Waltzman, to demonstrate the efficacy of the technology, in support of Jackson's request for a letter about the technology from Tauzin's office.  Mr. Jefferson's only other contact was a phone call to Waltzman to ask whether Congressman Tauzin was going to write a letter, but he put no pressure on Waltzman. In fact, the decision to write a letter had already been made by that point, based on Waltzman's observations of how well the iGate product worked.

- It was almost a year after that and 2 ½  years after the iGate–ANJ agreement was signed – in July 2003 – that Mr. Jefferson had any dealings with Vernon Jackson or iGate relating to Africa. He met the NDTV principals totally by happenstance, and once he learned of NDTV's interest in bringing high speed internet to Nigeria, Mr. Jefferson presented the business opportunity to Vernon Jackson. This was to be a sale of iGate equipment to a private foreign company, not a contract with a foreign government. NDTV was then going to sell "triple play" services in Nigeria using the iGate product.

- Mr. Jefferson attended an introductory meeting at the Export-Import Bank with representatives of NDTV in the summer of 2003, but no witness testified that he pressed for any decision or put any pressure on the bank personnel. There was no application pending with the bank at the time, and none of the real time communications (emails, correspondence) among Mr.

Jefferson, Jackson, and the NDTV representatives indicated that Mr. Jefferson was expected to have any role with the Export-Import Bank if an application was ever filed.

- After Lori Mody took NDTV's place in the venture in July 2004, there were no government contacts until after she began cooperating with the FBI and, acting under the FBI's direction, she asked Mr. Jefferson to accompany her to a meeting at the Export-Import Bank in July 2005. Mr. Jefferson arranged the meeting and introduced her to the outgoing Director, who provided a general description of the Ex-Im process. Their business venture did not have an application pending at the time. The entire meeting was recorded, and there was no evidence that Mr. Jefferson made any requests of the bank personnel, much less put any pressure on them to influence a decision concerning Mody's company. Indeed, the only part of the recorded conversation that the government introduced in evidence was a discussion concerning Mr. Jefferson's meeting with the Credit Committee on a completely unrelated matter – there was no recorded evidence offered of anything said about the iGate venture in Africa.

- For over four months, the FBI and Lori Mody arranged to have recorded conversations with Mr. Jefferson for the purpose of making a case against Mr. Jefferson. For approximately two months, the FBI recorded calls to or from Vernon Jackson's cell phone. There is no evidence from these recorded conversations or from any other source that Mr. Jefferson ever offered to perform, agreed to perform, or did perform any legislative act, such as arranging for an earmark or authorizing legislation, that might have benefited iGate or one of the African ventures.

- While the evidence relating to iGate did show that Mr. Jefferson met with U.S. government officials and with African government officials, it also showed his involvement in raising capital for iGate (one of the stated purposes of the iGate–ANJ agreement). Almost all of the money iGate actually paid to ANJ coincided with iGate's receipt of financial capital from

nongovernmental sources found by Mr. Jefferson. Moreover, Mr. and Mrs. Jefferson put some of their own money into iGate.

- With respect to Count 2 (conspiracy) involving Arkel, TDC, Procurer, and LETH, the evidence showed that at the times there was discussion about a role for a Jefferson family member, what these businesses were looking for was help in Africa, with African officials who were making decisions in Africa. In considering the nature of the offense, it is relevant that all of the alleged co-conspirators were granted full immunity, and at least one of the individuals who knowingly assisted John Melton in the TDC deal, and who stood to gain if it had succeeded, was not even deemed to be in a criminal conspiracy.[6] In other words, while the government's language conveys a view that there have been no more heinous acts by a Member of Congress, it gave a complete pass to those who were alleged to be his co-conspirators in Count 2.

- While there was testimony concerning efforts made by Mr. Jefferson and his staff to facilitate Arkel's communications with the Ex Im bank and TDC's dealings with the USTDA, no agency representative testified that Mr. Jefferson made demands or did anything more than gather information or inquire into the status of pending requests.

---

[6]     David Gibbs was not identified on the list that the government provided of those alleged by the government to be co-conspirators, and he never sought or received immunity. Gibbs testified a) that he was aware that Mose Jefferson was to receive a financial interest in the venture with TDC, even though he was not viewed as having substantive qualifications, b) that he thought this "smacked of corruption," c) that he nevertheless agreed to use his expertise to try to further the venture, and d) that he was to receive a financial gain if the venture succeeded.

Similarly, in the case of Lori Mody, Brett Pfeffer testified that she agreed to give Mr. Jefferson a stake in the company in August 2004. In March 2005, when Mody went to the FBI, her complaint was that she thought she had been defrauded by Jackson and Pfeffer. She agreed to become a cooperating witness, but there has never been any suggestion that Mody was ever viewed by the government as a co-conspirator in a bribery scheme. Clearly she was not.

- The primary thrust of the government's bribery case consisted of what Mr. Jefferson did in Africa to influence decisions that were to be made by African officials. The court has acknowledged that whether such actions constitute an official act within the meaning of the bribery statute is a serious question. While the court has made its legal determination and the jury has rendered its verdict based on the court's instructions, it says something about the nature of the offense that the government candidly stated that it might not be able to prove its case in the absence of expert testimony that the customary use of a Member's office, as clearly established by settled practice, includes the exertion of influence on U.S. and foreign government officials on behalf of individuals seeking to advance business interests in the United States and abroad.[7]  And the expert testimony that was ultimately introduced was considerably less definitive about whether it is settled practice for Members to promote individual private companies from outside of their districts to potential customers abroad than it was on the question of whether Members frequently contact U.S. government agencies on routine matters on behalf of their constituents.

