IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | Criminal No. 1:07cr209 |
| v. | ) | Civil Action No. 1:16cr1214 |
| | ) | |
| WILLIAM J. JEFFERSON, | ) | |
| | ) | Hon. T.S. Ellis, III |
| Defendant. | ) | |

**MEMORANDUM OF THE UNITED STATES
IN OPPOSITION TO DEFENDANT'S MOTION TO VACATE
AND SET ASIDE CONVICTION AND SENTENCE PURSUANT TO 28 U.S.C. § 2255**

The United States of America, by and through undersigned counsel, respectfully submits

this brief in opposition to the motion of Defendant William J. Jefferson to vacate and set aside

his conviction and sentence pursuant to 28 U.S.C. § 2255.

Dana J. Boente
United States Attorney

Mark D. Lytle
Assistant United States Attorney

Ankush Khardori
Special Assistant United States Attorney

2100 Jamieson Avenue
Alexandria, Virginia 22314
Phone: (703) 299-3700
Fax: (703) 299-3981

*Attorneys for the United States of America*

## TABLE OF CONTENTS

**Page**

Table of Authorities ...................................................................................................... ii

Preliminary Statement ..................................................................................................1

The Indictment and Counts of Conviction ...................................................................1

Statement of Facts .........................................................................................................2

      A.     Introduction ....................................................................................2

      B.     The Counts One, Three, and Four Bribe Schemes ......................3

      C.     The Count Two Bribe Schemes ...................................................19

      D.     The RICO Count ...........................................................................27

Procedural Background ...............................................................................................28

      A.     Pre-Trial Rulings Concerning the Meaning of "Official Act" ...............................28

      B.     Defendant's Rule 29 Motion and Position on Jury Instructions ............................30

      C.     The Defendant's Direct Appeal ...................................................31

      D.     The Supreme Court's Decision in *McDonnell* ..........................32

Argument .....................................................................................................................34

      I.     The Defendant's Claim is Procedurally Defaulted ....................35

           A.    The Defendant Did Not Raise the Challenge Asserted in *McDonnell* ..........35

           B.    The Defendant Has Not Shown Cause or Actual Prejudice Resulting from His Procedural Default ...........................37

           C.    The Defendant Has Not Shown that He Is Actually Innocent ......................43

      II.    Any Error in the Court's "Official Act" Instructions Was Harmless ......................45

Conclusion ...................................................................................................................45

## TABLE OF AUTHORITIES

**Cases**                                                                        **Page**

*Bousley v. United States,*
523 U.S. 614 (1998)................................................................ 35, 37, 43-44

*Brecht v. Abrahamson,*
507 U.S. 619 (1993)...............................................................................1, 45

*Davis v. Ayala,*
135 S. Ct. 2187 (2015)................................................................................45

*Evans v. United States,*
504 U.S. 255 (1992)....................................................................................40

*Jefferson v. United States,*
133 S. Ct. 648 (2012)..................................................................................32

*McDonnell v. United States,*
136 S. Ct. 2355 (2016).........................................................33-40, 42-43

*Miller v. United States,*
261 F.2d 546 (4th Cir. 1958) .............................................................. 34-35

*Reed v. Ross,*
468 U.S. 1 (1984).........................................................................................37

*Schlup v. Delo,*
513 U.S. 298 (1995)............................................................................... 43-44

*United States v. Biaggi,*
853 F.2d 89 (2nd Cir. 1988)..................................................................28, 31

*United States v. Birdsall,*
233 U.S. 223 (1914)...............................................28-32, 34, 37-38, 43

*United States v. Carson,*
464 F.2d 424 (2d Cir. 1972)......................................................................29

*United States v. Clarke,*
842 F.3d 288 (4th Cir. 2016) ...................................................................38

*United States v. Ellis,*
91 F.3d 135 (4th Cir. 1996) .......................................................................38

*United States v. Frady*,
    456 U.S. 152 (1982)..................................................................... 1, 35-36, 38

*United States v. Jefferson*,
    562 F.Supp. 2d 687 (E.D. Va. 2008) ........................................................28-29

*United States v. Jefferson*,
    634 F.Supp. 2d 595 (E.D. Va. 2009) .............................................................29

*United States v. Jefferson*,
    No. 09-5130, 4th Cir. Ct. App. Dkt. 74 (Nov. 15, 2010)...................................31

*United States v. Jefferson*,
    674 F.3d 332 (4th Cir. 2012) ...................................................1, 29, 34, 42, 45

*United States v. Lofthus*,
    992 F.2d 793 (8th Cir. 1993) ......................................................................37

*United States v. McDonnell*,
    792 F.3d 478 (4th Cir. 2015) .....................................................................32

*United States v. McDonnell*,
    2016 WL 1496878 (Apr. 13, 2016) .............................................................32

*United States v. McDonnell*,
    ___ U.S. ___ (2016).................................................................................1

*United States v. Mikalajunas*,
    186 F.3d 490 (4th Cir. 1999) ...........................................................35, 37, 44

*United States v. Pettiford*,
    612 F.3d 270 (4th Cir. 2010) .....................................................................34

*United States v. Smith*,
    723 F.3d 510 (4th Cir. 2014) .....................................................................45

*United States v. Sun-Diamond Growers of California*,
    526 U.S. 398 (1999)...................................................................30-31, 34, 37

*Valdes v. United States*,
    475 F. 3d 1319 (D.C. Cir. 2007)................................................................31

*White v. Lee*,
    238 F.3d 418 (4th Cir. 2000) .....................................................................45

**Statutes** and **Court Rules**                                                    **Page**

12 U.S.C. § 635.................................................................................................................6

18 U.S.C. § 201(a)(3)..............................................................................1, 30, 35, 38

Fed. R. Crim. P. 30.........................................................................................35

Fed. R. Crim. P. 52(b).....................................................................................35

## PRELIMINARY STATEMENT

More than seven years ago, the defendant was convicted of having conducted at least nine different bribe schemes from his congressional office.  In the wake of the Supreme Court's decision in *McDonnell v. United States*, __ U.S. __, 136 S. Ct. 2355 (2016), defendant now seeks to vacate his conviction, claiming that the "instructions in this case were erroneous for the same reasons. . . enunciated in *McDonnell*." Br. at 1.[1]  However, the defendant did not raise, either in the district court or on direct appeal, any of the objections that were raised in *McDonnell* regarding the definition of "official act."  Instead, defendant "*oppose[d] the use of any instruction that amends or elaborates upon the definition set forth in 18 U.S.C. § 201(a)(3).*" (emphasis added).  Dkt. 358 at 2.  *McDonnell* upheld the use of the "settled practice" instruction which defendant had also opposed in his case.

Defendant's claim is procedurally defaulted and should be denied. *United States v. Frady*, 456 U.S. 152, 166-68, (1982).  Moreover, any error related to the Court's "official act" instruction was harmless.  The defendant will not be able to meet his burden of establishing that the *McDonnell* error "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619 (1993).

## THE INDICTMENT AND COUNTS OF CONVICTION

In 2009, defendant, William J. Jefferson, was convicted of the following eleven counts contained in an original sixteen count indictment: Count One: Conspiracy to (1) solicit bribes by

---

[1] "JA__" refers to the Joint Appendix filed in connection with the defendant's appeal of his 2009 convictions to the U.S. Court of Appeals for the Fourth Circuit. *United States v. Jefferson*, 674 F.3d 332 (4th Cir. 2012), filed separately by CD with the Clerk of the Court. Dkt. 767; "Br." refers to the defendant's brief; and "GEX__" refers to government exhibit admitted at trial.  GEX not found in the JA will be filed with the government brief electronically.

a public official, (2) deprive citizens of honest services by wire fraud, and (3) violate the Foreign

Corrupt Practices Act (FCPA);  Count Two:  conspiracy to (1) solicit bribes by a public official

and (2) deprive citizens of honest services by wire fraud;  Counts Three and Four: solicitation of

bribes by a public official); Counts Six, Seven, and Ten; deprivation of honest services by wire

fraud; Counts Twelve through Fourteen: money laundering; and Count Sixteen: violation of the

Racketeer Influenced Corrupt Organization Act (RICO)(JA68-161; JA225-28).  The defendant

was sentenced to concurrent terms of imprisonment: 60 months on Counts One[2] and Two; 156

months on Counts Three, Four, Six, Seven, Ten and Count Sixteen; and 120 months on Counts

Twelve through Fourteen (JA245-54).

## STATEMENT OF FACTS

A.      <u>Introduction</u>

From 2000 through 2005, defendant, a then-Member of the U.S. House of

Representatives,[3] participated in multiple bribe schemes in order to enrich himself and his

family.  The bribe schemes followed a common pattern:  the defendant solicited payments,

percentage of profits, and shares of ownership, from businesspersons in return for performing a

stream of official acts designed to gain the approvals of both United States and foreign

government agencies.  In return, the defendant and his family received hundreds of thousands of

dollars, expected more than $100 million, and received millions of shares of stock.

---

[2] The Count One conspiracy included as an object, a violation of the FCPA. Performance of an "official act" is not an element of the FCPA.

[3] Defendant was a Member of the Committee on Ways and Means, Subcommittee on Trade; a Member of the Congressional Black Caucus; Co-Chair of the Africa Trade and Investment Caucus; and Co-Chair of the Congressional Caucus on Nigeria (JA353;JA355; JA382;JA504;JA1628;JA2051-52;JA2074-75;JA2216;JA2364;JA5912).

B.      The Counts One, Three, and Four Bribe Schemes

     (i)      *Defendant's Solicitations of Bribes from iGate's Jackson and NDTV*

Defendant's most far-reaching bribe scheme related to numerous official efforts to advance the business interests of iGate, Inc., a Kentucky-based telecommunications firm. iGate's founder, Vernon Jackson, developed a technology that permitted video, data, and audio to be transmitted through copper wire at high-speed (JA346-48).  When, in 2000, Jackson wanted to pursue government-sector contracts for his technology, he was introduced to defendant (JA350-54).  Following his first meeting with Jackson, defendant began promoting iGate in his official capacity (JA354).  For example, when Jackson was told that, before iGate's technology could be used by the United States Army, it had to be tested and validated at the U.S. Army's Technology Integration Center at Fort Huachuca, the defendant called General Hylton to his congressional office (JA849-53;JA358-59).  General Hylton was responsible for managing the annual budget of the Army's communication systems – approximately $1.5 billion. (JA849-53). For General Hylton, this was no typical meeting, having been the only time he was summoned to an individual representative's congressional office. (JA852).  Defendant told General Hylton that iGate's product could save the government money and that it needed to get tested at Fort Huachuca (JA359;JA855-60).  According to Jackson, "I perceived that he [defendant] gave him [General Hylton] instructions, let's get this done. And I perceived the general said, 'Well, we can make it happen, sir'" (JA359-60).  General Hylton's trial testimony was consistent with Jackson's recollection:

       Q.      During the meeting, did the congressman ask for a
            commitment from the Army [that] they would coordinate
            with iGate to facilitate the evaluation of their product?

