**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | **No. 1:07-cr-209** |
| | ) | |
| WILLIAM J. JEFFERSON | ) | |

## MEMORANDUM OPINION

In 2007, William Jennings Jefferson, a nine-term Congressman from Louisiana, was indicted, tried, and convicted by a jury of bribery, honest services wire fraud, money laundering, racketeering, and conspiracy to commit those crimes. Jefferson unsuccessfully appealed his sentence to the Fourth Circuit and the Supreme Court; his convictions and sentences were affirmed by both. Then, in 2016, the Supreme Court in *United States v. McDonnell*, 136 S. Ct. 2355 (2016), altered the legal landscape with respect to the principal element of bribery – the "official act." [1] Jefferson, seizing upon this decision, filed a petition under § 2255, challenging his convictions on the basis that the Supreme Court's new definition of official acts meant that the activities for which he was convicted were not criminal. Specifically, Jefferson argues that he never engaged in or agreed to engage in official acts as defined by *McDonnell*. The government disagrees, arguing that the evidence at Jefferson's trial supports a finding that he traded official acts for bribe payments, even after *McDonnell*. The matter is now ripe for disposition, and Jefferson's motion must be granted in part and denied in part.

---

[1] As explained *infra*, the bribery statute defines an "official act" as:

> any decision or action on any question, matter, cause, suit, proceeding or controversy, which may at any time be pending, or which may by law be brought before any public official, in such official's official capacity, or in such official's place of trust or profit.

18 U.S.C. § 201(a)(3).

**I.**

William Jefferson served nine terms in Congress representing the Second District of Louisiana, which includes much of the City of New Orleans. He was first elected in 1991 and maintained congressional offices in the District of Columbia and New Orleans. In his role as a congressman, Jefferson served on several House committees and subcommittees, including the Ways and Means Committee and its subcommittee on trade, and the Budget Committee. During his service in Congress, Jefferson also served as co-chair of the Africa Trade and Investment Caucus and the Congressional Caucus on Nigeria.

The government's charges against Jefferson involved payments Jefferson solicited for assistance with business promotion and development. In essence, the indictment charged Jefferson with soliciting and receiving payments from various entities in exchange for promoting their business activities. Indeed, the government adduced evidence at trial that from 2000 to 2005, Jefferson sought hundreds of thousands of dollars from companies involved in communications, oil, and sugar, often for projects in West Africa. Because the parties' arguments focus in part on whether Jefferson's activities involved performance of "official acts" in return for receiving that money, it is important to describe in detail the evidence adduced at trial.

**A.**

In the longest running scheme, the iGate scheme, Jefferson solicited money from Vernon Jackson, the President of iGate, a Louisville, Kentucky telecommunications company, in exchange for Jefferson's promotion of iGate's technology to the Army and to various West African countries. In return for money, and delivery of iGate shares to ANJ, a company controlled by Jefferson's wife, Jefferson agreed to promote and did promote iGate technology to

foreign and domestic officials over a span of several years, including in the course of trade promotion trips Jefferson took to Africa.

The iGate scheme began when Jefferson befriended Jackson in early-2000. Jackson was then the President of iGate, a company whose goal was to market and sell its high speed broadband technology to the military, African companies, and historically Black Institutions in the United States. In mid to late 2000, Jackson attempted to secure a number of military contracts for iGate and reached out to Jefferson for assistance in this regard. To assist Jackson, Jefferson arranged meetings with army officials to promote iGate technology. In 2000, Jefferson met with General Hylton and discussed the possibility of testing iGate technology at Fort Huachuca. A few months later, in 2001, Jefferson discussed the use of iGate technology with Colonel Brown, believing that Colonel Brown was the pertinent requisition officer for the Army.

Jackson was impressed by Jefferson's efforts on his behalf, and asked for Jefferson's help with promoting other ventures. Jefferson agreed to help, but for a price, asking Jackson to hire his family consulting firm, ANJ, to assist with marketing iGate products. Jefferson told Jackson that his wife and daughter owned and operated ANJ. Jackson and iGate agreed to hire ANJ, and Jefferson provided Jackson with a contract outlining the arrangement, under which iGate would pay ANJ with iGate shares, and $90,000 a year in twelve $7,500 monthly payments, with bonuses paid based on a percentage of iGate's profits. Jefferson and his wife, Andrea Jackson, executed the contract on January 15, 2001. In accordance with the contract, 100,000 shares of iGate stock were transferred to ANJ on January 22, 2002. By September 2002, a total of 550,000 shares of iGate stock had been transferred to ANJ. Jackson stated at trial that he understood that this arrangement really meant that he was paying Jefferson to promote iGate technology to customers, including the Army.

Following the execution of the contract between ANJ and iGate, Jefferson upheld his bargain by promoting iGate technology in West Africa. In 2003, Jefferson met with a number of high ranking West African government officials and businesspeople. In one of those meetings in Nigeria, Jefferson discussed iGate technology with Dumebi Kachikwu and Ahmed Vanderpuije, the founders of Netlink Digital Television ("NDTV"), a satellite television provider. Jefferson negotiated an agreement between NDTV and iGate to provide satellite television service in Nigeria. As part of his pitch to NDTV officers, Jefferson agreed to arrange meetings with the United States Export-Import Bank (the "Ex-Im Bank"). Jefferson eventually followed through on his Ex-Im Bank promise, bringing representatives of iGate and NDTV to the Ex-Im Bank, and expressing his support for the joint venture at that meeting.

Without informing iGate, Jefferson solicited a payment from NDTV, granting Jefferson a portion of revenue from the joint venture and shares in NDTV. NDTV also agreed to pay iGate $44,000,000 with a $6,500,000 down payment for the right to use iGate technology. After successfully negotiating the deal with NDTV, Jefferson convinced iGate to increase its payments to ANJ from five to thirty-five percent of iGate's profits.

Throughout 2003 and 2004, Jefferson continued to make trips to Africa to meet with foreign officials and support the iGate-NDTV venture. Jefferson arranged a meeting in 2003 with Jackson, Vanderpuije, another NDTV representative, and Nigerian Vice President Abubakar to discuss Nigeria's support for iGate-NDTV's Ex-Im Bank application. In February 2004, Jefferson met with Nigerian President Olusegun Obasanjo to discuss improvement of Nigeria's telecommunications infrastructure, and recommended use of iGate technology as a possible solution. During these visits, Jefferson presented himself as a member of the United

States Congress. He also used his congressional passport and the assistance of his staff to travel to Africa.

In 2004, the iGate-NDTV joint venture failed, and iGate agreed to refund $3,500,000 of the NDTV's down payment. Not willing to allow the flow of payments from iGate to stop, Jefferson secured a replacement for NDTV's role in the iGate scheme, Lori Mody and her company W2 Limited. Brett Pfeffer, Jefferson's former legislative aide, introduced Jefferson to Mody, and after a lengthy meeting Mody agreed to enter an investment agreement with iGate, based largely on Jefferson's assurances that he would be able to secure financing from the Ex-Im Bank and cooperation from Nigerian officials. The investment agreement provided compensation to Jefferson including payments to ANJ consulting, ownership interests in Mody's businesses, and payments to other businesses owned by Jefferson's family. In July 2004, Mody and W2 paid iGate $1,500,000, and Vernon Jackson remitted $50,000 to ANJ. In September 2004, Mody made a second payment to iGate in the sum of $2,000,000. Here again, $50,000 was remitted to ANJ, Jefferson's family business, despite the fact ANJ had not performed any work for iGate.

In late 2004 and early 2005, the iGate-W2 venture began to falter, and Mody grew concerned that Jefferson was engaged in criminal activity. Accordingly, Mody contacted the FBI and Justice Department and began working as a government informant in March 2005. Now working with the FBI, Mody renewed her efforts to promote the iGate-W2 venture with Jefferson. Jefferson traveled to Africa to meet with officials in Ghana and Nigeria to promote the W2-iGate venture. While in Nigeria, Jefferson determined that it would be necessary to secure the support of Nigeria Telecommunications Limited ("NITEL") in order for the iGate-W2 venture to succeed. To guarantee NITEL's support, Jefferson met with Nigerian Vice President

Abubakar on July 18, 2005 and offered Abubakar a bribe in exchange for help in securing NITEL assistance. In this regard, Jefferson asked Mody to provide cash to pay this bribe, and with the assistance of the FBI, Mody provided Jefferson with $100,000 in marked cash in a briefcase. On July 30, 2005, Mody delivered the briefcase to Jefferson with the understanding that Jefferson would deliver the briefcase to Abubakar in payment of the bribe. Two days later, the FBI executed six search warrants for Jefferson's residences and offices across the United States. During the search of Jefferson's Washington, D.C. home, the FBI found and seized $90,000 of the marked cash hidden in frozen food boxes in Jefferson's freezer.

**B.**

During his involvement with the iGate scheme, Jefferson was also involved in a number of other schemes related to business and development interests in West Africa. This included soliciting payments from businessman George Knost and his companies, Arkel International, Arkel Sugar, and Arkel Oil and Gas. Knost reached out to Jefferson in 2001 and arranged a meeting that fall to discuss Arkel's proposed sugar project in Nigeria. Jefferson agreed to assist Arkel with securing African and U.S. government support for the project, including promoting the project to African officials and assisting Knost in securing funding from the Ex-Im Bank. In exchange for these acts, Jefferson required Arkel to hire his brother, Mose Jefferson, as a consultant on the project. In the end, Mose would provide no consultant services and Jefferson would collect the payments from Arkel for himself.