In the end, while the defense has never denied that Mr. Jefferson used his status as a Member of Congress to assist certain businesses in which a family member had a financial interest, the record was devoid of any pressure brought to bear by Mr. Jefferson to get iGate – or any of the other co-conspirator companies – U.S. government business.[8]  And there was no

---

[7]     Government's Opposition to Defendant's Motion to Exclude Expert Testimony, Dkt. 334, at 3; Memorandum Opinion, Dkt. 400, at 16 (May 22, 2009).

[8]     The government states, "the defendant used his congressional office to promote the business interests of bribe-paying companies whose very success was dependent upon the approvals of certain U.S. and west African government agencies and officials." Gov't Sentencing Memo at 3. But the memorandum goes on to list the business ventures involved, and all of them – even the one or two that filed or considered filing loan applications with U.S. agencies – were

*(footnote continued on next page)*

evidence that Mr. Jefferson offered or promised to use his legislative position to direct other federal funding to the companies, in the form of an earmarks, appropriations, or tax breaks of any sort. Both what Mr. Jefferson did and what he did not do are factors to be considered under §3553(a)(1) in order to ensure that the punishment not only fits the crime of which he was convicted, but his particular conduct.

## III.    OTHER SENTENCING CONSIDERATIONS

In addition to the history and characteristics of the defendant and the nature and circumstances of the offense, 18 U.S.C. § 3553(a)(2) directs the court to consider the need for the sentence:

> (A)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> (B)    to afford adequate deterrence to criminal conduct;
> (C)    to protect the public from further crimes of the defendant; and
> (D)    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

A sentence in the range proposed by the defendant will take full account of all of these factors.

Mr. Jefferson is 62 years old, he is no longer in office, he has no prior criminal history, he has never abused alcohol or narcotics, and he poses no danger to the public. Obviously, incarceration is not needed to provide him with educational or vocational training, with medical treatment, or with some other form of rehabilitation. The more pertinent question before the court is what sort of sentence is required to deter others and to satisfy society's legitimate need to punish a violation of law.

---

highly speculative business ventures centered in Africa, and not opportunities that depended upon U.S. government approvals for their success.

In assessing the need for punishment, the defendant submits that the court can consider Mr. Jefferson's current circumstances: he is an infamous, bankrupt, former Congressman. The prosecution related to Mr. Jefferson's service as a member of the House of Representatives, and he has lost that seat. Proceedings have also been initiated to strip him of his membership in the bar. Whatever assets he has accumulated in his life, including his retirement savings, are being sought in forfeiture proceedings. And his name will be forever associated with this case.

There is no one more painfully aware than Mr. Jefferson that the stain on his honor is permanent and self-inflicted. He suffers in the knowledge that he has brought sorrow and humiliation to his family, and dishonor to the House of Representatives. His legacy  is not merely tarnished, but it has been obliterated, and worst of all, his personal and professional disgrace has been visited on his children, whose attempts to make their own way in the world will now also require overcoming what the name, fairly or unfairly, has come to represent. This is not to suggest that he has been "punished enough." But the profound personal fallout from his actions can be considered as one factor in determining what sort of judicial punishment is "necessary" or "just."

When former Congressman Cunningham was sentenced to 100 months, the longest term ever for a Member of Congress convicted on corruption charges, it was regarded as a severe sentence. And it was. While the circumstances of this offense obviously warrant punishment, the mitigating facts should not be ignored. A sentence less than 10 years fully recognizes the nature of the offense in this case.

## IV.     GUIDELINES CALCULATION

Pursuant to 18 U.S.C. § 3553(a)(4), the advisory Guideline sentencing range is one factor the court must consider in imposing its sentence. In this case, the calculation prepared by the

Probation Office resulted in a sentencing level of 41, which corresponds to a sentencing range of 324 to 405 months, or about 27 to 33 years. For a 62 year old man with a history of cardiovascular problems and hypertension, this would be tantamount to a life sentence. Such a sentence would contravene the mandate of 18 U.S.C. § 3553(a) that "[t]he court shall impose a sentence sufficient, but not greater than necessary" to fulfill the purposes of the statute, and based upon all of the information set forth above, there are numerous reasons to impose a sentence outside the Guideline range. *See* § 3553 (c)(2).

In addition, the defense has raised certain specific objections to the advisory Guidelines calculation set forth in the presentence report. The probation office has utilized the Guidelines manual in effect at the time of sentencing, but the application of the current version of the Guidelines to the facts in Count 2, and use of the proposed enhancement for facilitating entry into the United States, § 2C1.1(b)(4), raise ex post facto concerns. Given the facts of this case, the court should instead look to the sentencing manual in effect as of November 2003 for guidance. In addition, the enhancement for facilitating entry into the United States was not meant to apply to the circumstances in this case.

###    A.    The Court Should Not Apply a 2 Point Enhancement for Facilitating Entry into the United States.

U.S.S.G. § 2C1.1(b)(4), which became effective in November of 2004, permits a two level enhancement:

> if the defendant was a public official who facilitated (A) entry into the United States for a person, a vehicle, or cargo; (B) the obtaining of a passport or a document relating to … legal entry…; or (C) the obtaining of a government identification document.