A.   I believe that to be -- to be correct.

(JA857-8). The Army then asked iGate to send its product to Fort Huachuca (JA362-63;JA859-61).  After Jackson informed defendant of the testing's favorable preliminary results, defendant told Jackson that iGate needed someone to market iGate to corporate and government decision makers; defendant recommended that iGate hire his wife's consulting firm, The ANJ Group, which, unbeknownst to Jackson, had just been formed in the names of defendant's wife and daughters (JA364;JA378-79;GEX15-1).  Defendant provided Jackson with a contract whereby iGate agreed to pay ANJ a $7,500 monthly retainer, a percentage of gross profits, and options for up to one million shares of iGate stock (JA369-78;JA5307-11;JA5959-63).

It soon became clear to Jackson that the defendant, not his wife, was promoting and marketing iGate in return for the payments iGate was making to ANJ (JA387-88).  Although Jackson knew this was "flat-out wrong," Jackson continued to make payments so defendant could continue "promoting iGate's products and services from his congressional offices." (JA389).[4]  And defendant continued to do so.[5]

In July 2001, for example, defendant issued a congressional inquiry to the Army for a status update on the iGate testing (JA1569-72).  The Army sent Colonel Joseph Brown, the Army manager in charge of iGate's product, and an Army Congressional Liaison representative

---

[4] Jackson pleaded guilty to conspiracy and bribery of a public official for his role in bribing defendant (JA343;GEX28-2).

[5] Although the meeting with General Hylton in the defendant's congressional office took place before Jackson was solicited by the defendant to pay ANJ, the defendant's actions formed the basis for Jackson's reasonable belief of what the defendant would continue to do in return for the bribe payments.  After Jackson realized he was paying the defendant and not defendant's family, Jackson reflected back on the meeting with General Hylton: "I considered this congressman -- I watched him give orders, if you will, to a United States general. . . I just watched him be so effective for me, and he . . . [had] as much zeal as I did" (JA387-88).

to defendant's congressional office (JA1569-72).[6]  There, Colonel Brown delivered a powerpoint presentation, which had been reviewed and approved by two generals, and answered defendant's iGate-related questions (JA1571-95;JA5322-35).  Defendant had some "introductory remarks about the iGate product," "how well it was doing" and expressed interest in the Army's testing and use of iGate's technology, advising that iGate's technology "could be of a lot of value to the Army" (JA1575-76).[7]  During the course of the meeting, it became clear that defendant believed Colonel Brown was the decision maker within the Army who could purchase iGate's product "Army-wide" (JA1579-80).

The defendant's advocacy for iGate continued, leading him to speak at the iGate shareholder's meeting in April 2002 where he told the shareholders that he was "hoping to solicit additional support for iGate and for Mr. Jackson from his congressional colleagues in an attempt to help increase the number of contracts and contacts with the military in particular" (JA1179-84;JA5336).

Further, defendant introduced Jackson to Congressman Billy Tauzin, the Chairman of the Subcommittee on Telecommunications, Trade, and Consumer Protection (JA403-05;JA1499;JA5343).  At a meeting in Congressman Tauzin's office, defendant told him that iGate's technology "would be good for the government in terms of reducing cost and expediting access to services" for their constituents and asked Congressman Tauzin to evaluate the

---

[6] Colonel Brown testified that he had evaluated at least 100 to 150 products on behalf of the Army during his military career.  In that span, this was the only product where a congressional inquiry had been issued to address a product's status (JA1609-10).

[7] Similarly, in 2004, defendant's office contacted the House Armed Services Committee and asked a committee staffer to bring iGate to the attention of Department of Defense officials, which that staffer did (JA1532-36;JA1538-39).

technology for himself (JA404-06).  Congressman Tauzin instructed a committee staffer, Howard Waltzman, to assess the iGate technology; Waltzman did this by attending iGate demonstrations in D.C. and Georgia (JA1504-08).  Defendant later contacted Waltzman to ask about a letter endorsing iGate's technology (JA1511-13;JA1518).  Waltzman, who understood defendant to be acting on behalf of a constituent, prepared a letter for Congressman Tauzin's signature endorsing iGate's technology (JA1509-18;JA406-10;JA5343).  This endorsement was extremely beneficial to iGate because of Congressman Tauzin's committee chairmanships and his influence with major telecommunications companies (JA409-10;JA1515).

In July 2003, in Nigeria, defendant met Dumebi Kachikwu, the founder of Netlink Digital Television (NDTV), a Nigerian-based, satellite broadcast service (JA1192;JA1201-02;1207).  When Kachikwu told defendant that NDTV was trying to establish satellite service in Nigeria, defendant told him iGate's technology was better (JA1203).  Defendant further informed Kachikwu that he had already helped iGate "gain a lot of inroads . . . with government agencies in the U.S." (JA1203).  When Kachikwu and his NDTV partner, Ahmed Vanderpuije, met Jackson and defendant in London three days later, Jackson confirmed for Kachikwu how defendant had been "very instrumental" in getting iGate "access" to, *inter alia*, the Army (JA1205-08;JA417-18).  Defendant echoed this by outlining the numerous ways he could help an iGate/NDTV venture in his capacity as a congressman:  assisting NDTV in obtaining Ex-Im Bank[8] financing; securing for NDTV, through legislation, the rights to U.S.-based content; and helping NDTV obtain approval from NASA or the Pentagon to use iGate's product in Nigeria (JA1209-12;JA1244).  Moreover, defendant explained, his "good relationship[s]" with Nigeria's

---

[8] The Export-Import Bank of the United States is the official credit agency of the U.S. Government.  12 U.S.C. § 635.

President, Vice-President, and members of the Nigerian Communications Commission would be "helpful" to make any iGate/NDTV project "go" since the Nigerian telephone company (NITEL) was government-owned and NDTV would need access to NITEL's copper wires (JA428).  While still in London, NDTV and iGate signed a Memorandum of Understanding and defendant separately solicited a bribe from NDTV's Kachikwu (JA420-26;JA1214-29;JA1249;JA5429-31).  The two agreed defendant would receive $5 for every converter box NDTV purchased from iGate, which meant defendant stood to make at least $1 million from this arrangement (JA1227-28).  Kachikwu conveyed this bribe solicitation to Vanderpuije, who agreed to it because he "was excited about the fact that he could have a U.S. congressman in his pocket" (JA1240).[9]

Although defendant did not reveal his NDTV-bribe scheme to Jackson, he sought additional iGate-based bribery profits from him.  Within the month, defendant sought an increase in ANJ's compensation from 5% to 35% of profits (JA432-33;JA5994).  Jackson agreed to this because he expected that, in return, defendant would provide further official assistance at "meetings with the heads of state and heads of the government in Nigeria" (JA435-36).  Jackson testified about the continued official assistance he expected from the defendant, which included removing any problems iGate might have "at the government level" (JA1080-81).

In August 2003, NDTV and iGate reached a formal agreement whereby NDTV agreed to pay iGate approximately $44 million (with a down payment of $6.5 million) for the right to use iGate's technology in Nigeria (JA442-43;JA445-46;JA1255-56).[10]

---

9  After Kachikwu secretly entered into his bribe agreement with defendant, defendant reached out to the U.S. Embassy in London, seeking to expedite the granting of a visa allowing Kachikwu entrance into the United States for further meetings with iGate (JA6076).  Defendant did this by letter and a telephone call directly to the U.S. Ambassador to the United Kingdom (JA4252-55;JA-6076).

10  Although Kachikwu had restricted NDTV's bribe payments to $5 per converter box,

In accordance with the bribe agreements he had struck with NDTV officials and Jackson, defendant brought the iGate/NDTV venture participants to Ex-Im Bank (JA439). Ex-Im Bank funding was critical to the iGate/NDTV venture because Ex-Im Bank could fund 85% of the venture (JA439). Defendant participated in this meeting in his congressional capacity, talking "about trade issues between America and Nigeria companies" and the need to support "the use of the Export-Import Bank for these kinds of projects and activities" (JA440). Fashawe and Vanderpuije later reported to Kachikwu that defendant had gotten them an "excellent reception" at Ex-Im Bank and that they believed they had received "same-day approval in principal for the NDTV project" (JA1253). Defendant also brought Vanderpuije, Fashawe, and Jackson to the Maryland residence of Nigerian Vice-President Atiku Abubakar (JA453-54). At this meeting, defendant promoted the iGate/NDTV venture to VP Abubakar, who had direct authority over the Minister of Communications, telling the V.P. that the venture "would be good for U.S. trade overall, between the countries" (JA454-55;JA1311-12;JA1316-17).

In February 2004, defendant and his staff led a delegation to Nigeria and Cameroon to advance the iGate/NDTV venture (JA471-72;JA501-03;JA1312-13;JA4064-70;JA4256-66). In Nigeria, Jackson needed defendant's assistance to obtain government approval for, *inter alia*, right-of-ways on NITEL's telephone lines (JA472-73). Melvin Spence, defendant's Senior Policy Advisor, assisted in preparations for the participants and coordinated with State Department personnel, who requested meetings with high-level government officials, including the Nigerian President and ministers in the telecommunications, oil, and trade areas (JA4236-37;JA1617-19;JA1620-32). When James Maxstadt, a Nigeria-based U.S. Embassy officer, asked

---

Fashawe agreed to provide defendant a 2% ownership interest in NDTV's cable-television operation and other things (JA1285-89;JA5916).

Spence what defendant wanted to discuss with these officials, Spence pointed out defendant's Nigeria and Africa-Trade caucus positions and told Maxstadt that defendant "has been actively engaged in an effort to promote the Gulf of Guinea region as an area of strategic significance to the United States" (JA1628-29).

In his subsequent meetings with VP Abubakar, the Minister of Communications, and the Nigerian Communications Commission, defendant "came in his full apparatus as a U.S. Congressman, with embassy security, embassy vehicles, [and] introduced himself as a U.S. Congressman in charge of overseeing affairs of Nigeria or Africa" (JA1313). Further, he stated that "in his capacity as a congressman overseeing African affairs and Nigerian affairs, he was promoting an American company that had an innovative product and a new technology that would do miracles in the telecom space in Nigeria" (JA1313-14). In his meeting with the Nigerian Communications Commission, defendant asked that iGate be provided access to NITEL's infrastructure and suggested NITEL would benefit "tremendously" from the project (JA1321-22;JA505-07). Similarly, during his meeting with VP Abubakar, after first discussing the congressional committees he served on and his interest in "promoting trade and investment from the United States into Africa," defendant asked VP Abubakar to ensure NITEL would grant right-of-ways to iGate's product (JA504-06). Finally, defendant met with President Obasanjo at his presidential palace, having been driven there with the highest-ranking U.S. diplomat in Nigeria in an armored black limousine with an American flag on the front bumper; in this meeting, defendant described iGate's technology "as a way of improving telecommunication infrastructure in poor countries, such as those in Africa" (JA1640;JA4268;JA4270).

In all these meetings, defendant held himself out as a "U.S. Congressman interested in trade between the United States and Africa" (JA508).[11]  This was consistent with defendant's use of his official passport, which is limited "to the discharge of the bearer's or sponsor's official mission" (JA5880).  Indeed, defendant and Spence filed travel disclosure forms certifying that this trip was in connection with their respective duties as a Member and employee of the U.S. House of Representatives (JA1703-04;JA1716;JA1718-22;JA6172-73).  The publicly-filed form certified that the defendant was acting "[i]n his capacity as co-chair of Congressional Nigeria Caucus + Africa Trade + Investment Caucus . ." while leading the delegation to West Africa (JA6172).