Jefferson also agreed to help Arkel apply for financing from the Ex-Im Bank for an oil field venture in Nigeria. Arkel ultimately decided in September 2001 that it could not pursue the venture, and offered the project to businessman John Melton. Melton, an ex-Arkel employee, created TDC Energy Overseas, Inc. ("TDC") to pursue the project. In December 2001, Melton

met with Jefferson in Louisiana to discuss the oil field venture and other projects in West Africa. Jefferson solicited payments to his brother Mose in exchange for Jefferson's assistance with trips by Melton to meet Nigerian officials. Melton ultimately accepted Jefferson's offer of assistance, but nothing came of the oil field project.

In January 2002, Melton and TDC partners joined Jefferson on a trip to Nigeria to attend meetings with Nigerian officials arranged by Jefferson. No longer interested in the oil fields, TDC now wanted approval for a fertilizer project in Nigeria. After securing a letter of intent from a Nigerian governor authorizing TDC to move forward on a fertilizer plant project, Melton, on behalf of TDC, applied for a U.S. Trade Development Agency grant to fund a feasibility study for the Nigerian fertilizer plant. Jefferson assisted in the application process by securing support from Nigerian government officials and U.S. officials at the USTDA.

In another scheme, Jefferson used a lobbyist, Jim Creaghan, to solicit bribes from businessperson Noreen Wilson, in exchange for Jefferson's assistance in resolving a dispute over oil exploration rights in the waters off Sao Tome and Principe. In December 2001, Creaghan discussed with Wilson the acquisition of rights to develop offshore oil near Sao Tome and Principe. Wilson was working with a South African company called Procura Financial that assisted with oil drilling projects in West Africa. Creaghan and Wilson approached Jefferson on behalf of Procura Financial to secure Jefferson's assistance in resolving disputes of several governments in the region over ownership of the oil fields. Jefferson offered his help, but told Creaghan and Wilson that in exchange he would need them to assign an ownership interest in the venture to members of Jefferson's family. Creaghan and Wilson agreed and arranged for Mose Jefferson, Congressman Jefferson's brother, to receive an ownership interest in the oil field

venture. The Sao Tome and Principe oil venture ultimately failed, notwithstanding Jefferson's efforts to resolve disputes among the various African governments involved.

Creaghan and Wilson continued to work together on a project for Life Energy called "Biosphere," a waste treatment plant that produced electricity and potable water from waste. Creaghan and Wilson sought Jefferson's assistance again, this time in selling Biosphere in West African countries. Again, Jefferson was interested but required that Life Energy pay his brother, Mose Jefferson, in exchange for Jefferson's help. Life Energy ultimately agreed to pay Mose ten-percent of each Biosphere project sold in West Africa, and Mose was given an ownership interest in the Biosphere business in West Africa. Creaghan, Jefferson, and Mose travelled to Nigeria in February 2003 to promote Biosphere, and Jefferson encouraged Nigerian government officials to invest in Biosphere factories.

Jefferson also solicited payments from Noah Samara, founder of a satellite radio business, and a company named International Petroleum in exchange for Jefferson's assistance in obtaining oil concessions from the government of Equatorial Guinea. Samara first met Jefferson in the late 1990s. In May 2002, Jefferson and Samara visited countries in Africa to promote his satellite radio business, WorldSpace. Specifically, Jefferson travelled with Samara for a portion of the trip, and Jefferson convinced Samara to visit Equatorial Guinea, Congo, and Botswana. During this side trip, Jefferson recommended that Samara get involved in oil drilling in Equatorial Guinea. Jefferson suggested to Samara that he create International Petroleum to take advantage of an oil concession Jefferson was working to obtain from Equatorial Guinea. Jefferson also required that Samara hire his daughter, an attorney, to prepare the paperwork to form International Petroleum, and to pay her by giving her an ownership stake in the oil

concession. Samara refused this requirement and he ultimately abandoned the pursuit of the oil concession.

Later, in July 2002, Samara met with Jefferson and his wife to discuss a WorldSpace education initiative. By the end of that conversation, Samara agreed to hire ANJ, Jefferson's family business, to act as a consultant on the educational projects. Jefferson prepared a consulting contract between WorldSpace and ANJ, in which ANJ would be given four-percent of the gross amount paid to WorldSpace. ANJ was required to assist WorldSpace in procuring contracts in various African countries. Samara understood that Jefferson, not ANJ or Jefferson's family members, would be assisting with the contract. Jefferson wrote several letters to the President of the Democratic Republic of the Congo urging that he consider adopting the WorldSpace initiative. Eventually the WorldSpace initiative in Africa slowed down and Jefferson did not assist with any further attempts to promote WorldSpace technology in Africa.

**B.**

Based on these activities, Jefferson was arrested, and on June 4, 2007, a federal grand jury in Alexandria returned a sixteen count indictment against Jefferson, charging him with:

Count 1 – Conspiracy to solicit bribes, commit honest services wire fraud, and violate the Foreign Corrupt Practices Act (FCPA), in violation of 18 U.S.C. § 371;

Count 2 – Conspiracy to solicit bribes and commit honest services wire fraud, in violation of 18 U.S.C. § 371;

Counts 3 and 4 – Solicitation of bribes, in violation of 18 U.S.C. § 201(b)(2)(A);

Counts 5 through 10 – Self-dealing and bribery-related honest services wire fraud, in contravention of 18 U.S.C. §§ 1343 and 1346;

Count 11 – Foreign corrupt practices, in violation of 15 U.S.C. §§ 78dd–2(a), 78dd–

2(g)(2)(A), and 78ff(a);

Counts 12 through 14 – Money laundering related to bribery, in contravention of 18

U.S.C. § 1957;

Count 15 – Obstruction of justice, in violation of 18 U.S.C. § 1512(c)(1); and

Count 16 – Conducting and participating in a racketeering enterprise, in contravention of

18 U.S.C. § 1962(c) (the "RICO offense").

The indictment also included a count for criminal forfeiture related to the alleged offenses.

On September 7, 2007, Jefferson moved to dismiss counts 1-10, 12-14, and 16 – the

bribery-related charges – on the ground that the indictment did not allege receipt of bribes "in

return for . . . the performance of an official act" as required by 18 U.S.C. § 201(b)(2)(A).[2]

Jefferson argued that the definition of "official act" in 18 U.S.C. § 201(a)(3) was limited to

activities involving questions before Congress, including voting on legislation or conducting

committee work.

That position was rejected on the ground that the bribery statute required the government

to prove an official act by showing: "the act [was] among the official duties or among the settled

customary duties or practices of the official charged with bribery[] [a]nd . . . the act involve[d] or

affect[ed] a government decision or action." *United States v. Jefferson*, 562 F.Supp.2d 687, 691

(E.D. Va. 2008) ("*Jefferson I*"). In support of this conclusion, *Jefferson I* held that official acts

could include duties that were not in written rules but were "'clearly established by settled

---

[2] Jefferson also sought dismissal of Counts 2, 3, 10, and 12-14 for lack of venue and transfer of the remaining counts to the District of Columbia. That motion was denied by Order on November 30, 2007. Jefferson sought reconsideration of the venue motion, which was denied in a formal opinion. See *United States v. Jefferson*, 562 F.Supp.2d 695 (E.D. Va. 2008). The Fourth Circuit upheld the venue determination with the exception of Count 10. *United States v. Jefferson*, 674 F.3d 332, 368 (4th Cir. 2012).

practice.'" *Id.* (quoting *United States v. Birdsall*, 233 U.S. 223, 230–31 (1914)).  Because the

Supreme Court's one-hundred year old *Birdsall* opinion[3] was controlling in setting the proper

definition of an "official act" under the bribery statute, Jefferson's activities such as official

travel to foreign counties, official correspondence with domestic and foreign officials, and use of

his congressional staff to facilitate Jefferson's activities were official acts.  Thus, the bribery-

related charges were not dismissed.

On March 20, 2009, Jefferson moved for reconsideration of the ruling in *Jefferson I* and

the government sought clarification of the decision.  In response, this Court issued a clarifying

opinion.  *See United States v. Jefferson*, 634 F.Supp.2d 595 (E.D. Va. 2009) ("*Jefferson II*").

The *Jefferson II* decision clarified that an official act under the bribery statute is not limited

solely to legislative acts such as "voting on or introducing a piece of legislation." *Id.* at 602.

*Jefferson II* affirmed the earlier ruling that official acts could include actions that involve the

legitimate use of an official's office.  *Id.* (citing *United States v. Biaggi*, 853 F.Supp.2d 96-99 (2d

Cir. 1988)).

Jefferson's jury trial began on June 9, 2009 and continued for two months.  The

prosecution presented more than forty witnesses.  At trial, and guided by the *Jefferson I* and

*Jefferson II* opinions, the government presented evidence establishing that Jefferson's meetings

with foreign and domestic officials on behalf of bribers, and his use of congressional resources to

coordinate trips and meetings were "constituent services,"  a well-settled congressional practice.