This enhancement, which was meant to combat terrorism, is not appropriate in this case because Mr. Jefferson did not perform the sorts of duties specified by the Sentencing Commission when

it crafted the enhancement. Additionally, the enhancement was enacted well after the date Mr. Jefferson wrote the letters referenced in Paragraph 90 of the presentence report, and therefore its application to his conduct is prohibited by the Ex Post Facto Clause of United States Constitution.

The enhancement at issue was designed to increase penalties for public officials "whose position involves the security of the borders of the United States or the integrity of the process for generating documents related to naturalization, legal entry, legal residence, or other government identification documents." U.S.S.G § 2C1.1, Commentary to the 2004 Amendments. The Commission recognized "the extreme sensitivity of these positions in light of heightened threats from international terrorism." *Id.*

The provision has absolutely no applicability in this case. It is a national security measure passed in the wake of September 11 that increases the bribery guideline calculation when a public official who is responsible for the security of the borders or the issuance of official identification papers – an official in a position of "extreme sensitivity" – is the one who accepts the bribe.

But Mr. Jefferson had no responsibility for the security of the borders of the United States or the integrity of the process for generating documents related to legal entry or identification. He did not even serve on a committee that oversaw the federal agencies that had that authority. This is apparent from the letters cited in the presentence report: they were written to the people who did have responsibility over immigration matters, politely asking for their assistance. The probation officer suggests that being a Congressman somehow made Mr. Jefferson generally responsible for the integrity of the process, but she points to nothing that accords a Member of Congress such a role. The presentence report suggests, in contravention of

the Constitution, that a Member of Congress is personally responsible for performing duties specifically assigned to the executive branch, and it ignores the expressed purpose behind the sentencing enhancement.

Moreover, there was nothing about Mr. Jefferson's activities that threatened national security. There has never been an allegation in this case that he aided or abetted anyone who intended to do this country harm. Nor was there any allegation that the individuals who were the subject of the letters were seeking to enter the country unlawfully, or that Mr. Jefferson's letters were intended to circumvent or undermine the immigration process. Thus, the letters listed in paragraph 90 of the presentence report do not implicate the concerns the Commission identified when it included § 2C1.1(b)(4) in the 2004 amendments to the Guidelines.

Furthermore, the evidence did not suggest that getting people into the country was the goal or even a secondary objective of any of the schemes described in the indictment. What the case was about was Mr. Jefferson's promotion of private businesses ventures abroad. As the probation officer stated on page 24 of her report: "[Mr. Jefferson] used his relationships and influence with officials in African nations to secure business for these companies without disclosing that he and his family had a financial interest in the business endeavors." That is the essence of this case. Given the substantial criminal penalties the defendant is facing for that conduct, it is inappropriate and unnecessary to enhance his guideline calculation with a strained interpretation of § 2C1.1(b)(4).

There is also a constitutional reason why the enhancement should not be applied to Mr. Jefferson. The court should use the version of the Sentencing Guidelines Manual that was in effect at the time the offense was committed, if using the current version would violate the Ex Post Facto Clause. *United States v. Heater*, 63 F.3d 311, 331 (4th. Cir. 1995) ("Amendments to

the Guidelines occurring after a defendant's offense but before sentencing should not be applied

if doing so would increase the sentence because that would violate the Ex Post Facto Clause in

Article I, § 9 of the United States Constitution."). The Guidelines themselves contain the same

instructions. § 1B1.11(b)(1). Applying § 2C1.1(b)(4) would implicate the Ex Post Facto Clause

because Mr. Jefferson wrote the letters referenced in paragraph 90 in January 2002 and January

and February of 2004, but § 2C1.1(b)(4), the facilitating entry enhancement, was not effective

until November 1, 2004. Because the only conduct alleged to support the enhancement took

place before the enhancement was enacted, applying § 2C1.1(b)(4) to the conduct would violate

the Ex Post Facto Clause. As a result, this particular sentencing enhancement cannot be applied

to Mr. Jefferson.[9]

> **B.    Ex Post Facto Considerations Weigh Against Use of the 2008 Guidelines for Calculating the Offense Conduct for Count 2.**

Count 2 – the conspiracy involving Arkel, TDC, Procura, and LETH – also raises ex post

facto concerns. The defendant acknowledges that § 1B1.11(b)(3) of the advisory Guidelines

provides that if a defendant is convicted of two offenses, one of which occurred before and one

which took place after a revised version of the Guidelines became effective, the court should

---

[9]    The court and the probation office must be sensitive to ex post facto concerns when applying the Guidelines even though the ultimate calculation is advisory and not mandatory under *United States v. Booker,* 543 U.S. 220 (2005). The Sentencing Commission appears to acknowledge this since the admonition against ex post facto application of the Guidelines still appears in the 2008 version of the Manual. § 1B1.11(b)(1). *See United States v. Myers,* 553 F.3d 328, 330 (4th Cir. 2009)(Fourth Circuit cited *Heater* as authority in a post-*Booker* opinion but determined, for other reasons, that the Ex Post Facto Clause was not violated); *United States v. Sinclair,* 293 Fed. Appx. 235 (4th Cir. 2008)(Fourth Circuit noted in dicta that the trial court properly used Guidelines in effect at the time of the offense); and *United States v. Lewis,* 603 F. Supp.2d 874 (E.D. Va. 2009)(trial court found that the application of the Guidelines in effect at the time of sentencing instead of at the time of the offense would violate the Ex Post Facto Clause). *But see United States v. Demaree,* 459 F.3d 751 (7th Cir. 2006) (Seventh Circuit concluded that advisory Guidelines calculation would not implicate the clause).