In mid-2004, defendant was coordinating another official delegation to Africa, including visits to Cameroon and Nigeria, for the purpose of promoting iGate (JA541-42;JA1333-34;JA6114-15).  As was the case with the February 2004 delegation, defendant's congressional staffers were extensively involved in making arrangements for this delegation, including arranging the itinerary (JA4285-92;JA6090-91).  Defendant traveled to Cameroon on his official passport (JA5878;JA5885).  There, he met with officials of CAMTEL, the government-owned telephone company (JA543).  In his role as a congressman promoting U.S. trade and products, defendant recommended that these officials look at iGate's products for installation in CAMTEL's infrastructure (JA542-44).  Defendant then traveled to Nigeria in a failed attempt to meet with President Obasanjo to move the iGate/NDTV venture forward (JA547;JA1333-34;JA5433-36).[12]  He did, however, meet with the Minister of Communications

---

[11]  *See also* JA1649 (Maxstadt understood defendant was "acting as a U.S. Congressman, on an official visit" promoting constituents); JA4271 (Spence understood defendant was acting in his capacity as "a congressman").

12  On May 28, 2004, defendant wrote to the President of Nigeria, stating in part, "I have known you and have worked for the benefit of Nigeria and Africa in the United States for many

and promote the iGate venture in his capacity "as a U.S. Congressman," "promot[ing] American interests" (JA1339-41).

       (ii)   *Defendant's Solicitations of Bribes from Lori Mody*

The iGate/NDTV venture foundered and iGate agreed to re-pay NDTV $3.5 million (JA608-611). iGate was able to reach this settlement because defendant found an investor to replace NDTV (JA611-12;JA1367). Brett Pfeffer, one of defendant's former legislative aides, introduced defendant to Lori Mody, a wealthy Northern Virginia businesswoman (JA1914-15;JA1928-30). Pfeffer was president of Mody's business-development company, W2 (JA1922-24). Pfeffer, Mody, Jackson, and defendant met at defendant's congressional office in late-June 2004 and defendant pitched the venture, explaining that W2 would have the right to market and distribute iGate's products in Nigeria (JA613-15;JA1930-39). Defendant explained that Ex-Im Bank could finance 85% of the venture and that he would "make sure" W2's Ex-Im Bank application "got approved" (JA1935-36;JA1941-45;JA5438-42). Defendant further represented that he "would work with" Nigerian government officials "including the President" to help get NITEL on-board (JA1936).

Defendant's pitch succeeded and, in July 2004, iGate and W2-IBBS (Mody's Nigerian company created for the venture) entered into an agreement whereby W2-IBBS agreed to pay iGate $44.9 million for the Nigerian distribution rights of iGate products, with W2-IBBS putting up $3.5 million and Ex-Im Bank financing the rest (JA5381-83;JA1939;JA1951-52;JA615-22).

Also in August 2004, defendant met with Mody, Pfeffer, Jackson and Suleiman Yahyah in New Orleans (JA1965-67;JA647-49). Yahyah owned a Nigerian internet-service-provider

---

years. I have vouched for Nigeria as a place for U.S. Investment through my work as Chairman of the Nigerian Caucus and brought investment to Nigeria and Africa" (JA5433-36).

company called Rosecom; defendant recommended Yahyah to Pfeffer and Mody as a local

partner for W2-IBBS (JA1965-66).  Just before the meeting, defendant approached Pfeffer alone

and explained that he "would need between five to seven percent of the company, of W2-IBBS,

for his family" (JA1969).  Defendant simultaneously mentioned his belief that "this company,

W2-IBBS, and this opportunity would make hundreds of millions of dollars" (JA1969).  Pfeffer

testified about the defendant's illicit proposal:

> Q.   [W]as there any explicit statements made by the
>       Congressman exactly what he would do in exchange
>       for the five to seven percent?
>
> A.   He was going to work with the Nigerian officials, the president
>       and the vice-president and anybody else that we needed, to
>       ensure that the deal got done through NITEL. Because as I stated
>       before, NITEL was a government-controlled telecom. He would
>       ensure that we got our application approved through Ex-Im Bank.

 (JA1971-72;JA1986).  Although Pfeffer knew what defendant was asking "was illegal," Pfeffer

agreed to talk to Mody about it (JA1970-71).  This was, Pfeffer later recalled, "the worst

decision in my life" (JA1970).[13]

   Progress on the iGate/W2-IBBS joint venture stalled in Fall 2004 (JA664-65;JA1990).

In March 2005, Mody approached the FBI and reported she was the victim of fraud and said

defendant had solicited a piece of her company (JA2893-94;JA2224-27).  The FBI asked her to

reinitiate discussions with defendant about the iGate/W2-IBBS venture and, with the FBI's

supervision, record their conversations (JA2229-35).  Soon thereafter, defendant had a meeting

with Pfeffer and Mody where he advised them that he would likely not seek another

congressional term but was committed to advancing the iGate/W2-IBBS venture while he

---

[13]  Pfeffer pleaded guilty to conspiracy and bribery of a public official for his
participation in defendant's bribery scheme (JA1905-06;GEX28-4).

remained in office: "So, I'm gonna get your deal out of the way and I probably won't last very long after that" (JA6181).

In May, defendant solicited Mody for an increased ownership share of W2-IBBS. Defendant first referred to his "[o]ld deal" for 7% of W2-IBBS, but when Mody suggested defendant brought significant value to the venture, defendant increased his demands (JA2313;JA6195;JA6199;GEX106-3). Understanding the illegal nature of these discussions, defendant spoke cryptically and wrote numbers and letters on a piece of paper using rough code (JA5444;JA6193-6201;JA2313-21). By this coded discussion, defendant solicited an 18-20% ownership interest in W2-IBBS for his children: "[T]his 'C' is like for children. I wouldn't show up in there. I make a deal for my children. It wouldn't be me" (JA6195;JA5444;JA2313-21).[14] Three days later, defendant again upped his bribe demand, faxing Mody a document in which he described the "Original Deal" as a 7% ownership interest in Mody's company and the new "Deal for Discussion" as a 30% ownership interest (JA2328-30;JA5445). Defendant identified "Global" as the recipient of this interest (JA5445), which he later explained was Global Energy and Environmental Services, a company held in the name of his five daughters (JA6205;JA2380-83). Defendant and Mody also discussed pursuing similar iGate deals in Ghana and other West African countries (JA2333;GEX107-1;JA2401). During several of his meetings with Mody, defendant also brought up projected earnings, which forecast Global receiving over $145 million dollars within the first five years of the iGate/W2-IBBS venture in Nigeria (JA2415-16;JA2773-74;JA5627;GEX3-51G).

---

[14] During the awkward note-writing process, defendant laughed and said "[a]ll these damn notes we're writing to each other as if we thought. . . the FBI's watching us" (JA2321;GEX106-6).

And to earn this $145 million dollars, defendant understood that he was expected to perform official acts for the benefit and success of the iGate/W2-IBBS venture. Accordingly, in the summer of 2005, defendant prepared and sent congressional correspondence as well as participated in meetings with U.S. and foreign government officials to ensure that the telecommunications ventures in Nigeria and Ghana would get the foreign government approvals and Ex-Im Bank financing necessary for success. For example, when defendant learned that Rosecom's Yahyah was having trouble securing vital right-of-way agreements[15], defendant, through official correspondence, reached out to VP Abubakar and asked him to support the joint venture's request for access to NITEL's infrastructure, noting that it "would be a huge step forward on building a stronger reputation for the business climate in Nigeria, bring great benefits to the Nigerian economy, and bring an extraordinary amount of recurring revenue to NITEL" (JA726-31;JA2589-90;JA2597;JA6031-33;JA6012-14;GEX112-4;GEX144-1).

Around that time, defendant was also preparing to lead an early-July official trade delegation to Ghana for the purpose of acquiring the necessary government authorizations for the telecommunications project with IBBS, Mody's new company in Ghana (JA6239-40;JA6244).[16] The defendant assigned his legislative assistant, Angelle Kwemo, to assist with the preparations for the official delegation (JA3207-8). These items included, contacting the U.S. Department of

---

[15]  In May 2005, Yahyah spoke with Lori Mody over the telephone: "you, Congressman, and Vernon, and everybody comes into Nigeria before the end of this month . . .and we meet all the political, we'll meet the president, we'll meet the ministers, we'll meet the two executives, and we'll close this deal on the political basis without any go back and forth. I mean, that's the way it works in Nigeria, and you have to use all your muscle and all your leverage, you know. . . .It's like killing an ant with a sledgehammer" (JA2290-91; GEX105-3).

[16]  Before departing on the delegation, defendant had legislative assistant, Angelle Kwemo, contact the U.S. Embassy in Ghana, the State Department, and the Ghanaian Embassy in the U.S. to get visas for the participants and arrange meetings with the President, Communications Minister, and other high-ranking officials (JA3206-31;JA2027-33).

State to inform them of the upcoming delegation; and contacting the Ghanaian Embassy in Washington, D.C. in order to deliver (after preparing) the visa applications of the delegation members (JA3207-19).  In her June 27, 2005 email to the State Department, Kwemo outlined the purpose of delegation – that the Congressman was "leading a delegation of six American[s]" to pursue the establishment of a high speed internet project and that the congressman hoped to meet "with the officials who might be involved in the decision to permit [the] investment" (JA6119-20).  The itinerary for the delegation included meetings with the Deputy Chief of Mission, U.S. Embassy; Vice President of Ghana, and other Ministers in the Ghanaian communications sector (JA5544-46).  Four specific objectives were listed, each of which required the approval of Ghanaian government officials for iGate's technology to be successfully deployed in Ghana (JA5544-46).

When in late June, Mody called defendant to discuss the specific agreements and approvals she expected him to obtain from government officials in Ghana and Nigeria, defendant said, "I'm gonna give it a thousand percent as you, as you might imagine I will.  I'm gonna try my very best to ah, ah, deliver for you and not disappoint you" (JA2559-63;JA6249-51).[17]

Meanwhile, defendant was growing apprehensive about Jackson.  For example, when Jackson indicated he thought Mody should be replaced by another investor, defendant warned Jackson about how that might lead to a lawsuit, angrily adding, "[w]e've got to do this shit right. . . otherwise, we're going to all be in the goddamn pokey somewhere" (JA783-84;GEX144-2).

---

[17] Mody met with defendant on June 24, 2005 to discuss the upcoming delegation to Ghana.  "Mody: Do we have an itinerary yet? Jefferson: I am working on one with the Ambassador . . . I asked him to meet with me, with the President, with the Minister of Communications, with the Director of . . . Ghana Telecom, this and any other official person in the chain of decision.  I told him the decisions that need to be made" (JA2529-30).