After the parties rested, the jury was instructed on the meaning of "official act" in § 201(a)(3):

---

[3] In the *Birdsall* case, two individuals were bribed in exchange for their agreement to advise the Commissioner of Indian Affairs that leniency should be applied to individuals convicted for liquor trafficking with Indians.  The district court in Iowa ruled that the indictment was defective because giving advice was not an "official act" within the meaning of the bribery statute.  The Supreme Court reversed, holding that the bribery statute covers more than acts that are "prescribed by a written rule" and that "[e]very action that is within the range of official duty comes within the purview of these sections.  233 U.S. at 230.

[a]n act may be official even if it was not taken pursuant to responsibilities explicitly assigned by law. Rather, official acts include those activities that have been clearly established by settled practice as part [of] a public official's position.

Jefferson objected to this instruction, arguing that the proper definition of an official act is more circumscribed and should include only the statutory definition. That objection was rejected and the above-cited instruction was given.

The jury returned a verdict on August 5, 2009, convicting Jefferson on eleven of the sixteen counts of the indictment.[4] Following his conviction, Jefferson was sentenced to serve thirteen years in prison. Specifically, Jefferson was sentenced to serve 60 months on Counts 1 and 2, 156 months on Counts 3, 4, 6, 7, 10, and 16, and 120 month on Counts 12, 13, and 14, all of which were to be served concurrently. Because Jefferson was allowed to remain free pending appeal, he did not begin serving his sentence until May 4, 2012.

Jefferson appealed his conviction to the Fourth Circuit Court of Appeals, arguing (i) that the bribery instructions were erroneous for including the *Birdsall* settled-practice language, (ii) that the quid-pro-quo bribery instruction was erroneous, (iii) that the honest services wire fraud theory on which he had been convicted had been rejected by the Supreme Court, and (iv) that there was a lack of venue in the Eastern District of Virginia with respect to Count 10 of the indictment. The Fourth Circuit rejected all but the last of these arguments, affirming Jefferson's conviction with respect to every count except Count 10. Jefferson appealed to the Supreme Court and certiorari was denied on November 26, 2012. *United States v. Jefferson*, 133 S. Ct. 648 (2012) (cert denied). After Count 10 was vacated, the same sentence was imposed.

---

[4] Jefferson was acquitted on Counts 5, 8, and 9 (honest services wire fraud), Count 11 (the substantive FCPA violation), and Count 15 (obstruction of justice).

**C.**

Four years after the Fourth Circuit affirmed all but one of defendant's convictions, the Supreme Court addressed the definition of an "official act" in *McDonnell*, 136 S. Ct. 2355. In that case, a jury convicted former Virginia Governor Bob McDonnell of honest services wire fraud and Hobbs Act extortion. *See* 18 U.S.C. §§ 1343, 1349 (honest services wire fraud); *id.* § 1951(a) (Hobbs Act extortion). While McDonnell was in office, he and his wife accepted approximately $175,000 in loans, gifts, and other perks from a Virginia businessman seeking to push a nutritional supplement. *McDonnell*, 136 S. Ct. at 2361. The businessman sought McDonnell's help in arranging for Virginia universities to perform research on the nutritional supplement. *Id.* In exchange for lucrative gifts and loans, McDonnell arranged meetings with state officials, hosted and attended events at the Governor's mansion, and contacted other officials to promote or encourage studies on the nutritional supplement. *Id.* at 2365. At trial, the prosecutors asserted that McDonnell's conduct constituted "official acts" as defined by the bribery statute, 18 U.S.C. § 201(a)(3). *See* 136 S. Ct. at 2365.[5]

In its jury charge, the trial court in *McDonnell* described the five alleged official acts in the indictment, which "involved arranging meetings, hosting events, and contacting other government officials." *Id.* at 2366. Next, the trial court quoted the statutory definition of an official act. *See* 18 U.S.C. § 201(a)(3); *McDonnell*, 136 S. Ct. 2365-66. Finally, the district court gave a broad *Birdsall*[6] instruction:

> Official action … includes those actions that have been clearly established by
> settled practice as part of a public official's position, even if the action was not

---

[5] Importantly, McDonnell's convictions relied on the jury's conclusion that McDonnell performed "official acts" as defined by the bribery statute, 18 U.S.C. § 201(a)(3). *See* 136 S. Ct. at 2365.

[6] *United States v. Birdsall*, 233 U.S. 223 (1914) (holding that "official action" can be established by custom, rather than "by statute" or "written rule or regulation").

taken pursuant to responsibilities explicitly assigned by law. In other words, official actions may include acts that a public official customarily performs, even if those actions are not described in any law, rule, or job description. And a public official need not have actual or final authority over the end result sought by a bribe payor so long as the alleged bribe payor reasonably believes that the public official had influence power or authority over a means to the end sought by the bribe payor. In addition, official action can include actions taken in furtherance of longer-term goals, and an official action is no less official because it is one in a series of steps to exercise influence or achieve an end.

*United States v. McDonnell*, 792 F.3d 478, 505-06 (4th Cir. 2015). The trial court also denied Governor McDonnell's requested instructions. Specifically, the trial judge refused to give an instruction that the "fact that an activity is a routine activity, or a 'settled practice,' of an office holder does not alone make it an 'official act,'" and that "merely arranging a meeting, attending an event, hosting a reception, or making a speech are not, standing alone, 'official acts,' even if they are settled practices of the official" because they "are not decisions on matters pending before the government." *McDonnell*, 136 S. Ct. at 2366. The district court similarly declined to give McDonnell's requested instruction that an official act must "intend to or in fact influence a specific official decision the government actually makes—such as awarding a contract, hiring a government employee, issuing a license, passing a law, or implementing a regulation." *Id.* (quotation marks omitted).

The jury convicted McDonnell of honest services fraud and extortion. On direct appeal, the Fourth Circuit upheld the convictions, but the Supreme Court granted *certiorari* and reversed. 136 S. Ct. at 2361, 2375. Although the Supreme Court in *McDonnell* reaffirmed that a "settled practice" could in some cases constitute an "official act,"[7] the Court nonetheless found the trial court's instructions erroneous. In the Supreme Court's view, the trial court's instructions

---

[7] *See McDonnell*, 136 S. Ct. at 2371. Indeed, the Supreme Court cited its century-old *Birdsall* opinion, in which the Court concluded "that 'official action' could be established by custom rather than 'by statute' or 'a written rule or regulation,' and need not be a formal part of an official's decisionmaking process." *Id.* (quoting *Birdsall*, 233 U.S. at 230–231).

did not convey "meaningful limits" on the definition of an official act and thus "lacked important qualifications, rendering them significantly overinclusive." *Id.* at 2373-74.

In this respect, the Supreme Court emphasized that § 201(a)(3)'s definition of "official act" is comprised of two prongs:

> First, the Government must identify a "question, matter, cause, suit, proceeding or controversy" that "may at any time be pending" or "may by law be brought" before a public official. Second, the Government must prove that the public official made a decision or took an action "on" that question, matter, cause, suit, proceeding, or controversy, or agreed to do so.

*Id.* at 2368.

In other words, if the jury charge includes a *Birdsall*[8] instruction on the definition of an official act—that is, if the trial court instructs the jury that an "official act" includes "settled practices" of the office—then the trial judge must also instruct the jury *how* to identify the "'question, matter, cause, suit, proceeding or controversy' that must be pending for a defendant to commit an official act." *McDonnell*, 136 S. Ct. at 2374. Specifically, the jury should be instructed that a "question, matter, cause, suit, proceeding or controversy" must be something "focused and concrete," involving "a formal exercise of governmental power that is similar in nature to a lawsuit before a court, a determination before an agency, or a hearing before a committee." *Id.* at 2370, 2372. In other words, the question, matter, cause, suit, proceeding, or controversy "must also be something specific and focused that is 'pending' or 'may by law be

---

[8]233 U.S. 223.

brought' before a public official." *Id.* at 2372.[9] By contrast, a "broad policy objective," is not

sufficiently specific or focused. *Id.* at 2374.[10]

Next, the jury charge should note that "[t]o qualify as an 'official act,' the public official

must make a decision or take an action on that question, matter, cause, suit, proceeding or

controversy, or agree to do so." *Id.* (quotation marks omitted). Notably, "[t]hat decision or

action may include using [an] official position to exert pressure on another official to perform an

'official act,' or to advise another official, knowing or intending that such advice will form the

basis for an 'official act' by another official." *Id.* Yet, according to the Supreme Court,

"[s]etting up a meeting, talking to another official, or organizing an event (or agreeing to do

so)—without more—does not fit th[e] definition of 'official act.'" *Id.*[11]

Because the jury instructions in *McDonnell* lacked these qualifications, the Supreme

Court found it "possible that the jury convicted . . . without finding that [the defendant] agreed to

make a decision or take an action on a properly defined 'question, matter, cause, suit, proceeding

or controversy.'" *Id.* at 2375. Thus, "[t]o forestall that possibility," the Supreme Court

concluded that "the District Court should have instructed the jury that merely arranging a

---

[9] The Supreme Court in *McDonnell* defined "pending" and "may by law be brought" as "something that is relatively circumscribed—the kind of thing that can be put on an agenda, tracked for progress, and then checked off as complete." 136 S. Ct. at 2359. Furthermore, the Court rather tautologically noted that "may by law be brought" also suggests "something within the specific duties of an official's position." *Id.*

[10] In this regard, the Supreme Court was particularly concerned with (1) the government's closing argument that "'whatever it was' Governor McDonnell had done, 'it's all official action,'" and (2) the government's repeated references to McDonnell's slogan, "Bob's for Jobs." These two factors, the Supreme Court concluded, could have misled the jury to believe "that the relevant 'question, matter, cause, suit, proceeding or controversy' was something as nebulous as 'Virginia business and economic development[.]'" 136 S. Ct. at 2374 (alterations omitted).