utilize the revised Guidelines. And the government accurately reports that several courts, including the Fourth Circuit, have held that the post-*Booker* application of this provision to particular cases did not violate the Ex Post Facto Clause. *See United States v. Lewis,* 235 F.3d 215, 218 (4th Cir. 2000) and *United States v. Duane,* 533 F. 2d 441, 447 (6th Cir. 2008). But the Supreme Court has yet to rule on the question, and as the *Lewis* and *Duane* opinions point out, *see* 235 F.3d at 217 and 533 F.3d at 448-49, the circuit courts are clearly divided on the issue. *See United States v. Ortland,* 109 F.3d 539, 547 (9th Cir.1997) and *United States v. Bertoli,* 40 F.3d 1384, 1404 (3d Cir.1994). The *Duane* court assumed *arguendo* that retroactive change to the Guidelines could implicate the Ex Post Facto Clause even though the Guidelines are no longer mandatory, but it held that the application of the "one book rule" did not offend the Constitution as applied to the facts of that particular case. 533 F. 3d at 447. In other words, the analysis is to be made on a case by case basis, and the reasoning behind the cases cited by the government is not applicable in this case.

In *Lewis* and in *Duane,* the courts reasoned that a defendant cannot complain that he has been denied the fair notice the Ex Post Facto Clause is meant to guarantee if he commits further violations of the same law after the sentencing guideline for that offense has been modified. But that logic does not supply grounds for utilizing the version of the Guidelines potentially applicable to Count 1 to increase the offense level for Count 2. The operative conversations with the businesses in Count 2 involving the hiring of Jefferson family members took place before the bribery guideline was significantly altered in November of 2004. But the bribe solicitations that formed the basis of Count 1 took place before that date as well – with Vernon Jackson in early 2001 and Brett Pfeffer in the summer of 2004.

In any event, whether or not using revised guidelines would constitute a violation of the constitution under Fourth Circuit precedent, the fact that the *Booker* decision has made the Guidelines advisory frees the court to make its own reasoned decision about which version of the Guidelines is the most appropriate source of advice. And the fact that the defendant's proposed sentence falls within a calculation consistent with the Guidelines that were effective at the time of the operative events in this case supports a finding that a sentence in the 8 to 10 year range is reasonable. The indictment alleged overt acts related to Arkel which took place between August 2000 and April 2002, acts related to TDC between September 2001 and September 2003, acts related to Procura which took place between late 2001 and January 2002, and acts related to LETH (which, because the jury acquitted on the LETH racketeering acts, the defense believes should not be included in any event) between early 2003 and March 2004. Thus, in the view of the defense, it would be inappropriate to apply a sentencing manual that became effective after these events had already transpired if the use of that manual increases the calculation.

It is the defendant's position that the sentencing manual that was effective as of November 1, 2003 should apply to this count because the bribery and honest services guideline, § 2C1.1, was amended in November 2004 in a manner that increased both the base offense level and the specific offense characteristics. *See Sinclair,* 293 Fed. Appx. at 235; *Myers,* 553 F.3d at 330; and *Lewis,* 603 F. Supp.2d at 874. Under the Guideline that would have been in effect at the time of the events in Count 2, the base offense level would have been 10, not 14, and there would have been no 4 level increase specifically attributable to the defendant's status as an *elected* public official and no 2 level increase for facilitating entry into the United States. This would reduce the offense level for Count 2 from 36 to 26. Even if the 4 level enhancement for role in the offense, § 3B1.1, were to be added, the adjusted offense level would come to 30,

resulting in a sentencing range of 97 to 121 months – approximately 8 to 10 years – rather than the 324 to 405 months – or 27 to 33 plus years – set out in the presentence report.[10]

In other words, the amendments to the Guidelines that became effective in November of 2004 had the result of almost quadrupling the sentencing range for an elected public official charged with bribery. The advisory Guidelines are supposed to add fairness and regularity to sentencing proceedings, but applying an amended version of the Guidelines to an offense that took place prior to the effective date of those amendments would produce an arbitrary and unfair result. Using the Guidelines that were in effect at the time of the offense instead would support the imposition of a substantial sentence, but it would be a sentence within the range requested by the defense and more in keeping with sentences imposed in similar cases.