At another point, defendant remarked to Mody about Jackson, "I'm not going to let him let me use my good offices, whatever they are . . . and then blow it up" (JA6222-24).  Indeed, apparently because of these concerns about Jackson, defendant asked Mody to "financ[e his] acquisition" of iGate *via* ANJ (JA6236-38;JA2500-02;JA2556).  Ultimately, in late-June 2005, Mody agreed to contribute $3.5 million to the capital of ANJ to support defendant's takeover of iGate and, in return, defendant agreed to "keep grinding away" at getting "signed written agreements from Nigeria" and "from Ghana" (JA2551-53;GEX114-5;JA5519-46;JA2561).[18]

In early-July 2005, using his official passport, defendant led the delegation to Ghana with Pfeffer, Eddie Kufuor (the Ghanaian President's son), an iGate representative, Torey Bullock (defendant's son-in-law), and staffer Kwemo (JA2032-34;JA5878).  During the next four days, in order to secure the agreements necessary for the telecommunications venture, defendant met with high-ranking Ghanaian officials, including the Vice-President, the Minister of Communications, the Minister of Energy, and the Chairman of the National Communications Authority, which was the government entity that regulated communications in Ghana (JA5594-95;JA2039-54).  At these meetings, defendant described "what he was doing in Congress" and how the proposed iGate/IBBS venture would "help the government and business and their constituency" (JA2039-40;JA2048-54;JA2653-61;JA2666-67).[19]  After returning from Ghana,

---

[18]  Before leaving for Ghana, defendant asked Mody to send ANJ an additional $30,000 for one of iGate's employees (GEX116-10).  At the FBI's direction, Mody wired the $59,200 and the $30,000 to ANJ, which forwarded the money to iGate in three separate transactions (GEX34-5;GEX31-125;GEX30-72;GEX30-79;GEX30-81).  These formed the basis for defendant's money-laundering convictions.

[19]  While Pfeffer was in Ghana, he provided regular email reports to Mody (JA5596-5603), but when defendant found out about these emails, he cautioned Pfeffer to "be careful," noting that was how "Jack Abramoff got in trouble, because of what he was writing in e-mails" (JA2045-46;JA2058-59).

defendant and Kwemo filed travel disclosure forms certifying the trip was in connection with

their respective duties as a Member and employee of the U.S. House of Representatives

(JA6174-75;JA3269-74).  Defendant also turned his attention to securing Ex-Im Bank financing

for the Nigerian venture, explaining to Mody that they needed to arrange a meeting with Ex-Im

Bank's new Director, Joseph Grandmaison, and get any W2-IBBS loan application "get the gears

moving with the regular people over there . . . on a fast track to get it moving" (JA2663-

65;GEX118-1).  Defendant accompanied Mody and Pfeffer to this meeting to show

congressional interest and support for the loan guarantees (JA2059-67;JA2068;JA2676).  At this

meeting, Director Grandmaison also asked defendant to speak with Ex-Im Bank's Credit

Committee to convince it to approve a separate Nigeria-project loan that Grandmaison believed

the committee might reject (JA2060-69;GEX119-1A).  Defendant agreed, and later described to

Mody what he had said to the committee members:

> I say, "I'm William Jefferson," . . . "I'm on the Nigerian Caucus."
> I tell them all it's very important, just like that.  So, I tell them that
> we're very concerned about the slowdown in Nigerian approvals  .
> . . "It's a big, big problem for us". . . and Ex-Im is very important
> to Nigeria.

(JA6287;JA2748-49).  Pfeffer considered this significant because if defendant "could get a

project that we had no interest in . . . approved, certainly he could get our project approved"

(JA2069).

In late July, defendant instructed Mody to make several wire transfers totaling nearly

$9 million to different bank accounts - all of which were controlled by his family members

(JA5631-32;JA2795-2800;JA2808-14).  The money was to be divided between start-up costs for

the Nigerian and Ghanaian projects, operating costs for Multimedia (a company defendant had

formed to substitute for iGate), and $1 million to be reserved for "other project costs," which was

code for bribes to foreign government officials (JA5631-32;JA2769-81;JA2808-14; GEX14-1).[20] One such bribe payment had, by that time, already been decided upon.

     *(iii)   Defendant's Bribe to the Nigerian VP*

When it seemed the W2-IBBS/iGate venture might not get access to NITEL's infrastructure, defendant devised a plan to bribe Nigerian government officials.  As early as April 2005, defendant explained to Mody that VP Abubakar, whom he described as "really corrupt," could ensure the venture's success for a percentage of the proceeds (JA6183-89), but that they would not need to bring Abubakar's "hands into the pot" if Yahyah could secure NITEL's cooperation (JA6190-91).

And, indeed, when problems arose with NITEL in June 2005 (JA695-735;GEX140-1;GEX144-1), defendant told Mody they would have to pay a bribe to get VP Abubakar's assistance (JA6226;JA6241-43).  Defendant thereafter sent Abubakar a letter on congressional letterhead asking for his assistance in securing NITEL approvals (JA6031-33).  Defendant also enclosed iGate/W2-IBBS financial projections - estimating a five-year $717 million cash flow - so that Abubakar could "salivate over what opportunities [were] there" (JA6030-68;JA6247).

On July 18, 2005, defendant and VP Abubakar had a private meeting at the VP's Maryland home (JA2707-16;JA2729;JA6275-78;GEX121-4;GEX121-5).  Following this meeting, defendant explained to Mody they had "a deal" whereby VP Abubakar would intercede with NITEL on their behalf (JA2726-32;JA2751-58;JA6289-91;GEX122-1;GEX122-2).  In return, they would pay the VP a "goodwill" "front-end" payment of $500,000 and a "back-end" payment of 50% of Rosecom's share of the joint venture (JA2752-57;JA6289-91).  They agreed

---

[20]  These transfers never took place as the FBI executed multiple search warrants and conducted a series of interviews in early-August 2005 (JA2849-50).

to make a partial up-front payment to VP Abubakar before he left the U.S., and on July 30, 2005, Mody delivered $100,000 in cash to defendant for this purpose (JA6303-08;JA2792;JA2815-18). Defendant, however, was unable to deliver the cash before the VP left the country, and on August 5th, FBI agents found $90,000 of this cash concealed in defendant's freezer (JA2836-37;JA6309-10;JA2822; JA5937-49;JA3240-61).[21]

C.    The Count Two Bribe Schemes

During this same 2000-2005 period, defendant pursued numerous other bribe schemes:

(i)    Sugar Plant

In Fall 2000, Arkel, a Louisiana company, was pursuing a sugar-plant feasibility study and construction contract in Jigawa State, Nigeria worth $100-$150 million (JA2977-78;JA2992-94;JA2997).  To advance these efforts, Arkel's President, George Knost, turned to the defendant for help (JA2982-83).  Knost met with defendant, defendant's brother (Mose Jefferson), and the Governor of Jigawa State, as such a contract depended on the Governor's approval (JA2993-96). After defendant promoted Arkel to the Governor, defendant demanded of Knost . . . "You need to hire my brother, Mose, as a consultant . . . to handle this deal" (JA2995-97).  Knost understood that hiring Mose Jefferson was a "prerequisite requirement to getting the assistance" of the congressman (JA2997;JA3000-01;JA3011).  Accordingly, in late-January 2001, Arkel executed a contract to pay three to ten percent of the contract price to Mose Jefferson's nominee company, Providence Lake (JA3013-17;JA3715-16;JA5664-67).  Knost never expected Mose Jefferson to do any work for Arkel, and Mose never did (JA3021;JA3038 39;JA3731;JA3749; JA3762-63;JA3769-79).  But Knost counted on the defendant to get the deal approved:

---

[21] Defendant admitted in closing arguments that the cash found in the freezer was a "toxic fact. I acknowledge to you, the public, they're not going to want to walk away from that" (JA5062).

> Q.   Now, was the contract for the construction of a sugar
>       plant in J[i]gawa State, Nigeria, dependent upon the approval
>       of government officials in Nigeria?
>
> A.   It was. . .
>
> Q.   And were you counting on Congressman Jefferson to
>       assist you in getting that approval?
>
> A.   Yes, I was.

(JA2995-96).  Further, the defendant and his congressional staff assisted Arkel by securing visas

and invitation letters from Jigawa State officials and facilitating possible Ex-Im Bank funding

(JA5730-31;JA3021-30;JA3060-63;JA3620-24;JA3721-28).  Indeed, in February 2001,

defendant arranged a meeting at his congressional office among Ex-Im Bank Chairman and staff,

Arkel officials, the Governor of Jigawa State, defendant, and congressional staff.  The purpose of

the meeting was to find a way to structure Ex-Im Bank financing for the sugar plant (JA3621-

22;JA3632;JA3722-23;JA5685-86).  Defendant participated in this meeting as "an advocate for

his constituent" (Arkel) (JA3623;JA3645).  Subsequently, defendant arranged another meeting

so that Arkel representatives (along with defendant's congressional staff) could meet with Ex-Im

Bank's project-finance officers to discuss whether Ex-Im could "do this deal" and, if so, how to

structure it (JA3628;JA3632-35;JA3747-48;JA5685-86).  At this meeting, defendant's staff were

"advocating on behalf of Arkel Sugar" (JA3635).

Although Arkel never built the sugar plant, Arkel received payments totaling over

$533,000 from Jigawa State for its feasibility study (JA3763-77;JA6326).  Consistent with his

contract, Mose Jefferson received approximately $21,000 of that amount into an account that

was later used to pay defendant's daughter's $7,621 tuition bill and his wife's $8,593.73 credit

card bill (id.).

### (ii)   Marginal Oil Fields

In August 2001, defendant suggested Knost pursue a marginal oil field deal in Nigeria (JA3046-3048).  At a meeting among Knost, defendant, and Mose Jefferson, defendant discussed his "ability to be able to influence African leaders to be able to get Arkel in a position to be awarded marginal fields" (JA3050;JA3075-77).  Knost and defendant also discussed "that Mose would have to be compensated to get the Congressman's assistance" in exchange for defendant "deliver[ing] an oil field" through "his relationship" with the Governor of Akwa Ibom State, Victor Attah (JA3048;JA3050;JA3055;JA3075;JA3085-86;JA3089;JA3660).  On August 30, 2001, Knost signed an agreement whereby Arkel agreed to pay yet another Mose Jefferson nominee company (BEP) a bonus of no less than $200,000 per marginal oil field and a 1/6 interest in all revenue derived therefrom (JA3080-82;JA5750-53).  Once this contract was signed, defendant introduced Knost to Governor Attah and promoted Arkel in his capacity as a congressman (JA3085).  Had the oil fields been developed, they would have been "worth a lot of money" – "tens of millions of dollars" (JA3084).  Knost testified about his expectations once he agreed to pay the defendant's brother:

> Q.   What, if anything, did you expect of Congressman Jefferson in terms of this announcement that's coming up in Nigeria about the marginal oil field rights?
>
> A.   That through his relationship or capacity, with his status in Nigeria and his relationship with Governor Attah, that he'd be able to convince the governor that Arkel was the company to work with to get these marginal fields developed.

(JA3077-78;JA3050-51).

Ultimately, however, Knost could not pursue the development of any oil fields because of a business conflict (JA3087-90).  Nonetheless, Knost pitched the deal to John Melton, who later formed a Louisiana company (TDC-OL) to pursue the deal (JA3090-94;JA3488;JA3528).  Knost informed Melton of the bribe angle: "I told him that if he wanted to do this deal and get the marginal oil fields, that [Melton] had to enter into an agreement with Mose Jefferson, the . . . congressman's brother because the congressman delivered the relationships and the ability to get the deal done" (JA3093;JA3457-61;JA3464-66).