[11] Curiously, the Supreme Court drew a distinction between "[s]imply expressing support," which is *not* criminal, and "exert[ing] pressure … or provid[ing] advice, knowing or intending such advice to form the basis for an 'official act,'" which would be unlawful. 136 S. Ct. at 1371. The Supreme Court, however, did not offer guidance on how to distinguish between "support" and "pressure" or "advice."

meeting or hosting an event to discuss a matter does not count as a decision or action on that matter." *Id.* The Supreme Court thus vacated McDonnell's convictions and remanded.[12]

Three months after the Supreme Court issued its opinion in *McDonnell*, Jefferson filed his § 2255 motion, invoking the Supreme Court's new, constrained definition of an "official act" to attack his bribery-related convictions. As the § 2255 motion has been extensively briefed and argued orally, it is now ripe for disposition.

## II.

Before turning to the merits of Jefferson's 28 U.S.C. § 2255 motion, it is necessary to address whether Jefferson's motion is procedurally proper. The first issue is a question of timeliness; the second is whether Jefferson procedurally defaulted on his motion. As the following analysis confirms, Jefferson's motion is proper on both fronts.

## A.

Section 2255 provides habeas relief if the movant shows (1) that his sentence was imposed in violation of the Constitution or laws of the United States; (2) that the sentencing court was without jurisdiction to impose the sentence; (3) that the sentence was in excess of the maximum authorized by law; or (4) that the sentence is otherwise subject to collateral attack. 28 U.S.C. § 2255. In this regard, it is well-settled that a "conviction and punishment [] for an act that the law does not make criminal . . . inherently results in a complete miscarriage of justice and presents exceptional circumstances that justify collateral relief under § 2255." *Davis v. United States*, 417 U.S. 333, 236 (1974) (quotation marks and alterations omitted). Importantly, the statute also imposes a strict limitations period on habeas petitions. *See* 28 U.S.C. § 2255(f).

---

[12] It is important to note, however, that *McDonnell*'s procedural posture differed from that presented here. *McDonnell* reached the Supreme Court on direct appeal, not on a § 2255 motion. As explained *infra*, whether a matter is on direct appeal or a habeas petitions dictates the standard of review.

As relevant here, § 2255 permits a prisoner to level a collateral attack on his conviction

and sentence within a one-year window of "the date on which the right asserted [by Jefferson]

was initially recognized by the Supreme Court, if that right has been newly recognized by the

Supreme Court and made retroactively applicable to cases on collateral review[.]"  28 U.S.C. §

2255(f)(3); *see also Miller v. United States*, 735 F.3d 141, 145 (4th Cir. 2013) ("A petitioner

who collaterally attacks his conviction must establish that the change applies retroactively.").

Whether a newly-recognized right is retroactive is a question analyzed under the well-settled

*Teague v. Lane* framework.  *See* 489 U.S. 288 (1989) (plurality opinion).  According to the

*Teague* line of cases, a new *procedural* rule[13] applies on collateral review only if it is a

"'watershed rule[] of criminal procedure' implicating the fundamental fairness and accuracy of

the criminal proceeding." *Saffle v. Parks*, 494 U.S. 484, 495 (quoting *Teague*, 489 U.S. at 311)).

By contrast, a new *substantive* rule is generally applicable to criminal cases on collateral review.

*See, e.g.*, *Schiro v. Summerlin*, 542 U.S. 348, 351 (2004) ("New *substantive* rules generally apply

retroactively.").  As Supreme Court precedent teaches, "substantive" rules "include[] decisions

that narrow the scope of a criminal statute by interpreting its terms[.]" *Id.*  Decisions announcing

new substantive rules "apply retroactively because they necessarily carry a significant risk that a

defendant stands convicted of an act that the law does not make criminal or faces a punishment

that the law cannot impose upon him." *Id.* at 352 (quotation marks and citations omitted); *see*

*also Bousley v. United States*, 523 U.S. 614, 620-21 (1998) (decision was substantive and

---

[13] To be sure, § 2255(f)(3) refers to a new *right*, whereas the *Teague* framework focuses on a new *rule*. *Compare* 28 U.S.C. § 2255(f)(3), *with Teague*, 489 U.S. 288. Thus, some could argue that *Teague* and its progeny do not apply in the § 2255(f)(3) context. Although the Fourth Circuit has not explicitly resolved this question, it "seems unlikely that Congress meant to trigger the development of a new body of law that distinguishes rights that are 'newly recognized' from rights that are recognized in 'new rule' under established retroactivity jurisprudence." *Headbird v. United States*, 813 F.3d 1092, 1095 (8th Cir. 2016); *see also United States v. Willis*, 208 F. Supp. 3d 739, 742 n.7 (E.D. Va. 2016) (equating "right" and "rule" in the § 2255 and *Teague* contexts), *appeal dismissed*, --- F. App'x ---, 2017 WL 1040539 (4th Cir. Mar. 17, 2017). Thus, a new "right" in the § 2255(f)(3) context will be equated with a new "rule" in the *Teague* retroactivity inquiry.

collaterally available on retroactive review because it limited the scope of 28 U.S.C. § 924(c)(1)'s prohibition on "using" a firearm during a crime of violence to proscribe *active employment*, rather than *mere possession* (citing *Bailey v. United States*, 516 U.S. 137 (1995)); *Miller*, 735 F.3d at 145-56 (similar).

These principles, applied here, confirm that Jefferson meets both prongs of § 2255(f)(3). To begin with, Jefferson filed the instant motion within a year of the Supreme Court's *McDonnell* decision; the Supreme Court issued that opinion on June 27, 2016, and Jefferson filed his § 2255 three months later, on September 26th. Furthermore, Jefferson relies on a "newly recognized" right applicable on collateral review. In this regard, the Supreme Court's *McDonnell* decision is a new "substantive" rule that applies on collateral review because the Supreme Court's decision altered the scope of § 201(a)(3)'s definition of "official act." *See, e.g.*, *Schiro*, 542 U.S. at 351-52; *Bousley* 523 U.S. at 620-21; *Miller*, 735 F.3d at 145-46. Thus, Jefferson's motion is timely brought pursuant to 28 U.S.C. § 2255(f)(3).

**B.**

Next, the government asserts that Jefferson procedurally defaulted on his § 2255 argument. On collateral review, the doctrine of procedural default generally bars claims that "could have been but were not pursued on direct appeal." *United States v. Pettiford*, 612 F.3d 270, 280 (4th Cir. 2010). A defendant procedurally defaults on a challenge to a jury instruction if he (1) fails to object to the jury instructions as required by Rule 30(d), Fed. R. Crim. P., or (2) neglects to raise the issue on direct appeal. *See United States v. Frady*, 456 U.S. 152, 166-68, (1982) (defining procedural default); Rule 30(d), Fed. R. Crim. P. ("A party who objects to any portion of the instructions or to a failure to give a requested instruction must inform the court of the specific objection and the grounds for the objection before the jury retires to deliberate....

Failure to object in accordance with this rule precludes appellate review, except as permitted under Rule 52(b).").[14] The government believes Jefferson defaulted because he did not raise the precise error asserted in *McDonnell*.

To be sure, former Governor McDonnell argued that a *Birdsall* instruction was overbroad and proposed alternative instructions, whereas Jefferson objected to a *Birdsall* instruction as overbroad and opposed any instruction that amended or elaborated on § 201(a)(3)'s definition of "official act." Put differently, whereas former Governor McDonnell challenged an overbroad *Birdsall* instruction by proposing limiting language, Jefferson challenged a similarly overbroad *Birdsall* instruction by seeking to eliminate it altogether. This is a distinction without a meaningful difference; the government's arguments regarding procedural default are therefore meritless.

Jefferson did not procedurally default because throughout this prosecution he consistently challenged the government's definition of "official act" and opposed any jury charge that included a *Birdsall* instruction. Jefferson first raised his argument regarding the definition of "official act" in a pretrial motion to dismiss the indictment, which motion was denied. *See Jefferson I*, 562 F. Supp 2d. 687.[15] Jefferson remained steadfast in his position. *See* Docs. 340 & 358; *see also Jefferson II*, 634 F. Supp. 2d 595. Indeed, during a hearing on the parties' dispute over the proper definition of "official act," defense counsel stated,

> We believe that an official act has to be a decision or action on any question, matter, suit, proceeding, cause or controversy; in other words, that there does have to be some sort of official – it's just not an official taking an act; it's an official taking an act that relates to, as the Court said, a governmental decision.

---

[14] A Jefferson may overcome a procedural default by (1) showing cause for the default and actual prejudice, or (2) establishing clear and convincing evidence that he is actually innocent. *Bousley*, 523 U.S. at 624. These standards need not be explored further, however, because Jefferson did not procedurally default.

[15] In fact, Jefferson unsuccessfully moved for reconsideration of that denial.