C.    **Especially Given that the Guidelines are Advisory, Ex Post Facto Considerations Weigh in Favor of Using the November 2003 Guidelines to Calculate the Offense Level for the Count 1 Conspiracy and Related Counts.**

That the offense level for bribery was increased so dramatically in November of 2004 provides a reason for the court to reject the advisory Guideline calculation set forth in the presentence report and to impose a sentence more in keeping with all of the factors set forth in 18 U.S.C. § 3553. The defense submits that the Guidelines in effect prior to the November 2004 amendments provide the more appropriate advisory guide for the sentence to be imposed even on the Count 1 conspiracy and related counts, since, according to the government's evidence, the

---

[10]    The probation officer notes in the amended presentence report that there is no difference between the Guidelines that were effective in November 2004 and the 2008 Guidelines. That is correct, but the defense is not seeking a sentence calculated under the November 2004 sentencing manual – he is directing the court's attention to the manual that was in effect *before* November 2004 (the one effective as of November 2003) because that was when the operative events took place.

solicitation of Vernon Jackson took place in January of 2001, Kachikwu and NDTV became involved with Mr. Jefferson in July of 2003, and the solicitation of Lori Mody was communicated through Brett Pfeffer in August of 2004. Indeed, as the evidence established and the presentence report recounts, the Mody/iGate venture was essentially dead as of November 2004, and all of the events that occurred thereafter came about as a result of the FBI's initiation of the undercover operation and its use of Lori Mody to revive the Nigerian venture.

Based on all of those factors and the Supreme Court's clear direction that the Guidelines are meant to serve as an advisory benchmark, but carry no presumptive effect, the defense submits that a sentence in keeping with the November 2003 Guidelines would satisfy all of the goals of a criminal sentence.

## V.    A SENTENCE UNDER 10 YEARS WOULD AVOID UNWARRANTED SENTENCING DISPARITIES.

Pursuant to 18 U.S.C. § 3553(a)(6),  the sentencing judge is required to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." Consideration of this factor militates strongly in favor of a sentence of less than 10 years; no Member of Congress has ever been sentenced to more than 100 months, and Mr. Jefferson's two co-conspirators in this case received sentences of just 87 and 96 months. So this statutory factor points to a sentence of less than 10 years as well.

### A.    A Sentence Longer than 10 Years Would be Markedly Disproportionate to Sentences of Other Members of Congress Convicted on Corruption Charges.

An analysis of cases involving Members of Congress sentenced on corruption charges pursuant to the sentencing guidelines (i.e., for conduct after November 1, 1987) reveals that a sentence over 100 months would exceed the longest prison term ever handed out to a Member of Congress. As set forth in more detail below, while some members of Congress facing criminal

prosecution entered pleas of guilty that reduced their exposure, many did not. They were convicted of a variety of bribery, racketeering, conspiracy, and honest services fraud counts, and the cases generally involved attempts to steer U.S. government contracts to the businesses that paid the Congressmen and/or efforts to fend off criminal or administrative investigations of the businesses. And in almost every case, the defendant was found to have participated in a widespread, complex scheme involving more than one transaction or co-conspirator. Yet sentences of eight years or less – often much less – have been deemed to be sufficient to serve the ends of justice and reflect the seriousness of such offenses.

When assessing the need to avoid unwarranted sentencing disparities under §3553(a)(6), the court should consider the following cases:

### 1.     Rep. Randall "Duke" Cunningham

Congressman Randall "Duke" Cunningham performed Congressional favors for the highest bidders in exchange for a wide array of payments and items of value.   Cunningham received at least $2.4 million in bribes from several co-conspirators through checks, cash, antiques, furniture, yacht club fees, boat repairs, moving costs, and vacation expenses. Among the illegal benefits he received were the purchase of his home for an inflated price, full payment of his mortgage, a down payment on his condominium, and the purchase and maintenance of a yacht and a Rolls Royce for his personal use. Information at 4–6, *United States v. Cunningham*, No. 3:05-CR-02137 (S.D. Cal. Nov. 28, 2005); Amended Judgment at 2–5, *Cunningham*, No. 3:05-CR-02137 (S.D. Cal. Apr. 6, 2006).

In exchange for these payments, Cunningham steered Congressional appropriations and Department of Defense contracts to co-conspirators. Information at 5–6, *Cunningham*, No. 3:05-CR-02137 (S.D. Cal. Nov. 28, 2005). Indeed, the government's investigation famously revealed

that Cunningham actually maintained a written "bribe menu," setting forth the prices he would charge up front for the delivery of earmarks and contracts in different dollar amounts. Randal Archibold, *Ex-Congressman Gets 8-Year Term in Bribery Case*, N.Y. TIMES, Mar. 4, 2006. In 2005, he pled guilty to (1) conspiracy to commit bribery, honest services wire fraud, honest services mail fraud, and tax evasion; and (2) tax evasion. He was sentenced to eight years and four months in prison and ordered to pay $1,804,031.50 in restitution. Amended Judgment at 2–5, *Cunningham*, No. 3:05-CR-02137 (S.D. Cal. Apr. 6, 2006). The United States government, "which called the misconduct unprecedented for its 'depth, breadth and length,' said the sentence was the longest ever handed down for a member or former member of Congress in a federal corruption case." Randal Archibold, *Ex-Congressman Gets 8-Year Term in Bribery Case*, N.Y. TIMES, Mar. 4, 2006. The fact that unlike Cunningham, Mr. Jefferson went to trial and will not receive credit for acceptance of responsibility in this case is a factor this court can consider, but it hardly justifies the grossly disproportionate sentence that the government is seeking.