(iii)  *Fertilizer Plant*

Melton agreed to pursue the Marginal Oil Field and certain other Nigerian projects (JA3472-74).  Jim Creaghan was a Louisiana-lobbyist who acted as a "liaison" between Melton and defendant (JA3473-74).  In December 2001, a meeting was held among Melton, Creaghan, defendant, Mose Jefferson, and others to discuss an upcoming defendant-led trade delegation to Nigeria (JA3478-80).  Before the meeting started, Creaghan informed Melton that the "Congressman wants you to do a deal with his brother" (JA3481).  During the meeting, defendant looked to his brother and "indicated that we needed a deal for Mose before we go on this trip" (JA3484) in return for "[h]is assistance as a congressman" (JA3484).  Melton knew that defendant "was asking for a bribe" (JA3484;JA3994-95).  Following a moment of "dead silence," Melton agreed to draft an "engagement document for Mose" to present to defendant (JA3485;JA5788-89).  The day before defendant led the trade delegation to Nigeria, defendant called Melton (JA3489-90;JA3515).  Melton had prepared an agreement for BEP (Mose Jefferson's company), though this deal was less lucrative than the prior one offered by Knost (JA3494;JA5788-89;JA3496).  Melton understood the agreement's import:  "I was basically breaking the law and paying a bribe by giving this to the Congressman" (JA3495;JA3572-73).

22

When Melton proffered this less-lucrative bribe deal to defendant, defendant coldly declared, "This won't do" (JA3497-98). Fearing defendant would cancel the trade delegation to Nigeria, Melton promised him that Melton would maintain Mose Jefferson's interest in the Nigerian projects (JA3504). Defendant's mood immediately lightened, and he proposed that Melton pursue another project, a fertilizer plant in Akwa Ibom State with Governor Attah (JA3504-05). Melton knew that he had agreed "to pay a bribe" to defendant (JA3505).

Defendant's delegation traveled to Nigeria, where they received special treatment at the Lagos airport and were accompanied through security, immigration and customs, and ushered to black limousines and black Suburbans before being driven to another part of the airport in preparation for their next flight (JA3518-19). Once the delegation arrived in Abuja, the Capitol of Nigeria, the delegation met with U.S. Ambassador, the business attaché from the U.S. Embassy, and other Nigerian officials (JA3517-24;JA3996-4005;JA4013-14). Defendant arranged for Melton to meet with Governor Attah to discuss the fertilizer-plant project (JA3524-26). Following this meeting, Melton immediately received an Akwa Ibom government letter-of-intent to develop a fertilizer plant (JA3526-30).

Melton then sought funding for the fertilizer-plant project with the U.S. Trade and Development Agency (USTDA) (JA3534;JA4017-18).[22] Over the next several months, defendant and his staff actively advocated for Melton's USTDA financing hopes (JA3538-55;JA3925-57;JA4219-35;JA5793-96). Thomas Hardy was USTDA's Country Manager for the Sub-Saharan African Region at the time (JA3909). Hardy remarked that he had never before

_____

[22] USTDA is an independent, congressionally-funded U.S. foreign assistance agency located in Arlington, Virginia. 22 U.S.C. § 2421.

seen a congressional office as involved in the USTDA application process as defendant's was in

this matter (JA3946;JA5793).

> Q.   Now, in terms of active involvement with congressional
>       offices with a specific business project, in your
>       experience, was this typical?
>
> A.   This was not typical.
>
> Q.   What effect did this level of interest from
>       Congressman Jefferson['s] office have over the life of this
>       project with TDA?
>
> A.   It raised it to a much higher level. . . The director of [USTDA]
>       was aware of it on an ongoing basis.  Congressman Jefferson's
>       interest in seeing this project advance was noted by myself as
>       a country manager to the director as well the regional -- my
>       direct supervisor, the regional director.

(JA3929).  After USTDA had approved a $450,000 grant for the fertilizer-plant feasibility study,

the project hit a snag (JA3561-63;JA3948-55;JA5798-800).  Defendant thus set up a meeting in

September 2002 with Hardy, Melton, and Governor Attah (JA3556-58;JA3953-54).  At this

meeting, defendant "was there clearly representing his constituents" interest in trying to push

[Governor Attah] to move forward with finding some solution necessary to signing the contract

for the feasibility study to commence" (JA3956).  Over the next several months, defendant

continued to advocate on behalf of Melton to USTDA, including summoning USTDA officials to

his congressional office in July 2003 for a meeting with Governor Attah (JA5797).  Defendant

wanted an update on "where the project stood" and a sense of "what was going to need to happen

to move this project forward" because "it was of great importance to him to see this project move

forward" (JA3962-64;JA3973;3565-68).  The meeting was run by the defendant, who wanted to

know "What were the hold-ups in the project? Why hadn't it moved forward?  He asked

specifically for an update and what were [the] problems and what was going to need to happen to

move this project forward" (JA3964).  Hardy, the USTDA Country Manager, felt the pressure

from Congressman Jefferson:

> Q.   Were you nervous?
>
> A.   [A]ny time you are called up to a member's office, they
>       hold a certain sway over the Executive Branch, and to be
>       called up to address why the project was being held up,
>       certainly was not -- wasn't a comfortable feeling.

(JA3963-64).  The defendant's intervention caused USTDA to re-review the application and re-

approve the grant (JA3968-71).  Hardy testified about the important role the defendant's

insistence played on the USTDA decision:

> He had made it clear to us that we needed to continue
> to look at this, continue to work through, that it was an
> important -- it was of great importance to him to see this
> project move forward.  And in our analysis of that, while it didn't
> force us to make the decision, it certainly weighed heavily
> in our analysis. These are his constituents. He knows
> Africa, and he knows the constituents. He knows more than
> we do. We do our due diligence, and given what we have done
> and his promotion of this project that we should favorably
> look to that. And that was the recommendation I made.

(JA3973-74).  After the meeting with the defendant, the USTDA staff recommended and later,

the USTDA approved, a grant of $450,000 to TDC (JA5798-5800;GEX-6-77).  Ultimately,

however, despite defendant's great efforts, the feasibility study never took place because the

Akwa Ibom State could not come to a final contract on pricing with Melton's company – TDC

(JA3974;JA3569-70).

### *(iv)   Oil Drilling Rights*

In late 2001, Creaghan and Florida businesswoman Noreen Wilson approached

defendant to secure his assistance in resolving a dispute relating to highly lucrative oil drilling

rights off the coast of Sao Tome & Principe (JA4341-44;JA4363-64).  Defendant agreed to

discuss the matter with Wilson, but defendant told Creaghan that "his family would have to have an interest" (JA4028). Creaghan conveyed this to Wilson, who knew that any assistance from defendant meant that Mose Jefferson "would be involved in the transaction" (JA4346). Wilson understood she would be "[b]ribing" defendant so that he would "work with the government" of Sao Tome "to get the government to help solidify the settlement of the outstanding issues" (JA4346-47). In January 2002, Wilson suggested to Creaghan that Mose Jefferson's company be provided an oil block, which could be worth "hundreds of millions of dollars" (JA4355-61;JA4364;JA5802-03).

Ultimately, a deal was struck when defendant told Wilson "he was going to be able to help" as he had upcoming meetings scheduled with Sao Tome government officials (including the President) (JA4363-64;JA4034-35). Defendant simultaneously handed Wilson a copy of a signed agreement that provided yet another newly-created Mose Jefferson nominee company (PIPCO) with 25% percent of any income derived from a settlement of the drilling-rights dispute (JA4364-70;JA4035-39;JA5804-10;JA5807-09;GEX15-5). As Wilson understood, she "was bribing a congressman" (JA4370). Specifically, Wilson expected defendant would use "his political access to the president of Sao Tome . . . to see if a negotiated settlement" of the oil-rights dispute could be reached (JA4370-71;JA4039). Indeed, defendant later phoned Wilson from Sao Tome and told her that "they were there and they had meetings" (JA4374;JA4040). Defendant was ultimately unsuccessful in this endeavor, however, and defendant and his family never received the millions in bribe money he had sought (*id*.).[23]

---

[23]  Wilson also agreed to pay a bribe to defendant in 2005 when she sought his assistance in obtaining access to NASA officials on behalf of E'Prime Aerospace (JA4431-32). Like the other schemes, Wilson agreed to pay a commission on sales of E'Prime's satellite system to a company controlled by defendant  s family (JA4432-46). In return, defendant wrote a letter to NASA's Administrator on Congressional Black Caucus letterhead, identified himself as a

D.        The RICO Count

Defendant was also convicted of conducting a pattern of racketeering activity as charged in Count Sixteen.  Specifically, the jury found defendant operated his congressional office as a criminal enterprise (JA5193;JA227).  At trial, the government thus proved defendant's use of his congressional office to advance nine different bribe schemes (Racketeering Acts 1-6, 8, 10-11) and a series of money-laundering transactions (Racketeering Act 12).  Besides those discussed in Parts B and C of this brief, the government proved two additional bribe schemes as part of Count 16:  First, defendant solicited bribes from Noah Samara, a founder of a satellite company called WorldSpace in return for promoting WorldSpace to various high-ranking government officials in Africa (JA3347; JA3357-69;JA3400-02;JA5867).  Samara testified that he felt that the defendant would "assist Worldspace in securing contracts in Botswana, Equatorial Guinea, and the Republic of Congo" (JA3426).  Defendant proposed benefits from this scheme should be funneled through ANJ (JA3421-22;JA5867).  Second, defendant solicited bribes from Samara in return for defendant's efforts to secure an oil concession from the President of Equatorial Guinea (JA3374-77;JA3384-94;JA3435-37;JA5860-63).  As Samara recalled about the defendant: "[h]e had discussions with the President . . . he suggested if I wanted an oil concession . . . he could recommend me to the President of Equatorial Guinea" (JA3374-75).  Defendant proposed that benefits from this scheme would be provided to defendant's daughter (JA3435-36).

Member of Congress, and asked NASA to give "close consideration of E'Prime Aerospace" (JA4437-42;JA5876).  This scheme was presented as "other crimes" evidence as it was interrupted by the FBI's execution of search warrants in early-August 2005.  In addition, there was evidence supporting two other bribery schemes charged in Count Two (involving a factory in Kaduna State and the promotion of "Biospheres" in West Africa) but such evidence is not repeated here because the jury found these schemes "not proven" (JA228).

All told, defendant's bribery-focused criminal conduct resulted in defendant and his family receiving:  $449,300 (through ANJ); approximately $21,000 (through BEP); 30.7 million shares of iGate stock (issued to ANJ); 1.5 million shares of W2-IBBS stock (issued to Global); and 1.5 million shares of IBBS stock (issued to Global) (Dkt. 555).