*Jefferson*, No. 07-cr-209 (E.D. Va. May 8, 2009) (Hr'g Tr.) at 20-21. Jefferson raised this same issue at trial in his motion for judgment of acquittal pursuant to Rule 29, Fed. R. Crim. P. *See* Doc. 526 at 2 n.1 (explicitly preserving Jefferson's objection to a *Birdsall* definition of "official act"). And Jefferson also preserved his objection to the jury charge; in fact, the Fourth Circuit itself observed that Jefferson "objected to the [jury] instructions in a consistent and timely manner [and] asserted that the proper definition of an official act is much more circumscribed than the jury instructions indicated, as he had contended in the pretrial proceedings." *Jefferson III*, 674 F.3d at 338 n.5. Furthermore, on direct appeal, Jefferson contended that the jury charge's definition of an "official act" was overbroad and should have been limited to legislative acts or governmental decisions, and that such decisions could not include actions taken or choices made by foreign officials. *See* Brief for Jefferson-Appellant William J. Jefferson, No. 09-5130 (Nov. 15, 2010). Simply put, Jefferson has not procedurally defaulted on his argument that the jury instructions erroneously defined an "official act."

In opposition to this conclusion, the government argues that Jefferson cannot rely on *McDonnell* because Jefferson challenged his *Birdsall* jury instruction by opposing any language that ventured beyond § 201(a)(3)'s text, whereas former Governor McDonnell opposed a similar *Birdsall* instruction by proposing additional, qualifying instructions.[16] In other words, the government sees a meaningful difference between a defendant who aims to eliminate an erroneously overbroad instruction by embracing the relevant statutory text and one who seeks to fix the same instruction by offering qualifying language. These are simply two sides of the same

---

[16] There is no doubt that the instructions given here and in *McDonnell* were similar. *See United States v. McDonnell*, 792 F.3d 478, 509 (4th Cir. 2015) (observing that former Governor McDonnell's instructions on "official act" largely "echoed the 'official act' instruction in *United States v. Jefferson*"), *rev'd on other grounds*, 136 S. Ct. 2355 (2016).

coin: both here and in *McDonnell* the defendant correctly argued that a *Birdsall* instruction by itself is overbroad; the fact that the remedies proposed for the overbroad *Birdsall* instruction were different does not affect exhaustion.

In this respect, it is worth noting that the error recognized in *McDonnell* is not, as the government contends, the trial court's failure to include former Governor McDonnell's proposed instructions in a vacuum. Rather, the error in *McDonnell* stemmed from the overbroad *Birdsall* instruction itself. *See id.* at 2375 ("Because the jury was not correctly instructed on the meaning of 'official act,' it may have convicted Governor McDonnell for conduct that is not unlawful."). The *McDonnell* decision therefore stands for the proposition that *if* a *Birdsall* instruction is included in the jury charge, the charge must also include clarifying language. Jefferson's challenge to the *Birdsall* instruction was therefore sufficient to preserve the issue.

This sensible conclusion recognizes that Jefferson, in challenging a similarly infirm instruction as that rejected in *McDonnell*, needed not propose alternative language to cure the jury charge. *See, e.g.*, *United States v. Hassan*, 578 F.3d 108, 129 (2d Cir. 2008) (rejecting the government's argument that a defendant who objected to a jury instruction failed to preserve that objection by declining to propose alternative language). This is so because Rule 30(d), Fed. R. Crim. P., requires only that a party "inform the court of the specific objection." Fed. R. Crim. P. 30(d). The Rule does not obligate the party to propose new language. *See Hassan*, 578 F.3d at 129 ("[T]he substance of the claim now being raised on appeal was squarely raised below: counsel made it clear to the trial court that he objected to the [jury] charge because it permitted the jury to convict [the Jefferson] based on a finding that [the defendant] intended to import and distribute [a legal or uncharged substance].").

Simply put, there is no question that Jefferson "inform[ed] the court" of his objection to a *Birdsall* instruction, or that the key issue here was the proper interpretation of the term, "official act," in § 201(a)(3). *See* Rule 30(d), Fed. R. Crim. P. Nor is there any doubt that the *McDonnell* case involved essentially this same issue: "The issue in this case is the proper interpretation of the term, 'official act.'" 136 S. Ct. at 2367. Accordingly, Jefferson is not in procedural default and may therefore avail himself of *McDonnell* on the instant § 2255 motion.[17]

## III.

Analysis next turns to the merits of Jefferson's motion. Where, as here, a defendant mounts a collateral attack on a jury instruction that erroneously instructs on an element of an offense, the courts in this circuit apply a less-stringent "harmless error" standard than that applicable on direct appeal. Indeed, to uphold a jury verdict on direct appeal, the reviewing court must find an instructional error harmless beyond a reasonable doubt; but on habeas review, courts evaluate "whether the error had a substantial and injurious effect or influence in determining the jury's verdict." *United States v. Smith*, 723 F.3d 510, 517 (4th Cir. 2013). Nevertheless, under the "substantial and injurious effect" standard "[t]he inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error." *Kotteakos v. United States*, 328 U.S. 750, 765 (1946). Rather, if "one is left in grave doubt . . . whether the error itself had substantial influence" on the jury's verdict, then "the

---

[17] The government also relies on *United States v. Hale*, 857 F.3d 158 (4th Cir. 2017). Yet that decision is inapposite. There, a defendant charged with transporting stolen property objected to the trial court's giving a "willful blindness" jury instruction, but conceded that "if the court is going to give one, we don't have any problem with the proposed instruction of the court." *Id.* at 170. On appeal, defendant asserted (1) that the trial court erred by giving a willful blindness instruction, and (2) that the *form* or *content* of the given instruction was also erroneous. *See id.* at 168-70. The Fourth Circuit addressed the first argument on the merits and concluded that the defendant had waived his challenge to the form or content of the instruction, holding that "[w]hen counsel states affirmatively to the court that he has *no problem* with the form of the proposed instruction, he waives any objection he has to the form." *Id.* Given this, the government's reliance on *Hale* is plainly misplaced. Here, Jefferson objected to a *Birdsall* instruction and never acquiesced to the form or content of such an instruction.

conviction cannot stand." *Id.* In other words, if "in the judge's mind[] the matter is so evenly

balanced that he feels himself in virtual equipoise as to the harmlessness of the error," then there

has been a "substantial and injurious effect or influence" on the jury verdict and a writ must

issue. *O'Neal v. McAninch*, 513 U.S. 432, 435 (1995). Ultimately, this question must be

answered "in light of the evidence presented" at trial. *Smith*, 723 F.3d at 517.

## A.

Preliminarily, Jefferson's claim depends on whether the jury received an erroneous

instruction on the meaning of "official acts" under the bribery statute.  The instructions in

Jefferson's case stated:

> An act may be official even if it was not taken pursuant to responsibilities
> explicitly assigned by law.  Rather, official acts include those activities that have
> been clearly established by settled practice as part [of] a public official's position.

This instruction included language from *Birdsall* that allowed a jury to convict for acts that were

part of the settled practice of Jefferson's office.  Notably, the instruction in Jefferson's case was

strikingly similar to the one the district court gave in *McDonnell*,[18] with the Fourth Circuit

observing that Governor McDonnell's instructions on "official act" largely "echoed the 'official

act' instruction in *United States v. Jefferson*."  *McDonnell*, 792 F.3d at 509.

The Supreme Court identified a number of errors in the *McDonnell* instruction that were

also present in Jefferson's instruction.  The instructions in Jefferson did not convey "meaningful

limits" on the meaning of official act and "lacked important qualifications, rendering them

---

[18] The district court's instructions in *McDonnell* stated:

> Official action . . . includes those actions that have been clearly established by settled practice as
> part of a public official's position, even if the action was not taken pursuant to responsibilities
> explicitly assigned by law.  In other words, official actions may include acts that a public official
> customarily performs, even if those actions are not described in any law, rule, or job description.

*United States v. McDonnell*, 792 F.3d 478, 505-06 (4th Cir. 2015).

significantly overinclusive." *McDonnell*, 136 S. Ct. at 2373-74. First, where a *Birdsall* instruction on the definition of official act includes "settled practices" of the office, as it did in Jefferson's case, the instructions must tell the jury how to identify the "question, matter, cause, suit, proceeding or controversy that must be pending for a defendant to commit an official act." *Id.* at 2374. Furthermore, the instructions in Jefferson's case did not inform the jury that a question or matter must be something "focused and concrete," involving "a formal exercise of governmental power that is similar in nature to a lawsuit before a court, a determination before an agency, or a hearing before a committee." *Id.*

Second, the jury instructions in Jefferson's case did not explain that to qualify as an official act "the public official must make a decision or take an action on that question, matter, cause, suit, proceeding or controversy, or agree to do so." *Id.* (quotation marks omitted). The jury charge in Jefferson's case did not require the jury to consider whether Jefferson could actually make a decision on a pending matter, nor did the instructions clarify that Jefferson's actions could include "using [an] official position to exert pressure on another official to perform an 'official act,' or to advise another official, knowing or intending that such advice will form the basis for an 'official act' by another official." *Id.* Without these instructions, the jury could have believed that any action Jefferson took to assist iGate or other businesses was an official act, even if those acts included the innocent conduct of attending a meeting, calling an official, or expressing support for a project.

Because the jury instruction in Jefferson's case was erroneous in much the same way as the *McDonnell* instruction, analysis must proceed to the next inquiry, namely whether these erroneous instructions had a substantial and injurious effect on the jury's verdict, or whether there was sufficient evidence at trial that a conviction would have nonetheless occurred.