### 2.    Rep. Robert Ney

Congressman Robert Ney performed Congressional favors for lobbyists, including Jack Abramoff and his associates, in exchange for campaign contributions, expensive meals, tickets to skybox suites for sporting events and concerts, and luxury travel. One trip alone cost in excess of $160,000. Factual Basis for Plea at 4, *United States v. Ney*, No. 1:06-CR-00272 (D.D.C. Oct. 13, 2006). Unlike Mr. Jefferson, Ney accepted items of value in return for clear legislative acts: he garnered support for and opposed legislation, inserted specific amendments into legislation, and inserted statements into the *Congressional Record*. Ney supported a license application for one of Abramoff's lobbying clients, helping that client win a multi-million dollar contract to install wireless infrastructure in the United States House of Representatives. *Id*. at 4. Ney also actively

reached out to agencies in the executive branch, including the Secretary of Housing and Urban Development, seeking to influence the decisions of those agencies on behalf of the lobbyists. *Id.* at 4–6.

The evidence also showed that Ney took thousands of dollars in gambling chips from a foreign businessman who sought his help with the United States Department of State and U.S. laws affecting his business. Ney took many of these actions with the assistance of a member of his Congressional staff, who often joined him on his trips abroad and helped him conceal his gambling earnings. *Id.* at 6–8.

In 2006, Ney pled guilty to conspiracy to defraud the United States and to falsifying financial disclosure forms. He was sentenced to 30 months in prison and two years supervised release on each count, to run concurrently, and was fined $6,000. Judgment at 1–5, *Ney*, No. 1:06-CR-00272 (D.D.C. Jan. 23, 2007).

### 3.     Rep. James Traficant

In 2002, a federal jury convicted Congressman James Traficant of all ten counts with which he was charged, including bribery, racketeering, fraud, and tax evasion. Traficant demanded thousands of dollars in goods and services from businesses in return for intervening in state and federal criminal and enforcement proceedings against them and for marketing their technology within the federal government. *See* Indictment, available online at *http://fl1.findlaw.com/news.findlaw.com/cnn/docs/traficant/traficant50401indt.pdf; United States v. Traficant*, 368 F.3d 646 (6th Cir. 2004). He also "paid inflated salaries to his staffers, who were required to kickback the difference to their boss; and forced his congressional staffers to bale hay, repair plumbing, and reinforce barns at his show-horse farm." *Id.* at 649. Traficant maintained his innocence throughout the trial. He was sentenced to eight years in prison and

three years of supervised release, and ordered to pay $150,000 in restitution. *Id.*; *see also* Criminal Docket, *United States v. Traficant*, 4:01-CR-00207 (N.D. Ohio July 31, 2002).

### 4.    Rep. Melvin Reynolds

Congressman Melvin Reynolds was convicted by a federal jury on 15 of 16 counts related to election fraud and bank fraud. *United States v. Reynolds*, 189 F.3d 521 (7th Cir. 1999). Reynolds devised a scheme to launder money donated from a union to his congressional campaign. He directed congressional staff members to carry out his scheme and conceal the true source of the funds, forged signatures, and funneled illegal contributions to cover campaign expenses. *Id.* at 523–24.

Once in office, Reynolds repeatedly misrepresented his financial condition to numerous banks while applying for a home mortgage. He also misrepresented the source of his down payment and forged documents in connection with the loan applications. *Id.* at 524. Reynolds' "conspiracy lasted over five years, involved millions of dollars, involved sham ward organizations designed to launder money from unions, and required deceiving the Federal Election Commission, the Internal Revenue Service, and the general public." *Id.* at 529. For these crimes, Reynolds was sentenced to 78 months in prison, five years supervised release, and ordered to pay $20,000 in restitution. *Id.* at 523; *see also* Criminal Docket, *United States v. Reynolds*, No. 1:96-CR-00701 (N. D. Ill. July 15, 1997).

### 5.    Rep. Jay C. Kim

Congressman Jay Kim pled guilty in 1997 to accepting illegal campaign contributions totaling $250,000. Lizette Alvarez, *Lawmaker Votes in Congress after Conviction for a Crime*, N.Y. TIMES, March 11, 1998. According to the United States Attorney's Office, Kim "admitted to committing the largest amount of campaign violations ever by a member of Congress." Juliet

Eilperin, *Days in the Life of Jay Kim in the U.S. House of Correction*, Wash. Post, May 22, 1998, at A23. He was sentenced to 60 days home detention, one year probation, 200 hours of community service, and fined $5,000. Judgment and Commitment Order at 1, *United States v. Kim*, No. 2:97-CR-00726 (C.D. Cal. Mar. 10, 1998).

### 6.    Rep. Donald Lukens

Congressman Donald Lukens was convicted by a jury in 1996 of one count of bribery and one count of conspiracy to engage in bribery. Lukens cashed several checks from officials at the Cambridge Technical Institute ("CTI"), an educational institution that the United States Department of Education was investigating at the time the checks were cashed. *United States v. Donald Lukens*, 114 F.3d 1220 (D.C. Cir. 1997). At trial, Lukens claimed the checks were given to him to help his re-election campaign. The government argued the checks were bribes to get Lukens to attempt to persuade the Department of Education to cease its investigation of CTI. *Id.* He was sentenced to 30 months in prison on each count, to run concurrently, followed by three years of supervised release. Criminal Docket, *United States v. Lukens*, No. 1:95-CR-00041 (D.D.C. June 20, 1996).