## PROCEDURAL BACKGROUND

A.    Pre-Trial Rulings Concerning the Meaning of "Official Act"

Prior to trial, defendant moved to dismiss the bribery-related counts in the indictment, claiming that the statutory definition of the term "official act" should be limited, in the context of a member of congress, to only those "decisions or actions [that] include sponsoring or voting for particular pieces of legislation, authorizing appropriations, earmarks, or private bills, initiating hearings or investigations, or exercising any of the powers set forth in Article I, Section 8 of the Constitution." Dkt. 23, p.9.  The government opposed the motion to dismiss, citing to *United States v. Biaggi*, 853 F.2d 89, 97 (2d Cir. 1988), in which the Second Circuit flatly rejected the same argument – "Biaggi's suggestion that a congressman's only 'official act[s]' within the meaning of § 201 are acts in the legislative process itself is untenable." *Id*. at 11.  The government also cited to the "settled practice" standard first enunciated by the Supreme Court in *United States v. Birdsall*, 233 U.S. 223 (1914).  The defendant opposed the *Birdsall* standard and claimed that "even if *Birdsall* has some continuing vitality, the official action involved must fall within the category of a "duty" or a "requirement." Dkt. 358 at 6.

The Court issued two decisions addressing the meaning of "official act."  In the first, the Court denied the defendant's motion and explained that the phrase "official act" had been interpreted to avoid the risk that it would "apply to any action taken by a public official acting in his official capacity."  *United States v. Jefferson*, 562 F. Supp. 2d 687, 691 (E.D. Va. 2008).  Rather, "the act must be among the official duties or among the settled customary practices of

the official charged." *Id*.  In the second decision, the Court (i) denied the Defendant's motion for reconsideration of that earlier ruling; (ii) granted the United States' motion for clarification, and (iii) addressed the parties' dispute at the time over the proper jury instruction on what constitutes an "official act."  *United States v. Jefferson*, 634 F. Supp. 2d 595 (E.D. Va. 2009).  The Defendant had explicitly objected "to any [jury] instruction that amends or elaborates upon the definition [of "official act"] set forth in . . . § 201(a)(3)."  *Id*. at 599.  The Government sought an instruction that would express the *Birdsall* "settled practice" principle. *Id.*  As is relevant here, the Court rejected the defendant's positions: (1) that the jury should be instructed solely on the statutory definition contained in Section 201(a)(3); and (2) the defendant's proposal to limit the definition of "official acts" "to so-called 'legislative acts' such as voting on or introducing . . . legislation."  *Id*. at 602.  Rather, the Court decided, the United States could meet its burden "by showing that defendant's action (of exerting his influence in person or by written correspondence) was on a question, matter, cause, suit, proceeding or controversy (such as the question of how various federal agencies allocate funds, the question of how embassies handle visa requests, or the matter of how the Nigerian government pursues business development in Nigeria) that may at any time be pending before a member of Congress for advice or recommendation as a matter of custom and settled practice."  *Id*. at 604.[24]

---

24 The Court further explained: "it is also settled that the charged public official need not have authority to make a final decision or take binding action on the "question, matter," *etc.,* at issue.  Rather, § 201(a)(3) "cover[s] any situation in which the advice or recommendation of a [public official] would be influential, irrespective of the [official]'s specific authority (or lack of same) to make a binding decision." *United States v. Carson,* 464 F.2d at 433 (citations omitted)." *United States v. Jefferson*, 634 F. Supp. 2d 595, 602 (E.D. Va. 2009), *aff'd,* 674 F.3d 332 (4th Cir. 2012), *as amended* (Mar. 29, 2012).

B.        Defendant's Rule 29 Motion and Position on Jury Instructions

In his Rule 29 Motion, the defendant maintained his opposition to the Court's May

2009 decision to provide both the "settled practice" instruction alongside the statutory definition

of "official act." Dkt. 526.  Defendant claimed that the Supreme Court's decision in *United*

*States v. Sun-Diamond Growers of California*, 526 U.S. 398 (1999) foreclosed the Court's ability

to give the "settled practice" jury instruction. Dkt. 526 at 2.  The defendant further argued that

even if *Birdsall* survived *Sun Diamond*, an "official act" could only include those things that

were a "requirement" or "duty" of the position. Dkt. 526 at 2.  While arguing the Rule 29

Motion, the defendant did make one significant concession:

> We agree there has been testimony that constituent service can be
> an official act, that intervening with United States Government
> agencies on behalf of people that live in your district falls within
> the duties of a Congressman and there is evidence in the record to
> support that. There is evidence in the record that members can do
> that for people who live outside their district[.]

JA4662.  When it came to the jury instructions, the defendant did not mince words on the

definition of "official act:" "*Mr. Jefferson opposes the use of any instruction that amends or*

*elaborates upon the definition set forth in 18 U.S.C. § 201(a)(3).*" (emphasis added.) Dkt. 358 at

2.  The defendant also renewed his objection to the *Birdsall* "settled practice" instruction: "[the

Court] should reject the government's proposed jury instruction *in favor of an instruction*

*tracking the language of the statute*." (emphasis added).  Dkt. 358 at 12.  The defendant's

submission of proposed jury instructions matched his arguments:  Only one instruction was

proposed to define "official act" – the definition contained in § 201(a)(3).  Dkt. 404-1 at 74.[25]

---

25 The defendant also proposed a jury instruction that limited bribery to the defendant
being influenced in the defendant's "own performance of an official act."  Dkt. 404-1 at 75.

C.      The Defendant's Direct Appeal

On appeal, the Defendant objected to the *Birdsall* "gloss to the statutory definition of the term [official act]" and argued that it had been improper to include the "settled practice" instruction.  (*United States v. Jefferson*, No. 09-5130, 4th Cir. Ct. App. Dkt. 74 (Nov. 15, 2010) at 14).  The defendant argued that an "official act" "must concern a question resolvable through the formal *legislative* process, or, at most . . . resolvable through a *governmental* process."  (*Id.* (emphasis in original).)[26]

The Fourth Circuit rejected the proposition "that *Sun-Diamond* supersedes *Birdsall*."  *Id.* at 356.  The court noted that the evidence at trial showed that the Defendant performed various "official acts" in exchange for receiving favors and gifts, and held that this Court's instruction was "entirely consistent with the *Birdsall* principle" and "simply explained to the jury that an official act need not be prescribed by statute, but rather may include acts that a congressman customarily performs, even if the act falls outside the formal legislative process."  *Id.* at 356-57.  The Fourth Circuit further held that even if the "settled practice" instruction had been incorrect, the error was harmless because the defendant had been tried "under both 'settled practice' and 'pending question' theories."  *Id.*  Accordingly, "the jury was free to find, first of all, that performing constituent services was a settled official practice of Jefferson's congressional office and, second, that African trade issues were 'matters' or 'causes' that were pending before him" and, in turn, to "conclude that Jefferson's actions in connection with both constituent requests

---

26 The defendant cited to *Valdes v. United States*, 475 F.3d 1319 (D.C. Cir. 2007)(*en banc*)(*Valdes* also held that "the [bribery] statute easily covers . . . a congressman's use of his office to secure Navy contracts for a ship repair firm, as in [*Biaggi*]." *Id*. at 1325.)

and the promotion of trade in Africa fall under the umbrella of his 'official acts.'" *Id.* at 357-58, *See also*, n. 39.[27]

D.    The Supreme Court's Decision in *McDonnell*

On June 27, 2016, the Supreme Court vacated the conviction of former Governor Bob McDonnell on charges of honest services fraud and Hobbs act extortion on the basis that the jury instructions in that case "lacked important qualifications" as to the term "official action."  136 S. Ct. at 2374.  The underlying facts involved McDonnell's receipt of payments and other benefits from a Virginia businessman, Jonnie Williams, who wanted Virginia's public universities to perform research studies on the efficacy of Anatabloc, a nutritional supplement derived from tobacco.  *Id.* at 2357.

The Jury Instructions in *McDonnell*

After first providing the statutory definition of the term, the *McDonnell* instruction explained (as this Court did) that an "official act" "includes those actions that have been clearly established by settled practice as part of a public official's position, even if the action was not taken pursuant to responsibilities explicitly assigned by law."  *United States v. McDonnell*, 792 F.3d 478, 505-06 (4th Cir. 2015).  On appeal to the Supreme Court, McDonnell explained that "[f]ar from contesting that principle, [his] proposed jury instructions highlighted that official acts *may* include 'settled practice[s],'" but *McDonnell* took issue with the suggestion that "every action within the range of official duties *automatically* is 'official.'"  *United States v. McDonnell*, No. 15-474, 2016 WL 1496878 (Apr. 13, 2016), at 6-7.

---

[27] The Defendant's petition for a writ of certiorari was denied.  *Jefferson v. United States*, 133 S. Ct. 648 (2012).

In the district court, Governor McDonnell proposed several instructions which would have limited the reach of "official act," such as:  (1) the "fact that an activity is a routine activity, or a 'settled practice,' of an office-holder does not alone make it an 'official act;'" (2) "merely arranging a meeting, attending an event, hosting a reception, or making a speech are not, standing alone, 'official acts,' even if they are settled practices of the official," because they "are not decisions on matters pending before the government;" and (3) that an "official act" must intend to or "in fact influence a specific official decision the government actually makes—such as awarding a contract, hiring a government employee, issuing a license, passing a law, or implementing a regulation." *McDonnell*, 136 S. Ct. 2355 at 2366.  The district court declined to give McDonnell's proposed instructions to the jury.  *Id*.

Citing three specific flaws, the Supreme Court agreed with McDonnell's argument that the district court's instructions lacked "meaningful limits on 'official act.'" 136 S. Ct. at 2373. *First*, the Supreme Court found that the district court did not adequately explain to the jury how to identify the 'question, matter, cause, suit, proceeding or controversy'" 136 S. Ct. at 2374.  The *McDonnell* decision emphasized that the jury must be required to "identify a 'question, matter, cause, suit, proceeding or controversy' involving the formal exercise of governmental power." *Id.  Second*, "the District Court should have instructed the jury that the pertinent 'question, matter, cause, suit, proceeding or controversy' must be something specific and focused that is 'pending' or 'may by law be brought before any 'public official,' such as the question whether to initiate the research studies." *Id*.  Finally, the Supreme Court held that "the District Court should have instructed the jury that merely arranging a meeting or hosting an event to discuss a matter does not count as a decision or action on that matter."  *Id*.

The Supreme Court explained that its decision in *Sun-Diamond* made it "apparent . . . that hosting an event, meeting with other officials, or speaking with interested parties is not, standing alone, a 'decision or action' within the meaning of § 201(a)(3)." *Id.* at 2370.  Nevertheless, "setting up a meeting, hosting an event, or making a phone call is [not] always an innocent act, or . . . irrelevant," because "[a] jury could conclude, for example, that the official was attempting to pressure or advise another official on a pending matter," which would be illegal.  *Id.* at 2371.

The Supreme Court also clarified that the official involved in the bribery scheme need not have control over the outcome of the question or matter—rather, the matter may be pending before "any public official."  *Id.* at 2369.  The bribed official can take "action on" the matter "by using his official position to exert pressure on *another* official" or by advising another official to take action, "knowing or intending that such advice will form the basis for an 'official act' by another official."  *Id.* at 2370 (emphasis in original).