**B.**

Count 1 of the indictment, the alleged conspiracy to violate the Foreign Corrupt Practices Act (the "FCPA"), was not infected by the allegedly improper jury instruction. To prove a conspiracy in violation of 18 U.S.C. § 371, "the government must prove an agreement between two or more persons to act together in committing an offense and an overt act in furtherance of the conspiracy." *United States v. Chorman*, 910 F.2d 102, 109 (4th Cir. 1990). To prove a substantive FCPA violation, the government must prove that (i) a domestic concern made use of means or instrumentalities of interstate commerce corruptly; (ii) in furtherance of an offer or payment of anything of value to any person; (iii) while knowing that the money would be offered or given directly or indirectly to any foreign official for purposes of influencing any act or decision of such foreign official in his official capacity. *See* 18 U.S.C. § 78dd-2(a); *see also United States v. Jefferson*, 594 F. Supp. 2d 655, 668 (E.D. Va. 2009).

The erroneous jury instructions on the meaning of "official acts" under the bribery statute have no bearing on the jury's guilty verdict on the FCPA conspiracy count simply because an "official act" is not an element of an FCPA conspiracy. Furthermore, the record overwhelmingly supports the FCPA conspiracy charge. Jefferson attempted to bribe foreign officials on multiple occasions as part of the iGate scheme. Most egregiously, Jefferson accepted money from Mody, an FBI informant, for the purpose of bribing the Vice President of Nigeria and concealed that money in his freezer. Although Jefferson never completed the bribe, completion of the act is not necessary to prove that Jefferson took part in a conspiracy to violate the FCPA. *See* 18 U.S.C. § 371; *see also United States v. Thompson*, 493 F.2d 305, 310 (9th Cir. 1974) ("[T]he crime of conspiracy is . . . not at all dependent upon the ultimate success or failure of the planned

scheme").[19]  As such, Jefferson's claim for habeas relief in relation to his FCPA conspiracy conviction is unmeritorious.  Because Jefferson has already served the 60-month sentence for this conviction, however, his other claims with respect to the remaining counts on which he was convicted require careful attention.

## C.

Jefferson challenges his convictions for Counts 3, 4, 6, 7, 12, 13, and 14 of the indictment on the ground that the erroneous *Birdsall* instruction allowed the jury to convict him for innocent activities that were not "official acts" within the meaning of *McDonnell*.  Each of these Counts relates to Jefferson's involvement in the iGate scheme.  There are two steps in evaluating his claim for relief.  The first is to identify whether there was sufficient evidence at trial to establish that Jefferson took "official acts" in exchange for bribe payments in relation to the iGate scheme. The second is to determine whether, in light of the evidence presented at trial, the erroneous jury instruction had a "substantial and injurious effect or influence on the jury's verdict."  *Smith*, 723 F.3d at 517.

The government alleges that there was more than sufficient evidence at trial to show that Jefferson took "official acts" within the meaning of *McDonnell*.  Specifically, the government alleges that Jefferson took seven official acts in relation to the iGate scheme: (i) Jefferson pressured General Hylton to admit iGate products for testing at Fort Huachuca, (ii) Jefferson pressured Colonel Brown to purchase or lease iGate's technology for use by the Army, (iii) Jefferson promoted iGate technology to African government officials, (iv) Jefferson led trade delegations to Nigeria and Cameroon to promote the use of iGate technology, (v) Jefferson

---

[19] *Stichting Ter Behartiging Van de Belangen Van Oudaandeelhouders in Het Kaptaal Van Saybolt Int'l B.V. v. Schreiber*, 327 F.3d 173 (2d Cir. 2003); *United States v. Rose*, 590 F.2d 232 (7th Cir. 1978); *cf. United States v. Feola*, 420 U.S. 671 (1975).

worked to obtain a visa for Dumebi Kachikwu from the U.S. Embassy in London, (vi) Jefferson agreed to work to obtain Ex-Im Bank financing for NDTV's joint venture with iGate, and (vii) Jefferson met with and pressured Ex-Im Bank officials to get loan guarantees for W2's project with iGate. In opposition, Jefferson argues that none of these is an official act.

*McDonnell* holds that there are two prongs to § 201(a)(3)'s definition of "official act." First, the government must identify a "question, matter, cause, suit, proceeding or controversy" that "may at any time be pending" or "may by law be brought" before a public official. *McDonnell*, 136 S. Ct. at 2359. Second, the government must prove that the public official made a decision or took an action "on that question, matter, cause, suit, proceeding, or controversy, or agreed to do so." *Id.* Furthermore, an official act can include an official "attempting to pressure or advise another official on a pending matter" and "if the official agreed to exert the pressure or give that advice in exchange for a thing of value, that would be illegal." *Id.* at 2371.

The evidence presented at trial does not support a finding that Jefferson took "official acts" with respect to his meetings with either General Hylton or Colonel Brown. Jefferson met with General Hylton and Vernon Jackson in his congressional office to discuss possible testing of iGate technology at Fort Huachuca. At that meeting, Jefferson made several encouraging statements about iGate's technology, and General Hylton described the process by which the Army admits products to be tested. It is true, as the government argues, that whether to admit iGate technology for testing might qualify as a "pending matter." *Id.* at 2370. But, as the Supreme Court explained, "[s]etting up a meeting, [or] talking to another official . . . — without more — does not fit th[e] definition of 'official act.'" *Id.* at 2359. There is no indication that Jefferson pressured General Hylton to admit iGate technology for testing; in fact, General Hylton's own testimony at trial was that Jefferson never ordered him to test iGate products. The

government contends, using Vernon Jackson's testimony, that Jefferson ordered a general to get this iGate product test. That account is not corroborated, however, by the General's testimony that the purpose of the meeting was to come to a "determination as to whether the product would be of some value to the Army." (JA 857).[20] Furthermore, the meeting between Jefferson and General Hylton occurred in the year 2000, before Jefferson and Vernon Jackson agreed to any kind of bribery scheme, so even if Jefferson's actions amounted to "pressure," there was no "quo" for the alleged quid pro quo.

The meeting with Colonel Brown was similarly unofficial in nature. First, there was no "pending question or matter" on which Jefferson could have attempted to pressure Colonel Brown. There were no applications or proposals by iGate currently pending before the Army. The government is correct that a pending matter can include something that "may by law be brought before a public official[,]" *McDonnell*, 136 S. Ct. at 2370, but without a specific application on behalf of which to apply pressure, Jefferson could not perform an official act. Second, even if the matter of use of iGate technology could have come before Colonel Brown for approval in the future, Jefferson's interactions with Colonel Brown are of the kind that *McDonnell* explicitly excluded from the meaning of "official act." Specifically, Jefferson met with Colonel Brown to discuss the possible use of iGate technology by the Army. As explained before, merely setting up a meeting or making introductions between Colonel Brown and Vernon Jackson — without more — is not an "official act." For those reasons, Jefferson's interactions with Colonel Brown were not official acts within the meaning of *McDonnell* and were therefore did not violate the bribery statute.

---

[20] Citations to the "JA" refer to the Joint Appendix of the Fourth Circuit in Jefferson's previous appeal, which helpfully collects and organizes the trial materials.

The third set of purported official acts, namely the meetings with African officials, also does not qualify as official acts within the meaning of the bribery statute. The reason for that is simple: the bribery statute does not criminalize pressuring foreign officials to perform official acts; the bribery statute defines a public official to include only officials of the U.S. government. *See* 18 U.S.C. § 201(a)(1).[21] The evidence at trial shows that Jefferson agreed to use his position as a U.S. Congressman to pressure or influence decisions of a number of foreign officials in Africa on several questions and matters, but Jefferson's actions to pressure foreign officials cannot be official acts because questions or matters before African officials are not questions or matters pending before a "public official" within the meaning of the bribery statute.

Next, the government contends that privately sponsored trade delegations that Jefferson took on behalf of a number of U.S. companies are official acts. The basic theory is that Jefferson could make a "decision" on the pending question or matter of whether to participate in a privately sponsored trade delegation as a Congressman and that Jefferson made the decision to travel with these delegations in return for bribe money. The problem with the government's theory is that while a trade delegation is something "concrete and focused" that can be "checked off a to-do list" as required by *McDonnell*, a privately funded trade delegation does not "involve a formal exercise of governmental power that is similar in nature to a lawsuit before a court, a determination before an agency, or a hearing before a committee." *Id.* at 2370. This issue presents a much closer question than the aforementioned acts. The decision to lead a private trade delegation did require Jefferson to disclose his activities to the House Ethics Committee,

---

[21] Section 201(a)(1) of the bribery statute states that:

> [T]he term "public official" means Member of Congress, Delegate, or Resident Commissioner, either before or after such official has qualified, or an officer or employee or person acting for or on behalf of the United States, or any department, agency or branch of Government thereof, including the District of Columbia, in any official function, under or by authority of any such department, agency, or branch of Government, or a juror.

and Jefferson did travel in his capacity as Congressman, but leading a private trade delegation appears to be closer to holding a dinner at the Governor's mansion as occurred in *McDonnell* than "something in the nature of a lawsuit." *Id.* And, as the Supreme Court explained in *McDonnell* "organizing an event" for the purpose of promoting constituent interests "without more . . . does not fit the definition of official act[.]" *Id.*

Seeking to avoid this conclusion, the government argues that Jefferson's membership in House caucuses that promote trade in West Africa makes his decision to lead delegations a formal exercise of his congressional power. This argument has considerable force. In the end, however, promoting trade is too general to be a matter pending before a public official, just as "promoting business in Virginia" was too general in *McDonnell*. *Id.* at 2359. Thus, the decision to lead privately funded trade delegations to West Africa is not a matter or question under *McDonnell* and is therefore not an official act on which Jefferson's conviction could be based.[22]

The next official act identified by the government is Jefferson's effort to convince State Department officials at the U.S. Embassy in London to grant Dumebi Kachikwu a visa to travel to the United States. The two-step *McDonnell* analysis applied here makes clear that whether to issue a travel visa to Kachikwu was a matter or question pending before U.S. embassy officials. The decision of whether to grant a visa is "a determination before an agency" and thus has sufficient concreteness and formality to qualify as an official act. *Id.* at 2370. The important second question is whether Jefferson used his "official position to exert pressure on" State Department officials "to perform an 'official act.'" *Id.* at 2359. The trial evidence shows that

---

[22] Most members of the public, not mesmerized by legalisms would be surprised to learn that someone can pay a Congressman to lead trade delegations and that the Congressman would avoid liability because leading a trade delegation is not an official act. Needless to say, not only would members of the public be surprised, but overseas recipients of trade delegations might be equally astonished that the trade delegation is not an official act. Perhaps Congress, should it undertake a review of the bribery statute, should consider amending the statute to make clear that making a decision to mount a trade delegation mission to another country is an official act.