### 7.    Rep. Daniel Rostenkowski

Congressman Daniel Rostenkowski was indicted in 1994 on 17 felony charges, including several counts of wire fraud, embezzlement, concealing a material fact, and tampering with a witness. David Johnston, *U.S. Indicts Rostenkowski in Broad Corruption Case; He is out of Key House Post*, N.Y. Times, June 1, 1994. The indictment charged Rostenkowski with embezzling $500,000 from his official expense accounts "to benefit himself, his family and his friends." *Id.* Also part of the pattern of corruption was a kickback scheme in which he hired employees who did little or no work, or did personal work for him, and Rostenkowski took cash payments

disguised as office purchases of stamps. *Id*. In the face of all these charges, he pled guilty to two counts of mail fraud and aiding and abetting, and was sentenced to 17 months in prison. He was also ordered to pay $100,000 in restitution. Criminal Docket, *United States v. Rostenkowski*, No. 1:94-CR-00226 (April 6, 1996).

### 8.    Rep. Albert Bustamante

A federal jury convicted Congressman Albert Bustamante of racketeering and illegal gratuities in 1993. *United States v. Bustamante*, 45 F.3d 933 (5th Cir. 1995). To support the RICO conviction, the jury found Bustamante accepted a $35,000 bribe in exchange for using his official influence on behalf of a military contractor. The contractor enlisted Bustamante's support to renew its multi-million dollar food services contract, and in exchange funneled $35,000 directly to Bustamante. *Id.* at 936–38.

The jury also based the RICO conviction on Bustamante's acceptance of an illegal gratuity, for which the jury also found him guilty on a separate violation of the gratuity statute. Bustamante received loan guarantees of $20,000, promises of loans worth $650,000, and "a loan guarantee for the purchase of stock and the promise of future loans for additional investment in [a business venture], all at no personal risk…." *Id.* at 940. He was also invited to participate in the business venture at no personal risk to himself, in violation of the gratuities statute. *Id.* For these crimes, Bustamante was sentenced to concurrent terms of 42 months in prison on the RICO count and 24 months in prison on the gratuities count. He was also sentenced to two years of supervised release and fined $55,000. *Id.* at 936; *see also* Criminal Docket, *United States v. Bustamante*, No. 5:93-CR-00039 (W.D. Tex. Feb. 18 1993).

### 9.    Rep. Patrick Swindall

Congressman Patrick Swindall was convicted by a federal jury in 1989 of nine counts of perjury after lying to a grand jury investigating a loan worth $850,000. *United States v. Swindall*, 971 F.2d 1531 (11th Cir. 1992). Swindall negotiated for several weeks with a man who was later convicted of money laundering, as well as an undercover IRS agent posing as a money broker. Swindall continued negotiations despite the fact that he was informed that the loan might be financed with drug money that he would help launder. *Id.* at 1535. He was sentenced to one year in prison for each of the nine counts, to run concurrently, and fined $30,000. Criminal Docket, *United States v. Swindall*, No. 1:88-CR-00477 (N.D. Ga. Aug. 28, 1989).

*       *       *

The court should also factor into its consideration the most recent public corruption prosecution involving a Member of Congress: that of Alaska Senator Ted Stevens. In that case, the charges were dismissed before sentence was imposed, but the case demonstrates the manner in which the government's charging decision can dramatically affect the outcome, and it establishes that any sentence over 10 years would be disparate and unjust.

The indictment alleged that from 1999 to 2006, Stevens received items valued over $250,000 from VECO, a large Alaska corporation, and its CEO, Bill Allen. And while the indictment alleged that "Stevens could and did use his official position and his office on behalf of VECO during that same time period," Senator Stevens was not charged with bribery or gratuities under 18 U.S.C. § 201. And, while the indictment alleged a scheme to conceal the public official's receipt of things of value, Stevens was not charged with honest services fraud under 18 U.S.C. § 1346. He was not charged with conspiracy or with RICO. He faced only 7 counts of violating 18 U.S.C. § 1001 – making false statements on his annual financial disclosure

38

statements. This limited his sentencing exposure to a maximum of five years on any count, and the facts could have resulted in a Guideline calculation of 27 to 33 months, not years.[11] Had the Department of Justice followed a consistent charging policy in the instant case, Mr. Jefferson would be looking at an entirely different presentence report.

*    *    *

Mr. Jefferson has been convicted for what he did, the jury has rendered its judgment, and his sentence – even one that does not exceed 10 years – will be severe. But the government's recommended punishment is dramatically out of line with how similar conduct has been dealt with in previous situations.

**B.    A sentence of more than 10 years would not be consistent with the sentences already imposed in this case.**

When applying the sentencing factor in § 3553(a)(6),  the court should also consider the sentences that have been imposed in this case, for convictions arising out of the same set of facts and circumstances. Vernon Jackson, the CEO of iGate, was sentenced to 87 months, and Brett Pfeffer, Mr. Jefferson's former aide who worked for Lori Mody and W2-IBBS, was sentenced to 96 months, or 8 years. (No other co-conspirator was prosecuted.) As the court explained at the time, these sentences specifically took into account the nature and seriousness of the offense. The court told Pfeffer: "To promote respect for the law and to provide for general deterrence, we have to make clear that public corruption is unacceptable, will not be tolerated and will be punished severely." *United States v. Brett Pfeffer,* Cr. No. 1:06cr10, Transcript of Proceedings

---

[11]    Sen. Stevens's base offense level under § 2B1.1 would be 6, plus 12 levels for a value greater than $200,000, resulting in an offense level of 18. Had he received the enhancement for abuse of a position of trust and/or a leadership role in the offense, the calculation could have been increased by up to six levels, resulting in a maximum offense level of 24, or 51 to 63 months.

on May 26, 2006 at 39. And it stated to Jackson: "The first factor that I take into account is, of course, the nature and seriousness of the offense, which it is a very serious offense. … [T]he sentence I impose on you has to stand as a beacon to those who would corrupt our public life, and I have that in mind." *United States v. Vernon Jackson,* Cr. No. 1:06cr161, Transcript of Proceedings on September 8, 2006 at 17. In other words, the court has already indicated that an 8 year sentence is in keeping with the seriousness of this particular offense and with § 3553(a)(1) and (2).