Finally, the Supreme Court reaffirmed its holding in *Birdsall*—that an "'official action' could be established by custom rather than 'by statute' or 'a written rule or regulation,' and need not be a formal part of an official's decision making process"—as "fully consistent with our reading of § 201(a)(3)."  *Id.* at 2371.  *McDonnell* clarified that *Birdsall* "does not mean, however, that every decision or action customarily performed by a public official . . . counts as an 'official act.'" *Id.*[28]

## ARGUMENT

Defendants bear the burden of showing their entitlement to relief on collateral review. *United States v. Pettiford*, 612 F.3d 270, 277 (4th Cir. 2010); *Miller v. United States*, 261 F.2d

---

[28] *McDonnell's* limitation on the "settled practice" instruction is consistent with this Court's ruling in the defendant's case and the Fourth Circuit reviewing defendant's appeal. *Jefferson*, 674 F.3d at 336-37 and 356.

546, 547 (4th Cir. 1958).  In order to prevail on collateral review, a defendant "must clear a significantly higher hurdle than would exist on direct appeal."  *Frady*, 456 U.S. at 166.

## I.     The Defendant's Claim Is Procedurally Defaulted

"[T]o obtain collateral relief based on trial errors to which no contemporaneous objection was made, a convicted defendant must show both (1) "cause" excusing his double procedural default, *and* (2) "actual prejudice" resulting from the errors of which he complains."  456 U.S. at 167-68. (emphasis added).  Alternatively, the defendant must establish by "clear and convincing evidence" that he is "actually innocent."  *Bousley v. United States,* 523 U.S. 614, 624 (1998); *United States v. Mikalajunas*, 186 F.3d 490, 493 (4th Cir. 1999).

The defendant will not be able satisfy any of these requirements.

### A.     The Defendant Did Not Raise the Challenge Asserted in *McDonnell*

The defendant claims that his conviction should be vacated "because the instructions in this case were erroneous for the same reasons . . . enunciated in *McDonnell*."  Br. at 1.

But, defendant Jefferson did not raise, in the district court, or on direct appeal, any of the errors claimed by Governor McDonnell or found by the Supreme Court in the *McDonnell* decision.  For instance, Governor McDonnell proposed several instructions which would have limited the reach of "official act" and the district court declined to give those instructions to the jury in that case.  *McDonnell*, 136 S. Ct. 2355 at 2366.  The Supreme Court held that the district court's instructions to the jury were erroneous because they lacked important qualifications. *McDonnell*, 136 S. Ct. 2355 at 2374.

In stark contrast to Governor McDonnell's case, defendant Jefferson affirmatively sought to prevent "*any instruction that amends or elaborates upon the [official act] definition set forth in 18 U.S.C. § 201(a)(3).*" (emphasis added.) Dkt. 358 at 2.  Moreover, defendant Jefferson claimed that the "settled practice" instruction was given in error, a position rejected by

*McDonnell*.  Pursuant to *McDonnell,* the "settled practice" instruction was "fully consistent with our reading of § 201(a)(3)."  136 S. Ct. at 2371.  Defendant also proposed a jury instruction that limited bribery to being influenced in the defendant's "own performance of an official act."  Dkt. 404-1 at 75.  *McDonnell* rejected this argument as well – "A public official may also make a decision or take an action by using his official position to exert pressure on *another* official to perform an "official act." 136 S. Ct. at 2359.

Defendant Jefferson failed to raise, in the district court or on appeal, any of the errors outlined in *McDonnell*.  Accordingly, the defendant's claim on collateral review is in procedural default and should be denied.[29]

> Orderly procedure requires that the respective adversaries' views as to how the jury should be instructed be presented to the trial judge in time to enable him to deliver an accurate charge and to minimize the risk of committing reversible error. It is the rare case in which an improper instruction will justify reversal of a criminal conviction when no objection has been made in the trial court.

*Frady*, 456 U.S. at 165-66.

B.     The Defendant Has Not Shown Cause for or
       <u>"Actual Prejudice" Resulting from His Procedural Default</u>

*(i) The Defendant Has Failed to Demonstrate Cause*

The existence of cause for a procedural default must turn on something external to the defense, such as a denial of effective assistance of counsel or novelty of the claim.  *United States v. Mikalajunas*, 186 F.3d 490, 493 (4th Cir. 1999).  The Defendant does not claim ineffective

---

[29] The Defendant's failure to raise any of the *McDonnell* errors in his own trial or on direct appeal also amounts to a waiver under Fed. R. Crim. P. 30.  Rule 30 provides: "A party who objects to any portion of the instructions or to a failure to give a requested instruction must inform the court of the specific objection and the grounds for the objection before the jury retires to deliberate. . . Failure to object in accordance with this rule precludes appellate review, except as permitted under Rule 52(b)."  Under *Frady* though, the "plain error" standard contained in Fed. R. Crim. P. 52(b) "is out of place when a prisoner launches a collateral attack against a criminal conviction . . . after affirmance of the appeal upon conviction." 456 U.S. at 164.

36

assistance of counsel, and he has failed to demonstrate that the theory adopted in *McDonnell* was—as the Supreme Court has required—"'so novel that its legal basis [was] not reasonably available to counsel.'"  *Bousley*, 523 U.S. at 622 (citing *Reed v. Ross,* 468 U.S. 1, 16 (1984)).

Indeed, *McDonnell's* central holding was explicitly premised on its earlier decision in *Sun-Diamond*, which made it "apparent . . .  that hosting an event, meeting with other officials, or speaking with interested parties is not, standing alone, a 'decision or action' within the meaning of § 201(a)(3)." 136 S. Ct. at 2370.  *See also United States v. Loftus*, 992 F.2d 793, 796 (8th Cir. 1993) (stating, in the context of Hobbs Act extortion claim, that a "promise[] only" to make an introduction "to influential persons" is not equivalent to a "promise to use [an] official position to influence other persons").  The Defendant cited *Sun-Diamond* on appeal, but he argued that it stood for a different proposition—that the decision foreclosed the use of the "settled practice" instruction.  However, *McDonnell* made clear that "*Birdsall* is fully consistent with our reading of § 201(a)(3)." 136 S. Ct. at 2371.

*(ii) The Defendant Has Failed to Demonstrate Actual Prejudice*

When a defendant challenges a jury instruction on collateral review, the degree of prejudice a defendant must show before prevailing is assessed by determining "whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process, not merely whether the instruction is undesirable, erroneous, or even universally condemned." *Frady*, 456 U.S. at 169.  The degree of prejudice must "evaluated in the total context of the events at trial"—because "[a] single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge," and because a conviction is "the culmination of a trial which includes testimony of witnesses, argument of counsel, [and] receipt of exhibits in evidence" in addition to the jury charge.  *Id*.; *see also United States v. Ellis*, 91 F.3d 135 (4th Cir. 1996).  To put it another way, defendant Jefferson "must

shoulder the burden of showing, not merely that the errors at his trial created a *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Frady*, 456 U.S. at 170.

The defendant cannot show actual prejudice.

First, the defendant cannot show actual prejudice from the *McDonnell* errors at his trial because the defendant affirmatively stated that he "*opposes the use of any instruction that amends or elaborates upon the definition set forth in 18 U.S.C. § 201(a)(3).*" (emphasis added). Dkt. 358 at 2. The defendant also opposed the *Birdsall* "settled practice" instruction, which was upheld by *McDonnell*. 136 S. Ct. at 2371. Since defendant did not seek any of the limiting instructions sought by Governor McDonnell, defendant was not prejudiced in the way he defended himself at trial. In fact, nothing prevented the defendant from making his arguments to the jury despite the *McDonnell* errors. *United States v. Clarke*, 842 F.3d 288, 296 (4th Cir. 2016)(defendant failed to demonstrate actual prejudice due, in part, to his ability to make all arguments essential to his case).[30] Indeed, defendant's trial strategy seemed to include an effort to limit "official acts" for a congressman to "legislative acts" only, so that the government would be prevented by the Speech or Debate Clause as to the evidence it could use at trial. U.S. Const. art. I, § 6, cl. 1. *See also*, *United States v. Jefferson*, 546 F.3d 300 (4th Cir. 2008)(defendant's interlocutory appeal claiming Speech or Debate Clause materials prejudiced the grand jury).

---

30 Defendant's counsel in closing arguments: "Using letterhead and using staff does not, in and of itself, make something an official act" (JA5005); "[H]e is not someone who threw his weight around in all of [the] meetings with the government officials." (JA5067); "William Jefferson had a good faith understanding that if he did not legislate about these matters, that that was on the right side of the line" (JA5048); and Arguing that legislation, earmarks, and voting are "official acts" within the definition of "official acts" (JA5002-7).

Next, the evidence presented at defendant's trial was overwhelming and demonstrated that the defendant was properly found guilty of exchanging a "course of conduct of things of value" in return for a "pattern of official actions" (JA4907). These actions furthered at least nine different bribe schemes (JA4907;JA68-161;JA225-28). Evidence of defendant's decisions to lead official trade delegations to West Africa and the defendant's pressure and advice aimed at both U.S. and foreign governmental officials on behalf of U.S. business persons was equally strong.

For instance, *McDonnell* requires that a jury be instructed to identify a "question" or "matter" involving the "formal exercise of governmental power" which is "more specific and focused" than a "broad policy objective." 136 S. Ct. at 2374. *McDonnell* even provided an example – "such as the question whether to initiate the research studies." *Id. See also infra*, discussion of defendant's pressure/advice to influence the U.S. Army's decision to test iGate's product at the Army's testing center at Fort Huachuca). Indeed, defendant's ability to impact the formal exercise of government power went to the heart of why business persons agreed to pay the bribes to the defendant in the first place. Put simply, the bribe payers' business objectives would not succeed without the government approvals. These included the "questions" or "matters" of whether: (1) the U.S. Army should admit iGate's product into its Technology Integration Center at Fort Huachuca for testing; (2) the U.S. Army should purchase or lease iGate's technology; (3) the Ex-Im Bank should provide financing; (4) the USTDA should provide grants and/or financing; (5) the defendant should lead Trade Delegations to West African countries; (6) the U.S. or foreign embassies should issue visa requests; and (7) the defendant should promote U.S. companies to high-ranking officials in West Africa.[31]

---

[31] Although the indictment was not sent to the jury for deliberation, this list of

The evidence also established that the defendant made "decisions" and/or took "actions" for the purpose of influencing these "questions" or "matters."  All told, there was no "actual prejudice" to the defendant because the "official acts" that were the basis of the defendant's convictions seven years ago would result in same convictions following the *McDonnell* decision in 2016.  For each count of conviction, the evidence showed that the defendant performed "official acts" on his own and/or exerted pressure on other officials and/or provided advice to other officials, knowing such advice or pressure would form the basis of "official acts" performed by other government officials. *McDonnell*, 136 S. Ct. 2371.  A brief summary of the defendant's counts of convictions and the basis for the official acts performed by the defendant are outlined by bribe scheme or group of bribe schemes as follows:

**(a)  iGate/ NDTV / Mody W2 Companies**: (Counts 1, 3, 4, 6, 7, 12-14, and 16: Acts 1, 2, 3, 12).  Defendant sought to pressure/advise: **General Hylton** (US Army) to initiate testing of iGate technology at TIC (JA849-53;JA358-63;JA855-61); **Colonel Brown** (US Army) to purchase iGate technology (JA1575-76;JA1579-80); **(House Armed Services Committee)** promote iGate to Defense Department (JA1532-36;JA1538-39); **(Rep. Billy Tauzin)** (Chair, Tele. Comm.) sought evaluation and endorsement of iGate product (JA409-10;JA1515); **Dumebi Kachikwu** – Agreement by defendant to obtaining **Ex-Im Bank** financing; securing for NDTV, through legislation, the rights to U.S.-based content; and approval from **NASA** or the **Pentagon** to use iGate's product in Nigeria (JA1209-12;JA1244).[32]  **Def. sought Visa** from **(US Embassy in UK)** for D. Kachikwu to travel to U.S.(JA6076); (JA4252-55); Def. pressure/advise **(Ex-Im Bank)** (JA439-40;JA1253); **Def. decision to lead official trade delegation** to **Nigeria/Cameroon** to pressure / advise government officials to approve iGate access.(JA4236-37;JA1617-19;JA1620-32)(JA1313-14) (JA1703-04;JA1716;JA1718-22;JA6172-73);(**Lori Mody**) Def. agreed to "make sure" **Ex-Im Bank** Application Approved (JA1935-36;JA1941-45;JA5438-42); Def. agreed to pressure/advise **Nigerian Govt** to get NITEL approval)(JA1936)(JA1971-72;JA1986); Def. pressured/advised **VP Nigeria** (JA726-31;JA2589-90); **Def. decision to lead Delegation to Ghana**(JA6239-40;JA6244) (JA5594-95;JA2039-54) (JA6174-75;JA3269-74) Pressure/advise **Ex-Im Bank** (JA2663-65;GEX118-1) (JA6287;JA2748-49); **Def. to Pay Bribe to VP Nigeria** (JA6303-08;JA2792;JA2815-18).