Jefferson wrote a letter on congressional letterhead in support of Kachikwu's visa application and made a phone call to individuals at the London embassy. The assistance with visa applications was not a significant focus of the trial, and so it is not clear what was said in these letters or the phone call. Based on the available evidence, there is no indication that Jefferson exerted pressure as required to make his actions official; instead, it appears that Jefferson was, as was true in *McDonnell*, "[s]imply expressing support" for Kachikwu's visa application. *Id.* at 2371. [23] That expression of support is not criminal under *McDonnell*, and therefore Jefferson's actions in support of Kachikwu's visa application could not support criminal liability.

The government also argues that Jefferson's agreement to assist NDTV in obtaining Ex-Im Bank financing for the iGate-NDTV joint venture was an official act. The Supreme Court in *McDonnell* made clear that "a public official is not required to actually [sic] . . . take an action on a 'question [or] matter'" and that "it is enough that the official agree to do so." *Id.* at 2370-71. Jefferson argues that there was no pending matter at the time of the agreement, and that there can therefore be no bribery. Although it is true that the financing for the iGate-NDTV project was not pending at the time that Jefferson agreed to assist NDTV, an agreement by a public official to help with a matter that "may by law be brought before a public official" is sufficient to support a bribery allegation. *Id.* at 2370. Otherwise, an agreement to trade bribes for pressuring a public official on a *matter already before* that public official them would result in criminal liability, while an agreement to trade bribes for assistance in pressuring an official on a matter that would be *pending in the future* would not. That would make liability turn on the timing of the

---

[23] Again, it would be reasonable for an average member of the public to scratch his head in confusion, because a call from a Congressman would seem *ipso facto* to be some sort of "pressure." The Supreme Court did not explain in *McDonnell* what constitutes "pressure" for purposes of the bribery statute. Measuring Jefferson's telephone call and letter against the only point of comparison – McDonnell's arrangement of meetings – suggests that the Supreme Court would not consider Jefferson's actions to amount to the requisite pressure for criminal liability under the bribery statute.

agreement and the pending matter in a way the Supreme Court's decision in *McDonnell* does not support. The inclusion of language about matters which "may by law be brought" suggests that the Supreme Court anticipated this issue and sought in *McDonnell* to make clear that an agreement to exchange bribes for assistance with matters that would be pending in the future is also illegal under the bribery statute. *Id.*

Although an agreement to accept money in exchange for a promise to exert pressure on a public official to take a future official act could well support a finding of criminal bribery, it does not do so on the evidence presented in this case. Jefferson agreed to assist NDTV with obtaining Ex-Im Bank financing, but testimony at trial does not clarify what Jefferson meant by "assistance." There is no evidence that Jefferson agreed to "exert pressure" on public officials as required in *McDonnell*, even if it was implied that his role as a Congressman would assist in the effort. *Id.* Ultimately, Jefferson's actions with respect to the Ex-Im Bank and NDTV amounted to nothing more than making introductions and expressing support, both of which are not criminal under *McDonnell*. *Id.* at 2371. The government's witness, Vernon Jackson, stated that the purpose of the first meeting between Ex-Im Bank officials and individuals from iGate and NDTV was to "introduce NDTV to [the] Ex-Im Bank." (JA 440). There was no evidence that Jefferson attempted to pressure Ex-Im Bank officials to approve funding for the iGate-NDTV endeavor at that meeting. In fact, it would have been impossible for Jefferson to do so in any meaningful way, as NDTV had not yet submitted an application for financing. Thus, neither the agreement by Jefferson to support NDTV's financing bid nor his actions in arranging a meeting between NDTV and the Ex-Im Bank qualify as official acts under *McDonnell*.

Next, the government argues that Jefferson's agreement with Mody to help secure Ex-Im Bank approval for W2's joint venture with iGate and Jefferson's arrangement of a meeting

between Mody and Ex-Im Bank officials were also official acts under *McDonnell*.  This is another close question, but again the government's argument fails for the same reasons it did for NDTV.  The trial evidence shows that Jefferson said he would "make sure" W2's Ex-Im Bank application "got approved." (JA 1935-36; 1941-45; 5438-42). [24]  What the trial evidence does not make clear is how Jefferson intended to "make sure" that approval would be forthcoming from Ex-Im Bank officials.  There is no evidence that Jefferson agreed to exert pressure on Bank officials, and that lack of specificity might mean that Jefferson intended only to assist W2 by showing support and arranging meetings as he had done with NDTV.  And as in the NDTV endeavor, Jefferson's only actions to help W2 were arranging a July 15, 2005 meeting between Mody and Ex-Im Bank officials and expressing support for the iGate-W2 venture at that meeting.  Mody recorded the meeting in anticipation of supporting the government's case against Jefferson, but Jefferson's statements on the tape amount to little more than support for the venture.  Such expressions of support are not official acts under *McDonnell*.

In summary, the evidence at trial does not support a finding that Jefferson took "official acts" in relation to the iGate scheme within the meaning of the bribery statute as clarified by the Supreme Court's opinion in *McDonnell*.  Because evidence at trial does not support a finding that Jefferson took official acts, his conviction for Counts 3, 4, 6, 7, 12, 13, and 14 of the indictment were erroneous.  It is therefore unnecessary to consider in much detail whether the jury instructions had a "substantial and injurious effect" on the jury verdict; had a proper jury instruction been given a reasonable jury could not have convicted Jefferson based on the evidence at trial.  Even if the government was correct that some of the aforementioned acts by Jefferson were official acts under the bribery statute, that would still not be enough to support

---

[24] This is not to say that an allegation of conspiracy to commit bribery could not succeed in this case, because Jefferson's statements imply that pressure could be used, if necessary, to secure Ex-Im Bank funding.

Jefferson's conviction because "[t]he inquiry cannot be merely whether there was enough to support the result." *Kotteakos*, 328 U.S. at 765. To decide this question, it is necessary to look at the evidence the government presented at trial, and how the government framed its case in light of the erroneous jury instructions. Thus, even if a few of the "official acts" still qualified as such, the overwhelming weight of the government's case with respect to the iGate scheme was focused on "constituent services" and other activities that were not criminal. As such, the instructional error was not harmless with respect to Counts 3, 4, 6, 7, 12, 13, and 14 of the indictment and Jefferson is entitled to relief.

### D.

The same two-step inquiry taken above applies to Counts 2 and 16 related to the other schemes in which Jefferson engaged, including the Arkel, Melton, Wilson, and Samara schemes. The government alleges that Jefferson took five official acts in relation to those schemes: (i) Jefferson worked on behalf of Wilson to pressure government officials in Sao Tome and Principe, (ii) Jefferson pressured foreign officials to approve the Knost oil field project, (iii) Jefferson pressured foreign officials on matters related Samara's African projects, (iv) Jefferson pressured Ex-Im Bank officials to approve the Arkel project, and (v) Jefferson pressured USTDA officials to provide funding for a feasibility study on Arkel's fertilizer project.

The first three official acts alleged by the government do not qualify as such for the reasons explained above: each act involved exerting pressure on foreign officials to take action on matters pending abroad, and the bribery statute applies only to domestic public officials. *See* 18 U.S.C. § 201(a)(1). Thus, none of those actions by Jefferson qualify as official acts or pressure on American officials to perform official acts within the meaning of the bribery statute.

The government argues that Jefferson's actions to obtain Ex-Im Bank approval for funding for Arkel's sugar plant project in Jigawa State in Nigeria were "official acts" under the bribery statute. Again, the government's argument fails because the trial evidence does not support a finding that Jefferson "exerted pressure" on Ex-Im Bank officials to approve the project.[25] Jefferson held two meetings with Ex-Im bank officials in connection with the Arkel project. The first, in February 2001, involved Jefferson, the Ex-Im Bank Chairman and staff, Arkel officers, and the Governor of Jigawa State. According to testimony from Bert Ubamadu, the attorney at the Ex-Im Bank responsible for assisting with the project, Jefferson attended the meeting at which the Arkel project was discussed, but the discussion in the meeting was primarily informational. Arranging informational meetings, as explained above, is not criminal under *McDonnell*'s reading of the bribery statute. The second meeting with the Ex-Im Bank occurred on May 1, 2001, and Jefferson did not even attend that meeting. A Jefferson staffer, Atonte Diete-Spiff, attended the meeting which was also informational and involved discussion of which Ex-Im Bank program the Arkel sugar project best fit with. There was no testimony by Ubamadu that Diete-Spiff said or did anything at the meeting. Neither of these meetings involved official acts. Jefferson's efforts to arrange meetings with Ex-Im Bank officials do not amount to "pressure" and neither did Jefferson's activities at either meeting. Agreeing to set up meetings to provide constituents with information and expressing support for a project are not official acts and do not amount to the requisite "pressure" for criminal liability under *McDonnell*. 136 S. Ct. at 2370.