The defense is aware that Mr. Jefferson is not eligible to receive the Guideline calculation reduction for acceptance of responsibility that the two men received. It is also understood that the advisory Guidelines add levels when the defendant being sentenced is the public official, as opposed to the payor. But those circumstances do not compel the court to impose a sentence that would far exceed what the co-conspirators received or multiply them in the fashion recommended by the government. After all, the sentences of 7 ¼ and 8 years were not even the last word in Jackson's and Pfeffer's cases. The court noted at the time of the Pfeffer sentencing that Pfeffer would have the opportunity to have his sentence "substantially reduced if the government files the appropriate motion." Tr. of May 26, 2006 at 43. And the government made the same commitment as part of Jackson's plea. So, the sentences ultimately served by the two men will reflect the differences in culpability and the benefits to be accorded their cooperation even if the court imposes a sentence in the range proposed by the defense.

## VI.    THE DEFENDANT SHOULD NOT BE REMANDED AT THE TIME OF SENTENCING.

The government has opposed bond pending appeal, and it has requested that the defendant be remanded at sentencing. At the time of the verdict, the court found by clear and convincing evidence that the defendant was not likely to flee or pose a danger to the community,

and it released the defendant pending the imposition of sentence under 18 U.S.C. § 3143. Nothing has changed since that time, and the defendant has cooperated fully with the Probation Officer and complied with the conditions of his release. The defendant will address the issue of bond pending appeal in a separate motion, but even if the court does not order bond pending appeal, the defendant requests that he be continued on his bond status until a facility has been designated by the Bureau of Prisons and that he be permitted to self-report to that facility at the appropriate time. Moreover, although the designation of a facility may in any event not be made until after the first of the year, the defendant requests that he be allowed to spend a final Christmas holiday with his wife, his daughters and sons-in-law, and most especially, his grandchildren. Therefore, in the event he is not granted bond pending appeal, defendant requests a stay of execution until Monday, January 4, 2010.

## VII.    CONCLUSION

The court has before it for sentencing a man who has been convicted of a very serious offense, but also a man who has dedicated his life to family, his community, and genuine public service. The court is bound by statute to consider the nature of the offense and the need for punishment and deterrence, and it is equally bound to consider Mr. Jefferson's life history and character. The law requires the court to impose a sentence that is in keeping with sentences imposed upon individuals with similar records who have been found guilty of similar conduct, and no court has ever imposed a sentence longer than 100 months in a case involving a United States Congressman, even a United States Congressman convicted of bribery after a trial. In light of all of the facts and circumstances set forth in this memorandum, the evidence presented at trial, the letters of support attached to this memorandum, and a full and fair consideration of all

of the factors set forth in 18 U.S.C. § 3553, the defense urges the court to impose a sentence of less than 10 years in this case.

Respectfully submitted,

/s/ Robert P. Trout
_____
Robert P. Trout
(Va. Bar No. 13642)
rtrout@troutcacheris.com
Attorney for William J. Jefferson
TROUT CACHERIS, PLLC
1350 Connecticut Ave, N.W., Suite 300
Washington, D.C. 20036
Phone: (202) 464-3300
Fax:  (202) 464-3319

/s/ Amy Berman Jackson
_____
Amy Berman Jackson
(Va. Bar No. 25919)
ajackson@troutcacheris.com
Attorney for William J. Jefferson
TROUT CACHERIS, PLLC
1350 Connecticut Ave, N.W., Suite 300
Washington, D.C. 20036
Phone: (202) 464-3300
Fax:  (202) 464-3319

/s/ Gloria B. Solomon
_____
Gloria B. Solomon
(Admitted *pro hac vice*)
gsolomon@troutcacheris.com
Attorney for William J. Jefferson
TROUT CACHERIS, PLLC
1350 Connecticut Ave, N.W., Suite 300
Washington, D.C. 20036
Phone: (202) 464-3300
Fax:  (202) 464-3319

**Certificate of Service**

I hereby certify that on this 9th day of November 2009, I electronically filed the foregoing memorandum with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to the following:

Mark Lytle
mark.lytle@usdoj.gov
Rebeca H. Bellows
becky.bellows@usdoj.gov
United States Attorney's Office
2100 Jamieson Avenue
Alexandria, Virginia 22314

Charles E. Duross
charles.duross@usdoj.gov
U.S. Department of Justice
1400 New York Avenue, N.W.
Washington, D.C. 20005

/s/ Robert P. Trout
_____

Robert P. Trout
(Va. Bar No. 13642)
rtrout@troutcacheris.com
Attorney for William J. Jefferson
TROUT CACHERIS, PLLC
1350 Connecticut Ave, N.W., Suite 300
Washington, D.C. 20036
Phone: (202) 464-3300
Fax:  (202) 464-3319