---

governmental decisions is consistent with those "official acts" listed therein (JA5124).

[32] Per *McDonnell*, "a public official is not required to actually make a decision or take an action on a "question, matter, cause, suit, proceeding or controversy"; it is enough that the official agree to do so." 136 S. Ct. at 2370-71(*citing Evans v. United States*, 504 U.S. 255, 268, 112 S. Ct. 1881).

**(b)  George Knost / Arkel Companies:** (Counts 2, 16: Acts 8 and 10). **Def. agreed** to get **Nigeria Govt approvals** for **Sugar Plant**;(JA2995-96). Def. to **secure visas** for Arkel workers, and acquire **Ex-Im Bank** financing. (JA3623;JA3645)(JA3635)(JA5730-31;JA3021-30;JA3060-63;JA3620-24;JA3721-28). **Def. agreed** to pressure/advise **Nigerian officials** to award **Marginal Oil fields** to **Arkel**.(JA3050;JA3075-77)(JA3085) (JA3077-78;JA3050-51).

**(c)  John Melton / TDC**:  (Counts 2 and 16: Act 11). **Def. agreed** to lead official **Delegation to Nigeria**. (JA3518-19)(JA3517-24;JA3996-4005;JA4013-14). **Fertilizer Plant** awarded to TDC. (JA3526-30). Def pressure/advise **USTDA** (Thomas Hardy) for financing to TDC. (JA3929)(JA3973-74).

**(d)  Noreen Wilson / Sao Tome Oil Rights**:  (Counts 2 and 16: Act 6). **Def. agreed** to pressure/advise **Govt of Sao Tome for oil rights**. (JA4346-47) (JA4363-64;JA4034-35).

**(e)  Noah Samara / World Space:** (Count 16; Acts 4 and 5**). Def. agreed to pressure/advise** obo **Worldspace** (satellite company) obtain **contracts** from / Govt officials in Botswana, Equatorial Guinea, and the Republic of Congo. (JA3347; JA3357-69;JA3400-02;JA5867). Def. to advise President of Equatorial Guinea to award **Oil Concession** to Samara. (JA3374-77;JA3384-94;JA3435-37;JA5860-63).

Defendant takes issue with defendant's pressure/advice of West African government officials being determined to be "official acts," "because contracts with foreign governments do not involve questions or matters that are pending before any public official of the United States."  Br. at 3.  But defendant misstates the facts. Whether defendant decided to lead trade delegations of U.S. businesses to West Africa, was a "matter" or "question" pending before the defendant himself, not the foreign government officials.  The evidence supported this conclusion, which included the defendant's participation in several congressional committees and caucuses specializing in trade between the U.S. and West Africa.  Congressman McHugh's testimony confirmed that it was a settled practice for members of congress with such committee focus to have U.S. business persons seek them out for assistance and for those members to influence foreign officials on behalf of the U.S. businesses (JA3835-36;JA3856-57). *See also discussion below*.  The evidence underscores all of the effort that goes into the

forming of a trade delegation. This includes, the defendant assigning congressional staff to assist; seeking visas for the U.S. business persons traveling; reaching out to the Department of State and local U.S. Embassy to help set up meetings with high-ranking foreign officials; drafting and sending official correspondence to the foreign officials asking for the meetings and the approvals being sought.  These activities demonstrate that a trade delegation is something that "may by law be brought, suggesting that is "relatively circumscribed—the kind of thing that can be put on an agenda, tracked for progress, and then checked off as complete." *McDonnell*, 136 S. Ct. at 2369.[33]

Defendant also mischaracterizes the nature of the pressure/advice defendant exerted on U.S. government agencies – describing his own actions as merely "making introductions or asking for information."  Br. at 3.  Certainly "instructing" General Hylton to have the U.S. Army test iGate's product at Fort Huachuca (JA359-60) and demanding an explanation from Thomas Hardy as to why the USTDA's grant approval for TDC had been delayed (JA3963-64) are clearly actions by the defendant that amount to pressure on and advice to U.S. government officials.  There was also defendant's concession in the district court acknowledging evidence of official acts influencing U.S. government officials (JA4662).

Not every holding in *McDonnell* would have benefited defendant during his trial.  First, *McDonnell* held that "if a public official uses his official position" to provide advice to or pressure on another public official, "that too can qualify as a decision or action for purposes of § 201(a)(3)."  *McDonnell,* 136 S. Ct. at 2370.  Indeed, the government presented a tremendous

---

[33] The Fourth Circuit rightly agreed with this conclusion because there was "ample evidence to [show] that Jefferson's acts related to the bribe payments were acts on "matters" or "causes" that were pending before him—such as acts in furtherance of his congressional duties to promote trade with Africa."  *Jefferson*, 674 F.3d at 358 n.39.

amount of evidence establishing that defendant pressured and/or provided advice to other government officials at United States and foreign government agencies.

Additionally, *McDonnell's* embrace of the *Birdsall* "settled practice" principle rendered moot defendant's objection to that jury instruction. In that regard, it was appropriate for the government to call former Congressman Matthew McHugh, who opined that in light of defendant's membership on the Trade Subcommittee of the House Ways and Means Committee, McHugh would expect "people who were concerned about trade and business activities abroad" to seek out defendant's assistance on those topics" (JA3835-36). Congressman McHugh further explained, "many members of Congress do" travel overseas in an effort to influence foreign government officials on behalf of individuals seeking to advance business interests in those countries" (JA3856-57). This also applied to constituents "asking for assistance on matters which relate to the Federal Government" (JA3825).

Accordingly, defendant cannot establish "actual prejudice."

C.     The Defendant Has Not Shown that He Is "Actually Innocent"

Since the defendant is unable to establish both (1) "cause" excusing his procedural default, *and* (2) "actual prejudice" resulting from the errors of which he complains, he must alternatively establish "actual innocence." *Bousley,* 523 U.S. at 624. To establish actual innocence, a defendant must show that it is "'more likely than not that no reasonable juror would have convicted him.'" *Bousley*, 523 U.S. at 623 (quoting *Schlup v. Delo*, 513 U.S. 298, 327-328 (1995)). "[A] movant must show actual innocence by clear and convincing evidence." *United States v. Mikalajunas*, 186 F.3d 490, 493 (4th Cir. 1990).

The Statement of Facts (above) and the section addressing the lack of "actual prejudice" from the *McDonnell* error(s) also demonstrates why the defendant cannot establish "actual innocence." "'[A]ctual innocence' means factual innocence, not mere legal insufficiency."

*Bousley,* 523 U.S. at 623.  *Bousley* explains that "[i]n cases where the Government has forgone more serious charges in the course of plea bargaining, petitioner's showing of actual innocence must also extend to those charges." *Bousley,* 523 U.S. at 624.  Likewise, where the defendant was convicted of the triple-object conspiracy of Count One, and there was no special verdict form to indicate which of the three objects the defendant was convicted, the defendant must now establish, on collateral review, that he was actually innocent of all the objects charged in count one, including the FCPA object, a crime which does not contain an "official act" element.

The defendant's challenge of his pressure and advice on foreign government officials does not help him here.  The defendant must show that his efforts to influence the decisions of U.S. government agencies was also not an "official act."[34]  Finally, the defendant's use of sham entities, controlled by family members, to enter into bogus agreements with bribe-payers showed that defendant believed his conduct was illegal and needed to be concealed.  The recorded conversations equally proved the defendant's consciousness of guilt.[35]  For these reasons, the defendant is unable to establish "actual innocence" and his claim is procedurally defaulted.

## II.    Any Error in the Court's "Official Act" Instructions Was Harmless

In Section 2255 cases like this one, where the defendant has alleged trial error, the defendant has the burden of establishing that the alleged "error had substantial and injurious effect or influence in determining the jury's verdict."  *Brecht v. Abrahamson*, 507 U.S. 619

---

[34] Under *Bousley*, where the evidence supported more than one official act, one of which would qualify under *McDonnell*, one of which would not, the defendant will not be able to establish "actual innocence." *Bousley*, 523 U.S. at 624.

[35] "As he advised Mody in 2005, 'these damn notes we're writing to each other, as if we thought ... [the] FBI's watching us.' J.A. 2321. More damning, his criminal mindset was established beyond peradventure by his statement to Jackson that same year that 'We've got to do this shit right, though. I mean, otherwise, we're going to all be in the goddamn pokey somewhere, fooling with ... shit like this.' J.A. 783–84." *Jefferson*, 674 F.3d at 357, n.38.

44

(1993); *United States v. Smith*, 723 F. 3d 510, 515-16 (4th Cir. 2014).  On collateral review, the defendant bears the burden of showing that an error was harmful—which requires showing "more than a reasonable possibility that the error was harmful" or "mere speculation" that the defendant was prejudiced by the error but, rather, "that the defendant was actually prejudiced by the error." *Davis v. Ayala*, 135 S. Ct. 2187, 2197-98 (2015).  As this suggests and as the Fourth Circuit has recognized, the "substantial and injurious" effect standard, as applied to purportedly erroneous jury instructions, is thus similar in nature to an "actual prejudice" inquiry.  *See White v. Lee*, 238 F.3d 418 (Table), 2000 WL 1803290, at *9 (4th Cir. 2000).

Accordingly, the defendant cannot meet his burden of showing that any "error had substantial and injurious effect or influence in determining the jury's verdict." *Brecht,* 507 U.S. at 623.

## CONCLUSION

For the foregoing reasons, the Court should deny the Defendant's Motion to Vacate and Set Aside Conviction and Sentence Pursuant to § 2255.

Respectfully submitted,
Dana J. Boente
United States Attorney

/s/
_____

Mark D. Lytle
  Assistant United States Attorney
Ankush Khardori
  Special Assistant United States Attorney