The final official act identified by the government is Jefferson's effort to pressure USTDA officials to approve funding for a feasibility study of TDC's fertilizer plant. The

---

[25] *See supra* note 24.

USTDA grant for the feasibility study was a "pending matter" before USTDA officials who were responsible for deciding which projects to approve. The trial evidence shows the Jefferson used his office to place significant pressure on USTDA officials to approve funding for the TDC fertilizer project. The testimony of Thomas Hardy, the USTDA official in charge of evaluating projects in West Africa, was particularly telling. Hardy testified that Jefferson was heavily involved in the application and approval process, calling on several occasions to check on the status of the project. Hardy explained that Jefferson's involvement "raised [the project] to a high level" because Jefferson's status as a Congressman meant "the director of [USTDA] was aware of it on an ongoing basis." (JA 3929). Hardy also stated that Jefferson's involvement caused Hardy to pay closer attention to the project. Moreover, after receiving the application, Jefferson inquired repeatedly about the project, going so far as to request from Hardy a "status update," and requiring Hardy to "draft a memo for the Congressman…to describe where the project stood in [the USTDA's] . . . life cycle." (JA 3936). In discussions with one of Jefferson's aides, Hardy explained that the USTDA "underst[ood] the congressman's interest in this project and are moving hastily to see this project move forward" and wanted to convey these facts because Jefferson "had expressed a clear interest in seeing the project move forward." (JA 3943). This pattern of influence clearly reflects the type of use of one's office to exert "pressure" contemplated by *McDonnell* for purposes of criminal liability.

Hardy also testified that Jefferson's extensive involvement and pressure helped to keep the project moving forward when other projects would have stopped. For one, Hardy explained that Jefferson's level of involvement in a USTDA funding approval was abnormal. Not only that, but there were issues with the TDC fertilizer project, including problems with the financing structure and with the shifting entities responsible for various portions of the project, that would

have killed any other deal, but significantly, because of Jefferson's involvement, did not kill the TDC plan. During cross-examination, Hardy explained that:

> The project may have fallen apart before we move [sic] forward with the redesign of it. Because of the continuing interest of the Congressman, it forced us to continue to look at that project in new lights to come to a conclusion that we could move forward.

(JA 3975).

Jefferson's extensive and ongoing involvement in the funding approval process and his pressure on the USTDA officials were clearly integral to moving the TDC project forward.

Later in the process, Jefferson called Hardy into his office to discuss the delays in the Arkel funding. In response to government questioning about whether he was nervous to attend the meeting, Hardy stated that:

> Any time you are called up — I hadn't been called up, but any time you are called up to a member's office, they hold a certain sway over the Executive Branch, and to be called up to address why the project was being held up, certainly was not — wasn't a comfortable feeling.

(JA 3963-64).

Hardy testified that Jefferson led the meeting and asked what the hold-ups were on the project and why it had not moved forward yet. Although Jefferson never explicitly demanded that the USTDA approve the project, Hardy explained that his impression was that Hardy was called to Jefferson's office because "[t]he Congressman was interested in seeing this project moving forward, and then making it clear by calling us up…that he wanted this to go forward." (JA 3965).

The ongoing pressure exerted by Jefferson on the USTDA to approve the TDC fertilizer plant's funding goes well beyond the facts in *McDonnell*, and clearly reflects sufficient pressure to warrant criminal liability under the bribery statute. Although Governor McDonnell arranged meetings with officials to test pharmaceutical products and expressed support for trials of

Anatabloc, *McDonnell*, 136 S. Ct. at 2364, Jefferson took a number of steps beyond that to pressure USTDA officials to approve funding for the feasibility study of the TDC fertilizer plant. Jefferson used his office to pressure Hardy and other officials at the USTDA to find ways to keep the TDC fertilizer plant's funding proposal alive even after similar projects would have failed. Jefferson continuously monitored the project using his congressional staff, making clear to USTDA officials that he wanted the project to be approved and that he intended to monitor the entire process. The Supreme Court in *McDonnell* drew a distinction between "expressing support" and "exerting pressure," with the former being innocent and the latter being criminal. *Id.* at 2372. The evidence here clearly supports a finding of criminal liability. Although the Supreme Court did not provide guidance on how to make the proper distinction, if "exerting pressure" is to have any force, it must at least include repeated actions by a public official to push and promote a project, encouraging other officials to find ways to keep the project going even after similar projects would fail. Accordingly, there was more than enough evidence presented at Jefferson's trial to support a finding that Jefferson pressured USTDA officials to perform an official act in exchange for bribes from TDC.

Jefferson argues that because no USTDA official ever used the word "pressure" to describe Jefferson's efforts, his actions could not qualify as official acts within the meaning of *McDonnell*. That argument is without merit. The Supreme Court did not describe the meaning of "exerting pressure" in *McDonnell*, but the Supreme Court surely cannot have intended to require that there be testimony explicitly using the word pressure in describing a public official's actions. Hardy's description of Jefferson's extensive involvement in the project, his repeated efforts to check in on the funding proposal, and Jefferson's call asking Hardy to come to his office to discuss the project all suggest that Jefferson was using his position as a Congressman to

exert pressure on USTDA officials. Hardy explained that he was "nervous" about meeting with the Congressman because members of Congress "hold a certain sway" over executive decision making. (JA 3963-64). These activities by Jefferson surely amount to "exerting pressure," even if Hardy's testimony did not describe it in as many words. *McDonnell*, 136 S. Ct. at 2370.

Given that Jefferson engaged in official acts with respect to Counts 2 and 16, the next question is whether the jury instructions had a substantial and injurious effect on the jury's ability to determine his guilt. That inquiry requires an evaluation of the evidence the government presented at trial, and the way the government framed its case with respect to Counts 2 and 16. The only official act on which Jefferson's conviction could rest with respect to Counts 2 and 16 was his pressuring the USTDA to approve the funding for the feasibility study for TDC's fertilizer plant. As detailed above, the evidence satisfying the official act element presented on Counts 2 and 16 was substantial. There was extensive testimony from Hardy that Jefferson exerted significant pressure on USTDA officials to approve the project. Testimony about Jefferson's efforts represented a significant portion of the government's case with respect to Counts 2 and 16, and the government discussed the alleged pressure on USTDA officials multiple times in their closing argument for an extended portion of their closing argument on those counts, and during rebuttal. (JA 9 37-39, Vol. 9 214). Based on this evidence, the instructional error was harmless with respect to Counts 2 and 16 of the indictment, and denial of Jefferson's § 2255 motion on those counts is warranted.

## IV.

No one reading this opinion should conclude that Jefferson was innocent of crime; he was not innocent of crime. Even by *McDonnell*'s standard he engaged in and was convicted of some criminal conduct. The Supreme Court described Governor McDonnell's actions as "tawdry" and

"distasteful." *McDonnell*, 136 S. Ct. at 2375. Jefferson's actions went well beyond being "tawdry" and "distasteful"; they were plainly venal and reflected corrupt intent, and this is true also for the conduct related to iGate and the other schemes for which his convictions will be vacated.[26] Still, in light of the Supreme Court's decision in *McDonnell*, it cannot be said that the erroneous *Birdsall* instruction that Jefferson received at trial was harmless with respect to his convictions for bribery in relation to the iGate scheme under Counts 3, 4, 6, 7, 12, 13, and 14 of the indictment. Jefferson's activities with respect to the U.S. Trade Development Agency, however, were criminal under the bribery statute, and based on the role that those actions played in his conviction for Counts 2 and 16, the erroneous jury instructions did not have a "substantial and injurious effect." Because Jefferson has served his full five-year sentence for Count 1, and his sentences for Counts 2, 3, 6, 7, 12, 13, and 14 were imposed to run concurrently with Counts on which relief is not awarded, it is necessary for Jefferson to be resentenced. Accordingly, an order will issue granting Jefferson's § 2255 motion in part and denying it in part, vacating his convictions and sentences on Counts 3, 4, 6, 7, 12, 13, and 14, but leaving his convictions and sentences intact on Counts 1, 2, and 16. Because there is no assurance that Jefferson would be required to serve a sentence beyond what he has already served, that order will require Jefferson's immediate release, followed by a prompt resentencing. Prior to his resentencing, he will be subject to all of the conditions previously imposed on him pending his appeals.

T. S. Ellis, III
United States District Judge

---

[26] The government's reliance on *Birdsall* in seeking an instruction on the meaning of official act is entirely understandable. The government could not anticipate that the *Birdsall* instruction would be invalidated by the Supreme Court's decision in *McDonnell*. After all, the Supreme Court had not even granted certiorari in Jefferson's case on that ground.